R.S. GASIOROWSKI, ESQ. – ID#244421968
GASIOROWSKI & HOLOBINKO
54 BROAD STREET
RED BANK, NEW JERSEY 07701
(732) 212-9930
Fax: (732) 212-9980
Attorney for Plaintiffs, Jenkinson's Pavilion,
Frank Storino and Anthony Storino

| | |
|---|---|
| JENKINSON'S PAVILION; ANTHONY STORINO AND FRANK STORINO<br><br>Plaintiffs,<br><br>    vs.<br><br>BOROUGH OF POINT PLEASANT BEACH; MAYOR AND COUNCIL OF THE BOROUGH OF POINT PLEASANT BEACH; POLICE DEPARTMENT OF THE BOROUGH OF POINT PLEASANT BEACH; PAUL M. KANITRA, Individually and in his capacity as the Mayor of The Defendant, Borough of Point Pleasant Beach; CARYN BYRNES, Individually, and in her capacity as a Councilwoman; ARLENE TESTA, Individually and in her capacity as a Councilwoman; DOUGLAS VITALE, Individually and in his Capacity as a Councilman, and KEVIN B. RIORDAN, Individually and in his capacity as the Borough Attorney for the Defendant, Borough of Point Pleasant Beach.<br><br>Defendant. | : SUPERIOR COURT OF NEW JERSEY<br>: LAW DIVISION<br>: OCEAN COUNTY<br>:<br>: Docket No.<br>:<br>:     Civil Action<br>:<br>:<br>: **VERIFIED COMPLAINT**<br>: **AND JURY DEMAND**<br>:<br>: |

Plaintiffs Jenkinson's Pavilion, Anthony Storino and Frank Storino aby way of Verified Complaint and Jury Demand against the named Defendants, says as follows:

**THE PARTIES:**

1. Plaintiffs Jenkinson's Pavilion (hereinafter "Jenkinson's") is a business entity owned by Plaintiffs Anthony Storino and Frank Storino. Jenkinson's the business entity privately owns Jenkinson's Aquarium, Jenkinson's Pavilion Bar and Restaurant complex, and most of the beachfront area and beach itself along the Atlantic Oceanfront in Defendant Municipality Point Pleasant Beach, New Jersey. Only a very small portion of the beachfront area and beach are owned by the Borough of Point Pleasant Beach operated as a Municipal Beach. This Plaintiff's primary place of business is located at 300 Ocean Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

2. Plaintiff Anthony Storino is a co-owner of Plaintiff Jenkinson's. This Plaintiff's primary place of business is located at 300 Ocean Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

3. Plaintiff Frank Storino is a co-owner of Plaintiff Jenkinson's. This Plaintiff's primary place of business is

located at 300 Ocean Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

4.  Defendant Borough of Point Pleasant Beach is a municipal corporation of the State of New Jersey located in Ocean County, New Jersey. This Defendant is a "... *person* ..." who was at all times relevant acting "... *under color of state law* ..." and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights* ..." and to at all times acted as part of an ongoing knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.*10:6-2. This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

5.  Defendant Mayor and Council of the Borough of Point Pleasant Beach is the elected governmental body of the Defendant Borough of Point Pleasant Beach.   This Defendant is a "... *person* ..." who was at all times relevant acting "... *under color of state law* ..." and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights* ..." and to at all times acted as part of an ongoing

knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.* 10:6-2. This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

6.    Defendant Police Department of the Borough of Point Pleasant Beach is a department of Defendant Borough of Point Pleasant Beach. This Defendant is a "... *person* ..." who was at all times relevant acting "... *under color of state law* ..." and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights* ..." and to at all times acted as part of an ongoing knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.*10:6-2. This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

7.    Defendant Paul M. Kanitra is sued both (a) individually and (b) in his capacity as the Mayor of the defendant Borough of point Pleasant Beach. This Defendant is a "... *person* ..." who was at all times relevant acting "... *under color of state law*

**-4-**

..." and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights ...*" and to at all times acted as part of an ongoing knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.* 10:6-2. This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

8.  Defendant Caryn Byrnes is sued both (a) individually and (b) in her capacity as a Councilwoman the defendant Borough of Point Pleasant Beach. This Defendant is a "... *person ...*" who was at all times relevant acting "... *under color of state law* ..." and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights ...*" and to at all times acted as part of an ongoing knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.* 10:6-2. This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

9.   Defendant Arlene Testa is sued both (a) individually and (b) in her capacity as a Councilwoman of the defendant Borough of point Pleasant Beach. This Defendant is a "... *person ...*" who was at all times relevant acting "... *under color of state law ...*" and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights ...*" and to at all times acted as part of an ongoing knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.* 10:6-2.  This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

10.   Defendant Douglas Vitale is sued both (a) individually and (b) in his official capacity as a Councilman of the Defendant Borough of Point Pleasant Beach.  This Defendant is a "... *person ...*" who was at all times relevant acting "... *under color of state law ...*" and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights ...*" and to at all times acted as part of an ongoing knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse

**-6-**

power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.* 10:6-2.   This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

11.   Defendant Kevin B. Riordan is sued both (a) individually and (b) in his capacity as the Borough Attorney of the Defendant Borough of Point Pleasant Beach.   This Defendant is a "... *person* ..." who was at all times relevant acting "... *under color of state law* ..." and in accordance with and in furtherance of an "... *ordinance, regulation, custom, or usage . ..*" and to at all times acted "... *with deliberate indifference to Plaintiffs' rights* ..." and to at all times acted as part of an ongoing knowing, intentional and conscious conspiracy to violate Plaintiffs' rights and by design and plan to intentionally abuse power to harm Plaintiffs, all within the meaning of 42 *U.S.C.* §1983 and *N.J.S.A.* 10:6-2.   This Defendant's primary place of business is located at 416 New Jersey Avenue in the Borough of Point Pleasant Beach, County of Ocean and State of New Jersey.

**THE FACTS:**

12.   At issue here in this action is the legal authority of the Borough of Point Pleasant Beach to enact and enforce, and the overall validity and legality of, certain portions of newly enacted "*ORDINANCE 2020-12, An Ordinance of the Borough of Point*

-7-

*Pleasant Beach Amending Chapter XXI, Beaches of the Revised General Ordinances of the Borough of Point Pleasant Beach"* **(hereinafter the "New Ordinance")** which was adopted into law by the Mayor and Council (there was a 3/3 vote split on the Council, so the Mayor cast the deciding "Yes" vote) on August 4, 2020. **(A true copy of the "New Ordinance" is attached hereto at "Exhibit A".)**

13. Prior to the 2020 Summer Season, the prior long existing form of Ordinance **(hereinafter the "Old Ordinance")** governing the Public Beaches was found in Borough of Point Pleasant Beach Ordinance §21-1.1 through -1.3 and §21-1A.1 through -1A.8. **(A true copy of the "old" Ordinance is attached hereto at "Exhibit B".)**

14. Significantly, in the Old Ordinance §21-1A.8 listed in paragraphs (a) through (n) a variety things which were designated as "Prohibited Acts", with the section stating that: "No Person shall do any of the following things ***at or upon the municipal beach.*** (Emphasis added). Contained within that section was paragraph (e), (l) & (m) which each previously read as follows:

> §21-1A.8   Prohibited Acts.
> No person shall do any of the following things at or upon the ***municipal beach***:
> ***
> 3.   Make any loud noise, sound or music to the annoyance of any other person, or use loud, profane or indecent language.

**-8-**

***

e.  Take any intoxicating liquor upon the beach, or any glass containers or bottles.

***

l. Bring any of the following onto the Beach:

1.  Coolers larger than 24 inches in width, or height and/or has a capacity greater than 36 quarts.

2.  Serving trays, warming trays, pots, pans, devices, equipment or utensils utilized for the preparation or storage of food.

3.  Canopy style son shades bigger than 10' x 10' and any size canopy style sunshade with sidewalls including tents and tent clusters.

4.  Devices designed or used to shade infants and small children, also known as "baby tents," larger than 36 inches high by 36 inches wide by 36 inches deep.

5.  Umbrellas with a collapsible circular shade greater than eight feet diameter or radiating from a center pole greater than 7 feet 6 inches in height, or with grounding lines, ropes, or sides.

6.  Umbrellas, baby tents and canopies anchoring lines, tethers, or the like that extended beyond the perimeter of the umbrella, the baby tent or canopy.

7.  Tables or stands or boards or other devices positioned to function as a table.

m. Cook on the Beach.

***

**[*See* Old Ordinance at "Exhibit B", §21-1A.8(e), (1) & (m)].**

15.   The   New   Ordinance   dramatically   changes   the   long existing "status *quo*" and with little or no advance notice suddenly expanded the scope of the Old Ordinance from regulating only   the   municipal   beach,   to   now   purportedly   regulating   *all beaches*, specifically including now for the first time ever regulating Plaintiff Jenkinson's private property beach.   The New Ordinance   accomplishes   this   simply   by   amending   the   new "Prohibited Acts" section of the existing Ordinance's definition of "beach" to now read in particular relevant part:

§21-1.4    Prohibited Acts.
No person shall do any of the following things at or upon **the Boardwalk and/or beaches or the ocean waters located in the Borough.**
***
3.   Make any loud noise, sound or music to the annoyance of any other person, or use loud, profane or indecent language.
***
5.   Take any intoxicating liquor upon the beach,   or   any   glass   containers   or bottles.
***
2. Bring   any   of   the   following   onto   **a** Beach:
3. Coolers larger than 13 inches in width, or length, or height and/or has a capacity greater than nine (9) quarts.

**[*See* New Ordinance at "Exhibit A", §21-1.4].**

16.   In what is quite clearly an illegal exercise of power the   Defendants   have   now   suddenly   changed   the   definition   of

"beach" to include ALL beaches, including private property beaches, and with literally no legal authority to do so, have illegally extended municipal regulatory jurisdiction now over all private property beaches and declared that it is illegal for adults over the age of 21 years to bring, possess and consume alcohol onto Jenkinson's private property beach and it is all but illegal to make any noise or play any music on Jenkinson's private property beach. *See* New Ordinance at "Exhibit A", §21-1.4(3) & (5). This is clearly something that is beyond the Defendants' lawful authority to regulate and prohibit. The Defendants have no authority to regulate Jenkinson's private property beach, yet they seek to do so and have even done things so with petty and illegal micro managing of Jenkinson's private property beach as to arbitrarily reduced the size of permitted coolers on "beaches" (formerly just *municipal* beaches) from a maximum of 24 inches in width and height and maximum of 36 quarts (9 gallon cooler), *see* Old Ordinance at "Exhibit B", §21-1A.8(1)(1), to now a maximum of 13 inches in width, height and length and a maximum of 9 quarts (2.25 gallon cooler). *See* New Ordinance at "Exhibit A", §211.4(2)(3). Moreover, regarding the alcohol issue and reduced size of coolers, the Defendants have enacted an entirely new section §21-1.2B which (illegally) places a new affirmative legal obligation on Plaintiff Jenkinson's to hire only persons 18 years or older who are also now purportedly

affirmatively required to actually "physically search" all patrons and their possessions as they enter the private beach to ostensibly search for alcoholic beverages (which are perfectly legal on this private property beach) and for other "contraband", all without a search warrant.    Lastly, the new Ordinance purports to confer "policing" authority on local municipal police to "police" the private  property beach, taking for themselves the right to have police officers not merely come when called, but to entry at will onto this private property beach and to walk amongst and "police" the beach patrons down on the sand on this private beach, again doing so with no authority to confer such authority on themselves or their municipal police department. *See* New Ordinance at "Exhibit A', §21-1.5.

### CAUSES OF ACTION:

### FIRST COUNT:

### (Federal Civil Rights Act - 42 *U.S.C.* §1983)

18.  Plaintiffs hereby repeat and re-allege the previous allegations of this pleading as if same were set forth herein again fully at length.

19.  The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures,

**-12-**

shall not be violated, and no Warrants shall
issue, but upon probable cause,  supported
by Oath or affirmation,  and particularly
describing the place to be searched, and the
persons or things to be seized.

[United States Constitution, Fourth Amendment].

20.   The Fourth Amendment is made applicable to the States
generally and to State actors such as the Defendants named herein
specifically by virtue of the Fourteenth Amendment to the United
States Constitution.

21.   The Section 1 of the Fourteenth Amendment of the United
States

Constitution provides as follows:

All persons born or naturalized in the
United States and subject to the
jurisdiction thereof, are citizens of the
United States  and of the state wherein they
reside.  No State shall make or enforce any
law which shall abridge the privileges or
immunities of citizens of the United States;
nor shall any State deprive any person of
life, liberty, or property, without due
process of law; nor deny to any person
within its jurisdiction the equal protection
of the laws.

[United States Constitution, Fourteenth Amendment, Section
1].

22.   Both the Fourth and Fourteenth Amendments to the United
States Constitution operate to recognize specific private

**-13-**

property rights that were retained by the people and specifically excluded from government interference.

23.   The Fourth Amendment operates to specifically prohibit the State or State Actor Government Officials from entering onto private property without a Warrant issued by a Judge upon a finding of "probable cause" that something illegal has occurred.

24.   The Fourth Amendment equally operated to specifically prohibit the State or State Actor Government Officials from entering onto private property without permission or a warrant and from conducting arbitrary government warrantless searches of people.

25.   The Fourteenth Amendment operates to specifically prohibit State or State Actor Government Official from taking any action, regulatory or otherwise, which deprives any person or a "liberty interest" or a "property interest" without due process of law.

26.   42 *U.S.C.* §1983 was enacted by Congress to provide citizens with a remedy for state action that deprives or is aimed at depriving a person of their rights

as secured and guaranteed by the United States Constitution and laws.

27.   42 *U.S.C.* §1983 provides as follows:

> Every person who, under color of any
> statute, ordinance, regulation, custom, or

usage, of any State or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person in the jurisdiction thereof to be deprived of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For purposes of this section any act of Congress applicable exclusively to the District of Columbia shall be considered a statute of the District of Columbia.

[42 *U.S.C.* §1983].

28.   42 *U.S.C.* §1983 provides a remedy for state action aimed at depriving persons of their rights as protected and guaranteed by the Constitution and laws.  42 *U.S.C.* §1983, in addition to other remedies, authorizes declaratory relief, injunctive relief, nominal damages, compensatory damages, punitive damages and attorneys fees.

29.   For a party to prevail in an action under 42 *U.S.C.* §1983 it must be shown that (1) there has been / is / will be a violation of that party's rights is guaranteed and secured by the federal Constitution or laws, and (2) that such violation was caused either directly or by a pattern, practice, usage or custom, by a "person" acting under "color of state law".

30.   In the present case, the collective defendants did knowingly and intentionally and / or with deliberate indifference

did conspire to violate and did in fact violate Plaintiffs'
clearly established Federal rights aforesaid under color of state
law proximately resulting in damage to Plaintiffs.

## SECOND COUNT:

### (New Jersey State Civil Rights Act - *N.J.S.A.* 10:6-1 and -2)

31. Plaintiffs hereby repeat and re-allege the previous
allegations of this pleading as if same were set forth herein
again fully at length.

32. Article I, paragraph 7 of the New Jersey State
Constitution (1947) provides as follows:

> \*\*\*
>
> 7. The right of the people to be secure
> in their persons, houses, papers,
> and effects, against unreasonable
> searches and seizures, shall not be
> violated; and no warrant shall issue
> except upon probable cause, supported
> by oath or affirmation, and
> particularly describing the place to be
> searched in the papers and things to be
> seized.

[New Jersey State Constitution (1947), Article I, paragraph
7].

33. Article I, paragraph 20 of the New Jersey State
Constitution (1947) provides as follows:

> \*\*\*
>
> 20. Private property shall not be taken for public use
> without just compensation. Individuals or private

corporations shall not be authorized to take private property for public use without just compensation first made to the owners.

[New Jersey State Constitution (1947), Article I, paragraph 20].

34.  Under the common law "Public Trust Doctrine" the public's ownership and rights to access and use of all tidal waterways and their shores for a variety of public leisure activities in addition to fishing are held by the State of New Jersey in trust for the benefit of all people.  Effective May 3, 2019, the "Public Trust Doctrine" has now been codified by the New Jersey State

Legislature into positive statutory law.  *See Public Law* 2019, Chapter 81.

35.  In such new law the State Legislature has specifically and unambiguously made clear that they have designated the New Jersey Department of Environmental Protection ("DEP") as the State entity with "*... the authority and the duty to protect the public's right of access to tidally flowed waters and their adjacent shorelines under the public trust doctrine and statutory law.*"  *See Public Law* 2019, Chapter 81, Section 1, paragraph d.

36.  As previously noted, the Fourth Amendment to the United States Constitution operates to specifically prohibit the State or State Actor Government Officials from entering onto private

**-17-**

property without permission or a warrant and from conducting arbitrary government warrantless searches of people.

36.   As previously noted, the Fourteenth Amendment to the United States Constitution operates to specifically prohibit State or State Actor Government Official from taking any action, regulatory or otherwise, which deprives any person or a "liberty interest" or a "property interest" without due process of law.

37.   On September 10, 2004 then New Jersey Governor James E. McGreevy signed into law the "New Jersey Civil Rights Act" ("CRA"), Public Law 2004, Chapter 143, now codified at *N.J.S.A.* 10:6-1 and 10:6-2.  The CRA was designed as a "... State analog of the federal civil rights statute

codified at 42 *U.S.C.* §1983..." and was not intended to "... create any new substantive rights."  *See* Governor's Statement on Signing Assembly Bill No. 2073 (September 10, 2004).

38.   *N.J.S.A.* 10:6-2 provides in part relevant to this case as follows:

> ***
>
> c.   Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose

**-18-**

exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief. The penalty provided in subsection e. of this section shall be applicable to a violation of this subsection.

d. An action brought pursuant to this act may be filed in the Superior Court. Upon application of any party, a jury trial shall be directed.

e. Any person who deprives, interferes or attempt to interfere by threats, intimidation or coercion with the exercise or enjoyment by any other person of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State is liable for a civil penalty for each violation. The court or jury, as the case may be, shall determine the appropriate amount of penalty. Any money collected by the court in payment of a civil penalty shall be conveyed to the State Treasurer for deposit into the State General Fund.

f. In addition to any damages, civil penalty, injunction or other appropriate relief awarded in an action brought pursuant to subsection c. of this section, the court may award the

**-19-**

                    prevailing party reasonable attorney's
                    fees and costs

[*N.J.S.A.* 10:6-2(c), (d), (e) & (f)].

39.  The CRA authorizes any "person" who has been deprived
of Federal or State rights by a person acting "under color of
state law " to bring a private cause of action for damages, civil
penalties and injunctive relief.   *N.J.S.A.* 10:6-2(c) & (e).
Jurisdiction is vested in the Superior Court to hear such claims,
and there is a specific statutory right to a jury trial and to
have a jury determined damages to be paid to the Plaintiff.
*N.J.S.A.* 10:6-2(e).  Civil Penalties assessed are not to be paid
to the plaintiff but rather are payable instead to "... *the State
Treasurer for deposit into the State General Fund."* *N.J.S.A.*
10:6-2(e).  A prevailing party is entitled to an additional award
of "... *reasonable attorneys fees and costs."* *N.J.S.A.* 10:6-
2(f).  41.     In *Owens v. Feigin*, 194 *N.J.* 607, 611 (2008), the
New Jersey Supreme Court ruled that given the "... *broad
remedial purpose of the CRA ..."* That the Title 59 Tort Claims
Act's "Notice of Claim" requirement was inapplicable to statutory
private causes of action for relief under *N.J.S.A.* 10:6-2(c)).
Moreover, in a pair of companion cases the New Jersey Supreme
Court ruled that a private cause of action under the CRA may be
pursued only against persons who were acting "under color of

state law." *Perez v. Zagami, LLC,* 218 *N.J.* 202 (2014); *Cottrell v. Zagami, LLC*, 217 *N.J.* 424 (2014).

40.  For a private Plaintiff to affirmatively impose liability on a wrongdoer, theprivate plaintiff must demonstrate that he or she has either been:

> (1) ... *deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State ...;*

OR, that his or her:

> (2) ... Exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law ...[.]

[*N.J.S.A.* 10:6-2(c)].

41.  In the present case, the collective defendants knowingly and intentionally and / or with deliberate indifference did conspire to violate and did in fact violate Plaintiffs' clearly established Federal and State rights aforesaid under color of state law proximately resulting in damage to Plaintiffs.

## THIRD COUNT:
### (Ultra Vires)

42.   Plaintiffs hereby repeat and re-allege the previous allegations of this pleading as if same were set forth herein again fully at length.

43.   The challenged portions of the New Ordinance are illegal and invalid and unauthorized as *ultra vires* as not falling within the express specific enumerated grants of authority in *N.J.S.A.*40:48-1 and *N.J.S.A.*40:48-1.2 or elsewhere and beyond the police powers conferred in *N.J.S.A.*40:48-2 or elsewhere and fall outside of any implied delegation of authority.

44.   Plaintiffs have been proximately damaged by the wrongful actions of the Defendants.

## FOURTH COUNT:
### (Statutory "Pre-Emption by Exclusion)

45.   Plaintiffs hereby repeat and re-allege the previous allegations of this pleading as if same were set forth herein again fully at length. The challenged portions of the New Ordinance are illegal as being a violation of *N.J.S.A.* 2C:1-5(d) and the statutory doctrine of "Pre-Emption by Exclusion".

46.   Plaintiffs have been proximately damaged by the wrongful actions of the Defendants.

**FIFTH COUNT:**
**(Common Law ("Judicial") Pre-Emption)**

47.   Plaintiffs  hereby  repeat  and  re-allege  the  previous
allegations  of  this  pleading  as  if  same  were  set  forth  herein
again fully at length.

48.   The  challenged  portions  of  the  New  Ordinance  are
invalid  as  they  violate  the  general  doctrine  of  Pre-Emption
("Judicial Pre-Emption") announced in

  *Overlook  Terrace  Management  Corporation  v.  Rent  Control*
  *Board of West New York*, 71 *N.J.* 451 (1976).

49.   Plaintiffs  have  been  proximately  damaged  by  the
wrongful actions of the Defendants.

**SIXTH COUNT:**
**(Arbitrary, Capricious and Unreasonable")**

50.   Plaintiffs  hereby  repeat  and  re-allege  the  previous
allegations  of  this  pleading  as  if  same  were  set  forth  herein
again fully at length.

51.   The  challenged  portions  of  the  New  Ordinance  are
arbitrary,  capricious  and  unreasonable  and  are  therefore  invalid
for such reasons.

52.   Plaintiffs  have  been  proximately  damaged  by  the
wrongful actions of the Defendants.

**WHEREFORE,** Plaintiffs demand judgment against Defendants individually, jointly or severally as follows:

**A.)**  Judgment pursuant to the authority of  42 *U.S.C.* §1983 (Federal Civil Rights

Act), *N.J.S.A.* 10:6-1 and -2 (New Jersey State Civil Rights Act), *N.J.S.A.*

2A:16-51 et seq. (New Jersey Declaratory Judgments Act), *R.* 4:52-2 and *R.*

4:69-3 Declaring that the New Ordinance is facially, and as applies to Plaintiffs and their Private Property Beach:

**(1)**  Is a violation of Plaintiffs Fourth and Fourteenth Amendment Federal Constitutional rights in violation of 42 *U.S.C.* §1983 (Federal Civil Rights Act); and alternatively or cumulatively,

**(2)**  Is a violation of Plaintiffs Fourth and Fourteenth Amendment

Federal Constitutional rights, and a violation of Article I

paragraphs 7 & 20 of the New Jersey State Constitution (1947) and a violation of Plaintiffs' statutory rights under the "Public Trust Doctrine", *Public Law* 2019, Chapter 81, all in violation of *N.J.S.A.* 10:6-1 and -2 (New Jersey State Civil Rights Act –

**-24-**

*N.J.S.A.* 10:6-1 and -2); and alternatively or cumulatively,

**(3)** Is illegal as an *ultra vires* exercise of the municipal governing authority delegated to Defendants by the State Legislature; and alternatively or cumulatively,

**(4)** Is a violation of *N.J.S.A.* 2C:1-5(d) and the statutory doctrine of "Pre-Emption by Exclusion"; and alternatively or cumulatively,

**(5)** Is a violation of the general doctrine of Pre-Emption ("Judicial Pre-Emption") announced in *Overlook Terrace Management Corporation v. Rent Control Board of West New York*, 71 *N.J.* 451 (1976); and alternatively or cumulatively,

**(6)** Is arbitrary, capricious and unreasonable; and

**B.)** Judgment pursuant to the authority of 42 *U.S.C.* §1983 (Federal Civil Rights Act), *N.J.S.A.* 10:6-1 and -2 (New Jersey State Civil Rights Act), *N.J.S.A.* 2A:16-51 et seq. (New Jersey Declaratory Judgments Act), *R.* 4:52-2 and *R.* 4:69-3 entering a Permanent Injunction permanently restraining and enjoining and specifically

**-25-**

prohibiting the enforcement of any portions of the New Ordinance;

**C.)** Judgment pursuant to the authority of 42 *U.S.C.* §1983 (Federal Civil Rights Act), *N.J.S.A.* 10:6-1 and -2 (New Jersey State Civil Rights Act), and *N.J.S.A.* 2A:16-51 et seq. (New Jersey Declaratory Judgments Act) awarding nominal damages;

**D.)** Judgment pursuant to the authority of 42 *U.S.C.* §1983 (Federal Civil Rights Act), *N.J.S.A.* 10:6-1 and -2 (New Jersey State Civil Rights Act), and common law awarding compensatory damages;

**E.)** Judgment pursuant to the authority of 42 *U.S.C.* §1983 (Federal Civil Rights Act), *N.J.S.A.* 10:6-1 and -2 (New Jersey State Civil Rights Act), and common law awarding punitive damages;

**F.)** Judgment pursuant to the authority of *N.J.S.A.* 10:6-2(e) (New Jersey State Civil Rights Act) imposing an appropriate "Civil Penalty";

**G.)** Judgment pursuant to the authority of 42 *U.S.C.* §1988 (Federal Civil Rights Act), *N.J.S.A.* 10:6-2(f) (New Jersey

State Civil Rights Act) awarding costs and statutory prevailing party attorneys fees;

**H.)**   Judgment awarding any other further relief as the Court deems fair, just and equitable;

**Dated:**   8/28/20                        **R. S. Gasiorowski, Esq.**

## DEMAND FOR JURY TRIAL:

Plaintiffs hereby demand a trial by jury on all contested issues of material fact.

**Dated:**   8/28/20                        **R. S. Gasiorowski, Esq.**

## REQUIRED CERTIFICATIONS:

**R. S. Gasiorowski, Esq.** hereby certifies as follows:

1.  I am the attorney for the Plaintiffs in this matter and as such I am fully familiar with all facts relevant to this case.

2.  Pursuant to R. 4:5-1, I certify that I know of no other actions or arbitration involving this same set of facts, none are contemplated, and I know of no other parties that should be joined.

3.  I also certify that there is no personal identifier information otherwise requiring redaction contained in this pleading.

**I certify that the foregoing statements made by me are true. I'm aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**

Dated: _____    R. S. Gasiorowski, Esq.

## VERIFICATION:

**Anthony Storino** hereby certifies and verifies as follows:

1.    I am a named Plaintiff in this matter and I am fully familiar with all facts relevant to this dispute generally and to this case specifically.

2.    All facts alleged in this Verified Complaint and Jury Demand are true. All documents attached are true copies of the original documents.

**I certify that the foregoing statements made by me are true. I'm aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**

**Dated:**  8/27/20                                    _____
                                                       Anthony Storino

## VERIFICATION:

**Frank Storino** hereby certifies and verifies as follows:

1.    I am a named Plaintiff in this matter and I am fully familiar with all facts relevant to this dispute generally and to this case specifically.

2.    All facts alleged in this Verified Complaint and Jury Demand are true. All documents attached are true copies of the original documents.

**I certify that the foregoing statements made by me are true. I'm aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.**

**Dated:**  8-27-2020                                  _____
                                                       Frank Storino

# "Exhibit A"

**Questions about eCode360? Municipal users <u>Join us</u> Monday through Wednesday between**

Note: Ordinance history includes Ord. Nos. 1984-6; 1984-32; 1986-2; 1994-21; 1997-11; 2008-53; Ord. No. 2017-15 deleted and replaced the entire chapter. Amendments noted where applicable.

## § 21-1 OCEANFRONT, BEACHES, OCEAN WATERS.

### § 21-1.1 Operating Season, Oceanfront and Ocean Waters Adjacent Thereto.

Unless determined otherwise by a resolution of the Borough Council, the general operating season shall commence on May 1 and continue through October 15. During the operating season all persons using the oceanfront and the ocean waters adjacent thereto during operating hours shall obtain and display an appropriate beach badge.

### § 21-1.2 Operating Hours.

a.   Daily operating hours at the oceanfront during the operating season shall be as follows, except during inclement weather:

1.   Saturday, Sunday and Holidays: 9:00 a.m. to 6:00 p.m.

2.   Monday to Friday: 9:00 a.m. to 6:00 p.m.

b.   Oceanfront bathing is permitted only when lifeguards are on duty regardless of operating hours. No person shall enter the bay or ocean when lifeguards are not on duty.

### § 21-1.3 Closing Time.

All persons are restricted from remaining on the beaches after 6:00 p.m. except with special permission of the owner.

### § 21-1A MUNICIPAL BEACH.

### § 21-1A.1 Established.

A municipal beach is hereby established for the public health, recreation, bathing and entertainment.

### § 21-1A.2 Municipal Beach Delineated.

The area lying to the east of the street ends known as Maryland Avenue and Delaware Avenue and being commonly designated as the "Plaza" area and having an approximate depth of 110 feet by an ocean frontage of 450 feet.

### § 21-1A.3 Safeguards, Equipment and Facilities.

The municipality shall arrange for the acquisition, use, and maintenance of such safeguards, equipment and facilities as the Borough shall deem necessary for the proper establishment and maintenance of said place or resort for public health, recreation, bathing, and entertainment.

### § 21-1A.4 Lifeguards.

The Borough shall arrange for lifeguards as the Borough shall deem necessary for the proper maintenance of said municipal beach. The hours of lifeguards shall be as set by Resolution of the Governing Body.

### § 21-1A.5 Policing.

The Police in the municipality shall police said beach.

### § 21-1A.6 Fee for Use.

In order to provide funds to improve, maintain and police the municipal beach and to protect the same from erosion, encroachment, damage by the sea, or otherwise, and to provide facilities and safeguards for public bathing and recreation, including the employment of lifeguards, reasonable fees shall be charged the person using said lands and bathing facilities for

access to the beaches and bathing and recreational facilities from May 1 to October 15. These fees shall be set by Resolution of the Governing Body.

## § 21-1A.7 (Reserved)

## § 21-1A.8 Prohibited Acts.

~~No person shall do any of the following things at or upon the municipal beach:~~

**a.**   Throw, drop, discard, dump, or leave any wastepaper, garbage, or other refuse, or in any way litter, make unsightly, damage, destroy or disfigure said beach, dune, water, or any public or private property.

**b.**   Sell, peddle or hawk any food, drink or confections.

**c.**   Make any loud noise, sound or music to the annoyance of any other person, or use loud, profane or indecent language.

**d.**   Play ball, or ride or operate a surfboard, or engage in any other activity which will endanger another person or interfere with the enjoyment of the quiet use of the beach.

~~**e.**   Take any intoxicating liquor upon the beach, or any glass containers or bottles.~~

**f.**   Take or permit his or her dog to be or go upon the beach or in the water at any public bathing beach; except that any dog under the control of a leash may utilize the municipal beach, and the approaches for access only, between October 1st and April 30th, between the hours of 8:00 a.m. and 3:00 p.m. of each year.

**g.**   Go into the water, or remain in the water:

    **1.**   When it is unsafe to do so;

    **2.**   When directed by a public lifeguard to come out of the water;

    **3.**   When Intoxicated;

    **4.**   Farther than directed by a public lifeguard; or

    **5.**   In violation of a reasonable order of a public lifeguard when the safety of the bather is or may be endangered by going into the water.

**h.**   Molest or disturb any person in the peaceful enjoyment of said beach, or bathing facilities.

**i.**   Refuse or neglect to obey the orders and directions of a public lifeguard as to time, place and distance for bathing, or interfere with or obstruct a Police Officer or lifeguard in the performance of his or her duty.

**j.**   Operate a privately owned beach buggy or other motor vehicle on the beach at any time.

**k.**   Pursuant to N.J.S.A. 40:48-1 and N.J.S.A. 40:48-2, smoke or burn a lighted cigar, cigarette or pipe, including any handheld electronic device which vaporizes a liquid (e.g., e-cigarettes, e-cigs, electronic nicotine delivery systems, electronic non-nicotine delivery systems, personal vaporizers, PVs), or any other matter or substance which contains tobacco on any property owned by the Federal, State, County or local government east of the entrance to the Beach;

**l.**   Bring any of the following onto the Beach:

    **1.**   Coolers larger than 24 inches in width, or length, or height and/or has a capacity greater than thirty-six (36) quarts.

    **2.**   Serving trays, warming trays, pots, pans, devices, equipment or utensils utilized for the preparation or storage of food.

    **3.**   Canopy style sun shades bigger than 10' x 10' and any size canopy style sun shade with side walls including tents and tent clusters.

4. Devices designed or used to shade infants and small children, also known as "baby tents," larger than 36 inches high by 36 inches wide by 36 inches deep.

5. Umbrellas with a collapsible circular shade greater than eight feet diameter or radiating from a center pole greater than 7 feet 6 inches in height, or with grounding lines, ropes, or sides.

6. Umbrellas, baby tents and canopies anchoring lines, tethers, or the like that extend beyond the perimeter of the umbrella, the baby tent or canopy.

7. Tables or stands or boards or other devices positioned to function as a table.

m. Cook on the Beach.

n. Bring a drone onto or operate a drone on the Beach.

# § 21-2 REGULATION, PRESERVATION AND PROTECTION OF BEACHES AND DUNES.

## § 21-2.1 Findings, Declaration and Purpose.

a. Although there may be no long term defense for fixed oceanfront structures against a constantly rising ocean level, effective protection of the oceanfront and adjacent coastal areas in the intermediate term against high tides and flooding and against damage by the ocean under storm conditions requires sufficient elevation and breadth in the beach and dune areas, hereinafter defined, to dissipate the force of the waves. The dunes should provide an uninterrupted barrier and a source of sand to mitigate the effect of storm waves for the benefit of the entire Borough - interior lands as well as oceanfront premises - and a beach for the recreational purposes of all. Accordingly, the Borough has a vital interest in the continued maintenance and protection of the beach and dune areas and in the right to cause their restoration in the event of damage or destruction.

b. Dune areas are vulnerable to erosion by wind, water, the absence of good husbandry by those responsible for their maintenance and preservation, and by indiscriminate trespass, construction or other acts which might destroy or damage them.

   A proven and available means of protecting dune areas against erosion is by preventing indiscriminate trespassing, construction or other acts which might destroy or damage them, and through the aggressive use of native plantings supplemented, when necessary, by sand fencing and other protective devices, or combinations thereof, designed to prevent the erosion of dune areas and to promote the root accumulations, normal contours and other features found in natural dune systems.

c. The beach area and dune area are dynamic and are not capable of rigid definition or delineation, or of completely firm stabilization. They can and do migrate, so that particular sites, at one time free of dunes may, as the result of natural forces, become a part of the dune area declared to be in the interest of the Borough to protect. Persons owning, using or purchasing such property do so subject to the public interest therein.

d. It is a purpose of this section to define the areas so affected and to establish regulations to assure their continued effectiveness.

e. This section does not attempt to define and regulate all parameters of dune delineation, function or management and the Borough Council declares its intent to review and update this section periodically to reflect appropriately new and beneficial knowledge treating of such things as, but not limited to, upper driftline, elevated walkways and buildings setback requirements.

f. This section is declared to be an exercise of the police power in the interest of safety and welfare for the protection of persons and property.

## § 21-2.2 Definitions.

For the purposes of this section, the following words shall have the meaning given herein.

a. Beach area shall mean that area between the mean high water line of the Atlantic Ocean, in reference to the 1929 Sea Level Datum as established by the U.S. Coast and Geodetic Survey and the seaward edge of the dune as hereinafter defined.

b. Seaward edge of dune shall be the line as identified on the adopted Dune Reference Map of the Borough. The line shall also be the easterly edge of the dune area as indicated on the adopted map.

c. Upper driftline shall mean that line produced by the winter spring tides (highest tides of the year) which contains oceanic debris (flotsam such as seaweed, etc.) and the seeds, rhizomes, or detached plants which can germinate and/or grow to produce a zone of new dune vegetation.

d. Landward edge of dune shall be the line as identified on the adopted Dune Reference Map of the Borough. The line shall also be the westerly edge of the dune area as indicated on the adopted map. The landward edge of dune shall also be the adopted 'Dune Reference Line'.

e. Vegetation line shall mean that line connecting the most seaward naturally occurring perennial plants with other such plants.

f. Dune area shall mean that area between the seaward edge of the dune and the landward edge of the dune.

g. Beach area shall be all areas located easterly of the dune area as shown on the adopted Dune Reference Map.

h. Setback line shall mean that line parallel to the dune reference line and located westwardly therefrom by the setback distances variously specified by Borough ordinance or maps or any subsequent modification thereof.

i. Natural vegetation shall mean and include the terms "native vegetation" or "indigenous vegetation." Specifically, it shall include such plants as beachgrass (Ammophila breviligulata), dusty miller (Artemisia stelleriana), sea rocket (Cakile edentula), seaside goldenrod (Solidago sempervirens), bayberry (Myrica pensylvanica), beach pea (Lathyrus japonicus), salt spray rose (Rosa rugosa), or seaside spurge (Euphorbia polygonifolia), which normally grow or may be planted on the slopes of dunes or behind them, no distinction being made as to how such plants are introduced into their location. Beach Plum shall be included as an acceptable plant.

j. Walkway shall mean a constructed means of crossing the dune area in accordance with drawings approved by Borough Council and on file with the Borough Engineer.

k. Sand fence shall mean and include the term "snow fence" of a barricade type established in a line or a pattern to accumulate sand and aid in the formation of a dune, such as:

1. Picket type consisting of light wooden fence held together by wire and secured by posts; or

2. Such other material as may be designed and approved for the purpose.

l. Dune consultant shall mean an expert on dunes and their care retained by the Borough. In any periods during which no such expert is regularly retained, it shall mean such other person designated by Borough Council. This person shall serve at the pleasure of the mayor and council.

m. Dune inspector shall mean that person designated by Borough Council and approval by the dune consultant. The dune inspector and dune consultant can be one in the same person or separate individuals as determined by Mayor and Council.

## § 21-2.3 Beach and Dune Areas; Regulations.

a. The setback line from the Dune Reference Line (Landward edge of dune) is hereby established at ten feet. No construction activity whatsoever shall be permitted in the areas of the Borough east of said line as established on the adopted Dune Reference Map of the Borough of Point Pleasant Beach except as provided in paragraph c herein.

b. The first floor of any new or rebuilt residence structure built east of Ocean Avenue within the Borough shall be at an elevation at least as great as that specified in the flood damage prevention ordinance or any subsequent modification thereof.

c. No person shall be in the dune area unless:

1. Upon an approved pathway, walkway or dune platform; or

2.  In the performance of such activities as may be reasonably and necessarily required to construct or maintain the dune or allowed structures with the permission of the owner; or

3.  For the purposes of enforcement of this section, the following shall apply:

Only one pathway or walkway across the dune area is permitted for each oceanfront residence. It shall run, generally, the shortest practical course between the residents and the seaward edge of the dune, and shall not exceed three feet in width. At street ends, wider pathways may be delineated by the Borough Engineer. In the event that any pathway or walkway shall be or become, in the opinion of the dune consultant, a substantial detriment to the development and maintenance of the continuous protective dune sought to be achieved by this section, the owner of the premises shall be subject to the provisions of paragraph I of this subsection.

In addition to the pathway or walkway, each oceanfront lot shall be allowed one dune platform not to exceed 200 square feet, situated within the dune area and specifically located and delineated by the owner of the premises. The dune platform shall, in all events, be maintained in the same fashion and subject to the same regulations as may govern the use of pathways and walkways. Dune platforms shall comply with such specifications as may hereafter be adopted by resolution of the Borough Council governing such structures.

d.  The removal, cutting, burning, or destruction of natural vegetation, sand fence or such other types of dune protection devices as may be approved by the Borough Council in the dune area is prohibited, except as necessary for construction authorized pursuant to paragraphs a and c.

e.  The removal and grading of sand from the beach area or dune area is prohibited unless an emergency has been declared in writing by virtue of a written memorandum from the dune consultant to the mayor and council consistent with all other governmental regulations governing the same.

During the time of such declared emergencies, grading of sand may take place only as directed and approved by the dune consultant.

f.  Any sand which is transported upon lands by action of wind, tides, storms or any combination thereof shall not be removed from the lot upon which it is deposited by such action if said sand is located east of the landward edge of the dune (Dune Reference Line). To the extent practicable, considering the utilization of the premises, such sand as may be affirmatively relocated by the owner upon the lot shall be moved eastwardly. Sand deposited upon any improved street ends shall be restored into the beach and dune area.

g.  One of the purposes of this section is to achieve the maintenance of sand dunes at the highest practical height. To this end, no dune shall be directly or indirectly lowered or reduced in height by the action or inaction of any owner or his agent. However, if any dune shall be or become lower than the elevation deemed materially significant by the dune consultant, applying recognized criteria, with due regard to the intent of this section and reasonable use of the premises, the owner thereof shall be obliged to install such sand fence and plantings as may be prescribed by the dune consultant. The owner shall have an obligation to maintain and replace, if necessary, these fences and plantings but shall not be obligated to take any other affirmative action, except as may be specified elsewhere in this section. If the dune is lowered or caused to be lowered by the direct or indirect action of any owner, then the dune shall, upon due notice to the owner, be restored its immediately pre-existing elevation by the owner or at his expense. The restored dune shall be planted and sand fenced in accordance with specifications promulgated under this section.

h.  In order to provide for effective protection and/or restoration of the dune area, each owner shall plant or cause to be planted in the dune area adjoining his property suitable vegetation and erect, or cause to be erected, suitable sand fencing all in accordance with such standards as may be recommended by the dune consultant and adopted by resolution of the Borough Council.

i.  The Borough dune inspector, and in his absence, the dune consultant and in all events the Borough Council shall enforce the affirmative duty of each oceanfront owner, as set forth in this section, by service of a written notice, certified mail return receipt requested, upon the record owner at his last known address as set forth in the Borough tax rolls, requesting specific compliance with these obligations concerning dune protection and/or restoration. The notice shall also advise that unless the owner shall take appropriate corrective action and complete the same within 30 days from the day of mailing said notice, the Borough may perform such acts of protection and/or restoration at the expense of the owner. Such expenditures by the Borough, if any, shall be due and payable upon demand. In the event that any such owner shall fail to pay, then the sum together with interest at the highest legal rate thereon shall become a lien upon the property and be collected in the same manner as delinquent real property taxes.

In addition to the action described above, the owner may, at the election of the enforcement officials or the Borough Council, be prosecuted for violation of this section in accordance with Subsection 21-2.4.

## § 21-2.4 Penalties.

a.  For any and every violation of this section, the owner of lands abutting the beach or dune area where such violation has been committed, or the trespasser if the violation is of Subsection 21-2.3 paragraph c, or any violator, shall for each and every violation be subject to a fine of not more than five hundred ($500.00) dollars or 90 days in detention at the discretion of the court. Each and every day that such violation continues shall be considered a separate violation of this section.

# "Exhibit B"

OCN-L-002009-20   08/28/2020 3:24:19 PM   Pg 38 of 44 Trans ID: LCV20201519422
Case 3:20-cv-11906-FLW-DEA   Document 1-1   Filed 08/28/20   Page 38 of 433 PageID: 43

8/7/2020                ORDINANCE 2020-12 Amend Ch 21, Regulations Governing Conduct on Beaches and Boardwalk - Borough of Point Pleasant Beach

# ORDINANCE 2020-12 Amend Ch 21, Regulations Governing Conduct on Beaches and Boardwalk

**ADOPTED: August 4, 2020**

**ORDINANCE 2020-12**

**AN ORDINANCE OF THE BOROUGH OF POINT PLEASANT BEACH AMENDING CHAPTER XXI, BEACHES OF THE REVISED GENERAL ORDINANCES OF THE BOROUGH OF POINT PLEASANT BEACH**

---

**WHEREAS** the Governing Body of the Borough of Point Pleasant Beach (hereinafter "Borough") has found that it is in the public interest to amend Chapter 21, entitled "Beaches" to further regulate the conduct of guests using the beaches located in the Borough.

**NOW, THEREFORE, BE IT ORDAINED,** by the Governing Body of the Borough of Point Pleasant Beach, County of Ocean, State of New Jersey, as follows:

**SECTION 1.** Chapter XXI, entitled "Beaches," Subchapter 1, entitled "OCEANFRONT, BEACHES, OCEAN WATERS" is hereby repealed and replaced with the following:

**21 – 1 BOARDWALK,  BEACHES, AND OCEAN WATERS**

**Operation**

**21-1.1** *Operating Season.*

Unless determined otherwise by a resolution of the Borough Council, the general operating season shall commence on May 1 and continue through October 15.  During the operating season all persons using the Beaches and the Ocean Waters adjacent thereto during operating hours shall obtain and display an appropriate beach badge as required by the owner of the beach.

### 21-1.2  Operation

#### A. Hours

Daily operating hours at the oceanfront during the operating season shall be as follows, except during inclement weather:

1. Saturday, Sunday and Holidays: 9:00 a.m. to 7:00 p.m.
2. Monday to Friday: 9:00 a.m. to 7:00 p.m.
3. Surfers, fishermen, and those using self-contained underwater breathing apparatus (SCUBA) equipment may access the beach, at their own risk, to surf, fish, or dive after the beach closes, but may not remain on the beach when not surfing, fishing or diving.
4. Exercising east of the mean high water mark is permitted at all times. Exercise classes may be held on the beach at any time with the permission of the owner.


1. **Contraband**
2. No one who operates a beach and charges a fee shall allow any employee under the age of 18 to inspect patrons or their possessions for alcohol and/or illegal or controlled substances.
3. If an individual who has paid a fee to access a beach is found in possession of alcohol or controlled substances while on a beach, the beach operator shall be investigated for, and, if warranted charged, with a violation of N.J.S.A. 2C:33-12. Upon a beach operator's conviction for violating N.J.S.A. 2C:33-12 the Borough may seek any and all penalties provided by N.J.S.A. 2C:33-12.1.
4. Oceanfront bathing is permitted only when lifeguards are on duty regardless of operating hours. No person shall enter the bay or ocean when lifeguards are not on duty, except with a surfboard, paddle board or the like, or while using self-contained underwater breathing apparatus.  Any such entry when lifeguards are not on duty is at the entrant's own risk.

### 21-1.3  *Closing Time.*

All persons are restricted from remaining on the beaches after 7:00 p.m. except with special permission of the owner.  Surfers, fishermen, and those using self-contained underwater breathing apparatus or exercising as described in 21-1.2A(3) and (4) above may access the beach, at their own risk, to surf, fish, dive, or exercise after the Beach closes, but may not remain on the beach when not surfing, fishing, diving or exercising.

### 21-1.4  *Prohibited Acts.*

No person shall do any of the following things at or upon the Boardwalk and/or beaches or the ocean waters located in the Borough:

1. Throw, drop, discard, dump, or leave any wastepaper, garbage, or other refuse, or in any way litter, make unsightly, damage, destroy or disfigure said beach, dune, water, or any public or private property.

2. Sell, peddle or hawk any food, drink or confections, with the exception of those licensed to do so by the Borough.

3. Make any loud noise, sound or music to the annoyance of any other person, or use loud, profane or indecent language.

4. Play ball, or ride or operate a surfboard, or engage in any other activity which will endanger another person or interfere with the enjoyment of the quiet use of the beach.

5. Take any intoxicating liquor upon the beach, or any glass containers or bottles.

6. Take or permit his or her dog to be or go upon the beach or in the water at any public bathing beach; except that any dog under the control of a leash may utilize the municipal beach, and the approaches for access only, between October 1st and April 30th, between the hours of 8:00 a.m. and 3:00 p.m. of each year.

7. Go into the water, or remain in the water:

8. When it is unsafe to do so;

9. When directed by a public lifeguard to come out of the water;

10. When intoxicated;

11. Farther than directed by a lifeguard; or

12. In violation of a reasonable order of a lifeguard when the safety of                    the bather is or may be endangered by going into the water.

13. Molest or disturb any person in the peaceful enjoyment of said beach, or bathing facilities.

14. Refuse or neglect to obey the orders and directions of a lifeguard as to time, place and distance for bathing, or resting on the sand, or otherwise for social distancing, or interfere with or obstruct a police officer or lifeguard in the performance of his or her duty.

15. Operate a privately owned beach buggy or other motor vehicle on the beach at any time except with the permission of the owner of the beach.


1. Pursuant to N.J.S.A. 40:48-1 and N.J.S.A. 40:48-2, smoke or burn a lighted cigar, cigarette or pipe, including any handheld electronic device which vaporizes a liquid (e.g., e-cigarettes, e-cigs, electronic nicotine delivery systems, electronic non-nicotine delivery systems, personal vaporizers,

PVs), or any other matter or substance which contains tobacco on any property owned by the Federal, State, County or local government east of the entrance to the Boardwalk or on the beach;

2. Bring any of the following onto a beach:

1. Coolers larger than 13 inches in width, or length, or height and/or has a capacity greater than nine (9) quarts.

1. Serving trays, warming trays, pots, pans, devices, equipment or utensils utilized for the preparation or storage of food.

1. Canopy style sun shades bigger than 7' x 7' and any size canopy style sun shade with side walls including tents and tent clusters.

1. Devices designed or used to shade infants and small children, also          known as "baby tents," larger than 36 inches high by 36 inches wide by 36 inches deep.

1. Umbrellas with a collapsible circular shade greater than eight feet in diameter or radiating from a center pole greater than 7 feet 6 inches in height or with grounding lines, ropes, or sides.

1. Umbrellas, baby tents and canopies anchoring lines, tethers, or the like that extend beyond the perimeter of the umbrella, the baby tent or canopy.

- Tables or stands or boards or other devices positioned to function as a table.

1. Cook on the Beach

2. Bring a drone onto or operate a drone on the Beach.

### 21-1.5  *Policing*.

The police in the municipality shall police the beaches, Boardwalk, and          waterfront located in the Borough.

8/7/2020          ORDINANCE 2020-12 Amend Ch 21, Regulations Governing Conduct on Beaches and Boardwalk - Borough of Point Pleasant Beach

**SECTION 2.**   A new section, 21-5, shall be added as follows:

**21- 5  Municipal Beach.**

**21-5.1  *Established.***

A municipal beach is hereby established for the public health, recreation, bathing and entertainment.

**21-5.2  *Municipal Beach Delineated.***

The area lying to the east of the street ends known as Maryland Avenue and Delaware Avenue and being commonly designated as the "Plaza" area and having an approximate depth of 110 feet by an ocean frontage of 450 feet.

**21-5.3  *Safeguards, Equipment and Facilities.***

The municipality shall arrange for the acquisition, use, and maintenance of such safeguards, equipment and facilities as the Borough shall deem necessary for the proper establishment and maintenance of said place or resort for public health, recreation, bathing, and entertainment.

**21-5.4  *Lifeguards.***

The Borough shall arrange for  lifeguards as the Borough shall deem necessary  for the proper maintenance of said municipal beach. The hours of lifeguards shall  be as set by Resolution of the Governing Body.

**21-5.6  *Fee for Use.***

In order to provide funds to improve, maintain and police the municipal beach and to protect the same from erosion, encroachment, damage by the sea, or otherwise, and to provide facilities and safeguards for public bathing and recreation, including the employment of lifeguards, reasonable fees shall be charged the person using said lands and bathing facilities for access to the beaches and bathing and recreational facilities from May 1 to October 15:.  These fees shall be set by Resolution of the Governing Body.

**21-5.7  *Reserved.***

OCN-L-002009-20    08/28/2020 3:24:19 PM  Pg 43 of 44 Trans ID: LCV20201519422
Case 3:20-cv-11906-FLW-DEA   Document 1-1   Filed 08/28/20   Page 43 of 433 PageID: 48

8/7/2020          ORDINANCE 2020-12 Amend Ch 21, Regulations Governing Conduct on Beaches and Boardwalk - Borough of Point Pleasant Beach

SECTION 3.  The provisions of this ordinance shall be severable.  If any section or provision shall be held to be invalid by any Court of competent jurisdiction, the same shall not affect the other sections or provisions of this ordinance which shall remain in full force and effect.

SECTION 4.  All ordinances or parts of ordinances inconsistent herewith are hereby repealed to the extent of such inconsistencies.

SECTION 5.  This ordinance shall take effect after final passage and publication as provided by law.

Approved this _____ day of _____, 2020:

_____

Borough of Point Pleasant Beach

Paul Kanitra, Mayor

NOTICE IS HEREBY GIVEN that the foregoing Ordinance was introduced and passed upon first reading at a meeting of the Governing Body of the Borough of Point Pleasant Beach, in the County of Ocean, State of New Jersey, on July 21, 2020. It will be further considered for final passage, after public hearing thereon, at a meeting of the Governing Body to be held via the Zoom online meeting platform on August 4, 2020 at 7:30 p.m., at which time and place any person desiring to be heard will be given an opportunity to be so heard. To attend the meeting online go to

https://zoom.us/j/98447103255?pwd=UWtMRGlxdjRWVlJKOThvSFBPNmRhUT09

Meeting ID:  984 4710 3255 / Password 752442

To attend the meeting via telephone dial 1 (929) 205-6099, follow prompts and press # (if prompted for participant ID, press # to bypass).  Any changes to the meeting location, online meeting platform, meeting ID, password, online URL or telephone dial-in number will be posted to the Borough's web

8/7/2020                ORDINANCE 2020-12 Amend Ch 21, Regulations Governing Conduct on Beaches and Boardwalk - Borough of Point Pleasant Beach

site, www.pointpleasantbeach.org.  During the week prior to and up to and including the date of such meeting copies of the full ordinance will be available at no cost for members of the general public in the Police lobby of the Municipal Building, 416 New Jersey Avenue, Point Pleasant Beach, NJ  08742 and on the Borough's website: (https://pointpleasantbeach.org/ordinances/) or can be obtained by calling the Borough Clerk (732/892-1118, extension 210) during the hours of 9AM to 4PM.

_____

EILEEN FARRELL, RMC

Municipal Clerk

R.S. GASIOROWSKI, ESQ. – ID#244421968
GASIOROWSKI & HOLOBINKO
54 BROAD STREET
RED BANK, NEW JERSEY 07701
(732) 212-9930
Fax: (732) 212-9980
Attorney for Plaintiffs, Jenkinson's Pavilion,
Frank Storino and Anthony Storino

| | |
|---|---|
| **J**ENKINSON'S PAVILION; ANTHONY STORINO AND FRANK STORINO : | : SUPERIOR COURT OF NEW JERSEY : LAW DIVISION |
| Plaintiffs, : | : OCEAN COUNTY : |
| vs. : | : Docket No. : |
| BOROUGH OF POINT PLEASANT BEACH; MAYOR AND COUNCIL OF THE BOROUGH OF POINT PLEASANT BEACH; POLICE DEPARTMENT OF THE BOROUGH OF POINT PLEASANT BEACH; PAUL M. KANITRA, Individually and in his capacity as the Mayor of The Defendant, Borough of Point Pleasant Beach; CARYN BYRNES, Individually, and in her capacity as a  Councilwoman; ARLENE TESTA,  Individually and in her capacity as a Councilwoman; DOUGLAS VITALE, Individually and in his Capacity as a  Councilman, and KEVIN B. RIORDAN, Individually and in his capacity as the Borough Attorney for the Defendant, Borough of Point Pleasant Beach. | : <u>Civil Action</u> : **: ORDER TO SHOW CAUSE SEEKING : PRELIMINARY INJUNCTION AND : ORIGINAL PROCESS (R.4:52)** : : : : : : : : : : : : : : : : : : : : : : : |
| Defendant. : | : |

**THIS MATTER** having been brought before to the Court by R. S. Gasiorowski, Esq., attorney for Plaintiffs, seeking relief by way Preliminary Injunction on the return date set forth below pursuant to *R.* 4:52-2 and / or alternatively or cumulatively a Stay pursuant to *R.* 4:69-3, based upon the facts set forth in the Verified Complaint and Jury Demand filed herewith, and for good cause shown.

**IT IS ON THIS \_\_\_\_\_ DAY OF AUGUST, 2020,**

**ORDERED** that Defendant(s) appear and show cause before the undersigned of the Superior Court of New Jersey, Law Division, Civil Part, at the Court Room of the undersigned located at the Ocean County Courthouse in Toms River, New Jersey at _____ o'clock or as soon thereafter as counsel can be heard, why an Order should not be entered as follows:

- An Order disqualifying attorney Kevin B. Riordan, Esq. from appearing as counsel or in any way, directly or indirectly, representing or giving legal advice to any of the Defendants in this action due to a disqualifying conflict of interest and / or alternatively or cumulatively due to a disqualifying "appearance of impropriety"; and

- An Order Preliminarily Enjoining and restraining Defendants from in any way enforcing any provisions of newly enacted *"ORDINANCE 2020-12, An Ordinance of the Borough of Point Pleasant Beach Amending*

*Chapter XXI, Beaches of the Revised General Ordinances of the Borough of Point Pleasant Beach"* which was adopted into law by the Mayor and Council on August 4, 2020, until further Order of this Court;

**AND IT IS FURTHER ORDERED** that:

1.   A copy of this Order to Show Cause, Verified Complaint and Jury Demand and Memorandum of Law and any supporting Affidavits or Certifications submitted in support of this application be served upon the attorney for the Defendants, and upon Defendant Kevin B. Riordan at the following address:

**Kevin B. Riordan, Esq.**
**KEVIN RIORDAN, LLC**
**20 Hadley Avenue**
**Toms River, New Jersey 08753**
**Attorney for Defendants Borough of Point Pleasant Beach, Mayor and Council of the Borough of Point Pleasant Beach; Police Department of the Borough of Point Pleasant Beach, Paul M. Kanitra, Caryn Byrnes, Arlene Testa, Douglas Vitale and Kevin B. Riordan**

personally within _____ days of the date hereof, in accordance with *R.* 4:4-3 and *R.* 4:4-4, this Order to Show Cause being original process as permitted by *R.* 4:52-1(b); and

2.   The Plaintiffs must file with the Court their Proof of Service of the pleadings and motion papers on the Defendant(s) no later than three (3) days before the return date.

3.   Defendant(s) shall file and serve a written response to this Order to Show Cause and the request for entry of Preliminary Injunctive Relief and a Proof of Service by _____.   The original documents must be filed with the Clerk of the Superior Court in the County listed above. A directory of these offices is available in the Civil Division Management Office in the county listed above and online at **njcourts.gov/forms/10153_deptyclerklawref.pdf.**   You must also send a copy of your opposition papers directly to the undersigned Judge whose address is listed above.   You must also send a copy of your opposition papers to the Plaintiffs' attorney whose name and address appears above.   A telephone call will not protect your rights; you must file your opposition and pay the required fee of $175.00 and serve your opposition on your adversary, if you want the Court to hear your opposition to the Preliminary Injunctive relief the Plaintiffs are seeking.

4.   The Plaintiff must file and serve any written reply to the Defendants' opposition to the Order to Show Cause by _____ . The reply papers must be filed with the Clerk of the Superior Court in the county listed above, a copy of the reply papers must be sent directly to the chambers of Judge at the address listed above, and a copy of the reply papers must be sent to the Defendants' attorney.

5.    If the Defendants do not file and serve opposition to this Order to Show cause the application will be decided on the papers on the return date and relief may be granted by default, provided that the Plaintiffs files a proof of service and a proposed form of Order at least three days prior to the return date.

6.    If the Plaintiff has not already done so, a proposed form of Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the court no later than three (3) days before the return date.

7.    **DEFENDANTS TAKE NOTICE** that the Plaintiffs have filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint and Jury Demand attached to this Order to Show Cause states the basis of the lawsuit. If you dispute this Verified Complaint and Jury Demand, you, or your attorney, must file a written Answer and Proof of Service within 35 days from the day of service of this Order to Show Cause not counting the day you received it.  These documents must be filed with the Clerk of the Superior Court of New Jersey, Law Division, Civil Part, in the County listed above.  A directory of these offices is available in the Civil Division Management Office in the county      listed      above      and      online      at

njcourts.gov/forms/10153_deputyclerklawref.pdf.     Include     a
$175.00  filing  fee  payable  to  the  "Treasurer  State  of  New
Jersey."     You  must  also  send  a  copy  of  your  Answer  to  the
Plaintiffs' attorney whose name and address appear above.   A
telephone call will not protect your rights; you must file and
serve your Answer (with the fee) or judgment may be entered
against you by default. Please note: Opposition to the Order to
Show Cause is not an Answer and you must file both.  Please note
further: if you do not file and serve an Answer within 35 days
of this Order, the court may enter a default against you for the
relief plaintiff demands.

   8.   If you cannot afford an attorney, you may call the
Legal  Services  office  in  the  county  in  which  you  live  or  the
Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW
(1-888-576-5529).  If  you  do  not  have  an  attorney  and  are  not
eligible for free legal assistance you may obtain a referral to
an attorney by calling one of the Lawyer Referral Services. A
directory  with  contact  information  for  local  Legal  Services
Offices and Lawyer Referral Services is available in the Civil
Division Management Office in the county listed above and online
at njcourts.gov/forms/10153_deptyclerklawref.pdf.

   9.   The court will entertain argument, but not testimony,
on the return date of the Order to Show Cause, unless the Court

**-6-**

and parties are advised to the contrary no later than _____

days before the return date.

_____
J.S.C.

R.S. GASIOROWSKI, ESQ. – ID#244421968
GASIOROWSKI & HOLOBINKO
54 BROAD STREET
RED BANK, NEW JERSEY 07701
(732) 212-9930
Fax: (732) 212-9980
Attorney for Plaintiffs, Jenkinson's Pavilion,
Frank Storino and Anthony Storino

| | |
|---|---|
| **J**ENKINSON'S PAVILION; ANTHONY STORINO AND FRANK STORINO | : SUPERIOR COURT OF NEW JERSEY : LAW DIVISION |
| Plaintiffs, | : OCEAN COUNTY : |
| vs. | : Docket No. : |
| BOROUGH OF POINT PLEASANT BEACH; MAYOR AND COUNCIL OF THE BOROUGH OF POINT PLEASANT BEACH; POLICE DEPARTMENT OF THE BOROUGH OF POINT PLEASANT BEACH; PAUL M. KANITRA, Individually and in his capacity as the Mayor of The Defendant, Borough of Point Pleasant Beach; CARYN BYRNES, Individually, and in her capacity as a  Councilwoman; ARLENE TESTA,  Individually and in her capacity as a Councilwoman; DOUGLAS VITALE, Individually and in his Capacity as a  Councilman, and KEVIN B. RIORDAN, Individually and in his capacity as the Borough Attorney for the Defendant, Borough of Point Pleasant Beach. | : <u>Civil Action</u> : **ORDER ENTERING PRELIMINARY** : **INJUNCTION AND DISQUALIFYING** : **COUNSEL** : : : : : : : : : : : : : : : : : : : : : : |
| Defendant. | : |

**THIS MATTER** having been brought before to the Court by R. S. Gasiorowski, Esq., attorney for Plaintiffs, seeking a Preliminary Injunction on notice to the Defendants who were afforded adequate opportunity to respond and to be heard, and the Court having considered the papers and argument of counsel, if any, and for good cause shown;

**IT IS ON THIS _____ DAY OF _____, 2020,**

**ORDERED** that the Defendants are hereby preliminarily enjoined and restrained from in any way enforcing any provisions of the newly enacted *"ORDINANCE 2020-12, An Ordinance of the Borough of Point Pleasant Beach Amending Chapter XXI, Beaches of the Revised General Ordinances of the Borough of Point Pleasant Beach"* which was adopted into law by the Mayor and Council on August 4, 2020, until further Order of this Court; and

**IT IS FURTHER ORDERED** that attorney Kevin B. Riordan, Esq. is hereby disqualified from appearing as counsel or in any way, directly or indirectly, representing or giving legal advice to any of the Defendants in this action (other than to or on behalf of himself) due to a disqualifying conflict of interest and/or alternatively or cumulatively due to a disqualifying "appearance of impropriety"; and

**IT IS FURTHER ORDERED** that a copy of this Order shall be personally served by the Plaintiff upon (1) the Defendant Point

-2-

Pleasant Beach Police Department and (2) the Municipal Clerk of

the Borough of Point Pleasant Beach immediately.


_____
                                                         **J.S.C.**

R.S. GASIOROWSKI, ESQ. - ID#244421968
GASIOROWSKI & HOLOBINKO
54 BROAD STREET
RED BANK, NEW JERSEY 07701
(732) 212-9930
Fax: (732) 212-9980
Attorney for Plaintiffs, Jenkinson's Pavilion,
Frank Storino and Anthony Storino

---

| | |
|---|---|
| JENKINSON'S PAVILION; ANTHONY STORINO AND FRANK STORINO : | SUPERIOR COURT OF NEW JERSEY : LAW DIVISION |
| Plaintiffs, : | OCEAN COUNTY |
| : | |
| vs. : | Docket No. |
| : | |
| BOROUGH OF POINT PLEASANT BEACH; MAYOR AND COUNCIL OF THE BOROUGH OF POINT PLEASANT BEACH; POLICE DEPARTMENT OF THE BOROUGH OF POINT PLEASANT BEACH; PAUL M. KANITRA, Individually And In His Capacity As The Mayor Of The Defendant, Borough Of Point Pleasant Beach; CARYN BYRNES, Individually, And In Her Capacity As A Councilwoman; ARLENE TESTA, Individually And In Her Capacity As A Councilwoman; DOUGLAS VITALE, Individually And In His Capacity As A Councilman, and KEVIN B. RIORDAN, Individually And In His Capacity As The Borough Attorney For The Defendant, Borough Of Point Pleasant Beach. : : : : : : : : : : : : : : : : : : : : : : : | Civil Action

**CERTIFICATION OF R.S. GASIOROWSKI, ESQ. IN SUPPORT OF ORDER TO SHOW CAUSE** |
| Defendant. : | |

**R.S. GASIOROWSKI, ESQ.** hereby certifies as follows:

1.    I am an Attorney at Law of the State of New Jersey with the firm of Gasiorowski & Holobinko, attorneys for the Plaintiffs in the within captioned matter.  As such, I am fully familiar with the facts and circumstances of this matter.

2.    I attach thereto true and accurate copies of the documents which are contained in my file:

EXHIBIT 1    July 21, 2020     Borough Council Transcript of Proceeding

EXHIBIT 2    August 4, 2020    Borough Council Transcript of Proceeding

EXHIBIT 3    August 4, 2020    Correspondence from R.S. Gasiorowski, Esq. to Mayor and Council

I certify that the foregoing statements made by me are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

GASIOROWSKI & HOLOBINKO

BY: _____
R.S. GASIOROWSKI, ESQ.
Attorney for Plaintiffs,
Jenkinson's Pavilion, Anthony
Storino and Frank Storino

DATE: August 27, 2020

2

R.S. GASIOROWSKI, ESQ. – ID#244421968
GASIOROWSKI & HOLOBINKO
54 BROAD STREET
RED BANK, NEW JERSEY 07701
(732) 212-9930
Fax: (732) 212-9980
Attorney for Plaintiffs, Jenkinson's Pavilion,
Frank Storino and Anthony Storino

| | |
|---|---|
| JENKINSON'S PAVILION; ANTHONY STORINO AND FRANK STORINO<br><br>Plaintiffs,<br><br>    vs.<br><br>BOROUGH OF POINT PLEASANT BEACH; MAYOR AND COUNCIL OF THE BOROUGH OF POINT PLEASANT BEACH; POLICE DEPARTMENT OF THE BOROUGH OF POINT PLEASANT BEACH; PAUL M. KANITRA, Individually and in his capacity as the Mayor of The Defendant, Borough of Point Pleasant Beach; CARYN BYRNES, Individually, and in her capacity as a Councilwoman; ARLENE TESTA, Individually and in her capacity as a Councilwoman; DOUGLAS VITALE, Individually and in his Capacity as a Councilman, and KEVIN B. RIORDAN, Individually and in his capacity as the Borough Attorney for the Defendant, Borough of Point Pleasant Beach.<br><br>Defendant. | : SUPERIOR COURT OF NEW JERSEY<br>: LAW DIVISION<br>: OCEAN COUNTY<br>:<br>: Docket No.<br>:<br>:    <u>Civil Action</u><br>:<br>:<br>:    **MEMORANDUM OF LAW** |

## INTRODUCTION:

At issue here is the legal authority of the Borough of Point Pleasant Beach to enact, and the overall validity and legality of certain portions of, newly enacted "*ORDINANCE 2020-12, An Ordinance of the Borough of Point Pleasant Beach Amending Chapter XXI, Beaches of the Revised General Ordinances of the Borough of Point Pleasant Beach*" which was adopted into law by the Mayor and Council (there was a 3/3 vote split on the Council. The Mayor cast the deciding "Yes" vote) on August 4, 2020.

The Borough of Point Pleasant Beach operates under the partisan Borough form of Government as permitted by New Jersey Statutes.  The elected governing body is Mayor Paul M. Kanitra and Council Members Tom Migut, Bob Santanello, Andy Cortes, Arlene Testa, Douglas Vitale and Caryn Byrnes.  This new local Ordinance in many ways vastly revised and changed the long prior existing Chapter XXI and, as will be discussed in more detail further herein, in many ways has done so illegally and impermissibly which will result most assuredly result a Superior Court of the State of New Jersey ultimately invalidating and striking the challenged provisions as illegal, ultra vires, preexempted and unconstitutional as explained more fully as follows.

Plaintiffs bring this challenge forward both as a traditional Declaratory Judgment and Damages action and equally as an Action in Lieu of Prerogative Writs. Plaintiffs have brought this Order to Show Cause simultaneous to the filing of this action seeking on the return date Preliminary Injunctive Relief under *R.* 4:52-2 and / or alternatively or cumulatively a "Stay" under *R.* 4:69-3 to maintain the status *quo* between the parties as it was before the August 4, 2020 adoption and enactment of challenged Ordinance 2020-12.

### STATEMENT OF FACTS:

The Borough of Point Pleasant Beach is a local municipality located in Ocean County New Jersey along the Atlantic Ocean situated to the East, South of the Manasquan River and North and East of Beaverdam Creek where it meets the Metedeconk River. The Atlantic Ocean, with a sandy beach area runs along the entire Eastern boundary. The beach has a definable and ascertainable historic "mean high water line". All of that dry sand area East of the "mean high water line" is subject to the common law "Public Trust Doctrine". Under the "Public Trust Doctrine" the public's ownership and rights to access and use all tidal waterways and their shores are held by the State of New Jersey in trust for the benefit of all people. The common law doctrine further provides that the public has the right to fully utilize

these lands and waters for a variety of public activities. Effective May 3, 2019, the "Public Trust Doctrine" has now been codified by the New Jersey State Legislature into positive statutory law. *See Public Law* 2019, *Chapter* 81. In such new law the State Legislature has specifically and unambiguously made clear that they have designated the New Jersey Department of Environmental Protection ("NJDEP") as the State entity with "...*the authority and the duty to protect the public's right of access to tidally flowed waters and their adjacent shorelines under the public trust doctrine and statutory law.*" *See Public Law* 2019, *Chapter* 81, section 1, paragraph d. *See* more detailed discussion, *infra.*[1]

Located directly west of the sandy beach is a large boardwalk area with structures housing many seasonal businesses such as arcade games, food vendors, rides, retail stores, bars, and Ocean County's largest tourist attraction - the regionally well known Jenkinson's Aquarium. Traditionally during the summer months the entirety of Point Pleasant Beach along the boardwalk is crowded with thousands of out of town tourists, who come to

---

[1] Because the "Public Trust Doctrine" was previously defined by case law rather than statute, New Jersey courts have decided how far the doctrine extends and, more importantly, who can enforce it. A 2015 Appellate Division decision invalidated the New Jersey Department of Environmental Protection's (NJDEP) Public Access Rule claiming that the State Legislature had not unequivocally designated jurisdiction in that agency to enforce the common law "Public Trust Doctrine". Specifically, in *Hackensack Riverkeeper, NY/NJ Baykeeper v. NJ DEP*, 443 *N.J Super* 293 (App. Div. 2015), the Appellate Division concluded that the NJDEP did not have the authority to adopt and enforce such rules and regulations implementing and enforcing the "Public Trust Doctrine". The Court stated there and then: "Case law that has developed regarding the public trust doctrine, including those which have expanded its reach to privately owned property, do not support NJDEP's contention that the legislature *implicitly delegated regulatory powers to the agency.*" (Emphasis added). In enacting *Public Law 2019, Chapter 81*, the State Legislature codified the "Public Trust Doctrine" into positive statutory law and EXPLICITLY DELEGATED all regulatory and enforcement powers to the DEP, essentially "carnifying and legislatively over-riding" and directly responding to the Appellate Division's decision in *Hackensack Riverkeeper, supra.*

enjoy the Ocean, beach, boardwalk, food, drink, games and attractions during the day with a continuing thriving social scene with dinner crowds in the early evening and entertainment later into the night at the Jenkinson's Pavilion Bar and Restaurant complex. Most of the beachfront area - specifically including most of the sandy beach area, most of the boardwalk area, most of the structures and buildings on the boardwalk and adjacent parking lots - are private property owned by related companies and businesses that make up and are referred to collectively here simply as "Jenkinsons", as all together are commonly known. Essentially today all of the beach and beachfront area is private property owned by Plaintiff Jenkinson's except for the small portion that is still owned by the Borough of Point Pleasant Beach operated as a Municipal Beach (South of Jenkinson's) identified and delineated in their own Ordinances as follows:

> §21-1A.2    Municipal Beach Delineated.
> The area lying to the east of the street ends known as Maryland Avenue and Delaware Avenue and being commonly designated as the "Plaza" area and having an approximate depth of 110 feet by an ocean frontage of 450 feet.

[*See* Borough of Point Pleasant Beach Ordinance, old §21-1A.2, and new §21-5.2].

The New Jersey State Legislature has conferred general authority to municipalities such as Defendant Borough of Point

-4-

Pleasant Beach to enact local ordinances **_to regulate their own_** Municipal Beaches. *See N.J.S.A.* 40:61-22.20 and detailed discussion, *infra.* The State Legislature has not conferred any specific or implied authority on local Municipalities to in any way govern or regulate private beach property. Jenkinson's beach of "private", not "public" property.

Prior to the 2020 Summer Season, the "Old Ordinance" governing the Public Beaches was found in Borough of Point Pleasant Beach Ordinance §21-1.1 through -1.3 and §21-1A.1 through -1A.8. Significantly, §21-1A.8 listed in paragraphs (a) through (n) a variety things which were designated as "Prohibited Acts", with the section stating that: "No Person shall do any of the following things **_at or upon the municipal beach._** Again, Plaintiff's beach is "private property", not "public property." (Emphasis added). Contained within that section was paragraph (e), (l) & (m) which each previously read as follows:

> §21-1A.8   Prohibited Acts.
>      No person shall do any of the following things at or upon the **_municipal beach_**:
> ***
> 3. Make any loud noise, sound or music to the annoyance of any other person, or use loud, profane or indecent language.
> ***
> e.  Take any intoxicating liquor upon the beach, or any glass containers or bottles.
> ***

l.   Bring any of the following onto the Beach:

1.   Coolers larger than 24 inches in width, or height and/or has a capacity greater than 36 quarts.

2.   Serving trays, warming trays, pots, pans, devices, equipment or utensils utilized for the preparation or storage of food.

3.   Canopy style son shades bigger than 10' x 10' and any size canopy style sunshade with sidewalls including tents and tent clusters.

4.   Devices designed or used to shade infants and small children, also known as "baby tents," larger than 36 inches high by 36 inches wide by 36 inches deep.

5.   Umbrellas with a collapsible circular shade greater than eight feet diameter or radiating from a center pole greater than 7 feet 6 inches in height, or with grounding lines, ropes, or sides.

6.   Umbrellas, baby tents and canopies anchoring lines, tethers, or the like that extended beyond the perimeter of the umbrella, the baby tent or canopy.

7.   Tables or stands or boards or other devices positioned to function as a table.

m.   Cook on the Beach.

***

[*See* §21-1A.8(e), (l) & (m)].

**A. The Relevant Substantive Changes in the Challenged Ordinance:**

The new Ordinance dramatically changes the existing "status quo" and with little or no advance notice it dramatically expands the scope of the prior Beach Ordinance from **_regulating only the municipal beach_**, to now purportedly regulating _all beaches_, specifically including **_now for the first time ever regulating Plaintiff Jenkinson's private property beach_**. The challenged Ordinance accomplishes this simply by amending the new "Prohibited Acts" section of the existing Ordinance's definition of "beach" to now read in particular relevant part:

> §21-1.4    Prohibited Acts.
>              No  person  shall  do  any  of  the following things at or upon **_the Boardwalk and/or beaches or the ocean waters located in the Borough._**
> ***
> 3. Make any loud noise, sound or music to the annoyance of any other person, or use loud, profane or indecent language.
> ***
> 5.  Take any intoxicating liquor upon the beach, or any glass containers or bottles.
> ***
> 2.[2] Bring any of the following onto **_a_**
> 3. Beach:
> 4. Coolers larger than 13 inches in width, or length, or height and/or has a capacity greater than nine (9) quarts.

[_See_ §21-1.4].

---

[2]This is the literal paragraph numbering in the official published version of the Ordinance available which appears to be in error.

In what is quite clearly an illegal exercise of power (*see infra.*) the Defendant Borough has now suddenly changed the definition of "beach" to include ALL beaches, including private property beaches with no legal authority to do so. It has illegally extended municipal regulatory jurisdiction now over all private property beaches. With no legal authority it declared that it is illegal for adults over the age of 21 years to bring, possess and consume alcohol onto Jenkinson's private property beach and illegal to make any noise or play any music on Jenkinson's private property beach. *See* §21-1.4(3) & (5). This is clearly something that is beyond the Borough's lawful authority to regulate and prohibit. (*see infra.*) The Borough has no authority to regulate Jenkinson's private property beach, yet they seek to do so. They have done things so petty in their illegal micro managing of Jenkinson's private property as to arbitrarily mandate the reduction of the size of ice coolers on "beaches" (formerly just *municipal* beaches) from a maximum of 24 inches in width and height and maximum of 36 quarts (9 gallon cooler), *see* §21-1A.8(1)(1), to now a maximum of 13 inches in width, height and length and a maximum of 9 quarts (2.25 gallon cooler). *See* §21-1.4(2)(3). The Court should consider the impact this has on families of moderate means, who can not afford the expensive food for sale on the boardwalk, to bring their own food

and drink onto the beach. Moreover, regarding the alcohol issue and reduced size of coolers, the Borough has enacted an entirely new section §21-1.2B which (illegally) places a new affirmative legal obligation on Jenkinson's to hire only persons 18 years or older who are also now purportedly affirmatively required to actually "physically search" all patrons and their possessions as they enter the private beach to ostensibly search for alcoholic beverages (which are perfectly legal on this private property beach) and for other "contraband", all without a search warrant. Lastly, the new Ordinance purports to confer "policing" authority on local municipal police to "police" the private property beach, taking for themselves the right to have police officers not merely come when called, but to enter at will onto this private property beach and to walk amongst and "police" the beach patrons down on the sand on this ***private beach***, again doing so with no authority to confer such authority on themselves or their municipal police department. *See* §21-1.5.

### B. Procedural History of the Passage of the Challenged Ordinance:

As a matter of procedure, the proposed Ordinance was initially and quickly proposed and formally introduced and subject to the required "First Reading" on July 21, 2020. During the public portion of that July 21, 2020 meeting, resident David Cavagnaro commented as follows on the proposed Ordinance:

-9-

\*\*\*
MR. CAVAGNARO: Good evening.  Dave Cavagnaro, 118 Parkway.  I'll start with the Beach Ordinance since that was just mentioned.  I appreciate your concerns and your dedication or what you're trying to do. ***My sticking point is that for the sake of public safety you are again tampering with people's private property rights.***  And this owner just indicated what my big concern would be. Before an ordinance like this comes to the table, why wasn't there a sit-down meeting with all the beach owners first to see what their input would be before the ordinance even comes to the table?  It shouldn't be introduced first and then let's sit down and talk to the people with their problems or issues.  (Emphasis added).

[See July 21, 2020 Transcript of Meeting at Page 129, Line 15 through Page 130, Line 4].

Though the Ordinance was admittedly written by Defendant Mayor Kanitra and Defendant Borough Attorney Riordan, the Ordinance was proposed as amended by Councilman Vitale and Seconded by Councilwoman Testa.  The Borough Clerk called and recorded the vote on the first reading on July 21, 2020 as follows:

\*\*\*
MS. FARRELL: Okay.  So I have a motion by Councilman Viale, second by Councilwoman Testa?
COUNCILWOMAN TESTA: Yes.
MS. FARRELL: Okay.  Councilman Vitale.
COUNCILMAN VITALE: Yes.
MS. FARRELL: Councilwoman Testa.
COUNCILWOMAN TESTA: Yes.

**-10-**

MS. FARRELL: Councilwoman Byrnes.

COUNCILWOMAN BYRNES:   Yes.

MS. FARRELL:   Councilman Cortes.

COUNCILWOMAN CORTES: I am for a lot of the stuff on this ordinance.  I mean, we have to control it.  I do have a problem, though, with regulating by. You know, private owners on when they can operate and who they can hire.

Other than that I love it.  But I'm going to vote no because it's my heart.

MS. FARRELL: Council Santanello.

COUNCILMAN SANTANELLO: No.

MS. FARRELL: Councilman Migut.

COUNCIL PRESIDENT MIGUT: No.

**\*[NOTE:   with a 3 /3 tie vote Ordinance does not proceed, but the Mayor, if eligible to vote, may cast a vote to split the tie]**

MAYOR KANITRA:  My turn?

MS. FARRELL:   Yes.

MAYOR KANITRA:  I vote yes.

MS. FARRELL: and this is just to amend the ordinance and to pass it as amend - - approve it as amended?  Is that correct?

MAYOR KANITRA: Correct.

MS.  FARRELL: Okay.   The public hearing on this ordinance will be August 4th.


[See July 21, 2020 Transcript of Meeting at Page 149, Line 19 through Page 150, Line 24]. [3]

With a recorded Council vote of a tie of 3/3, Defendant Mayor Kanitra voted in favor of the Ordinance breaking the tie. The Ordinance then proceeded on to a second reading and final

---

[3] The following documents are attached to the Certification of R.S. Gasiorowski, Esq: Exhibit 1-July 21, 2020 Borough Council Transcript of Proceedings; Exhibit 2-August 4, 2020 Borough County Transcript of Proceedings; Exhibit 3 August 4, 2020 correspondence from R.S. Gasiorowski, Esq. to Mayor and Council.

vote scheduled for August 4, 2020. Between the date of July 21,

2020 and August 4, 2020 Defendant Kanitra and Defendant

Riordan conspired to improperly lobby and pressure dissenting

members of the Council (Council members Cortes, Santanello and

Migut) to change their "No" votes. Such action – essentially

lobbying – is not unethical on the part of a Mayor, but is most

certainly absolutely unethical on the part of a Borough Attorney

whose professional allegiance is to (or is *supposed* to be to) the

entire governing body. The issue of the propriety of Defendant

Riordan's conduct was specifically raised on August 4, 2020 by

Councilperson Robert Santanello with the colloquy and a vote on

disqualification of Mr. Riordan from representing the Defendant

Borough any longer on this issue on the record being as follows:

> **COUNCILMAN SANTANELLO:** ... *** ... What I'm
> going to tell you, now, should chill you to
> the bone. I already stated repeatedly that
> Riordan is a walking, breathing, conflict of
> interest to residents as the borough
> Attorney. He's the head of the Republican
> Party in town and the Committee Chair of the
> (indiscernible).
> Over the last week, he has called Councilman
> Migut and Cortes to try to twist their arms
> to get them to change their votes. And he
> tried it again today with Councilman Cortes.
> So how could a Borough Attorney actively
> advocate for an ordinance that he is going to
> build an obscene amount of money from and
> through inevitable litigation? That goes
> beyond politics. It goes beyond logic. It
> goes be on ethics and, in my opinion, is

outright corruption. He's here to give us
legal advice, not to (indiscernible)
ordinance for his own enrichment. Even worse,
he told Councilman Cortes that once he was
done convincing him that he should change his
mind, and that Andy should then call me and
pretend that on his own he wanted to asked me
to change my vote as well. He's encouraging a
sitting Councilman to live to another sitting
Councilman. That's just despicable. And I'm
horrified that he is entrusted with such an
important position.

Now, due to this unethical behavior, by
making a motion now that neither Riordan nor
his firm makes dime 14 litigation tied to
this ordinance. My motion is that one of the
other several dozen firms who sign contracts
this year should handle this litigation. It's
imperative that we have representation that
is unbiased, that doesn't have a vested
financial interest in the ordinance. Please
send a message that behavior your like that
is simply unacceptable. Even if you agree
with the ordinance, you have to recognize the
entire reason and motivations behind it are
suspect as well.

So I have a motion on the floor. Does anybody
want to second it?

COUNCILMAN CORTES:  I'll second that.

MS. FARRELL:  Please repeat what your motion
is for me.

COUNCILMAN SANTANELLO:  My motion is that the
Riordan Law Firm are no longer involved in
any litigation that is involved in this
ordinance.

MS. FARRELL:  And your speaking of the Beach
Ordinance, correct, Ordinance 2020 - 12?

MAYOR KANITRA: and we just make a motion as a
governing body to  dis - you know, to exclude
the Borough Attorney who wrote the ordinance?

COUNCILMAN CORTES: Well, on Reorg. Day I
questioned why we had so many attorneys still

**-13-**

listed on the RFP, and to quote you, Mayor, I believe not verbatim but you said, so we have a big pool of attorneys to choose from if we need to. So we must have enough attorneys that can litigate any - - any issues that might come from this ordinance should it pass tonight.

MR. RIORDAN:    Folks, this is real simple. There are no conflicts despite what Mr. Santanello may say.    Certainly, this is an issue that could be discussed. But I have to object to the idea that I be disqualified based on what - - based on what Councilman Santanello said.    And I would also suggest a review should be on who's best able to defend this ordinance, and I would suggest to you that that's my firm.

COUNCILMAN SANTANELLO:    Object - - objection noted, but there's a motion on the floor, and Andy seconded it.

COUNCILMAN CORTES:    I made the second.

MS. FARRELL: Councilman Vitale.

MAYOR KANITRA:  Councilman Vitale, are you there?

COUNCILMAN VITALE:    Sorry.  No.

MS. FARRELL: Councilman Testa.

COUNCILMAN TESTA: No.

MS.  FARRELL:    Councilwoman Byrnes.

COUNCILWOMAN BYRNES:    That's a no.

MS. FARRELL:    Councilman Cortes.

COUNCILMAN CORTES: Yes.

MS. FARRELL:    Councilman Santanello.

COUNCILMAN SANTANELLO:    Yes.

MS. FARRELL:    Councilman Migut.

COUNCILMAN MIGUT:  Yes.

**\*[NOTE:    with a 3 /3 tie vote Ordinance does not proceed, but the Mayor, if eligible to vote, may cast a vote to split the tie]** MS. FARRELL: Mayor Kanitra.

MAYOR KANITRA:    I see absolutely no reason why the person who drafted the ordinance (indiscernible) vote on it and why the

**-14-**

Borough Attorney who's been friends with
Councilman Cortes isn't allowed to talk with
him. So I say no. I think it's ridiculous.
COUNCILMAN SANTANELLO:     Okay.   Well, it
failed.  But I have to say for members of the
governing body are in favor of an encouraging
and    approving    of    a    Borough    Attorney
encouraging  another  Councilman  to  lie  to
another one.  But I'm done, Mayor.    Please
feel free to spin away.
MAYOR    KANITRA:    Actually,    Councilman
Santanello,  normally  I  go  through  a  whole
list  of  all  the  reasons  why  your  – –  your
ramblings  were  insane,  but  I'll – I'll  just
take  a  pass  because  I  don't  even  want  to
(indiscernible). ***

[See August 4, 2020 in Transcript of Meeting at Page 44, Line 10
through Page 48, Line 14].

Later at the end of the public comment section at the August
4, 2020 meeting, a resident argued that in light of the mere
allegations - *which incredibly were never actually denied at any
time by Mr. Riordan* - that the matter should be tabled and
further investigated, with the colloquy as follows:

***
MR.  MOREAU:      May  I  speak  regarding  the
ordinance?
MAYOR KANITRA:      Who  is  that?___My – – my
screen froze a little bit.  Who's that?
MR. MOREAU:    this is Rob Moreau, 208 River
Avenue.
MAYOR KANITRA:    Sure, Dr. Moreau. Go ahead.
MR. MOREAU: I – I – I just think that this
ordinance is incredibly broad,
 and  one  of  the  statements  says  if  anybody
right  next  to  you  is  bothering  you,  that's

**-15-**

not acceptable. And, of course, this is going
to initiate court proceedings.
***
   It honestly is - - the fact that it is so
broad that a person could say you were
bothering me and it would have to, under this
ordinance, it would have to be enforced by
the police.
***
MR. RIORDAN:     Doctor, that's not what the
ordinance says.  I don't practice veterinary
medicine.  You shouldn't tell me what the
ordinance says.
MR.  MOREAU: I can - - I can read English,
Kevin.  And it says that if you're bothering
somebody,  you  can  - -  and  you've  also
memorialized  that  the  police  will  be
enforcing this
- - you can ask the police to come over and
stop somebody from bothering you.  ***
Anyway, let me just say one other thing, and
then I'll move on.
   **If Mr. Riordan is advocating, as Mr.
Santanello says, for passage and is being
behind the scenes - - being an advocate for
this ordinance and that was true, that
requires you guys to table this ordinance.
This cannot be because obviously there is
going to be litigation.  This is completely a
conflict of interest. And - - and especially
if you guys are voting four to three over
that. You need a further legal opinion from
people outside** - - MAYOR KANITRA:  Thank you.
MR.  MOREAU:  - - **Kevin's office**. (Emphasis
added).

[*See* August 4, 2020 in Transcript of Meeting at Page 88, Line 17
through Page 89, Line 5, at Page 90 Line 9 through Line 12, at
Page 90, Line 21 through Page 91, Line 5 and Page 91, Line 19
through Page 92, Line 7].

Ignoring the factual and legal reality that they were now improperly regulating privately owned beach property, and proceeding in the face of alleged improper and unethical "behind the scenes" lobbying conduct by Defendant Riordan - *which conduct was never denied* - that both an elected official

(Councilman Santanello) and a member of the community (Robert Moreau) claimed was on its face a clear conflict of interest (which means that therefore at very least was questionable attorney behavior that rises to the level to a disqualifying **_appearance of impropriety_**) the Defendants continued with a second and final vote which was recorded on the record on August 4, 2020 as follows:

> ***
> MAYOR KANITRA:   Okay.   Hearing no one, is there a motion to close and adopt?
> COUNCILWOMAN TESTA:   A motion to close and adopt.
> COUNCILMAN VITALE: I'll second that.
> MS. FARRELL: Councilwoman Testa.
> COUNCILWOMAN TESTA:   Yes.
> MS. FARRELL: Councilwoman Byrnes.
> COUNCILWOMAN BYRNES:   Yes.
> MS. FARRELL:   Councilman Cortes.
> COUNCILMAN CORTES: before I vote I'm going to say  I'm not in favor of bad things happening on the boardwalk and on the beach.   I love the town contrary to the mayor and his little rant before.   and I take really offense to that saying that I don't do anything.   My - - I'm not going to go on, but my track record

over the past eight years and all my elections and reelections speak volumes.

I cannot vote yes for this. I'm voting no because of the way it's written. I've made that clear. We are governing private property's hours of operation and who they can hire. In other towns, like our attorney alluded to, own their beaches in the entirety. We do not.

So I vote no.

MS. FARRELL: Councilman Santanello.

COUNCILMAN SANTANELLO: No.

COUNCIL PRESIDENT MIGUT: I just want to say I believe there are numerous constitutional and statutory flaws with this ordinance. it takes rules for public property and imposes them on private property. I have a problem with that. it's the same reason I voted against the tree ordinance. Its government overreach.

Also, I've had a number of discussions with the residents in favor of the ordinance believing it can discourage people of different ethnicities from visiting the town. The intent to change the type of people who visit the town in terms of ethnicity (indiscernible ) status is not a proper function of government. No.

MAYOR KANITRA: That sounds like it was drafted by somebody.

MS. FARRELL: Mayor Kanitra.

MAYOR KANITRA: Today the governing body received a letter from one beach operator's attorney timed to conveniently hit just a few hours before this vote. As it was email to the entire governing body, it's now considered public record, and I'm asking the borough clerk to attach it to the minutes for this meeting.

The first part of this letter is where they threatened to sue us if we don't back down and do exactly as they say, yada, yada,

**-18-**

yada. The second part goes on to say just another beach party was really no big deal and there's no bad or slovenly behavior on the beaches. Our Borough Attorney has read this letter and explains just how baseless it is. But it still is an entertaining read, and I encourage everyone to review it when they get a chance.

That all said, I'm going to vote yes because I'm not going to sell out my hometown.

MS. FARRELL:   Okay. So this ordinance is passed.

[*See* August 4, 2020 in Transcript of Meeting at Page 92, Line 13 through Page 95, Line 6].

The filing of this action and application for preliminary injunctive relief followed.

**I.   PLAINTIFFS ARE ENTITLED TO THE PRELIMINARY INJUNCTION AS REQUESTED:**

**A.   Applications for Preliminary Injunctive Relief or a "Stay" to Maintain the Status *Quo* Generally:** *R.* 4:52-1 says in relevant part as follows:

(a)   Order to Show Cause with Temporary Restraints. On the filing of a complaint seeking injunctive relief, the plaintiff may apply for an order requiring the defendant to show cause why an interlocutory injunction should not be granted pending the disposition of the action. *** ...

***

(b)   Order to Show Cause as Process; Service. If the order to show cause issues upon the filing of the complaint, no summons shall issue in

**-19-**

the action if the order contains the
name and address of plaintiff's
attorney *** ...

*** 

(c)   Hearing; Briefs. Oral testimony may be
taken in the court's discretion on the
return date of the order to show cause
and on the return date of defendant's
motion to dissolve or modify the
temporary restraint. Briefs shall be
submitted in support of the application
for an interlocutory injunction.

[R. 4:52-1(a)(b) &(c)].

R. 4:52-2 provides as follows:

During the pendency of an action, either a
temporary restraint or an interlocutory
injunction may be applied for either by
motion or by order to show cause. The order
to show cause shall be applied for and
proceeded with in accordance with the
provisions of R. 4:52-1, insofar as
applicable.

[R. 4:52-2].

**-15-**

Lastly, R. 4:69-3 provides as follows:

Upon or after the filing of the complaint,
the plaintiff may, by order to show cause or
motion supported by affidavit, and with
briefs, apply for ad interim relief by way
of stay, restraint or otherwise as the
interest of justice requires, which may be
granted by the court with or without terms.
When necessary, temporary relief may be

> granted without notice in accordance with *R.*
> 4:52-1.

[*R.* 4:52-1].

Plaintiffs now seek Preliminary Injunctive Relief under *R.*
4:52-2 and / or alternatively or cumulatively a "Stay" under *R.*
4:69-3 to maintain the status *quo* between the parties as it was
before the August 4, 2020 adoption and enactment of challenged
Ordinance 2020-12 during the pendency of this action or until
further Order of the Court.

**B. Standards for Issuing a Preliminary Injunction:**

Plaintiff now moves for an Order granting an
interlocutory injunction to maintain the status quo pending
the disposition of his claims in this prerogative writ action.

A party seeking a provisional interlocutory injunction
("preliminary injunction") has the burden to demonstrate that:
**(1)** the legal right underlying the claim is well settled, **(2)**
there is a reasonable likelihood of ultimately prevailing on the
merits; **(3)** there is a likelihood that immediate and irreparable
injury will occur if relief is not granted; and **(4)** on balance,
that the benefits of the relief granted would outweigh any harm
such relief will cause other interested parties.

*Crowe v. De Gioia,* 90 *N.J.* 126, 132-134 (1982).

**-21-**

While the Court must weigh all "4 factors", specifically when assessing "factor 4" it is incumbent on the Court to be specifically aware and mindful of the important role the public interest plays when implicated. In this regard, it is wholly proper that "… courts, in the exercise of their equitable powers, 'may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' " *Waste Management Company of New Jersey v. Union County Utilities Authority,* 399 *N.J.Super.* 508, 520-521 (App. Div. 2008) *(quoting Virginian Railway Co. v. Railway Employees,* 300 *U.S.* 515, 552 (1937)). It is for this reason that in another separate lawsuit by Waste Management, *Waste Management of New Jersey v. Morris County Municipal Utilities Authority,* 433 *N.J.Super.* 445 (App. Div. 2013), the Appellate Division made it further clear that Courts when the public interest is implicated by the litigation that the Court shall retain the "… authority to impose interlocutory restraints regardless of doubts about the movant's likelihood of success." *Id.* Thus, even in the case where the Court finds that the movant has failed to establish a likelihood of success early on and before discovery occurs, *Waste Management* quite clearly dictates that a movant may still be entitled to temporary interlocutory relief

simply to maintain the status quo, if such be in the public's

interest, as the Court in *Waste Management* specifically held

that:

> "… a court may take a less rigid view of the
> *Crowe* factors and the general rule that all
> factors favor injunctive relief when the
> interlocutory injunction is merely designed
> to preserve the status quo."

[*Id.*]

The Court in *Waste Management* continued:

> "[t]his less rigid approach, for example,
> permits injunctive relief preserving the
> status quo even if the claim appears
> doubtful when a balancing of the relative
> hardships substantially favors the movant,
> or the irreparable injury to be suffered by
> the movant in the absence of the injunction
> would be imminent and grave, or the subject
> matter of the suit would be impaired or
> destroyed.

[*Id.*]

**LEGAL ARGUMENT:**

### POINT I:

**THE LEGAL RIGHTS OF THE PARTIES ARE
CLEARLY ESTABLISHED AND PLAINTIFF CAN
SHOW A PROBABILITY OF SUCCESS ON THE MERITS
AND A RIGHT TO MAINTAIN THE STATUS *QUO*:**

As to the first two prongs Plaintiffs submit that the legal

rights of the parties are clearly established (*See infra.*) and

that Plaintiff can demonstrate a reasonable probability of

success on the merits (*See infra.*) and certainly can show a right to

"Stay" to maintain the status quo of the parties before August 4, 2020.

1. **The Disqualifying Conflict and Disqualifying Appearance of Impropriety Requires Disqualification of Municipal Attorney Defendant Riordan and as a Matter of Law Renders the Entirety of the Challenged Ordinance Void.**

   A. **Disqualification of Attorney Riordan:**

   Firstly, as a preliminary matter, Plaintiffs hereby move for an Order disqualifying Borough of Point Pleasant Municipal Attorney Kevin B. Riordan, Esq. and all members of his law firm from representing any of the Public Elected Officials and Public Entity Defendant Borough of Point Pleasant Borough in this case due to an actual disqualifying conflict of interest and /or alternatively or cumulatively for a disqualifying appearance of impropriety, neither which may be waived by the Defendants.

   Whether Borough of Point Pleasant City Attorney Kevin B. Riordan, Esq. and his law firm should be allowed to represent any of the Defendants in this case (except of course himself) is a threshold issue that, now specifically raised, must be decided first by this Court before this Court continues on and decide the other requests for relief in the Order to Show Cause. Plaintiffs are not the first to raise the issue. The issue was specifically raised on August 4, 2020 by Councilperson Robert Santanello with

-24-

the colloquy and vote on disqualification of Mr. Riordan being so

significant it is repeated here again a second time, as follows:

> **COUNCILMAN SANTANELLO:** ... *** ... What I'm
> going to tell you, now, should chill you to
> the bone. I already stated repeatedly that
> Riordan is a walking, breathing, conflict of
> interest to residents as the borough
> Attorney. He's the head of the Republican
> Party in town and the Committee Chair of the
> (indiscernible).
>
> Over the last week, he has called
> Councilman Migut and Cortes to try to twist
> their arms to get them to change their
> votes. And he tried it again today with
> Councilman Cortes. So how could a Borough
> Attorney actively advocate for an ordinance
> that he is going to build an obscene amount
> of money from and through inevitable
> litigation? That goes beyond politics. It
> goes beyond logic. It goes be on ethics and,
> in my opinion, is outright corruption. He's
> here to give us legal advice, not to
> (indiscernible) ordinance for his own
> enrichment.
>
> Even worse, he told Councilman Cortes
> that once he was done convincing him that he
> should change his mind, and that Andy should
> then call me and pretend that on his own he
> wanted to asked me to change my vote as
> well. He's encouraging a sitting Councilman
> to lie to another sitting Councilman. That's
> just despicable. And I'm horrified that he
> is entrusted with such an important
> position.
>
> Now, due to this unethical behavior, by
> making a motion now that neither Riordan nor
> his firm makes dime 14 litigation tied to
> this ordinance. My motion is that one of the
> other several dozen firms who sign contracts
> this year should handle this litigation.

It's imperative that we have representation
that is unbiased, that doesn't have a vested
financial interest in the ordinance. Please
send a message that behavior your like that
is simply unacceptable. Even if you agree
with the ordinance, you have to recognize
the entire reason and motivations behind it
are suspect as well.

     So I have a motion on the floor. Does
anybody want to second it?

     COUNCILMAN CORTES:  I'll second that.

     MS. FARRELL:  Please repeat what your
motion is for me.

     COUNCILMAN SANTANELLO:   My motion is
that the Riordan Law
Firm are no longer involved in any
litigation that is involved in this
ordinance.

     MS. FARRELL:  And your speaking of the
Beach Ordinance, correct, Ordinance 2020 –
12?

     MAYOR KANITRA:  and we just make a
motion as a governing body to  dis – – you
know, to exclude the Borough Attorney who
wrote the ordinance?

     COUNCILMAN CORTES: Well, on Reorg. Day
I questioned why we
had so many attorneys still listed on the
RFP, and to quote you, Mayor, I believe not
verbatim but you said, so we have a big pool
of attorneys to choose from if we need to.
So we must have enough attorneys that can
litigate any – – any issues that might come
from this ordinance should it pass tonight.

     MR. RIORDAN:   Folks, this is real
simple. There are no conflicts despite what
Mr. Santanello may say. Certainly, this is
an issue that could be discussed. But I have
to object to the idea that I be disqualified
based on what – based on what Councilman
Santanello said. And I would also suggest a
review should be on who's best able to

defend this ordinance, and I would suggest to you that that's my firm.

COUNCILMAN SANTANELLO:     Object - - objection noted, but there's a motion on the floor, and Andy seconded it.

COUNCILMAN CORTES:   I made the second.

MS. FARRELL: Councilman Vitale.

MAYOR KANITRA: Councilman Vitale, are you there? COUNCILMAN VITALE: Sorry. No.

MS. FARRELL: Councilman Testa.

COUNCILMAN TESTA: No.

MS. FARRELL:   Councilwoman Byrnes.

COUNCILWOMAN BYRNES:   That's a no.

MS. FARRELL:   Councilman Cortes.

COUNCILMAN CORTES: Yes.

MS. FARRELL:   Councilman Santanello.

COUNCILMAN SANTANELLO:   Yes.

MS. FARRELL:   Councilman Migut.

COUNCILMAN MIGUT:  Yes.

**\*[NOTE:  with a 3/3 tie vote, the Mayor may cast a vote to split the tie]**

MS. FARRELL: Mayhor Kanitra.

MAYOR KANITRA:     I see absolutely no reason why the person who drafted the ordinance (indiscernible) vote on it and why the Borough Attorney who's been friends with Councilman Cortes isn't allowed to talk with him. So I say no. I think it's ridiculous.

COUNCILMAN SANTANELLO:   Okay.  Well, it failed.  But I have to say for members of the governing body are in favor of an encouraging and approving of a Borough Attorney encouraging another Councilman to lie to another one.

But I'm done, Mayor.  Please feel free to spin away.

MAYOR KANITRA:    Actually, Councilman Santanello, normally I go through a whole list of all the reasons why your - - your ramblings were insane, but I'll - - I'll

just take a pass because I don't even want to (indiscernible). ***

[August 4, 2020 in Transcript of Meeting at Page 44, Line 10 through Page 48, Line 14].

The fact is that Defendant Riordan owed an ethical duty to ALL members of the Governing Body – which was evenly split – and rather than give objective, good and fair legal advice, knowing that the Ordinance was invalid in many diverse ways, nevertheless secretly advocated and lobbied behind the scenes for the three dissenters to change their "No" votes to "Yes" votes, including suggesting and encouraging Council Members he approached to lie about his involvement and activity!  The political positions in the Republican Party he simultaneously holds and his actions in this matter make it clear that – at least as to the Challenged Ordinance in this case  – that Defendant Riordan's loyalty and fidelity was solely to the Mayor, and not to the entire Council who were his clients. Clearly in secretly advocating for a controversial and clearly illegal Ordinance Defendant Riordan's actions indicated that he was not performing his duties on behalf of the municipality but rather that he was engaging in such conduct for individual interests which were adverse to *at least* 3 of his clients on the Council.

*N.J.S.A.* 40A:9-139 provides as follows:

**-28-**

> In every municipality the governing body, by ordinance, shall provide for the appointment of a municipal attorney who may be designated as the corporation counsel or municipal attorney and unless otherwise provided by law the term of office of the municipal attorney shall be 1 year.

[*N.J.S.A.* 40A:9-139].

In *N.J. Advisory Committee on Professional Ethics Opinion 174*, 93 *N.J.L.J.* 132 (1970) the Committee stated the following bright line rule with regard to a Municipal Attorney:

> The attorney for the municipality represents the whole municipality. In so doing he also represents individual officials of the municipality in the performance of their official duties. Accordingly, the municipal attorney is performing one of the duties for which he is employed when he represents a municipal official on municipal matters. ***The occasion may arise, however, when the official's actions or testimony indicate that he is not performing his duties on behalf of the municipality or that his individual interests or actions run contrary to the interests of the municipality. In that event the attorney must withdraw from the representation of the official who should seek separate counsel.*** (Emphasis added).

[*See N.J. Advisory Committee on Professional Ethics Opinion 174*, 93 *N.J.L.J.* 132 (1970)].

Plaintiffs contends that the foregoing facts give rise to actual disqualifying conflicts of interest requiring disqualification of Mr. Riordan and his law firm as attorneys for the individual Defendants and the Defendant Borough in this

case (except himself) based upon the applicability of the following specific rules.

First, *R.P.C.* 1.7(a) provides in relevant part as follows:

> **(a)** Except as provided in paragraph (b), a lawyer shall not represent a client of the representation involves a concurrent conflict of interest. A concurrent conflict exists if:
>> **(1)** the representation of one client will be directly adverse to another client; or
>> **(2)** there is a significant risk that the representation of one or moreclients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer. * * *

**[*R.P.C.* 1.7(a)]**

Next, *R.P.C.* 1.8 provides in relevant part as follows:

> * * *
> (b) Except as permitted or required by these rules, a lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client after full disclosure and consultation, gives informed consent.
> * * *
> (i) While lawyers are associated in a firm, a prohibition in the foregoingparagraphs (a) through (i) that applies to any one of them shall apply to all of them.
> (j) A lawyer employed by a public entity, either as a lawyer or in some other role,shall not undertake representation of another client of the representation presents a substantial risk that the lawyer's responsibilities to the public entity would

limit the lawyer's ability to provide
independent advice or diligent and competent
representation to either the public entity or
the client.

(k)   A public entity cannot consent to a
representation otherwise prohibited by
thisrule.

[*R.P.C.* 1.8(b), (i), (j) & (k)].

Lastly, *R.P.C.* 3.7 provides as follows:

(a)   A lawyer shall not act as an advocate
at a trial in which the lawyer is likely tobe
a necessary witness unless:

(1) the testimony relates to an
uncontested issue;

(2) the testimony relates to the nature
and value of legal servicesrendered in
the case; or

(3) disqualification of the lawyer would
work substantial hardship onthe
client.

(b)   A lawyer may act as advocate in a trial
in which another lawyer in thelawyer's firm
is likely to be called as a witness unless
precluded from doing so by *R.P.C.* 1.7 or
*R.P.C.* 1.9.

**[*R.P.C.* 3.7 ].**

The Defendant Borough of Point Pleasant Beach, as a public

entity, and the Defendant public officials sued in their official

capacity, unlike a private person or private business entity, may

not consent to allow Mr. Riordan to continue representing their

legal interests in the face of the enumerated actual conflicts.

*See R.P.C.* 1.8(k) and *R.P.C.* 1.9(d). As such, as a threshold

matter, the Court must enter an Order and formally and

**-31-**

specifically disqualify Mr. Riordan and his law firm from representing any Defendant in this case.

Moreover, this improper conduct on the part of Mr. Riordan carried legal consequences as to the validity of the challenged Ordinance. Under any scenario, in light of the nature of the legal claims asserted, Mr. Riordan will most certainly be a fact witnesses during discovery and at trial and must be disqualified for this additional reason alone. *R.P.C.* 3.7.

The foregoing clearly rise to the level of a "disqualifying" conflicts of interest within the meaning of the law which requires an accompanying declaration that the challenged Ordinance is *per se VOID*. *See Wyzykoski v. Rizas,* 132 *N.J.* 509 (1993); *Lafayette v. Board of Freeholders of Sussex,* 208 *N.J.Super.* 468 (App. Div. 1986); *Griggs v. Princeton,* 33 *N.J.Super.* 207 (1960); *Van Itallie v. Borough of Franklin Lakes,* 28 *N.J.* 258 (1958).

## APPEARANCE OF IMPROPRIETY:

Alternatively or cumulatively to the actual conflicts, Plaintiff submits that Mr. Riordan and his law firm must be disqualified from representing the Defendants in this case due to what is clearly a disqualifying appearance of impropriety.

The State of New Jersey is one of the few states that retains the "appearance of impropriety rule" with regard to

-32-

attorney conflicts of interest, rejecting the less stringent approach to attorney disqualification advocated by the American Bar Association. *In re Petition for Review of Opinion No. 569*, 103 *N.J.* 325, 330 (1986). For example, in *State v. Needham,* 298 *N.J.Super.* 100 (Law. Div. 1996) the Superior Court disqualified an attorney from representing a criminal defendant where the attorney had previously represented the chief prosecution witness in a completely unrelated matter. The Court found that "… such representation would create the appearance of impropriety and that the defense attorney should be disqualified." *Id.* at 135-136. New Jersey Courts have uniformly and repeatedly held that when there is an appearance of impropriety in an attorney's representation of a client that the representation may not be permitted and must cease. *See Id. and Ibid; see also State v. Catantoso,* 222 *N.J.Super.* 661, 644 (Law Div. 1987); State v. Morelli, 152 *N.J.Super.* 67, 70 (App. Div. 1977); *In re Abrams,* 56 *N.J.* 271, 277 (1970). The question as to whether there is an appearance of impropriety is to be viewed and judged from the "viewpoint of the public". *Opinion 569, supra,* 103 *N.J.* at 331. Even in circumstances where there is the absence of an actual conflict of interest, "[a]pperances too are a matter of ethical concern, for the public has an interest in the repute of the legal profession." *In re Abrams, supra,* 56 *N.J.* at 277. It is

emphasized that the question as to whether there is an appearance of impropriety requiring disqualification is to be viewed and judged from the "viewpoint of the public". *Opinion 569, supra,* 103 *N.J.* at 331.   Certainly in the eyes of the public (Councilman Santanello and Resident Robert Moreau) the actions of Defendant Riordan, if not an actual literal violation of the Ethics Rules of Professional Conduct for Attorneys, creates at the very least a disqualifying "appearance of impropriety" requiring Defendant Riordan's disqualification from any further participation in representing others in this matter.   Lastly and in this regard, challenged Government action (in this case, passage of the challenged Ordinance) must be voided where the Court finds a **_disqualifying_** conflict of interest such as here.   *See Wyzykoski v. Rizas,* 132 *N.J.* 509 (1993); *Lafayette v. Board of Freeholders of Sussex,* 208 *N.J.Super.* 468 (App. Div. 1986); *Griggs v. Princeton,* 33 *N.J.Super.* 207 (1960); *Van Itallie v. Borough of Franklin Lakes,* 28 *N.J.* 258 (1958).   Additionally, Defendant Riordan specifically qualifies as a "local government officer" within the meaning of the *New Jersey Government Ethics Law,* *N.J.S.A.* 40A:9-22.1 to -22.5 ("*N.J.G.E.L.*).    *See New Jersey Attorney General Formal Opinion No.* 91-0092 (September 30, 1991) (finding that a Municipal Attorney is a "local government officer" within the meaning of the *N.J.G.E.L.*).   Defendant

-34-

Riordan is also qualifies as a "local government officer" within the general legal meaning of such term. *See Lafayette v. Board of Freeholders of Sussex,* 208 *N.J.Super.* 468 (App. Div. 1986). The propriety of the conduct of Defendant Riordan is required to be evaluated by this Court against the standards of the *New Jersey Rules of Professional Conduct for Attorneys (R.P.C.).* When a declaratory judgment action or a prerogative writ action has been brought to challenge official government action taken by any government official, if a claim of conflict of interest and / or appearance of impropriety is raised, a Court is required to review the totality of the actions of the local government officers – including the actions of the municipal attorney – and the propriety of his or her participation and actions of all such local government officers, all to ensure that the challenged proceedings and decision have been conducted in accordance with law and constitutional mandate and without any disqualifying conflict of interest and / or without a disqualifying appearance of impropriety. Once again, if the Court finds that the challenged proceedings and decision have in fact been conducted contrary to law and in the face of either a disqualifying conflict of interest and / or in the face of a disqualifying appearance of impropriety existed, the challenged decision ***shall be voided*** by the Court. *See Wyzykoski v. Rizas,* 132 *N.J.* 509

(1993); *Lafayette v. Board of Freeholders of Sussex*, 208 *N.J.Super.* 468 (App. Div. 1986); *Griggs v. Princeton,* 33 *N.J.Super.* 207 (1960); *Van Itallie v. Borough of Franklin Lakes,* 28 *N.J.* 258 (1958).

In addition to legal ethical considerations and the appearance of impropriety, there are blunt political considerations which must also be considered in this context. Defendant Riordan is by no small coincidence, in addition holding employment as the Borough Attorney, also the Republican Party Municipal Party Chairman[4] and (on information and belief) the President of the Point Pleasant Beach Republican Club. At present

---

[4] *N.J.S.A.* 19:5-2 (Membership and organization of municipal committees) provides in relevant part as follows:

> The members of the municipal committees of political parties shall consist of the elected members of the county committee resident in the respective municipalities. ... *** ... ***The members of each committee shall elect some suitable person who shall be a resident of such municipality as chairman.*** The municipal committee shall have power to adopt a constitution and bylaws for its proper government. ***The chairman shall preside at all meetings of the committee, and shall perform all duties required of him by law and the constitution and bylaws of such committee.***

(Emphasis added).

[*N.J.S.A.* 19:5-2].

there are 3 Democrats and 3 Republicans on the Council, and when there is a "tie", the Republican Mayor, Defendant Kanitra, can vote to break any tie.   When objections were made to the New Ordinance and litigation was expected, Defendant Riordan wrote a Legal Memo (to date, still confidential) for the governing body. In light of the actual law, it is hard to imagine an honest accurate competent legal opinion that would advise the Defendants to proceed in light of the many and diverse ways that the New Ordinance is *ultra vires*, invalid, unconstitutional and illegal. However, Defendant Riordan will (if allowed to remain as counsel of record for Defendants) bill the public fisk tens of thousands of dollars (if not more) in legal fees for defending this New Ordinance before this is over, yet Defendant Riordan must know (or should know) that in the end, if challenged in Court, that there is little to no change of prevailing.   The legal deficiencies were obvious to those Democratic non-lawyers on the Council that voted "no".   The 4 Republicans who voted "yes" are at the mercy of Defendant Riordan to maintain their spot on the primary ballot.   The behind the scenes lobbying by the Borough Attorney (never denied) is not only wrong, but in context of his positions with the local political party which controls all 4 "yes" votes renders his participation in this matter all the more egregious.

Lastly, in this case it is clear Attorney Riordan will at a minimum be required to appear as a fact witnesses in this case regarding the conflict of interest and appearance of impropriety causes of action, so even if the Court declines to void the Ordinance for conflict reasons, he must be disqualified anyway.

**2.    The Defendant Municipality has no Authority to Regulate Plaintiffs' Private Property Beach Whatsoever rendering the Entirety of the Challenged Ordinance in General Invalid as *Ultra Vires*.**

**A. Limited Authority Delegated by the State Legislature to Local Municipalities to Regulate by Ordinance:**

Article 4, §VII, *par.* 11 of the *New Jersey State Constitution (1947)* defines the parameters of regulatory powers a local municipality or county government may exercise, providing as follows:

> The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations shall include not only those granted in express terms ***but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.*** (Emphasis added).

[*New Jersey State Constitution* (1947), Article 4, §VII, *par.* 11].

The definition of "municipalities" includes cities, towns, townships, villages, and boroughs, and any "... *municipality*

-38-

*governed by a board of commissioners, or improvement commission."* See *N.J.S.A.* 40:42-1.   Defendant Borough of Point Pleasant Beach clearly qualifies as a "municipality" under the cited New Jersey State Law.

In *N.J.S.A.* 40:48-1 the New Jersey State Legislature enumerated thirty four (34) specific defined areas[5] where the State specifically delegated to the governing body of every local municipality the authority to may make, amend, repeal and enforce ordinances to regulate specific issues.

An additional *specific* enumerated grant of regulatory authority is *N.J.S.A.* 40:48-1.2 which specifically permits a local municipality to, by Ordinance, probibit underage possession and/or underage consumption of alcohol on **_private property._** See detailed discussion, *infra.*

In addition to the *specific* enumerated grants of regulatory authority found in *N.J.S.A.* 40:48-1 and *N.J.S.A.* 40:48-1.2, next is *N.J.S.A.* 40:48-2 where the State Legislature grants municipalities such as Defendant Borough of Point Pleasant Beach

---

[5]The thirty four (34) enumerated specific areas listed, as briefly identified by their point headings in the statute itself are the following: (1) Finances and property; (2) Contracts and contractor's bonds; (3) Officers and employees; duties, terms and salaries; (4) Fees; (5) Salaries instead of fees; disposition of fees; (6) Maintain order; (7) Punish beggars; prevention of loitering; (8) Auctions and noises; (9) Swimming; bathing costume; prohibition of public nudity; (10) Prohibit annoyance of persons or animals; (11) Animals; pounds; establishment and regulation; (12) Hucksters; (13) Building regulations; wooden structures; (14) Inflammable materials; inspect docks and buildings; (15) Dangerous structures; removal or destruction; procedure; (16) Chimneys and boilers; (17) Explosives; (18) Firearms and fireworks; (19) Soft coal; (20) Theaters, schools, churches and public places; (21) Excavations; (22) Sample medicines; (23) Boating; (24) Fire escapes; (25) Care of injured employees; (26) Bulkheads and other structures; (27) Lifeguard; (28) Appropriation for life-saving apparatus; (29) Fences; (30) Advertise municipality; (31) Government Energy Aggregation Programs; (32) Joint municipal action on consent for the provision of cable television service; (33) Private cable television service aggregation programs; (34) Protective Custody.

*general* police power and authority to enact ordinances, regulations, rules and by-laws that are consistent with New Jersey State and Federal Law for, *inter alia*, the "... preservation of the public health, safety and welfare of the municipality and its inhabitants." *Id.* *See also Township of Chester v. Panicucci,* 62 *N.J.* 94 (1973) (Where the New Jersey Supreme Court recognized the general proposition that *N.J.S.A.* 40:48-2 grants municipalities "... *broad police power over matters of local concern and interest.*").

Lastly – and not at issue in this case – the *"New Jersey Municipal Land Use Law"*, *N.J.S.A.* 40:55D-1 et seq., also grants local municipalities the power to, by Ordinance, enact a master plan to set land-use priorities and direction, as well as the power and authority to  adopt a Zoning Ordinance to dictate where and in what form development should happen.

In sum, local municipalities are limited in their authority and jurisdiction over private persons and private property.  A municipality must act with a discernable source of authority delegated by the State Legislature, and at all times such local Ordinance may only regulate either areas expressly authorized by the State Legislature or "... those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by

**-40-**

this Constitution or by law." *New Jersey State Constitution* (1947), Article 4, §VII, *par.* 11.

**B.    Limitation on Municipal Authority and Pre-Emption Generally:**

While a municipality indeed has somewhat broad police powers conferred by *N.J.S.A.* 40:48-2 over matters of local concern, such power has limits, and must be exercised along with an accompanying delegation of authority to do so, otherwise the actions of a local municipality are without or beyond legal authority and *ultra vires*. Moreover, even when there is lawful authority to act and regulate by Ordinance, it is well known and clearly established that such authority may not be exercised in an "arbitrary, capricious and unreasonable manner." *See Riggs v. Long Beach Township,* 109 *N.J.* 601 (1988).

The New Jersey State Legislature has codified its intent that the New Jersey Code of Criminal Justice ("Title 2C") is to set one uniform statewide set of standards for conduct that is criminalized, and an area may be **statutorily preempted** ("statutory pre-emption") and beyond the authority and reach of local government to regulate whether by specific inclusion ("pre-emption") **_or by intentional exclusion_** ("preemption by exclusion") from the Criminal code. *See N.J.S.A.* 2C:1-5(d) and detailed discussion, *infra*.

**-41-**

Lastly, there are circumstances where the regulation of a subject matter by the State of New Jersey may operate to preempt ("Judicial Pre-Emption") a local municipality from using a local municipal ordinance from also regulating that very same subject matter.   As a general matter, a "... municipality may not contradict a policy the Legislature establishes." *Summer v. Teaneck*, 53 *N.J.* 548, 554 (1969)(citing *Auto-Rite Supply Company v. Mayor & Township Committeemen of Woodbridge*, 25 *N.J.* 188, 194 (1957).   When the Legislature has preempted a field by comprehensive regulation, a municipal ordinance attempting to regulate the same field is void if the municipal ordinance adversely affects the legislative scheme. *Fair Lawn Education Association v. Fair Lawn Board of Education*, 79 *N.J.* 574, 586 (1979); *Summer v. Township of Teaneck*, 53 *N.J.* 548, 554 (1969). Preemption is a judicially created doctrine which supports the elementary principle that a municipality cannot act contrary to the State. *Summer, supra*, 53 *N.J.* at 554.

The pertinent questions for consideration in determining the applicability of preemption are:

1.   Does the ordinance conflict with state law, either because of conflicting policies or operational effect (that is, does the ordinance forbid what the Legislature has permitted or does the ordinance permit what the Legislature has forbidden)?

2.   Was the state law intended, expressly or impliedly to be exclusive in the field?

3.   Does the subject matter reflect a need for uniformity?

4.   Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation?

5.   Does the ordinance stand "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Legislature?

[Overlook Terrace Management Corporation v. Rent Control Board of West New York, 71 N.J. 451, 461-62 (citations omitted).]

In sum, as a general proposition, an objective and comprehensive review of all applicable delegations of authority by the State Legislature to local municipalities show no legal authority (express or implied) that has been delegated to allows the Defendant Municipality to regulate Jenkinson's private property beach as they have done. Just as the local municipality can NOT enact an Ordinance that prohibits adults over 21 years of age from possessing or consuming alcoholic beverages in their back yard at an outdoor party held in their private back yard, the local municipality is powerless to regulate Jenkinson's private property beach. Research reveals that along the entire Atlantic Coast in Monmouth and Ocean Counties where there are several private beach clubs, only this Defendant has asserted any right to regulate private property beaches. This is an ultra

-43-

vires exercise of delegated power and as such the entirety of the regulations - as apply to PRIVATE property - must be declared illegal and enjoined.

**3.  The Specific Attempt to Regulate "Noise" and Constitutionally Protected "Speech" Here by the Defendant Local Municipality Must be Declared Void by this Court:**

§21-1.4(3) of the new Challenged Ordinance provides as follows:

> §21-1.4  No person shall do any of the following things at or upon the Boardwalk and / or beaches of the ocean waters located in the Borough:
> ***
> 3.   Make any loud noise, sound or music to the annoyance of any other person, or use loud, profane or indecent language.

[§21-1.4(3)].

As a threshold matter, Plaintiffs' repeat their position that the Borough of Point Pleasant Beach has no delegated lawful authority to regulate private conduct on the private property beach at issue. *See* Point I(2), *supra*. Moreover, if §21-1.4(3) is treated and viewed by the Court as a "General Noise" Ordinance regulation then it is cumulatively invalid as *ultra vires*. If §21-1.4(3) is treated and viewed by the Court as a "General Nuisance" Ordinance regulation enacted under the general "police power" conferred in *N.J.S.A.*40:48-2, then the regulation is unconstitutionally vague. Either way, and no matter how viewed, under any and every possible scenario, the noise and sound

restrictions in §21-1.4(3) are invalid and must be declared so by this Court and the Defendants must be enjoined from enforcing this invalid and absurd Ordinance.

### A.   Limited Delegated Municipal Authority to Enact a General "Noise Control Ordinances":

Prior to 1971 many local municipalities enacted "Noise Ordinances" under the general police powers delegated to them by the Legislature in *N.J.S.A.* 40:48-2. However, in 1971 the Legislature enacted the "Noise Control Act of 1971" ("NCA"), L.1971, c.418, s.1, *et seq.* (effective January 24, 1972), now codified at *N.J.S.A.* 13:1G-1 to -23. In this regard, the State Legislature at all times retains the right to reallocate previously delegated municipal power away from a local Municipality partially to or completely to a State Agency. That is exactly what the NCA did by vesting enumerated power in the New Jersey Department of Environmental Protection ("DEP") over the regulation of noise in the State of New Jersey. Under the authority of the NCA the DEP thereafter enacted regulations comprehensively dealing with all issues relevant to noises and regulation of noises. Mindful, however that many local municipalities had enacted local noise control ordinances, the State Legislature included s. 21, now codified at *N.J.S.A.* 13:1G-21, which provided and still provides as follows:

No existing civil or criminal remedy now or hereafter available to any person shall be superseded by this act or any code, rules, regulations or orders promulgated pursuant thereto.

No ordinances or resolutions of any governing body of a municipality or county or board of health which establish specific standards for the level or duration of community noise more stringent than this act or any code, rules, regulations or orders promulgated pursuant thereto shall be superseded. Nothing in this act or in any code, rules, regulations or orders promulgated pursuant thereto shall preclude the right of any governing body of a municipality or county board of health, subject to the approval of the department, to adopt ordinances, resolutions or regulations which establish specific standards for the level or duration of community noise more stringent than this act or any code, rules or regulations promulgated pursuant thereto.

[*N.J.S.A.* 13:1G-21].

In accordance with *N.J.S.A.* 13:1G-21, the DEP adopted implementing regulations to deal with the limited delegation of municipal authority to regulate noise in *N.J.A.C.* 7:29-1.8, which reads as follows:

(a)   A governing body of a municipality or county or board of health may adopt a noise control ordinance in accordance with the Noise Control Act of 1971, *N.J.S.A.* 13:1G-21, provided that the ordinance shall be more stringent than the Noise Control Act or the regulations promulgated pursuant

**-46-**

thereto, must be otherwise consistent with the Statewide scheme of noise control, in meets with the written approval of the Department.

(b)    Enforcement of a noise control ordinance is limited to the authorized enforcement agency as specified in the ordinance and enforcement actions shall be conducted in accordance with *N.J.S.A.* 9:29-1.7.

[*N.J.A.C.* 7:29-1.8].

While the regulation of noise by the DEP is not completely pre-empted by the NCA, the NCA and implementing regulations impose two material restrictions upon the very limited delegated authority to a local municipality to regulate or otherwise control noise through local ordinance:

First:    The NCA and DEP Administrative Regulations permit local municipalities the limited power to enact ordinances **with greater but not lesser noise restrictions**, *N.J.S.A.* 13:1G-21 & *N.J.A.C.* 7:29-1.8;

AND

Second:    The NCA and DEP Administrative Regulations requires that any municipality enacting a noise control ordinance submit the proposed ordinance to the DEP for review approval before it may be enacted, *Id.,* and moreover the approval given by the DEP of the proposed local Ordinance must be **in writing**. *N.J.A.C.* 7:29-1.8(a).

Only after *written approval* is given by the DEP can a municipality legally enact a local noise control Ordinance.

**-47-**

Lastly, to assist local municipalities, the DEP has issued a "Model Noise Ordinance", the most recent updated version being from December 19, 2014.

In this case it is undisputable that Defendant Borough of Point Pleasant Beach never submitted their proposed noise ordinance to the DEP, and it therefore equally undisputable that the DEP never approved §21-1.4(3) in writing before it was enacted (or re-enacted) on August 4, 2020. As such, as a matter of fact and law, §21-1.4(3) is *per se* invalid as an *ultra vires* "Noise Control Ordinance" for failure to comply with the mandatory review and approval process found in *N.J.S.A.* 13:1G-21 & *N.J.A.C.* 7:29-1.8.

### B.    If §21-1.4(3) is Viewed "General Nuisance" Quality of Life Regulation Then it Still Invalid as it is Unconstitutionally "Vague":

If §21-1.4(3) is treated and viewed by the Court as a "General Nuisance" Ordinance regulation enacted under the general "police power" conferred in *N.J.S.A.*40:48-2 (rather than the "Noise Ordinance" that it actually is), then the regulation is unconstitutionally vague as to what volume is prohibited. The relevant portion of §21-1.4(3) makes it illegal to "... *Make any* **loud noise, sound or music** to *the annoyance of any other person,* or **use loud**, *profane or indecent language.*" §21-1.4(3) contains no discernable objective standard of how loud is too loud and a

**-48-**

violation of law: Rather, liability attaches upon offending the subjective sensibilities of literally "... *any other person* ...".

Both the Federal and State Constitutions render vague laws unenforceable. *See United States Constitution, Amend. V; New Jersey State Constitution (1947) Art. I, par. 1.* The evils of constitutionally vague laws were explained in *Grayned v. City of Rockford,* 408 *U.S.* 104, 108-109 (1972) (footnotes omitted):

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

[*Grayned v. City of Rockford,* supra, 408 *U.S.* at 108-109].

The constitutional ban on vague laws is intended to invalidate regulatory enactments that fail to provide adequate notice of their scope and sufficient guidance for their application. *Papachristou v. City of Jacksonville,* 405 *U.S.* 156, 162 (1972). The requirement of statutory clarity "... is

essentially a due process concept grounded in notions of fair play." State v. Lashinsky, 81 N.J. 1, 17 (1979); accord State v. Lee, 96 N.J. 156 , 165 (1984). For a local ordinance to survive a challenge under the Vagueness Doctrine, the plain text of the ordinance must enable a person of "... common intelligence, in light of ordinary experience" to understand whether contemplated conduct is lawful. *Lashinsky, supra,* 81 *N.J. at* 18.   An ordinance that is challenged for facial vagueness is one that is assertedly impermissibly vague in all its applications, whereas a statute that is challenged as applied, however, need not be proven vague in all conceivable contexts, but must be shown to be unclear in the context of the particular case.

In *State v. Krause*, 399 *N.J. Super.* 579   (App. Div. 2008) and State v. Clarksburg Inn, 374 *N.J.Super. 624 (App. Div. 2005)* the Appellate Division upheld local Nuisance Noise Ordinances that each employed a so called "100 foot rule":  If the sound could be heard 100 feet from the origin, then it was too loud. That was the offending standard.  While not a perfect uniform objective standard, at least the "100 foot rule" was something that resembled a uniform objective standard, gave notice to the public of the standard, and therefore while not ideal, the ordinances did not rise to the level of being unconstitutionally vague.

Here the challenge ordinance is clearly unconstitutional as violating the vagueness doctrine. There is no scenario where the plain wording of §21-1.4(3) could survive any level of review. §21-1.4(3) is not only unconstitutionally vague, it is so embarrassingly obviously vague that any layperson can see the deficiency. And indeed, that is what happened during adoption process, where Councilman Santanello (who ultimately voted against the Ordinance) expressed the opinion that §21-1.4(3) was clearly obviously unconstitutionally vague, stating:

> I like the part about the - - all right. So here's what I - - I think the thing about loud noises, using bad language, the way it reads is kind of ridiculous. It says to the annoyance of any other person. Well, who's the judge of that? I mean, give an example, I hate country music. So does that mean I get to call the police if I hear a Luke Bryan song, or if somebody going past the Cocharan House playing their music, do they get the call as well? I think this part opens us to massive litigation because it's terribly weak and unenforceable. And I don't think were going to have the police have the decibel meters (indecipherable).

[*See* July 21, 2020 Transcript at Page 52 Line 2 to Line 14].

**C.   The Specific Portion of §21-1.4(3) That Makes it Illegal to Use "... *profane or indecent language* ..." Violates the United States Constitution's First Amendment and Article I, paragraph 6 of the New Jersey State Constitution (1947):**

50 years ago in *Cohens v. California*, 403 *U.S.* 15 (1971) the United States Supreme Court issued an opinion that has been

hornbook law for 50 years, ruling that government officials can not punish a person simply because he or she expresses profanity in public.   Cohen had worn a jacket with the phrase "Fuck the Draft" inside a California Court House.   The Supreme Court ruled that governments might seize upon the censorship of particular words as a convenient guise for banning the expression if unpopular views."   To the extent that the section of §21-1.4(3) reading "... *profane or indecent language* ..." could possibly survive a the vagueness challenge (or not), it is cumulatively clear that this absolute and *per se* bar on all "profane" or "indecent" language (whatever *that* means) also facially violates the Federal and State Constitution's right to free speech.

**4.    The Municipality has no Authority Whatsoever to Regulate the Possession and Consumption of Alcohol on Private Property by Persons Aged 21 Years or Older:**

§21-1.4(5) of the Ordinance provides as follows:

> **§21-1.4.**  No person shall do any of the following things at or upon the Boardwalk and / or beaches of the ocean waters located in the Borough:
> ***

**5.**    Take any intoxicating liquor upon the beach, or any glass containers or bottles.

[§21-1.4(5)].

As will be shown and explained, a local municipality such as the Borough of Point Pleasant Beach has (with one exception not

applicable here) no authority whatsoever to enact a local Ordinance regulating the possession and / or consumption of alcoholic beverages **_on private property by adults 21 years or older_**.

To start, the New Jersey State Legislature has fixed the age of 21 years of age or older as the legal minimum age for a person in New Jersey to "... purchase and consume alcoholic beverages ... [.]" See *N.J.S.A.* 9:17B-1(b).[6]  Therefore, it is illegal and a violation of State civil statutory law for a person under 21 years of age to purchase, possess or consume alcoholic beverages. Additional to the civil statutory law, any person under 21 years of age found guilty of having purchased or possessed or consumed any alcoholic beverage "... in any school, **_public_** conveyance,

---

[6] *N.J.S.A.* 9:17B-1(b) provides as follows:

The Legislature finds and declares and by this act intends, pending the revision and amendment of the many statutory provisions involved, to:
***

**b.**   Extend to persons 21 years of age and older the right to purchase and consume alcoholic beverages on January 1, 1983, provided that anyone attaining the age to purchase and consume alcoholic beverages legally prior to January 1, 1983, shall retain that right. Nothing in this act shall preclude any licensee under R.S. 33:1-1 et seq. from making purchases in the regular course of his licensed activities.

***public*** place, or place of ***public*** assembly, or motor vehicle, is guilty of a violation of state statutory criminal law (disorderly persons offense), and shall be fined not less than $500.00." (Emphasis added). *N.J.S.A.* 2C:33-15(1)(a). Under such circumstances upon conviction there are additional enhanced penalties for when a motor vehicle is involved, the court upon sentencing after conviction is authorized to require participation in an alcohol education or treatment program as part of the sentence, and there are immunity provisions written into the law to ensure that underage drinkers are not deterred from calling for medical assistance. *Id.* Significantly, the State Criminal Statute by its express terms only applies to conduct ***on public property.***

Just as it is a crime for an underaged person to purchase or possess or consume alcohol beverages, it is equally a violation of State criminal statuary law (disorderly persons offense) to "... serve or make[] available ... or entice or encourage ... [a] person to drink an alcoholic beverage..." to anyone under 21 years of age. *N.J.S.A.* 2C:33-17(1)(a). It is also a violation of State criminal statuary law (disorderly persons offense) for an owner of property to make the property available to other persons "... with the purpose that alcoholic beverages will be

made available for consumption ... by persons who are under the legal age ... [.]"  *N.J.S.A.* 2C:3317(1)(b).

In recent years, because of issues and concerns with **_underage drinking on private property_**, and after Courts had invalidated local ordinances that sought to regulate underage drinking on private property, ruling the subject as *ultra vires* as "pre-empted by exclusion" as per *N.J.S.A.* 2C:1-5(d), the State Legislature enacted both *N.J.S.A.* 40:48-1(6)[7] and *N.J.S.A.* 40:48-1.2[8] as new law so as to specifically delegate to local municipalities the power and authority to, by local ordinance,

---

[7] *N.J.S.A.* 40:48-1(6) provides as follows:

Maintain order. 6. Prevent vice, drunkenness and immorality; to preserve the public peace and order; to prevent and quell riots, disturbances and disorderly assemblages; *to prohibit the consumption of alcoholic beverages by underage persons on private property pursuant to section 1 of P.L.2000, c.33 (C.40:48-1.2);* (Emphasis added).

[8] *N.J.S.A.* 40:48-1.2 (Enactment of ordinance prohibiting possession, consumption of alcoholic beverages by underagedperson on private property, permitted) provides as follows:

**1. a.** A municipality may enact an ordinance making it unlawful for any person under the legal age who, without legal authority, knowingly possesses or knowingly consumes an alcoholic beverage on private property. The ordinance shall provide that a violation shall be punished by a fine of $250 for a first offense and $350 for any subsequent offense.
**b.**      The ordinance shall provide that the court may, in addition to the fine authorized for thisoffense, suspend or postpone for six months the driving privilege of the defendant. Upon the conviction of any person and the suspension or postponement of that person's driver's license, the court shall forward a report to the Division of Motor Vehicles stating the first and last day of the suspension or postponement period imposed by the court pursuant to this section. If a person at the time of the imposition of a sentence is less than 17 years of age, the period of license postponement, including a suspension or postponement of the privilege of operating a motorized bicycle, shall commence on the day the sentence is imposed and shall run for a period of six months after the person reaches the age of 17 years.
     If a person at the time of the imposition of a sentence has a valid driver's license issued by this State, the court shall immediately collect the license and forward it to the division along with the report. If for any reason the license cannot be collected, the court shall include in the report the complete name, address, date of birth, eye color, and sex of the person, as well as the first and last date of the license suspension period imposed by the court.
     The court shall inform the person orally and in writing that if the person is convicted of operating a motor vehicle during the period of license suspension or postponement, the person shall be subject to the penalties set forth in R.S.39:3-40. A person shall be required to acknowledge receipt of the written notice in writing. Failure to receive a written notice or failure to acknowledge in writing the receipt of a written notice shall not be a defense to a subsequent charge of a violation of R.S.39:3-40.

prohibit the possession and consumption of alcoholic beverages on **_private property_** by **_underage persons_**. (Emphasis added).  Despite having the express legal authority to do so, the Borough of Point Pleasant Beach has NOT enacted any such local Ordinance.

That said, it important to emphasize that there is no State criminal statute prohibiting the possession and consumption of alcoholic beverages on **_private property_** by someone under 21years of age.  Nor is there any criminal statute prohibiting the possession and consumption of alcoholic beverages on either

---

If the person convicted under such an ordinance is not a New Jersey resident, the court shall suspend or postpone, as appropriate, the non-resident driving privilege of the person based on the age of the person and submit to the division the required report. The court shall not collect the license of a non-resident convicted under this section. Upon receipt of a report by the court, the division shall notify the appropriate officials in the licensing jurisdiction of the suspension or postponement.

c.    (1) No ordinance shall prohibit an underaged person from consuming or possessing an alcoholic beverage in connection with a religious observance, ceremony, or rite or consuming or possessing an alcoholic beverage in the presence of and with the permission of a parent, guardian or relative who has attained the legal age to purchase and consume alcoholic beverages.

(2)    As used in this section:

"Guardian" means a person who has qualified as a guardian of the underaged person pursuant to testamentary or court appointment.

"Relative" means the underaged person's grandparent, aunt or uncle, sibling, or any other person related by blood or affinity.

d.    No ordinance shall prohibit possession of alcoholic beverages by any such person while actually engaged in the performance of employment by a person who is licensed under Title 33 of the Revised Statutes, or while actively engaged in the preparation of food while enrolled in a culinary arts or hotel management program at a county vocational school or post secondary educational institution; however, no ordinance enacted pursuant to this section shall be construed to preclude the imposition of a penalty under this section, R.S.33:1-81, or any other section of law against a person who is convicted of unlawful alcoholic beverage activity on or at premises licensed for the sale of alcoholic beverages.

**public property[9] or private property by persons over 21 years of age.**

Significantly in conferring authority on local municipalities to regulate the possession and / or consumption of alcoholic beverages on **_private_** property by **_minors_**, not such authority was conferred by the State Legislature on local municipalities to regulate the possession and / or consumption of alcoholic beverages on **_private_** property **_by persons 21 years of age or older_**. Nor as a general principle is there a state statutory law that prohibits the possession and / or distribution and / or consumption of alcohol on private property by persons

---

[9] Many local municipalities have relied upon the general police power conferred in *N.J.S.A.* 40:48-2 and the "... necessary or fair implication ..." standard in the *New Jersey State Constitution* (1947), Article 4, §VII, *par.* 11 as a source of claimed authority to enact a local ordinance that prohibits drinking alcoholic beverages in public by adults over the age of 21. Preliminary research reveals no published case on this exact issue, and there is no contemplated legal challenge to a municipality's right *to prohibit drinking in public or on public property*. In this regard, please note that the Borough of Point Pleasant Beach has in fact enacted such a local Ordinance, found at § 3-18.1 and 18.2, which provides as follows:

§ 3-18.1    Prohibited and Unlawful Conduct.

Any person who possesses an open container of alcohol and/or possesses an open container of alcohol with intent to consume same in public, and any person who shall consume alcoholic beverages in public is a disorderly person:

    a.    While in or on a public street, public parking lot, public boardwalk, public beach, public park or recreation area or in any public conveyance.

    b.    In a private motor vehicle while the vehicle is on any public street, lane or parking lot.

    c.    While upon any private property not his own without the permission of the owner or person having authority to grant such permission.

§ 3-18.2    Exceptions

Notwithstanding the provisions of Subsection 3-18.1, the mayor and Borough council may by resolution, permit the consumption of alcoholic beverages in any of the places designated in Subsection 3-18.1 in connection with special events or observances which have been authorized by the mayor and council.

By its express terms, local Ordinance § 3-18.1 only applies to possession or consumption of alcoholic beverages "... in *public* ..." generally , and specifically to the "... *public* boardwalk ..." or to the "... *public* beach ...[.]" *See* § 3-18.1(a). Jenkinsons Beach and Boardwalk are both PRIVATE property. As such, as long as "permission" is given within the meaning of § 3-18.1(c), this local Ordinance does not prohibit possession or consumption of alcoholic beverages on Jenkinsons Boardwalk or on Jenkinsons Beach by persons over the age of 21.

older than 21 years of age. State Park Administrative Regulations [10] make it illegal in most circumstances for adults over 21 years of age to possess and/or consume alcohol in New Jersey State Parks (including State Beaches such as Seven Presidents State Park in Monmouth County and Long Beach Island State Park in Ocean County). *See N.J.A.C.* 7:2-2.6. In *N.J.S.A.* 2C:33-27 [11] the Legislature specifically confirmed that it is completely permissible and legal for a "... restaurant, dining room or other public place where food or liquid refreshments are sold or served to the general public ..." ***that does not***

---

[10] *N.J.A.C.* 7:2-2.6 (Alcoholic beverages prohibited) provides as follows:

A person shall not possess and/or consume alcoholic beverages on lands and waters under the jurisdiction of the State Park Service except where the sale, use or possession is specifically approved by the Director of the Division of Parks and Forestry or the Assistant Director of the Division for the State Park Service.

[11] *N.J.S.A.* 2C:33-27 (Consumption of alcohol in restaurants) provides as follows:

a.  No person who owns or operates a restaurant, dining room or other public place where food or liquid refreshments are sold or served to the general public, and for which premises a license or permit authorizing the sale of alcoholic beverages for on-premises consumption has not been issued:
    (1)  Shall allow the consumption of alcoholic beverages, other than wine or a malt alcoholic beverage, in a portion of the premises which is open to the public; or
    (2)  Shall charge any admission fee or cover, corkage or service charge or advertise inside or outside of such premises that patrons may bring and consume their own wine or malt alcoholic beverages in a portion of the premises which is open to the public.
    (3)  Shall allow the consumption of wine or malt alcoholic beverages at times or by persons to whom the service or consumption or alcoholic beverages on licensed premises is prohibited by State or municipal law or regulation.
b.  Nothing in this act shall restrict the right of a municipality or an owner or operator of a restaurant, dining room or other public place where food or liquid refreshments are sold or served to the general public from prohibiting the consumption of alcoholic beverages on those premises.
c.  A person who violates any provision of this act is a disorderly person, and the court, in addition to the sentence imposed for the disorderly person violation, may by its judgment bar the owner or operator from allowing consumption of wine or malt alcoholic beverages in his premises as authorized by this act.

**_themselves have a liquor license_** to permit their customers of legal age to bring in their own beer or wine ("Bring Your Own Bottle") for consumption on the premises with a meal.  However, while this conduct on private property is presumptively permissible and legal everywhere, in *N.J.S.A.* 2C:33-27(b) the Legislature specifically delegated to a municipality or the owner of a restaurant themselves the authority to "... prohibit[] the consumption of alcoholic beverages on those premises ...", *Id.,* with a restaurant owner operating by "policy" and a Municipality acting by enactment of a specifically authorised local Ordinance. Despite being delegated the specific authority to do so, the Borough of Point Pleasant Beach has not enacted a local Ordinance banning the so called B.Y.O.B. practice in restaurants.  It is also illegal (a motor vehicle offense) in New Jersey for any person - whether such person is under or over the age of 21 - to have an open container of alcohol in the passenger portion of a private automobile.  *See N.J.S.A.* 39:4-51b. [12]   And though not

---

[12] *N.J.S.A.* 39:4-51b  (Prohibition of possession of open, unsealed alcoholic beverage container, circumstances) provides as follows:

    a.        All occupants of a motor vehicle located on a public highway, or the right-of-way of a public highway, shall be prohibited from possessing any open or unsealed alcoholic beverage container. This subsection shall not apply to a passenger of a charter or special bus operated as defined under R.S.48:4-1 or a limousine service.

    b.        A person shall not be deemed to be in possession of an opened or unsealed alcoholic beverage container pursuant to this section if such container is located in the trunk of a motor vehicle, behind the last upright seat in a trunkless vehicle, or in the living quarters of a motor home or house trailer. For the purposes of this section, the term "open or unsealed" shall mean a container with its original seal broken or a container such as a glass or cup

    c.        For a first offense, a person convicted of violating this section shall be fined $200 and shall be informed by the court of the penalties for a second or subsequent violation of this section. For a second or subsequent offense, a person convicted of violating this

reduced to statute or administrative regulation, by official "policy" consumption of alcohol by persons over the age of 21 is permitted on New Jersey Transit Trains, but is not permitted on New Jersey Transit Busses. Lastly, purchase and consumption of alcohol is also permitted by persons over the age of 21 at State owned Sports and Entertainment Venues.

In total, the New Jersey State Legislature has by statewide statutory law regulated the purchase, possession and consumption of alcoholic beverages by fixing a minimum age for purchase, possession and consumption at 21 years of age. *See N.J.S.A.* 9:17B-1(b). The New Jersey State Legislature has by statewide statutory law criminalized the sale or distribution of alcoholic beverages to persons under the age of 21, or to allow underaged persons to use property to drink at underage. *See N.J.S.A.* 2C:33-17(1)(a) & -17(1)(b). The New Jersey State Legislature has by statewide statutory law criminalized the purchase, possession and consumption of alcoholic beverages ***in public*** by persons under the age of 21. *See N.J.S.A.* 2C:3315(1)(a). Though it is not a violation of ***New Jersey State Criminal Law*** for underaged persons to possess or consume alcoholic beverages on ***private property***, the State Legislature has empowered and

---

section shall be fined $250 or shall be ordered by the court to perform community service for a period of 10 days in such form and on such terms as the court shall deem appropriate under the circumstances.

authorized local municipal governments to prohibit such conduct by local ordinance. *See N.J.S.A.* 40:48-1(6) and *N.J.S.A.* 40:481.2, though Point Pleasant has not enacted such a local Ordinance. Therefore, depending upon the municipality, it may – or may not – be a violation of a local ordinance for a person under the age of 21 years of age to possess or consume alcoholic beverages.[13] It is illegal for anyone to possess or consume alcoholic beverages in State Parks and Forrests in accordance with State Administrative Regulations, *see N.J.A.C.* 7:2-2.6, and it is illegal (a motor vehicle violation) for anyone to have an open container of alcoholic beverage in a Motor Vehicle. *See N.J.S.A.* 39:4-51b. Conversely it is not illegal for a person over age the age of 21 to bring beer or wine into a restaurant unless the local municipality has passed an "anti – B.Y.O.B Ordinance" or the restaurant owner himself prohibits it. *N.J.S.A.* 2C:33-27. It is not a violation of **New Jersey State Criminal or Civil Statutory Law** for a person over the age of 21 years old to drink alcoholic beverages in public, though some municipalities have used the general police powers conferred by the State Legislature **to regulate public property** to prohibit by local Ordinance the drinking alcoholic beverages in public. Consumption of alcoholic beverages by persons over the age of

---

[13]Frankly very few municipalities have taken advantage of this express grant of authority due to the realities of the inherent difficulties of "enforcing" such laws on private property, because such enforcement is complicated and impractical due to the very real reality that enforcement often results in unconstitutional warrantless entry onto private property.

21 is permitted on New Jersey Transit Trains, is not permitted on New Jersey Transit Busses and can be purchased and consumed by persons over the age of 21 at basically every State owned public Sports and Entertainment Venue.

In this regard, *N.J.S.A.* 2C:1-5(d) provides as follows:

> Notwithstanding any other provision of law, the local governmental units of this State may neither enact nor enforce any ordinance or other local law or regulation conflicting with, or preempted by, any provision of this code [the New Jersey Code of Criminal Justice] or with any policy of this State expressed by this code, whether that policy be expressed by inclusion of a provision in the code or by exclusion of that subject from the code.

[*N.J.S.A.* 2C:1-5(d)].

Under this statutory provision, the absence of a state ban on certain conduct indicates a legislative intent to "decriminalize" that conduct, and local regulation prohibiting or otherwise trying to regulate such conduct may be deemed "preempted by exclusion" under *N.J.S.A.* 2C:1-5(d). In essence the purpose of *N.J.S.A.* 2C:1-5(d) "preemption" is to ensure that there is one uniform set of criminal or quasi criminal statutes and regulations throughout the states, rather than each municipality having its own version of a criminal code. The regulation of a subject matter by the State of New Jersey Law may

**-62-**

operate to preempt a local municipality from using a local municipal ordinance from regulating that same subject matter. *See, e.g., G.H. v. Township of Galloway*, 401 *N.J.Super.* 392 (App. Div. 2008), aff'd, 199 *N.J.* 135 (2009) (holding that municipal ordinances prohibiting convicted sex offenders from living within specified distances of schools and other designated facilities were preempted by state law regulating convicted sex offenders); *State v. Crawley*, 90 *N.J.* 241 (1982) (the legislature's repeal of a state law prohibiting loitering had the effect of preempting by exclusion a Newark ordinance that criminalized loitering).

In the present case, and in totality of context, the State of New Jersey's failure to specifically prohibit possession and consumption of alcoholic beverages by persons over 21 years of age on private property quite clearly was a conscious decision. Otherwise stated, the State Legislature, when making decisions about the regulation and prohibition of the possession and consumption of alcohol by persons over the age of 21, the Legislature quite clearly made a conscious decision to exempt any regulation of private property possession or consumption from the scheme. Indeed, when faced with several Court decisions striking down local Ordinances prohibiting underage drinking on private property based upon *N.J.S.A.* 2C:1-5(d) and the doctrine of "Pre-Emption by Exclusion", the State Legislature decided to amend the

**-63-**

law, but only to confer authority on local municipalities to
enact ordinances regulating the possession and consumption of
alcohol by persons under the age of 21 on private property. The
Legislature, surely aware of the issue, consciously remained
silent on authorizing local municipalities authority to prohibit
possession and consumption of alcoholic beverages on private
property by persons over the age of 21. And by so doing then and
there, *N.J.S.A.* 2C:1-5(d) and the doctrine of "PreEmption by
Exclusion" operates to prohibit the Borough of Point Pleasant
Beach from prohibiting this conduct now. Any other conclusion is
simply intellectually dishonest. Indeed, a group of adults over
the age of 21 can drink alcohol without issue while taking a
public New Jersey Transit Train *to the beach*, but once at
Jenkinsons privately owned beach such persons are no longer
allowed to possess or consume alcohol? Moreover, it is fact that
many PRIVATE PROPERTY BEACHES up and down New Jersey's Atlantic
coastline permit the drinking and consumption of alcohol on the
private property beaches without issue or interference, and there
is nothing that the local Municipality is authorized to do to
regulate this perfectly legal conduct as local Ordinance
regulation is barred by *N.J.S.A.* 2C:1-5(d) and the doctrine of
"Pre-Emption by Exclusion". As such, §21-1.4(5) of the new

Ordinance  if  invalid  and  enforcement  must  be  permanently enjoined.

5.  **The Municipality has no Authority to Mandate by Ordinance That all Patrons to Jenkinson's Private Property Beach be Searched by an 18 Year at All Entry Points:**

§21-1.2 of the Ordinance provides as follows:

1.  Contraband

2.  No one who operates a beach and charges a fee shall allow any employee under the age of 18 to inspect patrons or their possessions for alcohol and/or illegal or controlled substances.

3.  If an individual who has paid a fee to access a beach is found in possession of alcohol or controlled substances while on a beach, the beach operator shall be investigated for, and, if warranted charged, with a violation of *N.J.S.A.* 2C:33-12. Upon a beach operator's conviction for violating *N.J.S.A.* 2C:33-12 the Borough may seek any and all penalties provided by *N.J.S.A.* 2C:33-12.1. [§21-1.2].

The cited portions of the new Ordinance are clearly an unconstitutional and *ultra vires* exercise of the power and must be stricken.

Firstly, the Borough has bizarrely mandated that all "beach badge checkers" at the entrance to Jenkinsons' private property beach must suddenly be at least 18 years old or older[14], and has

---

[14] The regulation of employment ages status is so clearly pre-empted by the State that a separate argument need not be made as it is cumulative to the other legal deficiencies anyway.

also mandated that such private employees are now – by Ordinance – legally responsible for and specifically legally required to conducting illegal warrantlees searches of each and every person entering onto the private property beach!  While private property beach owner Jenkinson's retains the right at their option to condition entry onto their beach with a patron's submission to a search of their person and effects for contraband, that is not at present the policy.  However, a state government law such as this – that literally orders private parties to conduct mandatory searches of private individuals in accordance with the law seeking contraband without a warrant – clearly converts the actions of the otherwise private employees  into agents of the municipality and therefore "state actors" who are acting "under color of state law" as they are acting under explicit direction and authority of a local municipal Ordinance exposing both the Defendant Borough, such private employees and Plaintiff Jenkinson's to liability for damages under 42 *U.S.C.* §1983 for violating the Fourth Amendment rights of citizens to be free from unreasonable warrantless searches.[15]   Therefore, such arbitrary

---

[15] The Federal Courts have identified four circumstances where a private person is a "state actor" for purposes if imposition of liability under §1983. First, under the "close nexus" test, a private party can be fairly said to be a state actor where "... *there is a sufficiently close nexus between the state and the challenged action of the [private] entity so that the action of the latter may fairly be treated as that of the state itself.*" *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (holding state responsible for private decision where it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must be deemed to be that of the State).

Second, under the "symbiotic relationship" test a private party can be fairly said to be a state actor where " ... *the state has so far insinuated itself into a position of interdependence ...*" with a private party that "... *it must be recognized as a joint participant in the challenged activity.*" *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961) (holding privately owned restaurant's refusal to serve an African American customer constituted state action where the restaurant leased space from a parking garage owned by state agency).

Third, under the "joint action" test a private party can be fairly said to be a state actor where a private party is a "... *willful participant*

mandatory warrantless searches are a *per se* violation of the Fourth and Fourteenth Amendment to the United States Constitution and Article I, paragraph 7 of the *New Jersey State Constitution* (1947).

*See eg. Camara v. Municipal Court, 387 U.S. 523* (1967) (Fourth Amendment warrant requirement extends and applies to bar warrantless civil and administrative searches by the state or state agents) . To be sure this is a pretty obvious elementary simple "horn book" principle of law. For this elementary and blatantly obvious reason, the mandatory "search" requirements must be stricken as unconstitutional.

Lastly, and even more bizzarely, this section seeks to impose *criminal liability* upon beach operators – such as Jenkinson's – for the wrongful conduct of third parties, something that is beyond the lawful authority of the borough of Point Pleasant Beach to do in the first instance for a variety of reasons, but most simply and obvious being that this attempt to in essence revise and re-write portions of Title 2C by local Ordinance to impose liability where the State has seen fit NOT to

---

in joint action with the State or its agents." *Lugar v. Edmonson Oil Company, Inc.*, 457 U.S. 922, 941 (1982).

Fourth and lastly, under the "public function" test a private party can be fairly said to be a state actor where the private party has been "... *delegated ... power traditionally exclusively reserved to the State*." *Terry v. Adams*, 345 U.S. 461, 468-470 (1953) (state action found where private actor administered election of public officials).

A fair application of each of the four examples noted above confirms that Jenkinson's private employees would therefore be exposed to civil liability for illegal warrantless searches of persons under 42 U.S.C. §1983.

impose liabillity is clearly pre-empted by exclusion in accordance with *N.J.S.A.* 2C:1-5(d).

**6.  The Municipality has no Authority to Mandate that Local Municipal Police Actively "Police" Plaintiff's Property Beach:**

§21-1.5 of the Ordinance provides as follows: "§ 21-1.5 Policing.   The police in the municipality ***shall police the beaches***, Boardwalk, and waterfront located in the Borough." (Emphasis added). §21-1.5

Here, the word "Police" is a verb, directing affirmative conduct and action. Under the old version of the Ordinance, §21-1A.5 (Policing) the Borough directed that:  "The Police in the municipality shall police said beach", with "said beach" under the old version of the Ordinance referring only to the small municipal beach, to the clear exclusion of Jenkinsons private property beach.  That section has now been modified changed, read in consort with the "new" expanded definition of "beaches" in §21-1.4,  means that now the Police are specifically and literally directed to "police" (verb)  Jenkinsons private beach, and presumably also the dry sand below the "mean high water line".  It is not clear what "policing" entails, but it would necessarily require physical entry onto Jenkinson's private property.  Other than the fact that this seems to be an open invitation to make Jenkinson's patrons uncomfortable if not

**-68-**

outright harassed, there is again the BLATANT reality that this is a clear a violation of Jenkinson's private property rights. As a threshold principle the Borough can not simply grant their police department free license to enter onto private property any time they want, as such clearly is a per se violation of the Fourth and Fourteenth Amendments to the *United States Constitution* and Article I, paragraph 7 of the *New Jersey State Constitution* (1947). Moreover, regulation of such private property beaches and private property boardwalks is beyond the authority of the local municipality to regulate. *See* supra. If and when (considerable) taxpayer Jenkinsons needs the assistance of the local municipal police department, they – like all other taxpayers - are certainly free to call for assistance. However, for the reasons stated, the Borough can not create a police state in the middle of private property without the consent of the owner of such private property which has not been given.

### POINT II:
### THERE IS A LIKELIHOOD THAT IMMEDIATE AND IRREPARABLE INJURY WILL OCCUR IF RELIEF IS NOT GRANTED:

The law is clear that "... a preliminary injunction should not issue except when necessary to prevent irreparable harm." *Crowe, supra*, 90 *N.J.* at 132-33. "[H]arm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." *Id.* Hence, the general rule that an

injunction will not ordinarily issue where there is an adequate remedy at law. *Morris County Transfer Station, Inc. v. Frank's Sanitation Service, Inc.*, 260 *N.J. Super.* 570, 574 (App. Div. 1992). Here, Plaintiffs have demonstrated their right to relief under this prong as well. The law is well settled that for injunctive relief purposes a Plaintiff satisfies the "irreparable harm" prong of the inquiry if they can demonstrate a constitutional injury. *See Elrod v. Burns,* 427 *U.S.* 347, 373 (1976). ("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Here, Plaintiff clearly alleged and proves violations of the First Amendment (Sound Regulations) and Fourth Amendment (Mandating Search of all Patrons) thus satisfies the "irreparable injury" prong as a matter of law.

Moreover, taken further, there is the incontestable reality that the Defendants' requiring and mandating - by local Municipal Ordinance - that Plaintiff's 18 year old employees must search any and all private individuals entering onto their Private Beach for contraband - have clearly as a matter of fact and law (whether knowingly or not) converted such 18 year old employees (and by extension, Plaintiff) into "persons acting under color of state law" for purposes of imposing affirmative civil liability for damages for Fourth Amendment violations under 42 U.S.C. sec.

1983. Worse, Plaintiffs KNOW that this municipal mandated conduct is *per se* illegal, converts them into "state actors" as the conduct is mandated by local Ordinance, *see* Footnote 15, *supra.*, and a violation of the United States Constitution's Fourth Amendment.[16]   To comply with the local Ordinance, knowing what they are doing is wrong as they are doing it, will not only exposes Plaintiffs to nominal and compensatory damages claims, but also to PUNITIVE DAMAGE CLAIMS!   *See Smith v. Wade,* 461 *U.S.* 30, 56 (1983) (*"A jury may be permitted to assess punitive damages in an action under §1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."*).   Here, the defendant Municipality has literally adopted a *per se* unconstitutional policy and drafted Plaintiffs to "carry it out", and while the Defendant Municipality has exposed themselves and Plaintiffs to §1983 liability for nominal and compensatory damages, local municipalities are immune from punitive damages claims, *see City of Newport v. Fact Concerts, Inc.,* 453 *U.S.* 247, 271 (1981), whereas Plaintiffs are not.   *Smith v. Wade*, *supra.*

It is submitted that there is no question that Plaintiff has demonstrated

---

[16]If there was not a local municipal Ordinance mandating these searches, and were Plaintiffs themselves to chose to independently implement such a *policy* (they have not done so) of requiring a search as a condition to entry onto private property, THAT would be legal. Patrons not wanting to submit to same could simply leave. However, GOVERNMENT mandating searches implicates state action and the Fourth Amendment, and converts Plaintiffs and their employees into "state actors acting under color of state law".

"irreparable damage" within the meaning of the law.

### POINT III:

**ON BALANCE, THE BENEFITS OF MAINTAINING THE STATUS *QUO* BY GRANTING THE PRELIMINARY RELIEF  REQUESTED OUTWEIGHS ANY "HARM" OTHER INTERESTED PARTIES MAY SUFFER:**

It is always and at all times in the "public interest" to for all "state actors" to comply with and not violate the Constitution.   There preliminary relief requested does no violence to other interested parties such as the public, but actually serves to vindicate their clearly established constitutional rights.

### CONCLUSION:

Plaintiffs submit that they have established that the legal rights of the parties and the applicable law is well settled. Plaintiffs submit that there is no serious question but that they have established a "probability" of success on the merits.   A significant portion of the harm alleged is *per se* irreparable under case law.   And clearly on the facts extant it is in the public interest to simply maintain the status *quo* as it existed for literally years.   Therefore, for the foregoing reasons and authorities cited in support thereof, it is respectfully requested that this Court maintain the long status quo and enter

a Preliminary Injunction as requested.

Respectfully submitted,

Dated: 8/28/20

R. S. GASIOROWSKI

# EXHIBIT 3

# GASIOROWSKI & HOLOBINKO
## ATTORNEYS AT LAW
54 Broad Street
Red Bank, New Jersey 07701
(732) 212-9930
Facsimile (732) 212-9980

R. S. GASIOROWSKI
JOHN E. HOLOBINKO

CHRISTIE A. GASIOROWSKI
CATHY S. GASIOROWSKI
ALEXIS L. GASIOROWSKI

August 4, 2020

Paul M. Kanitra, Mayor
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Tom Migut, Council President
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Bob Santanello, Councilperson
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Andy Cortes, Councilperson
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Arlene Testa, Councilperson
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Douglas Vitale, Councilperson
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Caryn Byrnes, Councilperson
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Eileen A. Farrell, Clerk
Borough of Point Pleasant Beach
416 New Jersey Avenue
Point Pleasant Beach, NJ 08742

Re:   Proposed Ordinance #2020-12 denominated: "AN ORDINANCE OF THE BOROUGH OF POINT PLEASANT BEACH AMENDING CHAPTER 21, BEACHES OF THE REVISED GENERAL ORDINANCES OF THE BOROUGH OF POINT PLEASANT BEACH."

Dear Mayor & Council:

Please be advised that I represent various Jenkinson's business entities on the boardwalk in Point Pleasant Beach. The Council recently

introduced at first reading, proposed Ordinance 2020-12 referenced above. The new proposed Ordinance, if enacted would supersede and replace the prior Ordinance governing and regulating the beachfront. Contemporaneous to this the Mayor has announced that he "...*plans to hire 30 more seasonal police officers to patrol the beach and boardwalk.*" See "Point Pleasant Beach: Mayor says disrespect, not race, why cops broke up beach party", by Keith Schubert in *Asbury Park Press*, June 10, 2020. Moreover, the Mayor is specifically quoted explaining the proposed Ordinance in a public text in part as follows: "... *And finally we taken measures to ensure beach operators have some skin in the game when it comes to restricting public drug and alcohol usage.*"

Proposed Ordinance #202012 contains certain changes specifically relevant and prejudicial to my client. Such changes are *ultra vires* and harm my client to a degree where he is entitled to seek a remedy at both equity and law to enjoin same. Jenkinson's will also be seeking damages. More specifically I am referring to what would, if enacted, be an entirely new section, §21-1.2B which would henceforth provide as follows:

       \*\*\*

B. Contraband

1.    No one who operates a beach and charges a fee shall allow any employee under the age of 18 to inspect patrons or their possessions for alcohol and/or illegal or controlled substances.

2

2.     If an individual who has paid a fee to access a beach is found in possession of alcohol or controlled substances while on a beach, the beach operator shall be investigated for, and if warranted charged, with a violation of *N.J.S.A. 2C:33-12*. Upon a beach operators' conviction for violating *N.J.S.A. 2C:33-12* the Borough may seek any and all penalties provided by *N.J.S.A. 2C:33-12.1*.

3.     Oceanfront bathing is permitted only when lifeguards are on duty regardless of operation hours. No person shall enter the bay or ocean when lifeguards are not on duty, except with a surfboard, paddle board or the like.   Any such entry when lifeguards are not on duty is at the bather's own risk.

Jenkinson's "... *operates a beach and charges a fee...*", bringing Jenkinson's clearly within the scope of proposed new §21-1.2B.  Jenkinson's owns the great majority of the beach along the boardwalk.  It is quite evident that this section was tailor written to target my client.

As has been the case for years, employees who check beach badges or collect daily admission fees from those without beach badges have often and traditionally been local high school students under the age of 17.  Moreover, generally the only "checking" for alcohol or other contraband at the place where patrons gain access to the beach has been a reminder to patrons that alcohol and "contraband" are prohibited.  Coolers are opened and if detected the alcohol must either be disposed of in the trash or the person takes it back to their vehicle.  All individuals checking, are equipped with two-way radios.  If a problem arises the "badge checker" calls "Security".  The

3

"Security" is responsible for dealing with "problems," not the "badge checks". If there is a problem, Security contacts a patrolman on the boardwalk. If the individual fails to comply, they are denied admission. Once patrons are on the beach, there is no further checking or "... *inspect[ing] patrons or their possessions for alcohol and/or illegal or controlled substances...*" by Jenkinson's employees ((whether younger or older than 18 years old). If someone on the beach has alcohol or other contraband and it is seen by or reported to Jenkinson's staff, that information is immediately reported to Security. They confront the individual and contact the police if needed. Further, there is no smoking on the boardwalk and is limited o a certain restricted area on the beach.

This new section, if approved would require and impose an affirmative obligation on private beach operators such as Jenkinson's to hire only persons only over 18 years of age to check for beach badges and to take some additional affirmative measures to try to ensure that alcoholic beverages and other contraband are not brought onto the beach. While this section would appear by Municipal Ordinance to empower and require such persons over 18 to literally search beach patrons, such would clearly violate the fourth amendment to the United States Constitution and Article 1 paragraph 7 of the New Jersey State Constitution (1947) which prohibits unreasonable searches and seizures and prohibits any and all searches

4

without a warrant with only a few judicially recognized exceptions not applicable to the matter being discussed.

Next, §21-1.2B (2) seeks and threatens to impose and extend existing criminal liability upon beach operators – such as Jenkinson's – for wrongful criminal conduct of third-party beach patrons in a way neither contemplated nor permitted by the statutes relied upon. The proposed change provides in relevant part that: "If an individual who has paid a fee to access a beach is found in possession of alcohol or controlled substances while on a beach, **the beach operator shall be investigated for, and if warranted charged, with a violation of N.J.S.A. 2C:33-12**. ..."

> A person is guilty of maintaining a nuisance when:
>
> **a.** By conduct either unlawful in itself or unreasonable under all the circumstances, he **knowingly** or **recklessly** creates or maintains a condition which endangers the safety or health of a considerable number of persons;
>
> **b.** He **knowingly** conducts or maintains any premises, place or resort where persons gather for purposes of engaging in unlawful conduct; or
>
> **c.** He knowingly conducts or maintains any premises, place or resort as a hour of prostitution or as a place where obscene material, as defined in *N.J.S.A. 2C:34-2* and *N.J.S.A. 2C:34-3*, is sold, photographed, manufactured, exhibited or otherwise prepared or shown, in violation of *N.J.S.A. 2C:34—2, N.J.S.A. 2C:34-3,* and *N.J.S.A. 2C:34—4.*
>
> A person is guilty of a disorderly person's offense if the person is convicted under subsection a. or b. of

5

this section.   A person is guilty of a crime of the fourth degree if the person is convicted under subsection c. of this section.

Upon conviction under this section, in addition to the sentence authorized by this code, the court may proceed as set forth in section 2C:33-12.1.

[*N.J.S.A. 2C:33—12*]

Only subsections (a) or (b) could apply.   In this regard, a person is guilty of "maintaining a nuisance" under subsection (a if "... *By conduct either unlawful in itself or unreasonable under all the circumstances, he* **_knowingly_** *or* **_recklessly_** **_creates or maintains a condition_** *which endangers the safety or health of a considerable number of persons." Id.* For there to be probable cause or to be found guilty under *N.J.S.A. 2C:33-12(a)* a person must have "knowingly" or "recklessly" (as those terms are specifically defined in the criminal code) "created" or "maintained" a condition which endangers others.   Here, contrary to the statute you seek to rely upon, instead of seeking to punish the actual wrongdoer, **_literally extend criminal liability_** for the actions of another (presumably someone who has managed to sneak alcohol or other contraband onto the beach) to a third party, in this case the beach operator.   Again, this is not a civil legal duty and civil liability you are seeking to create or impose.   This is CRIMINAL LIABILITY you are seeking to impose.   You are seeking to impose it for the actions of another.   The same is true as to subsection (b) *which applies*

6

where a party "... **_knowingly_** conducts or maintains any premises, place or resort where persons gather for purposes of engaging in unlawful conduct." _N.J.S.A. 2C:33-12(b)_. Here again, the conduct must be "knowingly", and a quick review of the literal specific definition in Title 2C (see Footnote 1)[1] of what action constitutes "knowing" conduct quickly confirms that this section may not be used as a vehicle to extent criminal liability of another to a third party (in this case Jenkinson's) in the circumstances you seek to.  Based upon literal Criminal Code definitions it would be impossible for any fair and objective court to _properly_ find probable cause and issue charges in the first instance.  There is no jury in Municipal Court and it is a reality that often illegal Ordinances are enforced at the local level by a Magistrate. Determining whether an Ordinance is legal or illegal is simply not within his power.  One wrongfully charged is not vindicated until appeal, well after damage is done.  Moreover, the penalties upon any wrongful conviction

---

[1]_N.J.S.A. 2C:2-2_ provides the following specific definitions of "Knowingly" and "Recklessly":

(2) Knowingly. A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.

(3) Recklessly. A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Recklessness," "with recklessness" or equivalent terms have the same meaning.

enumerated in *N.J.S.A. 2C:33—12.1* are draconian, and would permit forfeiture of property or an order closing Jenkinson's beach for a full year upon conviction. Otherwise stated, as written, if a beach patron successfully secrets a can of beer onto the beach, Point Pleasant Beach could impose liability upon Jenkinson's for that patron's conduct and the town could close the beach for a full year, or otherwise try to seize the property and sell it at auction!  That is the Ordinance you have proposed.  Clearly, the law does not allow this.  The insurance implications would be considerable – probably catastrophic.  Frankly, I am not sure whether you actually understand what your proposed Ordinance will actually do if enacted.[2]

Based upon the statements of the Mayor and the text of proposed §21-1.2B itself, it is clear that the Ordinance was drafted to directly and unfairly target Jenkinson's specifically.  The Ordinance threatens and all but directs that charges be brought against Jenkinson's without probable cause and for the actions and conduct of other third parties, contrary to law. Under the circumstances you cannot expect Jenkinson's to simply sit back quietly if this new Ordinance #2020-12 is enacted.  I would ask that you reconsider and withdraw the Ordinance and obtain a formal legal opinion on the issues I have pointed out here today.  Absent same, my client will have no choice but to consider filing litigation seeking declaratory and injunctive

---

[2] It is really not clear whether this Ordinance applies to the municipally owned beach.

relief and damages under various state law theories and under 42 *USC* §1983. My client's course of action will be guided by your actions.

There are other sections of the ordinance that are both discriminatory and unlawful; however, the above sections alone warrant it not being adopted. Interestingly, the proposed Ordinance is the third revision. If there is that much uncertainty, how can that Ordinance possibly be adopted in "good faith".

This summer season will almost be over by the time this Ordinance goes into effect, if adopted. My client has owned, operated and improved this facility for decades. Its operation is a "gemstone" and is a part of the fabric of this community. One would be hard-pressed to find one resident of Point Pleasant Beach who did not, at one time work at Jenkinson's or have one family member which did not. Even more difficult would be a resident who did not enjoy the boardwalk and the facilities. Young people earned money to help support their families and pay for their education. Jenkinson's is a family business dedicated to providing recreation to all families. It is a part of the "heart" of Point Pleasant Beach.

The Mayor's inflammatory comments after a large gathering of visitors is seemingly the basis for this Ordinance. He claims in public statements that these visitors turned the town into an "absolute toilet". Nevertheless,

State Police Colonel Pat Callahan says:

9

> "Last night it was a big gathering someone said about 1,000 folks on the beach: They're really from all the reports that I received that it was just that, a large gathering.
>
> The major complaint seemingly was that they failed to follow "social distancing guideline."

Reportedly, "No major incidents, arrests or damage was reported.

As one views Jenkinson's from the beach, on the boardwalk or from the street, it "sparkles". It has modern safe state of the art rides; a world class aquarium; countless arcade games as well as numerous food courts. There is also a restaurant where entertainment is provided and alcoholic beverages sold.

Sons, grandchildren as well as nieces and nephews of the Storino family work up to 14 hours a day to ensure the cleanliness and safety of the beach and the boardwalk. At the age of 87, Pat Storino is on the boardwalk every day observing and overseeing the business he loves, providing entertainment and happiness for thousands of families from all over New Jersey. Additionally, most Storino family members live in Point Pleasant Beach.

In addition to the Storino family, there are hundreds of employees as well as independent operators who are dependent

upon the summer season to pay their bills and provide for their families. The adverse publicity generated by this ill thought Ordinance will have a significant impact on these individuals and businesses. The Mayor's comment has already had an adverse impact.

There are many individuals who excel in their avocation, whether they be artists, lawyers or entertainers. The Storino family excels in making a family trip to Jenkinson's Boardwalk a fun-filled experience. All of us who are parents or grandparents remember that first trip either as a child or watching our children or grandchild enjoy the boardwalk.

Jenkinson's beaches are completely cleaned at least once during every 24-hour period. There are also containers for trash throughout the beach. My client has expended millions of dollars to create the beach as it is today. To allege that my client is allowing it to be trashed is ridiculous. Jenkinson's did not become the success it is today by allowing bad behavior and slovenly conditions.

This Ordinance is seemingly created as the result of a single gathering on 9 June 2020. This was a single isolated "phenomena". If adopted, this ill thought out ordinance will be

11

challenged by my client and perhaps by others and litigated at great expense and for no reason.

This Ordinance, as written will adversely affect one hundred years of history on the boardwalk. It is unlawful and in the hands of the wrong municipal officials – it can cause chaos.

My client has repeatedly offered to sit down to discuss this issue; however, it will not accept being deprived of the protections afforded them under existing statutes as well as the state and federal constitution.

Very truly yours,

R.S. GASTOROWSKI

RS/cb

cc:    Kevin Riordan, Esq. (via email)
       Edward R. McGlynn, Esq. (via email)

12

GASIOROWSKI & HOLOBINKO
ATTORNEYS AT LAW
54 BROAD STREET
RED BANK, NEW JERSEY 07701
(732) 212-9930
FACSIMILE (732) 212-9980

R.S. GASIOROWSKI
JOHN E. HOLOBINKO

CHRISTIE A. GASIOROWSKI
CATHY S. GASIOROWSKI
ALEXIS L. GASIOROWSKI

August 27, 2020

<u>E-File and Overnight Delivery</u>
Clerk of Ocean County
Ocean County Superior Court
118 Washington Street
Toms River, New Jersey 08754

Re:   **Jenkinson's Pavilion, et als. v. Borough of
Point Pleasant Beach, et als.**

Dear Sir/Madam:

This office represents Plaintiffs, Jenkinson's Pavilion, Anthony Storino,
Frank Storino, and Pasquale Storino, in connection with the above captioned
matter:   Enclosed please find and original and one copy of the following
documents in support of Plaintiffs' Order to Show Cause:

1.   Order to Show Cause.
2.   Memorandum of Law
3.   Verified Complaint with Exhibits
4.   Certification of R.S. Gasiorowski with Exhibits

Kindly file same and return a filed copy in the enclosed self-addressed
stamped envelope.  Please charge our Collateral Account #141964 for any filing
fees.

PAGE 2
APRIL 16, 2019
CLERK OF OCEAN COUNTY

Additionally, kindly contact my office and advise of the Judge that will be hearing this matter and what date and time it will be heard.

Respectfully submitted,

R. S. GASIOROWSKI

RSG:jai
Encls.
cc:   Honorable Marlene Lynch Ford, A.J.S.C. via efile and overnight delivery
Kevin Riordan, Esq. via efile and overnight delivery.
Ed McGlynn, Esq. via efile and overnight delivery

Z:\Litigation1\Jenkinson's - Boro of PPB (Beach Ordinance) 2020\ORDER TO SHOW CAUSE\Clerk re file OTSC 8.27.20.doc

# EXHIBIT 1

**1**

BOROUGH COUNCIL
BOROUGH OF POINT PLEASANT BEACH - COUNTY OF OCEAN
STATE OF NEW JERSEY

TRANSCRIPT OF PROCEEDINGS

Point Pleasant Beach Municipal Building
416 New Jersey Avenue
Point Pleasant Beach, New Jersey 08742

JULY 21, 2020
7:30 P.M.

COUNCIL MEMBERS PRESENT:

PAUL M. KANITRA, Mayor
CARYN BYRNES
ANDY CORTES
THOMAS MIGUT, Council President
ROBERT SANTANELLO
ARLENE TESTA
DOUGLAS VITALE

ALSO PRESENT:

Eileen Farrell, Municipal Clerk
Christine Riehl, Borough Administrator
Joseph Michigan, Police Chief

COLE TRANSCRIPTION, L.L.C.
Certified Court Transcribers
P.O. BOX 34
WHITING, NEW JERSEY 08759
848-227-5001

2

APPEARANCES:

      KEVIN B. RIORDAN, LLC
      BY:  KEVIN RIORDAN, ESQ.
      20 Hadley Avenue
      Toms River, New Jersey 08753
      Attorney for the Borough

3

## I N D E X

| COMMITTEE MEMBERS: | PAGE |
|---|---|
| Councilman Vitale | 6/34 |
| Councilwoman Testa | 15 |
| Councilwoman Byrnes | 36 |
| Councilman Cortes | 43 |
| Councilman Santanello | 56 |
| Council President Migut | 77 |

| MEMBERS OF THE PUBLIC: | PAGE |
|---|---|
| Tom Toohey | 107 |
| Mike Castellano | 108 |
| Vincent Castin | 111 |
| Margaret Windrem | 116 |
| E.J. Geiger | 119 |
| Kristin Hennessy | 121 |
| Burt Esrig | 126 |
| Dave Cavagnaro | 129/163 |
| Anne Lightburn | 131/143 |
| Kitty Stillufsen | 136 |
| John Taurozzi | 140 |

**4**

1              (Whereupon, a virtual meeting takes

2      place and is being recorded.  Due to feedback and

3      interference in audio, various parts of the recording

4      are indiscernible.)

5              MS. FARRELL:  "Adequate notice of the

6      time and place of this meeting was given under the

7      provisions of the Open Public Meetings Act and was

8      posted and sent to the officially designated newspapers

9      in compliance with the law."

10              Mayor Kanitra.

11              MAYOR KANITRA:  Here.

12              MS. FARRELL:  Councilman Vitale.

13              COUNCILMAN VITALE:  Here.

14              MS. FARRELL:  Councilwoman Testa.

15              COUNCILWOMAN TESTA:  Here.

16              MS. FARRELL:  Councilwoman Byrnes.

17              COUNCILWOMAN BYRNES:  Here.

18              MS. FARRELL:  Councilman Cortes.

19              COUNCILMAN CORTES:  Here.

20              MS. FARRELL:  Councilman Santanello.

21              COUNCILMAN SANTANELLO:  Here.

22              MS. FARRELL:  Councilman Migut.

23              COUNCIL PRESIDENT MIGUT:  Here.

24              MAYOR KANITRA:  If everybody could

25      stand for the flag salute and remain standing for the

5

1    invocation.

2                    (Whereupon, the Pledge of Allegiance is

3    recited, an invocation is given, and the meeting then

4    continues as follows:)

5                    MAYOR KANITRA:  Can I get approval of

6    the June 16th minutes and a second?

7                    COUNCILWOMAN TESTA:  I'll make the

8    motion.

9                    MS. FARRELL:  Was that Arlene?

10                   COUNCILWOMAN TESTA:  Yes.

11                   MS. FARRELL:  Is there a second?

12                   COUNCILMAN VITALE:  I'll second that.

13                   MS. FARRELL:  Doug, okay.

14                   Councilman Vitale.

15                   COUNCILMAN VITALE:  Yes.

16                   MS. FARRELL:  Councilwoman Testa.

17                   COUNCILWOMAN TESTA:  Yes.

18                   MS. FARRELL:  Councilwoman Byrnes.

19                   COUNCILWOMAN BYRNES:  Yes.

20                   MS. FARRELL:  Councilman Cortes.

21                   COUNCILMAN CORTES:  Yes.

22                   MS. FARRELL:  Councilman Santanello.

23                   COUNCILMAN SANTANELLO:  Yes.

24                   MS. FARRELL:  Councilman Migut.

25                   COUNCIL PRESIDENT MIGUT:  Yes.

D. Vitale                                    6

1              MAYOR KANITRA:  We're going to move
2    right into committee reports.
3              Councilman Vitale.
4              COUNCILMAN VITALE:  Thank you, Mayor.
5              I'm going to start off tonight with the
6    Rec. Committee.
7              As some of you may be aware, we had to
8    abruptly cancel the Rec. Summer Camp for a week last
9    week.  This was due to a counselor lying on a health
10   questionnaire about being exposed to anyone with COVID
11   and about being tested for COVID.  This counselor
12   ultimately tested positive for COVID after being around
13   the campers and staffers for a day.  Subsequently, the
14   counselor was then tested as negative, but we couldn't
15   take any chances.
16             The Township Administrator along with
17   the Rec. Director and myself made the difficult
18   decision yesterday to shut the camp down permanently.
19             I want to thank Michele Mosca, Allison
20   Pastor, Ryan Simonovitch and all the counselors who
21   spent months preparing for summer camp.
22             The Mayor and I visited with camp staff
23   during counsel training week, and we were blown away by
24   the programs that were put in place for this year's
25   camp.  I definitely look forward to camp returning next

D. Vitale                                    7

1    year.

2                    On a brighter note, the Yoga on the

3    Beach and Beach Yoga Programs are currently running and

4    are well attended.

5                    The Rec. Committee has been in touch

6    with the Manasquan Rec. Committee to begin planning for

7    the tug-of-war.  As of now, the event is up in the air

8    depending on factors related to the pandemic.

9                    The Rec. Committee will also start

10   planning for the bonfire in the next two weeks.  The

11   goal for this year's bonfire is to limit the attendance

12   to Point Beach residents and taxpayers.  More

13   information to come on that.

14                   Moving on to the Police Committee.

15   I'll read the Chief's report.

16                   "Since the last Council Meeting, the

17   police department has engaged in the following

18   activities:  73 arrests for numerous criminal offenses;

19   605 borough ordinances were issued for various quality-

20   of-life offenses.  This marks a 228 percent increase in

21   borough ordinance violations from the same weeks in

22   2019 and a 61 percent increase for criminal arrests."

23                   The Chief has this to say.

24                   "The summer of 2020 has been one of the

25   busiest summers in the history of the Borough of Point

**D. Vitale**                                                          **8**

1   Pleasant Beach.   This is proven by the high number of

2   arrests and summonses that the police department has

3   issued this year.   There has been a large amount of

4   borough ordinances and criminal arrests for disorderly

5   behavior where individuals are openly drinking alcohol

6   in public and smoking marijuana.

7              "I want to take this opportunity to

8   commend all my staff for doing an outstanding job this

9   summer season.   I know it has not been easy, and I'm

10   very proud of all of them for working under these

11   stressful times.

12              "In my 25 years of experience, I have

13   never seen the level of disrespect towards officers and

14   residents of this town as it is today.   It is truly

15   appalling.   These officers are being met with video

16   cameras filming their every move, people yelling

17   obscenities on virtually every call we are handling and

18   the constant screaming of being called racists and that

19   we are targeting people for the color of the skin

20   rather than for criminal behavior.   This narrative is

21   garbage and I will not stand for anyone spreading false

22   rumors about the character and integrity of this police

23   department and the officers who work here.   We will not

24   be deterred by these actions and have employed several

25   tactics to assist this department in identifying

**D. Vitale**                                                       9

1    problem areas and addressing issues.  Some are new

2    video cameras, extra beach patrols, additional bike

3    officers and foot patrols working on Saturday, Sunday

4    and Mondays, our most busiest days of the week.  With

5    the support of the (indiscernible), we've also hired

6    additional full-time officers and (indiscernible) to

7    address retirement of several senior personnel."

8                    (Whereupon, there is a lot of

9    background noise during Councilman Vitale's Committee

10   Report, making parts of his report indiscernible.)

11                    (Whereupon, the meeting then continues

12   as follows:)

13                    COUNCILMAN VITALE:  "We have also

14   called upon the Ocean County Prosecutor's Office and

15   the Ocean County Sheriff's Department to assist with

16   manpower and other logistical support on the weekends.

17   I am fortunate to have the full support of Mayor and

18   Council to combat the problems that we are facing

19   today.  In a world where it is common to say defund the

20   police, we have brave leaders to stand up and defend

21   the police.  It has not gone unnoticed and we

22   appreciate your support.

23                    "We also appreciate the support of the

24   residents and businesses of this town.  I've received

25   several phone calls, letters and emails stating that

**D. Vitale**                                              10

1    they support our department and praising the actions of

2    our officers.  As they say we are all in this together,

3    and I pledge to continue to employ (indiscernible) on

4    quality-of-life issues here in town."

5                    MAYOR KANITRA:   There's a lot of

6    background noise.  Some people are not muted.  Can you

7    please mute everybody.

8                    COUNCILMAN VITALE:   I think that's

9    everybody.

10                   "As always, I encourage residents and

11   businesses to contact the police department to report

12   unlawful activity.  It is critical that the police

13   department is contacted immediately so that we can

14   address these issues while they are unfolding.   It is

15   important that we work together to make our community a

16   great place to live and visit.  We are working very

17   hard every day on building a positive police-community

18   relationship.  And while we recognize that there's

19   still work to be done, we feel that great progress is

20   being made.

21                   "I personally want to thank all of you

22   for standing with us during this difficult time in law

23   enforcement.  We are lucky to serve in such a

24   supportive community."

25                   I have one last thing on the Police

D. Vitale                    11

1   Committee.  I just want to reiterate something that I

2   say almost every Council Meeting.  There are posts on

3   several community Facebook pages about criminal and

4   suspicious activity, littering, drinking, all quality-

5   of-life violations.

6                   First off, the police need to be

7   notified before posting on social media.  After that,

8   please post on the Neighborhood Partnership Initiative

9   Page.  That page was set up with the police department.

10  Everything that gets sent to that page gets shared with

11  the police department.  I initially get a notification

12  when a post comes into that page.  And in doing so, I

13  can act on it and forward it immediately.  Sometimes it

14  takes hours for someone who posts on other pages and

15  then forward it to the police department.

16                  So, again, I urge all residents if --

17  if you want to post something on social media, use the

18  Neighborhood Partnership Initiative page so that we can

19  forward it to the police department and they will see

20  it.

21                  FEMALE AUDIENCE MEMBER:  (Indiscernible)

22                  MAYOR KANITRA:  Whoever just said --

23  there's dog's, there's a t.v. --

24                  COUNCILMAN VITALE:  All right.

25                  There's a sinkhole on New Jersey and

D. Vitale                                      12

1   St. Louis Avenue that was repaired.  (Indiscernible) is

2   using outdoor seating (indiscernible).  The first

3   department has (indiscernible) the water barriers and

4   (indiscernible) is responsible for the other end.

5   There was a broken water valve on 35 South and New

6   Jersey which was repaired the same day.

7                We are looking to get a right-turn-only

8   arrow at the intersection of Arnold and River.

9   (Indiscernible) Painting will do this for $250 and use

10  a DOT compliant paint.  This was researched by not only

11  the Borough Administrator but DPW and our engineering

12  firm.

13                I would like to move forward tonight

14  and add this to the agenda.  So $250 for the

15  (indiscernible) Painting to -- to paint a right-turn-

16  only arrow on Arnold and River.

17                MS. RIEHL:  Doug --

18                COUNCILMAN VITALE:  Yes.

19                MS. RIEHL:  Doug, it's Arnold and Bay.

20                COUNCILMAN VITALE:  Oh, Arnold and Bay.

21  I'm sorry.

22                MS. RIEHL:  Yes.

23                COUNCILMAN CORTES:  Arnold and Bay?  I

24  think it's Arnold and River.

25                MAYOR KANITRA:  It is River.  It is

**D. Vitale** 13

1    River.

2                    COUNCILMAN CORTES:  Arnold and River

3    has two signs that say "No Left Turn."  And, you know,

4    it's amazing.  I asked a couple of years ago for an

5    arrow there.

6                    MAYOR KANITRA:  It is Arnold and River.

7    I was called by a couple of business owners.  I went

8    down there.  Literally, while I was there, I watched

9    about four cars make the left that they shouldn't have

10   made and -- and it almost caused a couple of accidents.

11   So that's correct.  I'm sorry about that.

12                   COUNCILMAN VITALE:  At the intersection

13   of Central and St. Louis, there's a huge tree reducing

14   the visibility of the stop sign there.  Code

15   enforcement and shade tree looked at it and the...

16                   COUNCILMAN SANTANELLO:  We lost you,

17   Doug.

18                   MAYOR KANITRA:  Is that my internet or

19   Councilman Vitale?

20                   COUNCILMAN SANTANELLO:  We lost Doug.

21                   COUNCILMAN CORTES:  We lost Doug.  He's

22   frozen.

23                   MAYOR KANITRA:  Okay.  Until he comes

24   back on, we'll temporarily move on to -- to

25   Councilwoman Testa.

**D. Vitale**                                    14

1              Councilwoman, can you start -- you know

2      what?  I know you're -- I know you're going to have a

3      pretty long report.  Let's give him -- let's give him

4      just a minute to try and -- and get it back.  I think

5      he just dropped off.

6              COUNCILMAN SANTANELLO:  Yeah, he

7      definitely dropped off.  It says the Zoom meeting is

8      still up there.

9              MS. RIEHL:  Right.

10             COUNCILMAN CORTES:  He's gone.  His

11     picture is gone.

12             MAYOR KANITRA:  He's getting back on.

13             MR. CASTIN:  I couldn't get on.  What

14     the hell is the matter here?

15             MAYOR KANITRA:  Vince, you want to run

16     the meeting?  What's your -- what's your committee

17     report, Vince?

18             MR. CASTIN:  Okay.  What committee am I

19     on?

20             MAYOR KANITRA:  Hold on.  Let's see if

21     he can -- you know what?

22             Councilwoman Testa, clearly, Councilman

23     Vitale is having internet problems.

24             COUNCILWOMAN TESTA:  Sure.

25             MAYOR KANITRA:  Maybe you can go with

A. Testa                          15

1    your report.

2                    COUNCILWOMAN TESTA:   Okay.   Can you

3    hear me?  Because I feel like it's low.

4                    COUNCILMAN CORTES:   Yeah.

5                    COUNCILWOMAN TESTA:   Can you hear me

6    okay?  Okay.   Good.   All right.   Awesome.

7                    Thank you, Mayor, and thank you to the

8    residents of Point Pleasant Beach for being on

9    tonight's Council Meeting.   I appreciate you being here

10   and being participants.

11                   I'd like to start with my committee

12   reports.

13                   The first is the Arts Committee.   We

14   are going to have some new murals going around up

15   during downtown by Stella Luna and also by Jim's

16   Gallery which is right next to Stella Luna.   So you're

17   going to start seeing those murals go up.   We're really

18   excited about that.

19                   There also was some discussion about a

20   new idea for downtown, an art gallery, that we would

21   feature artists into the windows of the empty store

22   fronts.   It would help beautify the downtown and it

23   would help artists display their artwork.   This would

24   help the building owners by adding a store for sale/

25   rent sign with the floor plan into the window art.

A. Testa                                    16

1   There's still -- we're working on a list of businesses

2   that would be interested in this, obviously.  And I

3   think it would -- you know, I think it's a -- a great

4   idea.  I think it's -- I'm totally onboard with this.

5   And I'd just like to thank the Arts Committee and the

6   team that they have for all their hard work.  So we'll

7   see what happens.  I'll keep you posted on that.

8             With the Beautification Committee, I

9   spoke with Mary Snyder.  They are working very hard

10  with the weeding and the watering of all the different

11  plants and areas this month, especially with the

12  extreme heat.  So hats off to them because that is a

13  huge dedication to go out there and water everything.

14            And just, you know, like, for myself

15  walking around and riding my bike, it does look great.

16  I mean, all the teams are doing a fantastic job.  So

17  thank you again to all the volunteers and thank you to

18  Mary and her team for doing a great job.

19            I don't know if there's anything that

20  you want to add, Andy, to the beautification that --

21            COUNCILMAN CORTES:  No.

22            COUNCILWOMAN TESTA:  No?

23            COUNCILMAN CORTES:  No, you covered it.

24            COUNCILWOMAN TESTA:  Okay.  Very good.

25            I know that we had a meeting Wednesday

A. **Testa**                              17

1   for the code enforcement.  I had to go to work early.

2   I really didn't hear back.  Did you guys have that

3   meeting or -- or was it rescheduled, Andy?

4                  COUNCILMAN CORTES:  Bob and I called in

5   and we waited ten minutes and nobody else called in.

6   The crux was that you canceled so it was changed.  I

7   did --

8                  COUNCILWOMAN TESTA:  Okay.  Well, I

9   didn't want it to be canceled.

10                  COUNCILMAN CORTES:  Okay.

11                  COUNCILWOMAN TESTA:  I just wanted to

12   know, Christine Riehl, do you know if code enforcement

13   was put into the Government Pilot Program?  I did ask

14   that question but I did not get a response back yet.

15   Do you know if that was implemented?

16                  MS. RIEHL:  It is in the works, yes.

17                  COUNCILWOMAN TESTA:  Okay.  So it's not

18   in yet but we're working on it.  Okay.

19                  MS. RIEHL:  Correct.

20                  COUNCILWOMAN TESTA:  Awesome.  Great

21   job.  Thank you.

22                  Okay.  I'd like to give a big shout out

23   for this past Saturday for the Little Silver cleanup.

24   How it came about was a resident, Margie McDonald, she

25   actually lives on the Little Silver Lake on Trenton

**A. Testa**                                                18

1    Avenue, and she had reached out to me and she had asked

2    if we could do a cleanup.  The last time it was done, I

3    believe, was two years ago and Council Members and the

4    dive team had all participated, and she was very, very

5    happy with that.  And she wanted to know if we could do

6    that again.  I reached out to the Mayor and Christine

7    Riehl, and they said absolutely.

8             And a huge thank you to Kristen

9    O'Rourke because I couldn't have done it without her

10   help.  She organized everything with me.  She made the

11   flier.  She sent out emails to all the other committees

12   and it was very successful.

13            I'd like to say thank you to Chet and

14   his amazing dive team.  They're amazing.  I don't know

15   -- is that -- is that dive team a specific team or is

16   that, like, part of the first aid squad?

17            MALE VOICE:  (Indiscernible)

18            COUNCILWOMAN TESTA:  Okay.  And then

19   the first aid squad came out and they had water.  They

20   had air-conditioning in their trucks because it was

21   almost 95 degrees that day.  So they went to make sure

22   all the volunteers were safe from heat exhaustion.  So

23   thank you to them.

24            Thank you to (indiscernible) for being

25   there.  That was awesome.  And to the students that

A. Testa                                      19

1   showed up.  I know a lot of people didn't know about

2   it, and I apologize.  I'll do better communication and

3   get it out there.  But we would love to have you.  It

4   was a huge success.  And I don't know if you can see my

5   picture.  But that was -- right there.  That's part of

6   the dive team and some of the volunteers, and those

7   were all the bags that we collected in trash.  So thank

8   you for that.   And I'd like to do that every year.

9   You know, just kind of keep it as a tradition, like,

10  not wait two years.

11              And the residents on the lake were so

12  thankful.  They really appreciated it.  They say a huge

13  thank you to everyone.

14              I'd like to keep you updated on what's

15  going on with the traffic and signage.  Again, a lot of

16  residents reach out to me and talk about their concerns

17  with streets, and I do write down all your suggestions,

18  and I send them to the appropriate people, and I follow

19  up with discussion to get feedback.

20              If you can bear with me for one moment,

21  I will let you know what was said.

22              So I spoke with Kristen O'Rourke, and I

23  asked her to follow up with me.  She said that -- and

24  I'm just going to read this out.  Hold on one second.

25  Okay.  Okay.

**A. Testa**                                                                20

1          "Christine Riehl and I had a phone

2    meeting with the NJ DOT at the end of June to discuss a

3    number of state road issues relating to outstanding

4    requests and new requests from residents.   The new

5    requests were discussed with the DOT and are outlined

6    throughout.

7          "One, direction arrows painted on 35

8    North and South to reduce the numbers of cars turning

9    on the wrong way onto the highway, focusing around the

10   downtown area.   DOT said this is definitely possible."

11         So that's good.

12         "They arrange painters to come out and

13   paint the arrows on the pavement.

14         "Two, left-turn signal at Arnold and 35

15   South.   DOT said this will require roughly a six-month

16   traffic study which requires rewiring and new

17   signaling.   That is impossible in this calendar year

18   due to the furloughs and the pandemic" which is

19   understandable.   "This will be considered in 2021, as

20   the Borough would need to provide 25 percent investment

21   in the project as part of the mandatory cost share

22   agreement.

23         "In the meantime we have requested to

24   have the entire intersection be considered for painting

25   "Don't Block the Box" to help clear traffic.   Crosswalk

**A. Testa**                    21

1    intersection on Route 35 and E Street, east of the

2    train tracks, DOT took our suggestion, and we worked

3    with the NJT to determine that it is their

4    right-of-way."

5                     So these were some of the suggestions

6    by a resident.  We're definitely, you know, doing the

7    best that we can to get these things addressed.  So

8    thank you and -- and keep bringing them into us.  Okay?

9    I love it.

10                    I'd also like to say thank you to Maser

11   Engineering Firm and especially to John Neely and

12   Kelsey Krammer.  They are just outstanding.  They have

13   helped me so much trying to get this grant process to

14   get us money to get these roads fixed.  They did a very

15   detailed plan.  They submitted it.  I'm waiting to hear

16   back.  We still haven't heard whether we got this

17   grant.

18                    I have to say on a personal note that

19   any time I reach out to them they're always available.

20   They always talk to me.  They're kind and considerate

21   and they work very, very hard.  And we're very

22   fortunate to have them.  So I can only speak highly of

23   the Maser Engineering Firm.  So thank you to them.

24                    So that's it for my committee reports,

25   but if you could just indulge me for a couple of more

**A. Testa**                                                    22

1   minutes, I would appreciate it.

2                    There are two things on the agenda

3   tonight that I'm sure we're going to have a long

4   discussion with, and everyone is going to have a

5   different opinion, and that's okay because we are all

6   adults and we're all allowed to have different

7   opinions, but we should always remain respectful.

8                    So the first two -- the first -- the

9   first ordinance is the beach ordinance and the second

10  one is the tree ordinance.

11                   So I'm going to talk about the beach

12  ordinance first, and I'd like to discuss my point of

13  view, my three points and then I'll go on to the tree

14  ordinance.

15                   A MALE VOICE:   (Indiscernible)

16                   COUNCILWOMAN TESTA:   I'm not allowed to

17  talk about it?

18                   A MALE VOICE:   No.

19                   COUNCILWOMAN TESTA:   Mayor, when am I

20  allowed to give an opinion about it?

21                   MAYOR KANITRA:   She's allowed to talk

22  about whatever she wants in her committee report.

23                   COUNCILWOMAN TESTA:   I wanted to

24  respond to the beach ordinance.  Am I allowed to say

25  anything?

**A. Testa**                                                23

1              MAYOR KANITRA:  Of course, you can.

2              COUNCILWOMAN TESTA:  Oh, okay.  Because

3    someone said I'm not allowed to.  Am I allowed to speak

4    about it?

5              A MALE VOICE:  I don't think so because

6    (indiscernible).

7              MAYOR KANITRA:  Doug, can you mute

8    whoever is speaking (indiscernible -- feedback).  I

9    mean we all do.

10             COUNCILWOMAN TESTA:  We all did in the

11   past.  I mean, I don't know why all of a sudden I can't

12   when other people in the past have major discussions

13   about things.

14             COUNCILMAN CORTES:  Kevin, this is

15   yours.

16             MR. RIORDAN:  I'm here.

17             COUNCILMAN CORTES:  This is yours.

18   Would we, you know, give our opinions on ordinances

19   during our committee report or would we when it comes

20   up to a vote?  Because it's on for first reading/

21   introduction which is not --

22             COUNCILWOMAN TESTA:  Okay.  Well,

23   whenever -- that's fine.

24             COUNCILMAN CORTES:  Arlene, I'm just

25   asking the attorney.

A. Testa                                    24

1           MAYOR KANITRA:  I -- I will say it does

2    seem like a double standard and a little bit of

3    mansplaining here to the Councilwoman.  Every other

4    meeting you guys always talk about every single thing

5    on there, and she starts to talk and it seems like

6    you're trying to --

7           COUNCILMAN CORTES:  I'm not trying --

8    Paul, I actually --

9           (Indiscernible -- simultaneous

10   conversations.)

11          COUNCILMAN CORTES:  -- a legal aspect.

12          COUNCILWOMAN TESTA:  Well, I don't want

13   to do anything illegal.  When I'm allowed to speak

14   about the ordinance, let me know.

15          MR. RIORDAN:  Let me know when you want

16   to hear from the lawyer.

17          MAYOR KANITRA:  No one else is

18   recognized to speak except for the Borough Attorney

19   right now.

20          Kevin.

21          MR. RIORDAN:  Thank you, Mr. Mayor.

22          What you're talking about is the

23   procedure for your meeting.  The procedure for your

24   meeting is set forth in your meeting procedure.  The

25   committee reports allow a very wide-ranging group of

A. Testa                                      25

1   topics including ordinances.  And I know that -- that

2   Councilman Santanello and Councilman Cortes are

3   thinking about the procedure by which ordinances have

4   to be passed, and they are absolutely right.  It has to

5   be introduced on first reading, and the public then has

6   an opportunity to comment at a second meeting which

7   would be a meeting after this one.  Of course, we have

8   always allowed comment on ordinances on first reading

9   during the, I believe it is, first public comment.  I

10  could stand to be -- stand to be corrected.  Somebody's

11  got the agenda in front of them and can look at it.

12              COUNCILMAN CORTES:  Yes.

13              MR. RIORDAN:  But there's nothing

14  illegal about the Councilwoman discussing the

15  ordinances at this phase.  It does not in any way

16  affect the legal -- legality of the enactment.

17              COUNCILMAN CORTES:  Okay.

18              MR. RIORDAN:  Does that answer the

19  question?

20              COUNCILMAN CORTES:  Yeah.  Thank you,

21  Mr. Riordan.

22              MR. RIORDAN:  I try, guys.

23              COUNCILMAN SANTANELLO:  Paul, would you

24  recognize me for one moment, Paul?

25              MAYOR KANITRA:  Sure.

**A. Testa**                                          26

1          COUNCILMAN SANTANELLO:  I think you

2   misunderstood what I was saying before.  I said that

3   she had every right -- every right to talk about the

4   ordinance.  I was not objecting to it.  That was

5   somebody else, not me.  I just --

6          MAYOR KANITRA:  And that's understood,

7   Bob.  There was someone jumping in and --

8          COUNCILMAN SANTANELLO:  Okay.

9          MAYOR KANITRA:  So thank you,

10  everybody.

11         COUNCILWOMAN TESTA:  Thank you,

12  everybody.

13         So -- so may I continue, Mayor?

14         MAYOR KANITRA:  Please.

15         COUNCILWOMAN TESTA:  Okay.  So just

16  bear with me, everyone.

17         Okay.  So my first point is that with

18  this ordinance, when it first initially started, there

19  was a lot of concern about the size of the coolers

20  going from the large size to 12-inch.  And I heard

21  people come up to me and I just heard different people

22  saying, like, wow, that's too small; there's a lot of

23  things that, you know, we're not going to be able to

24  fit in; I can't fit that stuff.

25         So for your entertainment, I have some

**A. Testa**                                    **27**

1    props.  I actually have two coolers.  They're actually

2    11 inches, where the new ordinance is 13 inches.  I

3    have two of these.

4                   MAYOR KANITRA:  Okay.

5                   COUNCILWOMAN TESTA:  I want to show you

6    what I can fit in them just for entertainment purposes.

7    Okay.  This is the (indiscernible).  Look, a whole box

8    of granola.  On the side we have more granola.  I open

9    this up, I have eight bottles of water.

10                  MAYOR KANITRA:  Eight?

11                  COUNCILWOMAN TESTA:  Eight.

12                  MAYOR KANITRA:  Wow.

13                  COUNCILWOMAN TESTA:  And I have a soda.

14   This is just one.  Moving on to the second cooler.

15   Here we go.  A whole bag of chips.  (Indiscernible) can

16   go in the beach bag because you can put as many chips

17   as you want to, but I thought, well, we'll put one in

18   there.

19                  MAYOR KANITRA:  Great.

20                  COUNCILWOMAN TESTA:  Let's see what

21   else we have.  Granola, granola snack bars.  And let's

22   see what we have in here.  Oh, salami, turkey, peanut

23   butter, a whole loaf of bread and eight cans of soda.

24   What else?  I have that, that.  And I have one more

25   thing.  Oh, I have a whole bag of carrots.

**A. Testa**                                           28

1            I think you kind of get the point that

2    I'm making.  The ordinance says they don't want lunch

3    coolers.  They didn't say that you can't have every

4    parent carry one of these and a child.  So think about

5    it.  If each one brings one of these up.  Mom, dad and

6    a kid, and they're on the beach for five hours, I truly

7    think there is enough in here to sustain a family for

8    five hours with water, nourishment, food, whatever they

9    need.

10            Now, when I go on the beach, I've

11   noticed -- not on Jenkinsons but on other beaches where

12   this ordinance isn't (indiscernible), I've seen large

13   coolers.  I've walked by.  I've seen a case of beer in

14   there.  I see people drinking all the time.  The reason

15   why the ordinance with the coolers is because you can't

16   sneak anything, really, in here and hide.  It's pretty

17   ob -- obvious.

18            So that's my first point.

19            The other point is on the age.  We

20   should not have 14 and 15-year-olds checking coolers.

21   It should be 18-year-olds checking coolers.  Eighteen

22   is the age to work in a liquor store.  If you're in a

23   restaurant, 14-year-olds can't be serving -- bringing

24   over liquor.  So why would we allow children at 14 or

25   15 checking coolers for alcohol?  That's why the age is

**A. Testa**                                                29

1   18.  That's just common sense.  It's for safety for

2   them.

3              Okay.  Another point is, my son has --

4   this is his fourth year working at the -- at the beach.

5   And I'm going to just say that when this ord -- when

6   this was put into effect, it changed the size of the

7   cooler.  And a weekend or two went by.  I actually

8   asked him.  I said, listen, I said, how's the beach

9   been in the morning?  Because he always works seven to

10  twelve in the morning.  He goes, "Mom, it is so clean

11  up there."  He goes, "I can't tell you."  He goes,

12  "Prior to this, I can't tell you the amount of garbage

13  that I was picking up, and I don't even want to tell

14  you things I had to pick up."  Now that this has gone

15  into effect, he goes, "Mom, it's unbelievable."

16             So I'm taking it from my son who works

17  up there five days a week and busts his butt.  Okay?

18  So do you want to hear from the source?  Hear from the

19  kids that actually work up there.  So he actually

20  thinks it's a good idea because it reduces the level of

21  litter.  So that's a good thing for the town.

22             Any another point with this -- and I'm

23  going to tell you a little story.  Just humor me.

24             Basketball, okay, last year, varsity

25  team, basketball team goes away for their away games.

**A. Testa** 30

1  And they're given the privilege to have subs when they

2  get out of a game because it's an hour away.  The

3  second away game, one child decides that after they get

4  done eating their sub they're just going to throw their

5  food everywhere and not clean up.  They get off the

6  bus.  They leave their garbage.  The coach asked him to

7  please go back in and clean up.  He says, no, I'm not

8  going to. So other children go in and clean up.  Well,

9  the next away game, guess what happens?  No more subs.

10  Guess what?  Were parents upset?  Absolutely.  Were the

11  kids upset?  Absolutely.  But guess what?  One person

12  decided that they weren't going to follow the rules and

13  they were going to do things their way, and that

14  privilege was taken away, and I'm okay with that

15  because there's consequences to your actions.

16            So to me if people are going to come

17  here and -- and visit our beautiful beach, then they

18  have to respect our beach, they have to respect the

19  residents, and they have to respect the ordinances.

20  And if you can't, what can I tell you?  These -- this

21  is the ordinance for a reason.  Okay?  So that is why

22  I'm voting and I'm for this beach ordinance to give you

23  my points of view.

24            When I went walking on the trail with

25  Mayor Paul Kanitra, Councilman, at the time, and Doug

**A. Testa**                                           **31**

1      Vitale, we spoke to, I want to say, over 800 residents,

2      easily.  And their number one concern was safety, okay,

3      and -- and the cleanliness of this town and the respect

4      of this town.

5                    I'm not -- when I ran, I didn't run for

6      any political gain or to get anywhere.  I'm here for

7      the residents of this town.  And I have to say that the

8      majority -- out of 1,000 residents, 950 people are on

9      agreement with this.  So to me that's my -- my concern

10     is the residents.  So that's what I have to say about

11     this beach ordinance.

12                   And, lastly, with the tree ordinance.

13     I know that there are two -- two sides of this, and I

14     understand both sides, why you're for the tree

15     ordinance and why you're against it.  I get both sides.

16     I truly do.  But I have to say that this -- this

17     ordinance has been up now for three weeks almost since

18     our last meeting, and I have to tell you that there's

19     only one resident that reached out to me, and that was

20     John Terrazi, of why he was against this ordinance.  He

21     spoke very eloquently and he brought his point of views

22     across.  And I understood what he meant as a homeowner

23     and his rights.  And he spoke to every Councilperson on

24     this Committee.  He spoke to the Mayor.  He spoke to

25     the other side as well to get everybody's perspective,

A. Testa                                    32

1   and I commend him and I respect him for that.

2            Recently, I also received two beautiful

3   letters from people that are for the tree ordinance,

4   and they were beautifully written, and I understand

5   where they're -- where they're coming from too.

6            So what I'd like to encourage, when we

7   do have open discussion, I want to hear from the

8   residents.  I want to hear why you're for the tree

9   ordinance and I want to hear why you're not for the

10  tree ordinance.  I know that they made some changes on

11  the tree ordinance to come to a happy medium, and

12  that's what this is about.  It's not about one side or

13  this side.  It's about everybody coming together and

14  trying to find something that works.

15           And I have to tell you, John Terrazi,

16  he made a powerful statement.  He goes if you're going

17  to pass something, at least 50 percent of the town has

18  to be in agreement with that.  And that spoke volumes

19  to me, and that stayed with me.

20           And all I want to say is that when we

21  have the open discussion and other people talk, let's

22  just be respectful to one another.  Let's -- we might

23  not agree with everybody's opinion, but we need to be

24  respectful and we need to be kind.  And that's all I'm

25  asking in this meeting.  That is all I'm asking.

A. Testa                          33

1          And I just want to say thank you to the

2    Council, thank you to the Mayor, thank you to Christine

3    Riehl and everyone on there and thank you especially to

4    our residents.  You guys, really -- you know, we have

5    to be all in this together.  And that's what I'm here

6    for.  I've got no objective here.  I'm not here for any

7    political gain.  No one is paying me a lot of money.

8    I'm here for you.  I work full-time like everybody

9    else.  I know I'm going on and on, but I want you to

10   know that my heart is in this.  And any one of you can

11   call me and talk to me about your concerns.  We might

12   not agree on everything, but I will surely listen to

13   you.  And that's what I'd like to say.

14          I thank you for giving me this time.  I

15   normally don't talk this long, but I felt it was very,

16   very important for me to express how I feel.  So thank

17   you.  God bless you and I -- and just thank you for

18   this time.

19          And that's all I have to say, Mayor.

20   Thank you so much.

21          MAYOR KANITRA:  Councilwoman Testa,

22   that -- that might be the committee report of the year.

23   I got four texts already about your cooler through my

24   phone right now.

25          Councilwoman Byrnes, you have to top

D. Vitale                                           34

1   that.

2               COUNCILWOMAN BYRNES:   That's a hard act

3   to follow.

4               COUNCILMAN CORTES:   Is Councilman

5   Vitale finished with his report?   Is he back on, Mayor?

6               MAYOR KANITRA:   We'll go back to

7   Councilman Vitale to finish his report.   He was halfway

8   through the police thing when the I.T. professional

9   that he is lost internet service.

10              Go ahead.

11              COUNCILMAN VITALE:   Can you hear me?

12              MAYOR KANITRA:   We can.

13              COUNCILMAN CORTES:   Yes.

14              COUNCILMAN VITALE:   All right.   I just

15  had a couple more things left.

16              I talked about the streets.   I talked

17  about the intersection of Central and St. Louis which

18  we --

19              COUNCILMAN SANTANELLO:   We lost you on

20  that one, Doug.

21              COUNCILMAN VITALE:   Okay.   All right.

22  So at the intersection of Central and St. Louis,

23  there's a huge tree reducing the visibility of the stop

24  sign.   Code enforcement and shade tree looked at it,

25  and the entire tree would have to come down.   They

D. Vitale                                    35

1   decided to keep the tree up and instead put a sign in

2   front of the -- the branches that are causing the

3   visibility issues to say that there's a stop sign

4   ahead.  So they're hoping that that will help alert

5   drivers that a stop sign is coming up without having to

6   take down this -- this huge, beautiful tree.

7             Finally, on cybersecurity initiative, I

8   created an acceptable use social media policy for

9   Borough employees which is currently being reviewed by

10  the Borough Attorney.

11            On the cooler ban, I -- I cannot follow

12  Councilwoman Testa.  That was a great speech.  But I

13  wanted to say that, you know, I -- I have a lot of

14  residents talk to me and -- and text me, and a lot of

15  residents work up on the beach.  And to mimic

16  Councilwoman Testa's point is that since we've started

17  to contain the size, the litter has significantly

18  decreased.  So I -- you know, I am in favor of the ban

19  of the cooler size.

20            And that's all I have.

21            Sorry for the technical difficulties.

22            Thank you.

23            COUNCILWOMAN TESTA:  That's okay.

24            MAYOR KANITRA:  All right.

25            Councilwoman Byrnes, you're up.

C. Byrnes                                    36

1           COUNCILWOMAN BYRNES:  Good evening,

2     everybody.

3           And thank you Point Pleasant Beach

4     residents for being in attendance tonight.  And thank

5     you, Mayor, my Co-Council.  Thank you, Chief, the

6     Administrator Christine, and Eileen.  Thank you very

7     much for all your support in the office all the time.

8           Governing during these unprecedented

9     times is no easy task.  That's for sure.  And is it

10    none that I take -- I take with the utmost despair.

11          Chief, thank you, especially for your

12    continued commitment, really, for these quality-of-life

13    issues along with the Mayor.  And it's -- it's made a

14    big deal.  It's making a big deal with our -- with our

15    residents.  And, you know, so many of them, sadly, are

16    looking to leave, you know, so this really needs to be

17    addressed, you know.  So I thank you.

18          I also thank you, Chief, for that --

19    for that wonderful memo that Doug just read.  That was

20    well-written and well-said.

21          So on to my reports.

22          The fire report, they've been fairly

23    busy this summer mostly with some minor issues to

24    contend with.  So they've had some minor issues to

25    contend with.  But like everything else during these

C. Byrnes                                    37

1    times, when they're called upon and there's

2    uncertainty, you know, it's unsettling, you know.  So

3    thank you to them for what they do.

4                    The membership has grown a little bit.

5    They have two new active members and two new junior

6    members that we're all very proud of.  So -- so very

7    good for that.

8                    On to the Environmental Commission.  So

9    some Green Team news.  We've shared a renting

10   discussion on various grant opportunities including

11   that -- the community -- the Clean Communities Grant

12   Program through the NJDEP, and that will be ongoing.

13   But we will certainly (indiscernible).

14                   Sustainable Jersey Actions, there was

15   certainly -- the Shade Tree Commission updated the

16   Environmental Commission on the actions of the proposed

17   (indiscernible) and some of the amendments that

18   everybody spoke about.  I voiced some of the concerns

19   that I have had through the -- throughout with our

20   constituents although there have not been too many.

21                   MAYOR KANITRA:  You're going to bring

22   up Al Verosi's comment for the Shade Tree thing when we

23   get into that, right?

24                   COUNCILWOMAN BYRNES:  Yes, yes.

25                   So the Shade Tree Committee was

C. **Byrnes**                                      38

1   submitting a proposal to the Ocean County Shade Tree

2   Commission for shade trees on Broadway.  And, again,

3   they're very happy with Rob so they thank us all for

4   that.  You know, that is working out real -- really

5   well.  And I mean if he wasn't out there watering

6   during this, you know -- you know, what I mean, it

7   would all be a moot point.  So it's all important, you

8   know?

9             For ongoing business with the

10  Environmental Commission, we've had a long discussion I

11  guess for another volunteer project involving clean-up

12  and replanting on Arnold Avenue between the property --

13  between the firehouse and the post office.  For that

14  effort we'll be seeking some high schoolers.  They'll

15  be -- they will be supervised by the Commission, and

16  they will be, I guess, putting a professional

17  landscaper on that one.  And together we'll work and do

18  something lovely.

19             During this meeting it was also

20  discussed that there was -- the -- the recycling

21  receptacles.  Many of them do not have the information

22  stickers on them.  They will also be replaced by the

23  volunteers.  And they work very hard out there doing a

24  lot of that.

25             Our Chair, Peter Richings, advised the

C. Byrnes                              39

1    Environmental Commission about a potential violation

2    that I think we all know.  You know, he had

3    communication with the NJDEP, the Bureau of Coastal and

4    Land Use and Coastal Environmental Office.  So thank

5    you for that.

6                    Some ongoing news.  I have a very -- I

7    would like to read the let -- the letter from the --

8    one of the eloquent letters that we received from the -

9    - for the Shade Tree Ordinance in support.  Can I do

10   that now or --

11                   MAYOR KANITRA:  Sure.

12                   COUNCILMAN CORTES:  Does that

13   constitute public comment?

14                   MAYOR KANITRA:  Kevin, can she read a

15   resident's letter?

16                   MR. RIORDAN:  No because it's coming

17   from the Councilwoman, but it is a relatively unusual

18   procedure.  It's up to you, Mr. Mayor.  Ordinarily, if

19   -- if residents want to speak, they come to the Council

20   Meeting.  Usually, they don't send Councilpeople

21   letters to be read so it's unusual but it's up to you.

22                   COUNCILWOMAN BYRNES:  Well, because

23   it's so well -- it's so eloquently stated to be in

24   support of the shade tree -- of the ordinance and which

25   I am supporting because we do need legislation to

C. Byrnes                    40

1   support our trees.

2                   MAYOR KANITRA:  Councilman, go ahead,

3   please.

4                   COUNCILWOMAN BYRNES:  Okay.  It's very

5   brief.

6                   So he states:

7                   "Dear Mayor and Council, I'm writing in

8   support of the above-ordinance as I strongly believe

9   that it's in the best interest of the Borough

10  environmentally, economically and aesthetically.

11  Further, it is neither overtaxing on government

12  structure or resources nor inconsistent with the

13  important goal of environmental protection and air

14  quality maintenance and improvement."

15                  So we can all really agree with that.

16                  "As a resident of this great community,

17  I strongly believe that we should be doing everything

18  in our power to ensure future generations will enjoy

19  all the resources that Point Pleasant Beach has to

20  offer.  Passing this legislation is an important step

21  in that direction in terms of natural resource

22  preservation.

23                  "Also, I am not often active political,

24  but I felt compelled to write you all to express my

25  views and to voice my strong support on this important

C. Byrnes                                    41

1   ordinance.  As we are all aware, trees are a precious

2   and invaluable resource.  For removal and planting of

3   trees in our community, we need explicitly stated

4   legislation and (indiscernible)" -- I had to look that

5   one up, actually -- "protection" -- I've never seen

6   that word, but I like it -- "whether public or private

7   lands."

8                  (Indiscernible -- feedback.)

9                  "The ordinance is very resident

10  friendly and as noted requires few additional

11  government resources to be implemented."

12                 So I just brought that -- that sums up

13  -- that sums up my feeling toward that -- toward the

14  argument now.  I know that we've worked hard on it and

15  it's been fine-tuned, and I would like to see that one

16  pass.  It makes sense.  You know, I mean, who doesn't

17  really enjoy the character and -- and all the beauty of

18  a tree-lined street, you know?  That's how it's -- how

19  I feel about that.

20                 On Arnold Avenue -- on another little

21  news -- I -- and, Arlene, this is kind of going to

22  piggyback on yours.  But I met with -- yesterday I met

23  with the -- the owner of Borden's property.  So he was

24  like -- you know, I said just -- I'm not certainly

25  looking for him to expend any, you know, any money in

C. Byrnes                                    42

1     there fixing up those windows.  It's been sitting there

2     empty for a long time.  But -- but these

3     (indiscernible), they're like shadow -- they're

4     recessed windows on the corner.  So he's going to work

5     with me and we're going to do something on all of those

6     windows on the ground level and removal of that old

7     signage from Borden's and that kind of thing.  He's

8     coming out with me to dress that up.  It's so

9     beautiful.

10                   And I had been working with Kim Carr

11    from the Art Department and -- and a couple of our

12    senior students to go put some ideas together, which we

13    have been.  So I guess I'll be in the touch with the --

14                   COUNCILWOMAN TESTA:  And, Councilwoman

15    Byrnes, hats off to you, seriously.  I mean, actions

16    speak louder than words.  And let me tell you

17    something.  You are out there and you are working it,

18    girl.

19                   COUNCILWOMAN BYRNES:  Thank you.

20                   COUNCILWOMAN TESTA:  You are definitely

21    working it.

22                   COUNCILWOMAN BYRNES:  Thank you.

23                   COUNCILWOMAN TESTA:  So hats off to

24    you.  I'm so proud to be working alongside you.  I

25    truly am.  So thank you.

C. Byrnes/A. Cortes                    43

1          COUNCILWOMAN BYRNES:  Now, if I could

2    just get through these -- these reports as easily as I

3    can be effective on the street.  They make me a little

4    nervous.  I'm sorry, everybody.

5          COUNCILWOMAN TESTA:  Me too.  Me too,

6    sister.

7          COUNCILWOMAN BYRNES:  And so I think

8    I'll wrap it up for now because there will be a

9    discussion in a little bit.

10          COUNCILWOMAN TESTA:  Oh, yeah,

11    definitely.

12          MAYOR KANITRA:  Okay.  Councilwoman,

13    fantastic.  I think it's very clear listening to you,

14    listening to Councilwoman Testa, listening to

15    Councilman Vitale just how much you're working for this

16    town.  And like Councilwoman Testa said, you know, you

17    can say a lot of words but, you know, you can't fake

18    work or you can't fake hard work.  So thank you for all

19    that the three of you are -- are doing.

20                    Councilman Cortes.

21          COUNCILMAN CORTES:  Thank you, Mayor.

22          Well, Councilman -- Councilwoman Testa,

23    you know, very nice report.  Councilwoman Byrnes, very

24    nice.

25          I'm going to start -- it seems like

**A. Cortes**                                                **44**

1   forever since our last meeting.  The first meeting in

2   July which happens to be towards the end of July we

3   have personnel that have anniversaries this month.

4           From DPW, Terry O'Connor, 15 years and

5   Brian Patton, 6 years.

6           Again, I don't know if there's anybody

7   new out there, but I've been doing this for the eight

8   years I'm here, recognizing every month who has

9   anniversaries, our employees.  I think that's very

10   important.  We all sit up here and make policy, but

11   they have to go and carry it through.

12           Public property, buildings and grounds,

13   I've been the Chairman of that, probably, for five or

14   six years now.  And, like the Councilwomen both said,

15   feel free to reach out to me on anything.  Public

16   property, buildings and grounds kind of covers quite a

17   bit.  In fact, both Councilwomen are on that Committee

18   with me as I chair that.

19           Letters were hand-delivered to all the

20   row houses between Parkway and Broadway explaining the

21   garbage and recycling collection, that it's done at the

22   backdoor.  That was done a couple of weeks ago, and I

23   have seen a shift in the -- in less garbage being

24   placed out on Ocean Avenue.  We're still working on it.

25   That's the first step.  We are still working to get rid

A. Cortes                                    45

1    of bags, you know, that the seagulls will attack.

2                        There were some issues that I had

3    noticed over the past weeks just in driving around

4    because I do that every day.  I go look around the

5    town.  For example, the flagpole at the gazebo was

6    broken.  There was a water valve cover on Ocean Avenue

7    and Elizabeth Avenue broken.  The sinkhole Councilman

8    Vitale mentioned on New Jersey and St. Louis.  We also

9    had water bubbling up in front of a resident's house in

10   the 500 block of New Jersey.  And New Jersey Transit

11   had a load of poles knocked over by the train station.

12                        And they were all taken care of within

13   a couple of days.  And it just goes to show you that

14   when you mention it to the right people and it gets to

15   the right department, things can get done.

16                        All right.  I'm going to openly

17   apologize to Councilwoman Byrnes.  We were going down

18   Arnold Avenue awhile back, like, at 11:30 -- and I know

19   you couldn't make it -- with John Trout, just looking

20   at the trash there.  I, at the last minute, couldn't

21   make that meeting, and we met at, like, six o'clock

22   that Friday morning.  And I apologize.  I inadvertently

23   did not contact you.  I'm sure you would have been out

24   there with me.

25                        But we walked it all out.  And the bags

**A. Cortes**                                    46

1    that seem to be placed out there, Mayor, seem to

2    becoming from the upstairs apartments, which is

3    understandable.  You know, people are leaving their

4    apartment.  They probably don't have a place to put a

5    pail.  They just put a bag.  A lot of them were placed

6    near our trash receptacles.

7                    Now, with that said, John and I -- I'm

8    going to put up behind me -- this is a container.  This

9    could probably hold two kitchen-size garbage bags.

10   John -- John Trout from the DPW, our Superintendent, is

11   looking to acquire one -- a -- a free demo, if you

12   will, just to see it.  We want to see what it looks

13   like.  It can't hurt.  This might be something that's

14   placed next to our containers down on Arnold Avenue

15   where bags won't be exposed.  They could be placed in

16   such a way where they won't pose a trip hazard if

17   they're right next to another container.  Just a

18   thought, okay, on that note so...

19                    MAYOR KANITRA:  It's a good idea.

20                    COUNCILMAN CORTES:  Just, as I said,

21   you know, you got to -- you got to look into it and get

22   that done.

23                    I -- I had a question about a Maser

24   p.o. for the -- you know, just a concern.  We had 11 of

25   them sent to all of us via email to approve.  The Ocean

**A. Cortes**                                47

1   Avenue Water Main Project, which we awarded to them,

2   which is fine, but in one of their line items,

3   construction administration and observation services

4   comes to $138,000.  That just seemed like a lot to me.

5              And there's an ordinance on here, a

6   multi-bond ordinance, for first reading.  I would like

7   to make a motion, you know, when that -- when the time

8   comes that any capital improvement project, that we get

9   quotes from all of our qualified engineers.  I know in

10  our reorg. meeting when you were sworn in, Mayor, we

11  had numerous legal people and engineers on there so I

12  know that they're all kept.  I just think that would be

13  a good idea to get -- just get quotes from everybody.

14             MAYOR KANITRA:  That's an interesting

15  -- that's an interesting thing to propose because in

16  the last four years of this administration since you

17  guys came into office, I don't think you ever gave a

18  single engineering project to anyone other than the one

19  firm --

20             COUNCILMAN CORTES:  Yes.

21             MAYOR KANITRA:  -- every single time.

22             COUNCILMAN CORTES:  Well, on -- you're

23  -- you're correct.  You know, I'm leading into this.

24             Okay.  Did anybody know that we --

25             MAYOR KANITRA:  We've already --

A. Cortes                                         48

1    already given a lot of projects out to different

2    engineering firms.

3                    COUNCILMAN CORTES:  Right.

4                    MAYOR KANITRA:  I think in the first

5    six, seven months of this administration, we've

6    actually given more projects out to different

7    engineering --

8                    COUNCILMAN CORTES:  Okay.  Okay.

9                    MAYOR KANITRA:  -- than the last

10   (indiscernible) combined.

11                   COUNCILMAN CORTES:  Okay.  My -- my

12   report.  Thank you.

13                   Did anybody know that Maser Consulting

14   was purchased by a Canadian international real estate

15   company in March?

16                   MR. RIORDAN:  Yes.

17                   MAYOR KANITRA:  Yes.

18                   COUNCILMAN CORTES:  Who's saying that?

19                   MR. RIORDAN:  I am, Kevin.

20                   COUNCILMAN CORTES:  All right.

21                   MR. RIORDAN:  It was -- it was all over

22   the news.

23                   MAYOR KANITRA:  They let us --

24                   COUNCILMAN CORTES:  Okay.

25                   MAYOR KANITRA:  They let us know that

**A. Cortes**                                        **49**

1    they were acquired too.

2                    COUNCILMAN CORTES:  Excuse me?

3                    MAYOR KANITRA:  They were acquired by a

4    conglomerate, and they are functioning as their own

5    stand-alone unit.

6                    COUNCILMAN CORTES:  Well, you know,

7    again I -- it would have been nice to know because you

8    never know.  It's a Canadian company, and, you know --

9                    MR. RIORDAN:  I'm sorry, Andy.  If I --

10   if I thought you hadn't seen it, I would have brought

11   it to your attention.  I'm sorry.

12                   COUNCILMAN CORTES:  No, but I just --

13   hey, from personal experience I used to work for a big

14   corporation, and from personal experience I know

15   changes were made, hence my position was eliminated.

16   So it just is concerning.  That's all.  You know, that

17   happened in March and here it is in July.  That's --

18   that's about it.

19                   Okay.  I'm moving on.

20                   Everybody seemed to make a comment

21   about ordinances.  I know that I don't want to be

22   perceived if I make negative comments that I'm not for

23   the town.  Hell, I'm in my third term.  I love the

24   town.  I grew up here.  I like trees.  I like the

25   beach.  I like bringing a cooler to the beach.  But on

**A. Cortes**                                    **50**

1    that note, once again, for the second meeting in a row,

2    a revision came out at 11:02, the morning of the

3    meeting.  And I work out on the road.  I got to settle

4    down and read it at about 5:30.  You'll have to take my

5    word on that.

6                 Now, we have had -- we've had 13

7    meetings since the beginning of the year.  Five of

8    those meetings have had revised agendas that came out

9    the day of the meeting.  That's just not right, you

10   know.

11                MAYOR KANITRA:  As far as in the number

12   changed, there are line change -- there's something

13   unneeded as a result of the lead-up to the meting.

14                COUNCILMAN CORTES:  Okay.  Well, the

15   point is -- another point of order, Mayor, if I may.

16                MAYOR KANITRA:  Go ahead.

17                COUNCILMAN CORTES:  I had to print out

18   the old ordinance and the new ordinance and try to scan

19   through them.  If there's a change made, why can't it

20   be redlined?  Why can't it be noted?  Why can't it be

21   in bold type?  Okay.  That's all I have to say.

22                With that, the -- the Shade Tree

23   Ordinance, I'll -- I'll, you know, mention that one

24   first.  I like trees.  I do.  I actually looked up

25   Spring Lake, Manasquan, Belmar, Point Borough and Bay

**A. Cortes**        51

1    Head.

2             Bay Head is a little unique.  They kind

3    of call it a buffer and landscape thing.

4             But Spring Lake, they talk pretty much

5    about public property, borough property.  They use

6    words in theirs, "encourage" and "recommend."  They

7    don't use the word "require."  They have a shade tree

8    committee, not a commission.

9             Manasquan, a shade tree commission.

10    The building department, the zoning department handle

11    things more so than the shade tree commission.  And

12    they mention private property just once in their whole

13    grand scheme of things.

14             Belmar, mainly public property again.

15             Borough property is mentioned.  Now,

16    granted, Point Borough doesn't have any shade tree

17    commission or committee.  They go through zoning and

18    code enforcement, and they have wording that says "any

19    tree in the borough," so that would constitute public

20    and private.

21             My issue with this is that it's another

22    group of people, volunteers, that are going to have say

23    on private property.  I -- I think if you're going to

24    tear a house down, nine out of ten times you're going

25    to have to go for a variance, so you're going to have

A. Cortes                                52

1    to deal with that board asking regulations and

2    enforcing what's going on.  And now you're going to

3    have to go against, you know, the Shade Tree Commission

4    if you have trees.

5           The biggest problem I have is having to

6    go through the Shade Tree Commission prior to getting a

7    building permit.  None of these other towns have that

8    verbiage in there.  You didn't have to go through them

9    first to get a building permit.  That's just my

10   concerns.  Once again, I like trees.  I think trees are

11   nice.

12          The biggest thing -- I know Spring Lake

13   was referenced -- the planting strip between the curb

14   and the sidewalk on every Spring Lake street, because I

15   rode them out, is four to five feet wide.  Ours is two

16   feet.  That gives them a very distinct advantage in the

17   type and size of tree that they can plant.  Okay?

18          The next one is the not so much -- I

19   mean, Councilwoman Testa referred to it -- to it as the

20   Cooler Ordinance, but it's ocean, beaches and waters.

21   The first thing that comes out to -- in my mind, hours

22   of operation, and that to me -- unless I've missed a

23   revision somewhere, it doesn't say Maryland Avenue

24   Beach, it says basically all beaches.  Am I right?

25                   MAYOR KANITRA:  It does.  That's

**A. Cortes**                                                    53

1    correct.

2                    COUNCILMAN CORTES:   Okay.   Now, we have

3    government here trying to tell private business when

4    they can operate.

5                    The second thing about having people of

6    18 years of age or older, now we're telling private

7    business who they have to hire.   That's -- that's an

8    issue.   You know, I have a small business here, and I

9    don't want government telling me when I can and cannot

10   operate or who I might have to hire.

11                   On the cooler note, Councilwoman Testa,

12   I liked your coolers.   I liked your presentation.

13                   COUNCILWOMAN TESTA:   Thank you.

14                   COUNCILMAN CORTES:   That was very good.

15                   COUNCILWOMAN TESTA:   Thank you.

16                   COUNCILMAN CORTES:   I mean, obviously,

17   for you to do a comedy act, and maybe pull a shovel or,

18   you know, bigger items out of there --

19                   COUNCILWOMAN TESTA:   I was going to,

20   but I decided not to.

21                   COUNCILMAN CORTES:   Okay.   It was --

22   and I know, Mayor, that -- that you know about this,

23   and I'm just going to mention it so that the general

24   public knows.   If this is going to go through, which I

25   have a feeling it will because the votes are there,

A. Cortes                                  54

1    instead of having badge checkers with a tape measure or

2    a box or a yardstick, I -- it was mentioned through a

3    third party to me and I know the same to you, that why

4    don't we have single-handle, single shoulder strap, no

5    backpack, no wheels, no two handles, no modified

6    handles.  That would make something easier when

7    somebody walks up if they're carrying a -- I think,

8    Councilwoman Testa, you have your --

9               COUNCILWOMAN TESTA:  Right.

10              COUNCILMAN CORTES:  You slung it over

11   your shoulder, a single shoulder strap.

12              COUNCILWOMAN TESTA:  Yes.

13              COUNCILMAN CORTES:  You know, just to

14   make it easier on these 18-year-olds, if they're going

15   to be 18 or -- or older.  You know, instead of having

16   them measure something to set it in a box, you know, a

17   single handle, single strap.

18              COUNCILWOMAN TESTA:  Yeah.  I agree

19   with you, and there's so many different designs.  That

20   was just the ones I had, you know, Andy, on hand.

21              COUNCILMAN CORTES:  Right.

22              COUNCILWOMAN TESTA:  There's so many

23   out there that are -- you know, that you can use.

24              Sorry.  I didn't mean to interrupt you.

25   I'm sorry.

**A. Cortes**                                    55

1          COUNCILMAN CORTES:  No, no, that's

2     fine.  I just -- I'm trying to --

3          MAYOR KANITRA:  The problem is you can

4     put a strap on a lot of different things and --

5          COUNCILMAN CORTES:  No, you can't -- no

6     aftermarket or modified cooler.  Like, yes, I can put

7     rope between a two-handle cooler and sling it over my

8     shoulder, but that's pretty obvious that it's a two-

9     handled cooler with an aftermarket strap, if you will.

10    You know, just a thought.  As much as I don't like

11    certain points of the ordinance, I have a feeling the

12    introduction votes are there, Mayor.  So I'm, you know,

13    just giving my two cents in.

14          MAYOR KANITRA:  Okay.

15          MR. RIORDAN:  Actually, if I might, if

16    you look at Spring Lake, Section 356-15, I think you'll

17    see it's identical to what's proposed for the Beach.

18          COUNCILMAN CORTES:  You're going to

19    make me look it up.  Okay.

20          MR. RIORDAN:  Well, you don't have to

21    look it up right now, Councilman.  You can -- I just

22    wanted you to have the chance to look it up at a later

23    date.

24          COUNCILMAN CORTES:  Three dash --

25    Spring Lake, three dash what?

### A. Cortes/R. Santanello                    56

1      MAYOR KANITRA:  Andy, can you look that
2  up while you -- while Councilman Santanello gives his
3  report?

4      COUNCILMAN CORTES:  Yes.  I'm -- I'm
5  okay with that.

6      MAYOR KANITRA:  Okay.  Thank you for
7  your report.

8      Councilman Santanello.

9      I think he unmuted, Doug, or he muted
10  himself.  So Councilman Santanello --

11      COUNCILMAN SANTANELLO:  Sorry.  Can you
12  hear me now?  Can you hear me now?

13      MAYOR KANITRA:  Yes.

14      COUNCILMAN SANTANELLO:  Yeah, you're
15  right.  I did mute because you said there was a lot of
16  interference so...

17      MAYOR KANITRA:  Okay.

18      COUNCILMAN SANTANELLO:  So, just to
19  start, we've mentioned the word (indiscernible) before.
20  I promise you I'm avoiding (indiscernible) tonight.  I
21  do have some -- some concerns about some of these
22  issues.

23      First, I want to say thank you to Doug
24  and Shade Tree Commission for looking at that issue on
25  Central Avenue.  I'll remind everybody that I brought

**R. Santanello**                                    57

1   it up twice in the last two months.  But I guess

2   somebody else spoke louder, and they said it was

3   (indiscernible).  So thank you very much for that.

4                I'm getting some background

5   interference here.

6                MAYOR KANITRA:  I am -- I am --

7                COUNCILMAN SANTANELLO:  I think it's

8   that 732-581-5965.

9                COUNCILMAN VITALE:  Yeah, that's --

10  that's Councilman Migut.

11               MAYOR KANITRA:  Can you mute him until

12  later.

13               COUNCILMAN VITALE:  Yeah.

14               MAYOR KANITRA:  All right.  Thanks.

15               COUNCILMAN SANTANELLO:  All right.

16  Appreciate it.

17               All right.  I'm concerned about

18  warnings and fines regarding the weeds.  I've gotten a

19  considerable number of phone calls and emails in

20  regards to this, that you're being inconsistent.  So

21  for instance on Ocean Avenue, a code enforcer went out

22  and wrote warnings about weeds and things like that.

23  But the problem is when that went out they were

24  incorrect.  They were getting summonses -- not

25  summonses but warnings for (indiscernible) versus

R. Santanello                                    58

1    (indiscernible) which is what the ordinance is.

2                And then downtown there were fines

3    without warnings.  And I do understand that our Code

4    Enforcement Officer Gina had said she was uncomfortable

5    with this because it conflicts with the code in

6    particular.  And if we're going to have code

7    enforcement enforce codes, they should be enforcing the

8    codes as they read, not based upon somebody's

9    interpretation.

10               MAYOR KANITRA:  Can I have a second,

11   Councilman, because I think this is important?

12   Because, you know, we are very close to talking about

13   an employee and the concerns that you're bringing up in

14   terms of performance and, you know, what expectations

15   are --

16               COUNCILMAN SANTANELLO:  I'm not talking

17   about -- I'm not talking about performance at all.  I'm

18   talking about whether or not you, as the Mayor, are

19   asking a public employee to do things that are outside

20   of what code has listed in our ordinances.  So I'm not

21   talking about the code enforcement officer.  I'm

22   concerned about --

23               MAYOR KANITRA:  Why don't you c.c. the

24   Borough Administrator on anything, and I'm sure she can

25   answer any of your concerns.

R. Santanello                              59

1          COUNCILMAN SANTANELLO:  Anyway, I'm

2    going to finish what I'm saying.  I'm very concerned

3    about asking our code enforcement officers to disobey

4    ordinances based upon an order from the Mayor.  I have

5    a very big concern about that.  They've got to follow

6    the codes as they are, plain and simple.

7          I want to -- I want to echo Councilman

8    Cortes' concerns about revised ordinances, and I would

9    ask the same thing he did.  If somebody could circle it

10   and just tell us where the changes are.  I didn't have

11   a chance to go through them.  And like Andy said, you'd

12   have to put them out and compare them side to side.

13          And it's better for our residents as

14   well because they read through the ordinances and then,

15   of all sudden, there's a change in the ordinance and

16   they're not aware of it, and we start talking about

17   certain things on that, and they don't understand it.

18          So if they could circle that and make

19   people aware of it, I think that would be very

20   important.

21          I want to talk about the tree -- the

22   tree ordinance.  So can somebody tell me specifically

23   what the revision was today on the tree ordinance?

24          MAYOR KANITRA:  I can tell you exactly

25   what it was.  It was a numerical change.  I believe the

**R. Santanello**                                          **60**

1   Borough Administrator or the Borough Clerk, somebody

2   used an old version that had four inches on there.  And

3   we -- things were going around quite a bit.  So it's

4   fully understandable.  So we sat down and --

5                    COUNCILMAN SANTANELLO:  That's fine.

6                    MAYOR KANITRA:  I'm just giving you my

7   -- and we sat down with John Terrazzi.  I believe Anne

8   Lightburn did, and now it is delineating the difference

9   in the footprint of the home and the buildable area of

10  the home and in the perimeter.  And for the perimeter

11  it's  been increased from four inches to six inches.

12  In the buildable area of a home, it's been increased

13  from four inches to twelve inches.  And, in addition to

14  that, the $500 fee, I believe, has been taken out.  And

15  that's it.

16                   COUNCILMAN SANTANELLO:  Excellent.

17  Well, that's good.  That -- that's my point.  In other

18  words, these are things that would have helped me to

19  want to support it more.  So it would be much easier if

20  we knew what they were.

21                   MR. RIORDAN:  And, Councilman, my -- my

22  apologies.  I'll make sure that I do that.

23                   COUNCILMAN SANTANELLO:  And to go back

24  to what I was saying about the tree ordinance.  I've

25  been too close to this.  I wanted to be able to give a

R. Santanello                                    61

1   speech about compromise and meeting in the middle and

2   things along those lines, but I'm not going to be able

3   to, and I'll tell you why.  There was one thing today

4   that I think was excellent -- and, Andy, I hope you're

5   paying attention to this because you were a little

6   mistaken.  The thing that I like is it took the Shade

7   Tree Commission out of the process and put it in the

8   hands of code enforcement.  If I'm reading that

9   correctly, they don't have to go before the Shade Tree

10  Commission.  It goes before the code enforcement

11  officer.  Am I correct?

12            MR. RIORDAN:  You are absolutely

13  correct, Councilman.  I -- I -- I chose not to bring

14  that to Councilman Cortes' attention at the present

15  moment.

16            COUNCILMAN SANTANELLO:  Okay.  I just

17  want to let Andy know that.  But I think that's --

18  that's an excellent change because, you know, there's

19  some people in the Shade Tree Commission that I trust

20  to be fair and honest but there are other ones on there

21  that I think would let the power go to their head and

22  really screw with people.  So that's a good change.

23            The one thing -- Paul, if you remember

24  the one thing that we talked about when you stopped at

25  my house the one day was that I love trees too.  I put

R. Santanello                    62

1   in four beautiful new trees.  It was my choice.  But

2   the problem that I feel with this ordinance more than

3   anything is (indiscernible).  That's what disturbs me

4   the most.  I think that's the -- that's the part that I

5   don't like.  I would have liked to have seen it become

6   part of the final p.o. rather than (indiscernible) you

7   get a permit.

8                As far as I know, that's the only thing

9   that stops them from getting a permit other than going

10  before the Board of Adjustment for a variance.  So for

11  that one reason in particular I'm going to vote no, but

12  I really did want to vote yes.

13                And I do appreciate the fact, Paul,

14  that you did listen to my concerns.  I know you paid

15  attention to them, and I do believe there's going to

16  come a point where there's going to be an ordinance

17  that we disagree upon but that we can meet in the

18  middle.  So, again, thank you for paying attention.  I

19  do appreciate that.

20                The second thing -- one more thing on

21  the shade tree.  I did get more calls against it than I

22  did in favor of it.  Yes, we all received the same

23  emails with people supporting it.  But the people I

24  talked to didn't like it at all.  They thought it was

25  too costly and too punitive and we overreach.  But it

R. Santanello                          63

1    is what it is.

2                    Beach rules, I said last time the tree

3    ordinance was one of the worst ones I've seen but this

4    one is a little bit worse.  Again, I'd like to know

5    what the revisions were specifically to the Beach Rules

6    Ordinance.

7                    MAYOR KANITRA:  They changed the time.

8    It was actually less restrictive.  It changed the time

9    from 6 p.m. to 7 p.m., and it allowed for surfers and

10   fishermen to -- to go up there.

11                   Am I -- am I missing another component,

12   Borough Attorney?  I thought it was very simple.

13                   MR. RIORDAN:  I think that's it, Mr.

14   Mayor.  I'm pretty sure.

15                   COUNCILMAN SANTANELLO:  All right.

16   Well, that's good because the first thing that I was

17   going to talk about was banning people from fishing and

18   surfing (indiscernible) --

19                   MAYOR KANITRA:  We --

20                   COUNCILMAN SANTANELLO:  Good.  So I'm

21   -- I'm fine.  But, again, it would be much easier if

22   those things were circled.

23                   My other deterrence, though, again, is

24   going to be the cost in legal fees because -- and I

25   have to tell you -- this is the truth -- I wrote this

R. Santanello                    64

1    before we got the emails today from Kraft today.  For

2    anybody that's on (indiscernible) CRAB.  I believe

3    we're going to get sued from them.  There was a veiled

4    threat from them when they put in the Bay Head lawsuit

5    that they had won so -- we'll also have a problem with

6    the (indiscernible).

7              MAYOR KANITRA:  Just -- just -- just

8    for your knowledge, I actually spoke with a

9    representative from all those groups, Surf Rider, CRAB,

10   the Litoral Society, all those groups, and they

11   actually looked at our language.  We sent them the

12   language.  I believe the diving reached out to

13   Councilman Vitale and had one or two other small

14   changes, and they were fine with it.

15             COUNCILMAN SANTANELLO:  Okay.  I just

16   we're great.

17             Some of the other things that I'm

18   concerned about was the no tables, cooking, pots and

19   pans on the beach.  I like that when people come to the

20   beach.  It means that places like Martells and Jenks

21   now can't have outdoor events like that on their

22   property because -- and as far as I could tell it's on

23   the Martell beach bar.  I think about the beach owner

24   being fined and prosecuted if somebody sneaks alcohol

25   onto the beach without their knowledge, I think that is

R. Santanello                                    65

1   a horrible thing to put onto these people.

2             I like the part about the -- all right.

3   So here's what I -- I think the thing about loud

4   noises, using bad language, the way it reads is kind of

5   ridiculous.  It says to the annoyance of any other

6   person.  Well, who's the judge of that?  I mean, to

7   give an example, I hate country music.  So does that

8   mean that I get to call the police if I hear a Luke

9   Bryan song, or if somebody going past the Cocharan

10  House playing their music, do they get to call as well?

11  I think this part opens us to massive litigation

12  because it's terribly weak and unenforceable.  And I

13  don't think we're going back to having the police have

14  the decibel meters (indiscernible).

15            No, ball playing or surfing -- well,

16  we'll get rid of the surfing part.  But no ball playing

17  which means, I guess, there's no more volleyball up

18  there which I think is pretty cool as well.

19            MAYOR KANITRA:  But the --

20            COUNCILMAN SANTANELLO:  Paul, can you

21  please stop interrupting me and let me finish.  I don't

22  mind if you want to make a point here and there, but

23  every sentence I talk about you want to interrupt me,

24  and I don't appreciate that.  I don't interrupt you

25  when you're talking.  As you said before, point of

**R. Santanello**                                          66

1   order.  So please hold off until I'm done with this

2   part.

3             All right.  Dogs only from 10/1 to 4/30

4   from eight to three.  So if you work and want to walk

5   your dog on the beach, you're out of luck.  Dogs are

6   not allowed on the beach as far as I know.  No dogs

7   allowed on the beach except Maryland Avenue now because

8   (indiscernible) and I think it's kind of weird that the

9   only place where dogs are allowed is by the Mayor's

10  house.

11            Now, what about movies on the beach?

12  (Indiscernible).

13            So I'm done with that part of it so,

14  Paul, please free to --

15            MAYOR KANITRA:  Okay.  I just want to

16  make a couple of points that you either conveniently or

17  not conveniently omitted.

18            The -- the Dog Ordinance hasn't changed

19  at all, correct, Borough Attorney?  It's been that way

20  since the beginning, correct?

21            MR. RIORDAN:  Correct.

22            MAYOR KANITRA:  Okay.  Thank you very

23  much.

24            Okay.  After the --

25            MR. RIORDAN:  Well, wait.  We were

**R. Santanello** 67

1    never allow -- we were never allowed to have dogs on

2    the beach in the past ever.

3                    MAYOR KANITRA:  That's not true.

4    That's not true.  It's been allowed on the one

5    municipal beach for five years, Council -- Borough

6    Attorney?

7                    MR. RIORDAN:  I don't remember quite

8    the number of years.  The Chief might be able to help

9    me.  But, yeah, the ordinance that you now have in

10   front of you is basically the Maryland Avenue Beach

11   Ordinance extended to all of the beaches with a few

12   minor tweaks, none of which are any that Councilman

13   Santanello was interested in.

14                   MAYOR KANITRA:  He is welcome to speak,

15   but he is not welcome to his own facts, I believe is --

16   is the term.

17                   I also wanted to go into the ball

18   playing.  That hasn't changed.  And if read the last

19   line after ball play and surfing which is the line that

20   has always been there which is to the effect that it

21   would be intrusive to other people.  So you playing

22   volleyball on Maryland Avenue beach is fine.  You

23   starting to throw a football around with 20 people

24   underneath where you're throwing, that's not fine.

25                   And going back to your music thing and

R. Santanello                          68

1    trying to make it seem like we are discriminating

2    taste, annoyance means -- and the Borough Attorney can

3    back me up on this -- the hoards of children that are

4    going up and down the boardwalk with their own music

5    blaring whatever very loudly and subjecting boardwalk

6    residents and all of our guests to that, that would be

7    considered an annoyance.  You going down to the beach

8    and playing rap music or country music or polka for the

9    enjoyment of your group is fine.  Me going down to the

10   beach and having to listen to whatever you play is not

11   (indiscernible) and that's what the ordinance is.  So I

12   just wanted to clarify those three points.  I know that

13   it's convenient to leave out a little bit, but I

14   appreciate it regardless.

15              COUNCILMAN CORTES:  I guess if you play

16   while you social distance.

17              MAYOR KANITRA:  The --

18              COUNCILMAN SANTANELLO:  I do believe --

19   I believe they're unenforcement.

20              A MALE VOICE:  (Indiscernible).

21              COUNCILMAN SANTANELLO:  Oh, come on.

22   Is this my report or everybody else's report.

23              MAYOR KANITRA:  You said you were done

24   at the end.  You just said you were done.

25              COUNCILMAN SANTANELLO:  I said I was

R. Santanello                                    69

1   done with that part of it.  I said I was done --

2                MAYOR KANITRA:  Okay.

3                COUNCILMAN SANTANELLO:   -- with that

4   part of it.

5                MAYOR KANITRA:  Sorry.

6                COUNCILMAN SANTANELLO:  I want to

7   repeat that I find it unenforceable and vague and I

8   think it leads to lawsuits.

9                Okay.  I'll keep going.  My last one

10  here.  And, again, I'm trying not to do the

11  (indiscernible) tonight.  I'm trying my best not to,

12  but here's my concern and I'm hoping that you folks

13  will listen to me a little bit on this, and it's with

14  regard to the skate park.  Okay.

15                Again, I'd like to know specifically

16  what the revisions are.

17                MAYOR KANITRA:  The revisions for the

18  Skateboard Park Ordinance had to do with a letter that

19  we received from Michael Aderone (phonetic) or somebody

20  like that at the JIF who said that we needed to have

21  knee pads and everything like that for everybody.  It

22  has capacity restriction because we just shut our

23  summer camp down because we can't have people in

24  (indiscernible) places.  And having more than ten

25  people in the skateboard park is probably not safe

R. Santanello                                    70

1   considering if you can't have social distancing there.

2   It allows for the permitting process.

3                    COUNCILMAN SANTANELLO:   Okay.   Thank

4   you.   I appreciate that.

5                    So my biggest concern with the way the

6   ordinance reads is you're putting in permanent

7   solutions for a temporary problem.   And you just said

8   it yourself which is that it is about social

9   distancing, wearing masks and things along those lines.

10  It is a permanent ordinance.   It's not a -- a -- a

11  temporary ordinance.   It's a permanent ordinance.   I

12  don't think that the ordinance should read that

13  permanently they need face masks, hand sanitizers and

14  social distancing.   I think that it should say during

15  the pandemic or in emergency situations.   It should

16  read that way.

17                   There are no other facilities in town

18  with a permit requirement.   For instance, the farmers

19  market, basketball courts, you mentioned the camp, the

20  Little League fields, tennis courts or boardwalk.   None

21  of them have it as a permanent thing.   I think that

22  needs to be a temporary type of thing.

23                   I also find the thing about not using

24  other's equipment kind of weird.   Being that it's a new

25  skate board park and someone saying that's pretty cool,

R. Santanello                                    71

1    can I try a couple of spins around?  I mean, and that's

2    kind of unenforceable again.

3                    I don't like the ten-user thing.  If

4    it's designed for, again, just the whole pandemic

5    thing, that's fine but it should read that way, during

6    the pandemic.

7                    My biggest concern is (indiscernible)

8    from members of the skateboarding community.  Now, most

9    of them, as I do, want this to open.  I desperately

10   want it to open.  I think it's going to be a great

11   thing for our town.  I think it's going to be

12   wonderful.  But a lot of people feel that the way it's

13   written is designed for the skateboard park to fail,

14   that it's going to lead automatically to a whole bunch

15   of, you know, summonses and things along those lines.

16                    The other concern that everybody has --

17   and I'm -- I'm going to make everybody mad -- I don't

18   think we should open up the skateboard park this

19   summer.  I think we should wait till the fall, because

20   what's going to happen if we approve it tonight and we

21   approve it on August 4th and it opens up on August 5th,

22   in the middle of the summer and all these kids are

23   coming down and say, wow, there's a skateboard park

24   there.  No matter how many signs we have up and how

25   much enforcement you have up there, there's going to be

**R. Santanello**                                    72

1   violations.  And then all of a sudden (indiscernible)

2   going to be at the park.  People are going to call the

3   cops every hour saying there's 12 people, there's 14

4   people, somebody doesn't have a helmet or somebody is

5   using somebody else's skateboard.

6            So I'm going to kind of piss everybody

7   off and say let's not open it until September when the

8   locals get to use it first, and then after that

9   (indiscernible) and all that kind of stuff.

10            My other concern is about the permit

11   itself.  It's very vague as to how the permit is

12   handled.  I think a permit is a great idea.  The

13   skateboard community doesn't disagree with that.  But

14   how is it supposed to be displayed?  Is it a sticker?

15   Is it a -- is it like a hunting license where you stick

16   something inside a clear plastic bag and you attach it

17   to the back of your shirt or something like that?

18            I just think it needs a little more --

19   a little more attention to it.  As it stands it -- it's

20   almost designed to have just a ton of ordinance

21   violations in the first month or so, so the people that

22   are against this can come out and say look how horrible

23   it is, let's shut it down.

24            So I'm going to ask everybody a favor.

25   I'm hoping that you'll -- that you'll agree with me

R. Santanello                                    73

1    that maybe we need to tweak a little here and there to

2    make it more realistic in the long term.

3                     So I'd like to see -- I'd like to make

4    a motion to hold the Skate Park Ordinance until the

5    next meeting.  We can get a little bit more input on

6    the things that are, again, permanent solutions for

7    temporary problems.  So I'm making that motion.

8                     MAYOR KANITRA:  There's a motion on the

9    table.  Is there a second?

10                     COUNCILWOMAN TESTA:  I will actually --

11   I will actually second that motion because I am in

12   agreement with Bob on that.

13                     MAYOR KANITRA:  Okay.  Great.

14                     COUNCILWOMAN TESTA:  I am because I

15   feel if we're going to open it to have it fail, then we

16   shouldn't open it in the sense that maybe we could look

17   at it.  Because the truth is, the Rec. Program just

18   shut down permanently.

19                     MAYOR KANITRA:  I'm sorry to interrupt.

20   But when there's a motion we can't --

21                     COUNCILWOMAN TESTA:  I'm sorry.  I'm so

22   sorry.  I'm sorry.

23                     I second the motion.

24                     MS. FARRELL:  Councilman Vitale.

25                     COUNCILMAN VITALE:  Yes.

R. Santanello                          74

1           MS. FARRELL:  Councilwoman Testa.

2           COUNCILWOMAN TESTA:  Yes.

3           MS. FARRELL:  Councilwoman Byrnes.

4           COUNCILWOMAN BYRNES:  Yes.

5           MS. FARRELL:  Councilman Cortes.

6           COUNCILMAN CORTES:  Absolutely, yes.

7           MS. FARRELL:  Councilman Santanello.

8           COUNCILMAN SANTANELLO:  Yes.

9           MS. FARRELL:  Councilman Migut.

10          COUNCIL PRESIDENT MIGUT:  Yes.

11          COUNCILMAN SANTANELLO:  All right.

12   Well, I -- I'm just going to say thank you very much to

13   everybody for that.  This is kind of like the point

14   that I was trying to make earlier.  I wasn't trying to

15   be argumentative with you, Mayor.  I really do truly

16   think that there are issues we can meet in the middle

17   on, and that's why I tired not to (indiscernible)

18   tonight (indiscernible) and things like that.  While we

19   disagree on things, I do think there is a way for us to

20   work together.

21          And I can't thank everybody enough from

22   the bottom of my heart for agreeing to hold this a

23   little bit.

24          And so I was going to asking the -- I

25   was going to (indiscernible) Borough Attorney Riordan's

R. Santanello                              75

1   bill again, but, you know what?  In the spirit of

2   compromise and getting along, I will not do that this

3   meeting.

4                   MR. RIORDAN:  Thank you, Councilman.

5                   Might I, in the same spirit, suggest in

6   an effort to make you feel better about the

7   enforceability -- and I definitely recognize your

8   concerns.  They are not unfounded.  But the ordinance

9   that we drafted, we -- we took stuff from Long Beach

10  Township and Seaside Park and Bradley Beach.  And so

11  the words that we used have been, if not well-tested,

12  at least have been on the books in other places for a

13  long time.  We didn't pull them out of thin air.

14                  COUNCILMAN SANTANELLO:  That's fine.

15  What I'd like to do, believe it or not, is set up a

16  time for you and I to sit and talk about this

17  (indiscernible).  Does that work for you?

18                  MR. RIORDAN:  Absolutely.

19                  COUNCILMAN SANTANELLO:  Okay.  Thank

20  you.

21                  Mayor, I'm done.

22                  MS. FARRELL:  Just to confirm.  This

23  motion was to table the ordinance, correct?

24                  MAYOR KANITRA:  Yes.

25                  MS. FARRELL:  Thank you.

R. Santanello                                76

1    MAYOR KANITRA:  And, Councilman, I -- I
2  wanted to apologize for interrupting you at the end
3  there because I really did think that you said you were
4  done.  If not, I would not have -- have done that.
5    And whether -- whether you are lulling
6  me into a false send of security or not, I thought you
7  were going to be much more bombastic this evening.  And
8  I'd like to thank you for how nice you were and how --
9  and how cordial your report was.  And that -- that
10  tabling that was a good decision.  Just remember when
11  the skateboard community complains about not opening it
12  the first week of August, I'm  (indiscernible).
13    COUNCILMAN SANTANELLO:  What's that?  I
14  missed the last sentence.
15    MAYOR KANITRA:  When the skateboard
16  community is upset that we're not opening right away,
17  the first week of August, I'm giving them your phone
18  number.
19    COUNCILMAN SANTANELLO:  Please do.  I
20  said -- as I -- as I mentioned before I figured I would
21  piss everybody off tonight on both sides.  You know, I
22  just -- again, you know, in the spirit of compromise.
23    I appreciate the fact that you came to
24  my house that one day and I say again that we can find
25  things to get along with on despite the fact that I'm

T. Migut                                                77

1   going to vote no on three of the four remaining

2   ordinances tonight.

3                   (Laughter)

4               MR. RIORDAN:  So we can point to you

5   when the skateboard community objects.

6               MAYOR KANITRA:  All right.  Thank you,

7   everybody.

8               Moving on.  Council President Migut.

9               COUNCIL PRESIDENT MIGUT:  Thank you,

10  Mayor.

11              Can you hear me?

12              MAYOR KANITRA:  Yes, I can hear you

13  loud and clear.

14              COUNCIL PRESIDENT MIGUT:  Okay.  The

15  Animal Welfare Committee has decided to postpone all

16  fund-raising gatherings for the foreseeable future due

17  to COVID-19.

18              The Planning Board will meet in August

19  to (indiscernible) a previous approval by resolution.

20  That will be a virtual meeting.

21              The Parking Authority will meet in

22  August virtually.  And I am happy to report that the

23  first applications for the Employee Parking Pass

24  Program have been delivered to Borough Hall during the

25  week.  So we'll get passes issued and employees from

T. Migut                                                     78

1    downtown businesses will begin utilizing the railroad

2    lot.

3                     MAYOR KANITRA:   Great.

4                     COUNCIL PRESIDENT MIGUT:   The Shared

5    Services Agreement with Bay Head and Mantoloking for

6    financing the repair to the town ambulance is being

7    finalized.

8                     Kevin, do you foresee that happening

9    this week?

10                     MR. RIORDAN:   I'm not sure, Councilman.

11   I have my partner working on it.   I will check with

12   him.   I apologize.

13                     COUNCIL PRESIDENT MIGUT:   Okay.   And

14   probably my most important report of the evening from

15   the Finance Committee.   I've heard from our tax

16   professionals to expect many tax appeals and

17   revaluation requests due to government-imposed

18   restrictions affecting the (indiscernible) of

19   businesses in coming years.   I'm speaking first on the

20   State COVID-19 restrictions, but also restrictions on

21   boardwalk businesses being introduced tonight.   As an

22   example, many landlords of commercial properties are

23   dealing with tenants' needs to help them get by.   So

24   the property did not have the same profitability as it

25   was assessed at.   So they may be entitled to tax

**T. Migut**                                          79

1   relief.  This statement was edited by (indiscernible)

2   the tax assessor and the municipal tax appeal attorney

3   for your consideration.

4                 MR. RIORDAN:  I'm sorry, Tom.  Which

5   attorney looked that over?

6                 COUNCIL PRESIDENT MIGUT:  The tax

7   appeal attorney.

8                 MR. RIORDAN:  We don't have a tax

9   appeal attorney.  So who looked it over?

10                 COUNCIL PRESIDENT MIGUT:  Mr. Dasti.

11                 MR. RIORDAN:  Yeah.  Okay.  Well,

12   that's not my opinion.  I -- I disagree with it

13   wholeheartedly.  We'll talk about it after the meeting

14   and I'll talk to Mr. Dasti about it tomorrow.

15                 COUNCIL PRESIDENT MIGUT:  Okay.

16                 That's all, Mayor.

17                 MAYOR KANITRA:  Okay.  Thank you very

18   much, Council President.  I appreciate that.

19                 So I'm just going to -- I'm just going

20   to get right into it here.  You know, I know why we

21   have a hundred-plus people on -- on the meeting

22   tonight, and, you know, we're not going to beat around

23   the bush.  I think Point Pleasant Beach doesn't need to

24   be resigned to a fate as a mediocre town, as a

25   hash-filled town, as a weed-filled town.  Our residents

**80**

1    don't need to just accept (indiscernible) because they

2    were allowed to act like lunatics on the beach.  And it

3    shouldn't fall on the shoulders of a 24-person police

4    department either, you know.  Our businesses don't need

5    to close and suffer just because we were too lazy to

6    have a plan to help them or fix up our downtown.

7         And, you know, we've all seen the

8    problems that are going on here.  And -- and I think

9    the ordinances in front of us clearly show that we're

10   trying to take strong, strong stances against

11   everything.  And I want to be clear.  You know, this

12   town is going to get turned around.  I wasn't elected

13   and -- and the other Council Members weren't elected to

14   be wallflowers or be like do-nothing politicians.  Our

15   campaign was about exactly what we're doing.

16        You know, I didn't take this job for

17   ribbon-cutting ceremonies or to have an office that

18   says "Mayor" on the door.  I took it to get things

19   done.  In my opinion hard work gets things done, not

20   political theater.  And we're going to be acknowledging

21   the problems that we have and not sticking our heads in

22   the sand.  We're going to fix them with real solutions,

23   not -- not b.s.  You know, this Council is going to

24   act.

25        And I'm going to start off my report

**81**

1    tonight by showing very clearly how we've listened to

2    the residents and -- and kind of what steps we're

3    taking to get things moving in the right direction.

4                So I guess I should start and say,

5    like, first, you know, let me say these problems didn't

6    happen overnight that we're experiencing in the town

7    right now, whether that's downtown, whether it's at the

8    beach or boardwalk, whatever it may be.  I think they

9    happened over years of neglect, and they're not going

10   to be fixed overnight either.   But we have taken and

11   we continue to take strong steps in the right

12   direction.

13               You know, as Councilman Vitale

14   mentioned in -- in his report about all the stuff that

15   the police department has going on -- has going on

16   right now.  You know, the two new officers are really

17   hitting the ground running, and they're really greatly

18   helping our police capacity.

19               We have tickets being issued with our

20   new zero-tolerance policy.  And, as he mentioned there,

21   it's over two times what we were at last year at this

22   time.

23               The new beach buggy with CARES Act

24   funding has been going up and down the beach

25   constantly, helping to catch a lot of the things that

82

1    previously we could not.

2                    Weekend code enforcement patrols have

3    started and are cracking down on places throughout the

4    town.

5                    DPW is working to get the staff back to

6    full force, and we're going to use CARES Act funding

7    again to purchase a new litter vac.

8                    The County has approved our increase in

9    the fines across the board that I mentioned at the last

10    Council Meeting.

11                    We have new "No Smoking" signs on the

12    boardwalk.  I think we got 20 of them the other day,

13    and we're making up another 10 or 20 as well.  And

14    we're also in the process of putting up "No Littering"

15    signs on our parking machines.

16                    I've also asked for a quote for four

17    new weatherproof speakers and a flag pole for the

18    police substation.  We'll have a recorded message

19    welcoming people to the boardwalk and reminding them of

20    our borough ordinances and what the penalties for

21    breaking them are.  Additionally, every day we're going

22    to start doing the National Anthem over those same

23    speakers.

24                    On the agenda tonight is Judge Bob

25    LePore, and that's for appointment to replace Judge

83

1    Liguori after his 30-plus years of service to the

2    community.  Bob LePore has built a reputation as a

3    tough but fair judge in Brick Township until he left

4    the position about five years ago.  He held the line

5    there, and that's exactly what's needed in Point

6    Pleasant Beach right now, someone that's going to hold

7    the line.  He's also a resident who cares about his

8    community, and that's an invaluable asset for us to

9    have.

10                    As for the Beach and Boardwalk

11   Ordinance, I think it's absolutely vital to the future

12   of this town that it be passed.  The cooler

13   restrictions will reduce litter, and it will make it

14   easier to check for alcohol and drugs.  The 18-year-old

15   limit will prevent girls and young boys, from as young

16   as 16 years old and younger, from having to check

17   coolers for substances that they can't even legally

18   touch and having to turn away tough people.

19                    I personally went up to the boardwalk

20   last week, as I go up just about every single day now,

21   and I documented these young kids having to do this

22   without any security assistance.  It must be stopped

23   and it will be stopped.

24                    The music restrictions that Councilman

25   Santanello was talking about will crack down on the

**84**

1   people who have been walking up and down the boardwalk

2   blaring their own personal theme music.  I have also

3   personally watched people bringing huge speakers down

4   to the beach.  The way that this ordinance is written,

5   you still will be able to quietly play music on your

6   cell phone at the beach or on a tiny speaker.  You just

7   won't be able to make it so loud that other guests are

8   subject to your musical tastes.

9           The liability component basically makes

10   beach operators finally have some skin in the game.

11   Isn't it about time that they have some skin in the

12   game?  Every day I look at TikTok videos and Instagram

13   posts with people blatantly doing drugs and drinking on

14   the beach.  My hope is that this will create real

15   incentive for beach operators to properly check bags

16   and coolers.  It's that simple.

17           We're also looking to clean up Ocean

18   Avenue, and you'll see that with the Garbage Bag

19   Ordinance.  It's pretty simple and common sense as

20   well.  All it says is that you can't put a plastic bag

21   out by itself.  That tends to be what a lot of visitors

22   do because it's the easiest, and it looks horrendous on

23   Ocean Avenue, especially when they're constantly torn

24   open by seagulls and strewn about.  This will still

25   allow for plastic bags if it's overflow from a

85

1    particular, busy day and they all can't fit in a can.

2                We have our new, amazing downtown

3    banners on the agenda tonight.  The Fisher Foundation

4    is going to split the cost with the town again.  We've

5    selected eight historic properties from our town's past

6    and they'll be highlighted on the banners.  You have

7    the Gottlieb Building.  You have Abramoss, I believe.

8    You have the hardware store, some places that I've

9    never even heard of before like Buckalew's Market.

10   We've got some really interesting ones, and I really

11   think you're all going to love them.

12               Finally, the Shade Tree Commission has

13   asked to have the ordinance brought up for discussion

14   tonight.  It doesn't mean it's getting rammed down

15   anyone's throats.  Government, real government is

16   supposed to work with ideas being brought up and

17   discussed in middle ground fashion.  That's what I

18   would hope would happen here tonight.

19               In my opinion, the original ordinance

20   was a little too restrictive.  It's been changed to

21   delineate the difference between a tree on the

22   perimeter of your property and one that's in the

23   buildable area.  And the diameters have changed greatly

24   as well, as I mentioned previously, to six inches in

25   the perimeter of the house and twelve in the buildable

86

1    area.

2              There's also been very other onerous

3    parts taken out like the $500 fee.  I'm looking forward

4    to some good back-and-forth there, and, hopefully,

5    there's a compromise that results in us being able to

6    protect the few little trees we have left in town while

7    encouraging more shade canopy as well.

8              And I wanted to end with the quality-

9    of-life reports because there is a tremendous amount

10   going on.

11             Kristen O'Rourke is in the process

12   right now of prepping the quarterly newsletter.  We're

13   going to shrink it down to, I believe, two pages which

14   will save us a little bit of money on the printing, but

15   that takes a lot of reformatting.

16             I want to bring to everybody's

17   attention a potential offshore wind farm.  And this is

18   something that I am adamantly opposed to.  We have

19   something called the Hudson South Pipe off the coast of

20   -- of Point Pleasant Beach, Sea Girt, Manasquan.  And

21   the closest point of this is 15 miles.  The visual

22   horizon for windmills and wind farms is about 35 miles.

23   At 15 miles you'll be able to sit at your beach and

24   stare at windmills constantly while you're out there.

25   To me it would be absolutely devastating to our tourism

87

1   industry, not to mention migratory bird patterns, not

2   to mention shell fish grounds and our fishing industry

3   overall.

4          What they've come to already is a

5   transmission table.  They're trying to take all the

6   various different areas off of the shores of New Jersey

7   that are going to have these wind farms and they're

8   going to try and bring it in right around Manasquan.

9   And we've already submitted my vehement opposition to

10  that.  The lease does not go up for about one year,

11  maybe one to two years or so.  But there are two huge

12  conglomerates out there -- EDF which is basically Shell

13  Energy and -- and another group stacking these things

14  up.  And, you know, we're going to be following that

15  extremely closely.

16          And I want to thank Kristen O'Rourke,

17  with her legislative experience working in the State

18  Legislature, for really getting us in the game well

19  ahead of time so that we actually can hopefully keep

20  this from decimating all those things that I mentioned.

21          Kristen is also working on the electric

22  vehicle charger grant.  She got into the nitty-gritty

23  details about fast chargers versus other charges.

24  That's coming up very quickly.  She has a public

25  information engagement opportunity with Sustainable

**88**

1    Jersey that she's working on.  I believe it's due

2    August 9th.  And she's going to work to coordinate a

3    resident survey on that front as well.

4            There's a national archives grant that

5    we're going to be applying for.  That is going to be in

6    conjunction with the Historic Commission.

7            There's a landscape restoration grant

8    that Kristen has reached out to the state forester to

9    see how it's going to fit with their plans.  That

10    deadline is coming up August 10th.

11            Work on the pop-up shop program is --

12    is continuing.  As everybody may have seen, you know,

13    things continue to really go in a positive direction

14    for the Gottlieb Building.  Not only did the Fisher

15    Family save that, but here in the middle of a pandemic,

16    they're working with a local woman, Fallon, who is

17    going to be make -- turning it into a market which I

18    think is exactly what we're going to need coming out of

19    the Coronavirus pandemic.  It's essentially going to be

20    a makers market.  She's going to have different crafts

21    in there, all having little different spaces.  She's

22    going to be make it a little bit of an event space.

23    And -- and I don't know if I'm at liberty to say, but

24    there's something really cool planned for the -- the

25    top floor as well.

89

1          But we're also going to try and

2    implement our own pop-up shop program.  You know, we

3    have a problem in town, and, you know, some of you may

4    drive by these things and might see it all the time.

5    We have businesses and land that have been sat on for

6    decades and are one of the main contributors that, you

7    know, create weeds and look like blighted properties

8    here in Point Pleasant Beach.  And we're going to try

9    and find ways to either get pop-ups in these businesses

10   temporarily or to encourage the building owners and the

11   landowners to finally do something and develop the

12   property properly.

13          The Volunteer Corps is moving along.

14   The mandatory volunteer form has been emailed to all

15   interested parties.  It's legally limited to Point

16   Pleasant Beach residents, age 18 and up because of some

17   of the activities that -- that they'll be undertaking.

18   And Kristen has already finished the volunteers'

19   mission statement.

20          The Senior Committee has a call

21   scheduled with a -- a senior committee in Montclair to

22   understand how they're doing things, because,

23   apparently, they're a model for all of New Jersey.

24   They've drafted a mission statement as well.  They're

25   going to print some AARP materials, and we need to get

90

1    on to our targeted committee membership list sometime

2    over the next couple meetings as well.

3              We're revitalizing the Mayor's Wellness

4    Campaign, and we're identifying potential committee

5    membership, researching health weaknesses in Point

6    Pleasant Beach, and we're developing ideas to combat

7    obesity and smoking and vaping and drinking and mental

8    health and all those sorts of things that hopefully I

9    could use my office to -- to better -- better things a

10   little bit as well.

11             And -- and we're looking at, at

12   something interesting which, you know, might serve as a

13   little bit of an art installation downtown.  I

14   mentioned the seagull bike racks.  They are essentially

15   little bike racks that are metal that are in the shape

16   of red seagulls.  And we're going to be looking at a

17   grant, hopefully from the Fisher Foundation, to start

18   deploying some of those in strategic areas around town,

19   like the town gazebo and the inlet and -- and, you

20   know, Pleasure Park and -- and places like that.

21             Lake of the Lillies, we had some issues

22   there with -- with shocking it for algae this year.

23   Because of all the furloughs at the -- the State level,

24   it took a lot longer than we were hoping.  But that is

25   going to be treated this coming -- this coming week,

91

1   and we continue to work on our lake management plan as

2   well for that.

3               Social media, we've started the first

4   Point Pleasant Beach Instagram account.  It's

5   Ptpleasantbeach with the accent in front of it.  And

6   anything that's kind of aesthetically pleasing or

7   beautiful about our town, which there's a lot, is going

8   to be going on there.

9               Census 2020, I literally -- I literally

10  received a call from the Governor's Office today about

11  this because we're right around the 50 percent mark of

12  compliance, and a lot of that has to do with the fact

13  that we are about 50 percent nonfull-time residents

14  which obviously is something that this administration

15  is looking to change.  I'm asking all of the

16  Nonresident Taxpayer Advisory Committee, and I'm going

17  to reach out to Seth Sloan and them to disseminate to

18  their membership that they need to mark off on their

19  census forms in their home localities that their house

20  here is actually a second home, and that'll help lower

21  our numbers and -- and move our numbers up as well.

22              And the State is talking about and

23  Kristen is talking with both the County and the State

24  about having a census vehicle come to the train station

25  lot so that we can raise a little bit of awareness and

**92**

1    -- and get things moving in that direction.  And we've

2    even produced some materials for the census in Spanish

3    for the Hispanic community in town so that we can

4    increase their rates as -- as well.

5                    We've been working together with

6    Sustainable Jersey and the Ocean County Road Department

7    for maintaining a legislative monitoring spreadsheet

8    for the first time in, I think, possibly ever, where

9    we're looking at the impact of what is going on in the

10    State Legislature to Point Pleasant Beach and finding

11    ways where we might need to -- to lean into that.

12                    And work continues on the New Jersey

13    Transit quiet zone.

14                    I mentioned that the new banners are in

15    production.

16                    And Councilman Santanello will

17    appreciate this.  We have quotes for landscaping RFPs

18    and irrigation as well, because I believe he's not --

19    not pleased with the time that Rob is spending on

20    watering, and we might be able to find a cost value

21    proposition, where for a couple of thousand dollars we

22    can get some irrigation placed in and around all our

23    trees, ensuring that they're going to be watered

24    properly on a regular basis and -- and --

25                    COUNCILMAN SANTANELLO:  Nice work.

93

1          MAYOR KANITRA:  -- and free him up.

2          COUNCILMAN CORTES:  It's not -- I don't

3    know if that's Bob, Mayor.  That was me.  But that'll

4    -- if that irrigation comes in, that'll free up our

5    part-timer, you know, Rob, our part-time guy to do what

6    you were looking to have him do more of, you know, on

7    your campaign.

8          MAYOR KANITRA:  And, obviously,

9    necessity is the mother of invention.  And, you know,

10   we had a lot of trees that were close to dying, and

11   it's great that he stepped in the way that he did.

12   And, as Anne Lightburn mentioned and a lot of people

13   have mentioned, I think he's been the difference

14   between us having, you know, 50 to 100 dead trees

15   again.  And, hopefully, we can help him and help free

16   him to do -- to do even more.

17          And -- and that is it for -- for my

18   report.

19          And I'm going to turn it over to the

20   Borough Administrator.  And, as usual, she can cross

21   out the things that I stole from her and -- and fill in

22   the gaps that I forget.

23          MS. RIEHL:  Thank you, Mayor.

24          First, I'd like to say we touched on

25   the "No Smoking" signs for the boardwalk.  We actually

**94**

1    told DPW to install 40 signs throughout the boardwalk,

2    so they are up and installed which is a great help to

3    the police department for enforcement.

4            In addition, I am working with the

5    Department of Public Works and the Police Chief on

6    permanent signs which will probably go up early next

7    year.  That will include some of the ordinance changes,

8    if passed, that are on tonight as it regards to beach

9    activities, different fines, and they will be located

10   on the railing at the boardwalk at each beach entrance.

11   So we are continuing to make progress on that.

12           You talked about quotes for a speaker

13   system on the boardwalk.  In addition to the four

14   speakers for District Two, I am also getting quotes for

15   -- they're going to be alternate quotes so we can

16   select what we want to do and if we want to go this

17   far.  But, in addition, for an illuminated sign board

18   to be erected on District Two and for a full boardwalk

19   system so that we would have speakers that continue

20   both north and south at strategic locations instead of

21   just in the plaza area.  So the prerecorded messages or

22   if someone's using live mic, it would -- it would blast

23   throughout the boardwalk.

24           MAYOR KANITRA:  That's fantastic.

25   That's great.

95

1          MS. RIEHL:  There are going to be

2     alternate bids.  So, you know, depending on how the

3     cost comes in, if we can only do one this year and

4     budget one the next year or, if it's cost efficient,

5     we'll do them all this year.  So when those are -- we

6     have two different vendors quoting.  I know both of

7     them were up there today.

8          We talked about irrigation.  I

9     solicited and actually received quotes on the

10    irrigation systems from two different vendors.  The

11    areas in question that I asked to have quoted were for

12    the comfort station at the inlet, across the street

13    from the comfort station where the new vegetation was

14    planted, and then pretty much the entirety of Little

15    Silver Lake from the band shell all the way around to

16    the OCUA pump station, that one being the largest

17    component of the irrigation.

18          One company came in at a total of

19    53,600 for all three locations.  The second company

20    came in at a total of 27,590.  I do have money left in

21    the --

22          MAYOR KANITRA:  Could you repeat that

23    one more time.  You cut off for me, Christine.

24          MS. RIEHL:  Yes.  The two proposals,

25    one for the -- all three locations came in at a total

**96**

1    of $53,600.  And the other quote came in for all three

2    locations at a total of $27,590.

3                    MAYOR KANITRA:  And what would it

4    entail?

5                    MS. RIEHL:  Irrigation, soakers,

6    sprinkler heads, installation.  It's quite -- it's

7    quite laborious, particularly at Little Silver Lake

8    with the size that we have out there.  That was the

9    largest of the two.  And I was surprised at the

10   different price quotes.  One came in at 48,000 just for

11   Little Silver Lake.  The other one for Little Silver

12   Lake was only in the 20 thousands.

13                   COUNCILMAN CORTES:  Christine, is it

14   possible to see that just so I can look them over,

15   having some knowledge?

16                   MS. RIEHL:  Yes, of course.

17                   COUNCILMAN CORTES:  That's a big

18   disparity.

19                   MS. RIEHL:  It is -- it is a big

20   disparity.

21                   What I'd like to do is if we could have

22   authorization tonight after to move forward with this

23   or, if you'd like, I can wait until the August 4th

24   meeting and disseminate the quotes to everyone.  Just

25   let me know your preference.

97

1          MAYOR KANITRA:  I -- I would love it if

2     we could move it tonight and give you the -- give you

3     the ability to work through -- work through the pricing

4     and, you know, have everybody kind of take a quick look

5     at it.  But just in terms of authorization, you know,

6     by the next meeting in August and then by the time it

7     gets installed, I assume if we okay it now, we could

8     probably have it in within a couple of weeks which

9     would buy, you know, a ton more hours for Rob for

10    tackling litter and tackling some of the other things,

11    you know, during the busiest month of the summer.

12          MS. RIEHL:  The more cost-effective

13    quote came from the company we currently use that does

14    other maintenance on our current sprinkler system.  So

15    they are familiar with what we have.

16          So, yes, just let me know how you'd

17    like to proceed.

18          MAYOR KANITRA:  Would we decide which

19    one right now or could we just decide to move forward?

20          MS. RIEHL:  We could do the

21    authorization to move forward with the irrigation quote

22    and after review --

23          MAYOR KANITRA:  Okay.

24          COUNCILMAN CORTES:  Christine, why

25    don't you have -- let John Trout -- you know, it's

**98**

1   easier for him than any of us.  But let him look it

2   over.  That's so -- I just want to make sure it's --

3   that you're comparing apples to apples, what you're

4   getting from each one, what material, what -- you know,

5   that's a big -- big difference between quotes.

6           MR. RIORDAN:  I think what Councilman

7   Cortes is -- is suggesting -- and I think he may very

8   well be right -- is that somebody very well may have

9   made a mistake.

10          MS. RIEHL:  You know what?  I called

11  them.  Actually, I emailed them and gave them a map,

12  the same -- reiterated you're quoting this entire

13  section of lake, and they said, yes, absolutely.  I was

14  surprised as well.  But I'll certainly share all of

15  this information.

16          MAYOR KANITRA:  Can I -- can I ask a

17  question?  Can we -- can we make a motion to move

18  forward with the better quote, the more cost-effective

19  quote, pending the fact that a review by John Trout and

20  even Andy determines that it is -- it is of the same

21  caliber and quality as the other one?

22          MR. RIORDAN:  Of course, she can

23  absolutely rely on the -- on the Director of Public

24  Works and Councilman Cortes.

25          COUNCILMAN CORTES:  You know, you want

99

1    to see --

2                    MAYOR KANITRA:  Do we have a motion for

3    that?

4                    COUNCILMAN CORTES:  I'll make the

5    motion to move forward on that.  That way it'll free

6    Rob up.

7                    COUNCILMAN SANTANELLO:  I'll second

8    that.

9                    MS. FARRELL:  I can just add it to the

10   agenda.  Do you want me to just add it to the agenda?

11                   MAYOR KANITRA:  Perfect.  That's fine

12   too.

13                   COUNCILMAN CORTES:  Okay.

14                   MS. FARRELL:  Okay.

15                   MS. RIEHL:  Thank you, Eileen.

16                   MS. FARRELL:  You're welcome.

17                   MS. RIEHL:  You spoke about the lake

18   treatment.  They'll actually be onsite tomorrow.  So if

19   anyone gets reports of a (indiscernible) in the lake,

20   they are actually doing the application of the

21   algaecide in Lake of the Lillies tomorrow.  And then

22   the following Tuesday, we will be onsite with our lake

23   shore rehabilitation vendor to talk about progress on

24   the lake shore rehabilitation and to talk about

25   nanobubblers and aeration.

100

1        MAYOR KANITRA:  Great.

2             MS. RIEHL:  I'm going to get with DOT

3    on this Thursday at 35 and Arnold to discuss signage

4    for the left-hand turning lane, the potential for the

5    left-turn only on the signalization and the line

6    painting in the street.

7             The locks of love has been in and will

8    be installed at the inlet tomorrow morning.  So we have

9    removed some additional locks that had gone up on the

10   boardwalk.  Once the install is done tomorrow, it'll be

11   -- it'll be open for everyone to utilize.

12            I have received quotes and I'm moving

13   forward with renovations to the Council chambers.

14   We're going to be installing new carpeting, paint,

15   blinds and really spruce it up, and we're going to do

16   that before we get back in there.

17            And, lastly, I would just like to say

18   that we are -- we have received seven applications for

19   DPW laborers.  We're working through them, and I hope

20   to appoint two very shortly.

21            MAYOR KANITRA:  Fantastic.  Thank you

22   for all that -- all that you're doing and -- and

23   keeping everything running now that we're -- you know,

24   we're -- we're fully operational in town hall.  It

25   seems like we're right where we need to be.

101

1              MS. RIEHL:  Thank you.

2              That's it.

3              COUNCILMAN CORTES:  Mayor, Mayor,

4    before we -- before we go to public, are you available

5    Friday morning?

6              MAYOR KANITRA:  I can give you an

7    answer right now, Councilman.

8              I am available -- I am available at

9    nine -- from nine a.m. to ten a.m.

10             COUNCILMAN CORTES:  Okay.  Nine a.m.

11   Friday.

12             MAYOR KANITRA:  Yep.

13             COUNCILMAN CORTES:  Okay.  I'll meet

14   with you and John Trout.  Is that fine?

15             MAYOR KANITRA:  As long as you keep six

16   feet away from me, you can meet with me.

17             COUNCILMAN CORTES:  I can keep six feet

18   away.

19             MAYOR KANITRA:  Fair enough.

20             COUNCILMAN CORTES:  Where do we want --

21   where do we want to meet, your office?

22             MAYOR KANITRA:  You want to meet at the

23   yard?

24             COUNCILMAN CORTES:  Yeah, nine o'clock

25   on Friday over at the yard then.  That's great.  We'll

**102**

1    just -- we'll get everything onboard, you know, like

2    we, you know, you and I talked about offline.

3                    MAYOR KANITRA:  Right.

4                    COUNCILMAN CORTES:  Okay.  Thank you.

5                    COUNCILWOMAN TESTA:  Mayor, can I --

6    Mayor, can I say just two more things real quickly?

7    I'm sorry.

8                    You know at town hall again -- this

9    person didn't want to get any recognition.  He did

10   something really wonderful.  He donated the flowers.  I

11   don't where -- Andy Cortes, you know where the outside

12   patio is?  I don't know if anyone noticed.  There's

13   some ornamental grass.  There's --

14                   COUNCILMAN CORTES:  Yes.

15                   COUNCILWOMAN TESTA:  Did you see them

16   there?

17                   I -- I don't want to mention the -- the

18   resident's name, but he graciously went out and he made

19   that donation to town hall.  So kudos --

20                   MAYOR KANITRA:  Wow.

21                   COUNCILWOMAN TESTA:  Yeah, it was

22   really, really nice of him.  You know, because he could

23   get the plants at half price, and, you know, that was

24   his gift towards the town.  He doesn't want his name to

25   be mentioned, but, you know, I just wanted to give a

103

1        shout out to him.

2                    And I did mention to the Mayor, that

3        they have a hose, Andy, that we could put in there that

4        could water it.  I didn't want to put the mulch down

5        until we have that hose.  So I don't know if that's

6        something that we could add, maybe possibly get that or

7        the town could get that for us.  Is that something

8        maybe we can look into?

9                    COUNCILMAN CORTES:  It's like a drip

10       hose, right?

11                   COUNCILWOMAN TESTA:  Yeah.  And there's

12       a spigot outside that we can hook it up, and we then we

13       can just put it real close and bury it and then we can

14       put --

15                   COUNCILMAN CORTES:  Right.

16                   COUNCILWOMAN TESTA:  -- the mulch.  And

17       then we don't have to worry about watering it.  And

18       next year you can put some pretty flowers there and put

19       it on a timer.  So it'll definitely -- it'll look

20       really pretty.  So I just wanted to mention that.

21                   And, lastly, I forgot to mention this

22       from one or our residents.  Chantel Terrazi, she wanted

23       to give you a special thank you note.  "Hi All.  I just

24       wanted to say thank you to all involved when I called

25       about the flooding during the last tropical storm.  If

104

1    you would please extend my sincere thanks to Christine

2    Riehl and Kristen O'Rourke for getting back to me with

3    good information about the pump station and dealing

4    with the issue in real time.  I was unable to find

5    their new email address on the new website.  While

6    flooding is a continual occurrence here in town, I

7    found it interesting that the County sets the

8    parameters for the activation of the pump much like

9    every present pothole puddle near McDonald's parking

10   lot entrance.  (Indiscernible) finally found it's way

11   back up and raw sewage was the real problem.  So for

12   the last 20 years every (indiscernible).  So glad that

13   was resolved.  So I just want to say thank you so much

14   to everyone and for your quick response."

15                    And I just wanted you to all know that.

16   So thank you.  Thank you for letting me have that time.

17                    MAYOR KANITRA:  Great.  Okay.

18                    COUNCILMAN VITALE:  Mayor, can I say

19   one thing that I failed to mention in my Committee

20   Report?

21                    I alluded to the conversation I had

22   with the diving group -- and this is really to the

23   Beach Ordinance.  I'm hoping that we can add them in as

24   -- as people that are allowed on the beaches after

25   hours and allow for navigating the lateral shoreline so

105

1    no stopping or standing, but navigating the -- the

2    shoreline.

3              MAYOR KANITRA:  We can ask for an

4    amendment when we bring -- when we bring it up, I

5    think.

6              COUNCILMAN VITALE:  Okay.

7              MAYOR KANITRA:  Okay.  Perfect.

8              Okay.  So that's it.  We're going to

9    move to -- to the first public participation.

10             Councilman Vitale, if you can unmute

11   everybody, and we'll ask everybody to turn off your

12   TV's, turn off your background noise and -- and then be

13   orderly when you speak.  And, again, because we have a

14   lot of people to -- to get through tonight, and we know

15   everybody's passionate, we are going to enforce the

16   three-minute rule tonight.  And I'm going to look at

17   the clock, and I am going to do my best to,

18   unfortunately, cut you off.  Whether you're pro or anti

19   or whatever stance you have, we're going to -- we're

20   going to, unfortunately, have to cut you off at three

21   minutes tonight.

22             So, Councilman Vitale, go ahead.

23             COUNCILMAN VITALE:  And, remember, I

24   can't unmute every -- everybody, so if you want to

25   talk, you'll have to unmute yourself.  And it's star

106

1    six on the landline.

2                    MAYOR KANITRA:  Star six if you're on a

3    landline or just hit unmute on your video.  We're ready

4    to go.

5                    MR. TOOHEY:  So how do we jump in?

6                    Tom Toohey, 114 Niblick.

7                    MS. FARRELL:  Excuse me, Mayor.  Can I

8    please add what needs to be added to the agenda?

9                    MAYOR KANITRA:  Yes.

10                   MS. FARRELL:  Okay.  Item 3q) is going

11   to be approval of the painting of the right turn on

12   Arnold and River Avenue for $250.

13                   And 3r) is going to be authorization to

14   move forward with the irrigation quote, the more cost-

15   effective quote, pending review by the Administrator

16   that it is the same caliber as the other quote.

17                   Since the agenda was originally posted,

18   there were a couple of changes.

19                   Item 2f), appointing Robert LePore as

20   the judge in the Municipal Court.  And I did send you

21   an updated resolution with salary, et cetera.

22                   Let's see.

23                   And Ordinance 2020-11, 2020-12 and

24   2012-15 were amended today, and the amendments are on

25   the website.  They can be accessed via the links on the

T. Toohey                                           107

1    agenda page.

2                    MAYOR KANITRA:  Okay.

3                    MS. FARRELL:  That's it.

4                    MAYOR KANITRA:  Fantastic.

5                    I'm sorry, as every Council Meeting,

6    for cutting you off.

7                    And, as a courtesy, we're going to go

8    first to Councilman Tom Toohey, who clearly is

9    (indiscernible) and flexing for us in his tank top.

10                   MR. TOOHEY:  We don't do air-

11   conditioning in our house.

12                   So thank you for letting me go first,

13   Paul.  I think the item I want to bring up is going to

14   get a lot of discussion so I just kind of want to talk

15   and get out of the way.

16                   I want to thank the governing body

17   tonight for tabling the Skate Park Ordinance.  I'm

18   going to do my best -- I had a conversation with the

19   Mayor a few weeks back about serving as liaison of the

20   project.  I'm going to do my best to mitigate any blow-

21   back, although I really don't anticipate any from the

22   skateboard community.  I think everybody really wants

23   to get it right  So that's all I wanted to say.

24                   Thank you.

25                   Please -- everybody has my contact

T. Toohey/M. Castellano                                108

1   information -- involve me in those conversations when

2   they happen if -- if you see fit.

3                    And the other thing I just want to

4   throw in and this isn't -- this isn't picking on

5   anybody, but it's really coming from a place of a

6   mistake that I made as a newly-elected official.  I

7   don't remember who it was, but during a committee

8   report somebody talked about how Maser is -- is great

9   at returning phone calls.  They will.  They always

10  will.  And they'll talk to you forever because

11  everybody on this call is paying for it.

12  I found that 95 percent of the questions I -- I had

13  could be answered by the Borough Administrator.  But

14  that's not to pick on anybody.  It's -- it's a mistake

15  that I made, and I just wanted to throw my experience

16  out there.

17                    Thank you and -- and good luck, guys.

18                    MAYOR KANITRA:  Thank you, Councilman.

19                    MS. FARRELL:  Tom Toohey.

20                    MR. CASTELLANO:  Hey, this is Mike

21  Castellano, Chair of the Surf Rider Foundation, Jersey

22  Shore Chapter.

23                    I just wanted to first thank you guys

24  for speaking with our legislative liaison, Joe, on the

25  access issue.  And, you know, seeing that this is

M. Castellano                                                    109

1    privately-owned land versus -- versus public land, you

2    know, we are a lot more understanding, and, you know,

3    we completely sympathize with you guys regarding the

4    behavior of people who are, you know, on the beach

5    during the night and at night.

6                    You know, conducting beach cleanups

7    throughout the entire year, I get to see it every day

8    just how bad the problem is, and I can only imagine

9    what you guys are going through.  So, again, we

10   completely understand and, you know, are very

11   appreciative of how willing you guys are to, you know,

12   amend what can be amended, extend what can be extended.

13                   But the two things that were actually

14   just brought up and the two things that I -- I thought

15   were -- were very important to -- to be amended were --

16   were the divers, adding divers to that list along with

17   surfers and fishermen, and then that lateral access.

18   That, out of everything for me, is the biggest thing.

19   Just because like one of the -- one of the attributes

20   of living at the Jersey Shore is walking the high-tide

21   line at night.  I mean, I do it every single night.  I

22   live in Asbury Park.  I go down to the beach at sunset.

23   I walk the beach.  I'm not down there throwing a

24   blanket out.  I'm not down there with a bunch of beers

25   or food.  I take my nightly stroll.  I get off and I go

M. Castellano                                110

1    home.  So if that could be added strictly --

2                MAYOR KANITRA:  Mike, you cut out right

3    after you said "if that could be added."

4                COUNCILMAN CORTES:  Houston, we have a

5    problem.

6                MAYOR KANITRA:  I can hear Councilman

7    Cortes so I assume everybody --

8                COUNCILMAN VITALE:  Mike's still signed

9    in, but I don't see his microphone going.

10               MAYOR KANITRA:  I think we got the gist

11   of what he said.  He ended by asking if that could be

12   added and -- and, you know, I think that that's --

13   that's very reasonable.  And I appreciate Surf Rider

14   and the other beach access groups working with us and

15   understanding, you know, the predicament and the

16   situation that we're in here.  You know, Point Pleasant

17   Beach is a surfing town.  We've always been a surfing

18   town.  And -- and I certainly want to make sure that

19   everybody feels comfortable with that, that we're not

20   going to be messing with the -- with the fabric of the,

21   you know, the community there.

22               So, Mike, if -- if you come back on or

23   you hear us or if anybody else knows Mike, just let him

24   know that we heard him loud and clear, but we're going

25   to move on to the next person because I think his feed

**M. Castellano/V. Castin**      **111**

1  went out.

2           MR. CASTELLANO:  Thank you, guys, very

3  much.  I really appreciate it.

4           MAYOR KANITRA:  Oh, perfect.  There you

5  are, Mike.  Okay.

6           MR. CASTELLANO:  Yeah.

7           MAYOR KANITRA:  Great.

8           Thank you.

9           MR. CASTELLANO:  Thank you, guys.  Have

10  a good night.

11           MR. CASTIN:  I'm next.

12           MAYOR KANITRA:  Okay.  Go ahead.

13           MR. CASTIN:  Okay.  Just a couple of

14  things.  I won't -- I won't --

15           COUNCILMAN CORTES:  Name and address,

16  please.

17           MAYOR KANITRA:  Mr. Castin, what's your

18  address.

19           MR. CASTIN:  Vince Castin, 15 Trenton

20  in Point Pleasant Beach, Borough of Point Pleasant

21  Beach, actually.

22           First of all, how come we only get

23  three minutes and all those other people talking got,

24  like, 15?  It's past my bedtime here.

25           Okay.  On -- on 2u), it looks like, the

**V. Castin**                                                    112

1    Bureau of Housing will give money to us so we can

2    inspect multiple dwellings.  What -- what's that?  Can

3    you explain that to me?

4                    MS. RIEHL:  Yes.

5                    MR. CASTIN:  Go ahead.

6                    MS. RIEHL:  We do all the inspections

7    on multiple housing dwellings for the State of New

8    Jersey, and then they compensate us for that.  We've

9    been doing this for, ooh, 25, 30 years.

10                   MR. CASTIN:  Oh, okay.  I guess I

11   didn't -- okay.

12                   MS. RIEHL:  Yep, we do it every year.

13                   MR. CASTIN:  Okay.  Just a couple of

14   things real quickly.

15                   I -- I do agree with Andy and Mr.

16   Santanello on just about 95 percent of all the issues

17   regarding the trees and the code enforcement thereof

18   and also the changes by -- by our Mayor.  I -- I think

19   -- I think everybody's on the right -- right page with

20   that.  So I -- I think those are some good changes.

21                   I also agree with the opening of the

22   park until September.  I think that's a -- that's a

23   good idea.

24                   And, Paul, I think you mentioned the

25   windmill thing.  I -- I'm 1,000 percent behind you on

V. Castin                                    113

1   the -- the -- no windmills out there.  There's a thing

2   a lot of people don't know is that they -- they also

3   have to run electricity from the windmills to the shore

4   because there's not always enough wind to propel them.

5   So, as a result of that, they have to use alternate

6   power to run the windmill.  And it's kind of an

7   oxymoron there.  You got a windmill that needs

8   electricity.  So I'm totally against -- against

9   windmills on the shore.

10              Oh, by the way, on Silver Lake, I saw

11  the guys -- guys? -- guys and girls out there cleaning

12  up, and I appreciate that having lived on the lake for

13  a while.  And I think they do a -- they do a heck of a

14  job out there, you know.

15              And I think that's -- oh, the one

16  thing, maybe -- Andy, maybe you can take a look at

17  this.  When you go up on Inlet Drive, where it starts,

18  right at the end of Ocean Avenue there --

19              COUNCILMAN CORTES:  Right.

20              MR. CASTIN:  -- there's a parking lot

21  there.  I ride my bike through there.  And right by

22  those condos, there's a fence.  It's about 2-1/2, 3

23  feet high and it's got, like, spears on it.  It's

24  really short to have that type of finish on it.  It's

25  not the Coast Guard fence where it's, like, ten feet

**V. Castin**                                    **114**

1   tall and it's protected.  I don't know.  It looks to me

2   -- it looks kind of hazardous there.  I don't know if

3   there's any -- any regulation about that.  You know

4   what I'm talking about?

5               MAYOR KANITRA:  You talking about the

6   new one?

7               MR. CASTIN:  There's a brick fence.

8   It's maybe three feet tall.  Going up Inlet Drive, it's

9   on the right-hand side just before you make the turn.

10   There's a fence, a short fence there with -- just

11   before you turn into the condos there.

12               COUNCILMAN CORTES:  I think I know

13   where you are.  I'll look at it tomorrow.

14               MR. CASTIN:  Yeah.  It just seemed a

15   little hazardous.  I mean, if someone falls off a bike,

16   speaking of me, they'd be impaled there for a while and

17   nobody would know it.

18               Okay.  So that's -- that's kind of it,

19   and keep up the good work, guys.

20               Oh, Mr. Mayor, I can talk to you later

21   or quickly about the -- I left a message on your phone

22   regarding the Coast Guard Station versus the museum.

23               MAYOR KANITRA:  Yep.

24               MR. CASTIN:  They -- I had a -- I left

25   a message with Chris Smith also in that regard and also

V. Castin                                        115

1   I spoke to the association down here.  This has been in

2   the works for a while and nothing seems to be

3   happening.  I thought maybe you could use your

4   expertise in D.C. to maybe talk to someone down there.

5   There's so many different groups there.

6                  MAYOR KANITRA:  When I went to D.C. to

7   meet with Congressman Smith it was mentioned that we

8   would get together at the end of August.  We were going

9   to do that in person.  Obviously, that's unrealistic

10  now.  But I will -- I will follow up with them in

11  August and -- and we'll go from there.

12                 So thank you, Vince, and we'll talk to

13  you in a little bit.

14                 MR. CASTIN:  Okay.  Thanks a lot.

15                 COUNCILMAN CORTES:  Mayor.  Mayor.

16                 MAYOR KANITRA:  Yep.

17                 COUNCILMAN CORTES:  Real quick.

18                 I believe a year ago April, Governor

19  Murphy was on the boardwalk and signed some kind of

20  legislation against any utility -- I don't know the

21  word.  Maybe you can have Kristen O'Rourke look this

22  up.  Against any utility coming out into state, you

23  know, state waters, you know, riparian rights.

24                 MAYOR KANITRA:  So these are federal

25  DOEM leases.  So the federal waters start about 15

M. Windrem                                    116

1    miles off.

2                    COUNCILMAN CORTES:  Right.

3                    MAYOR KANITRA:  Right.  So this is not

4    in state waters.  It's a federal lease but --

5                    COUNCILMAN CORTES:  Right.  But I'm

6    saying, just like Vince Castin had said, electricity

7    has to get out there.  Well, this might come under

8    whatever the Governor signed that's not allowed.  You

9    know, that's why we can't have gas, oil.  You have to

10   get a way to get stuff back onshore.  So maybe double

11   -- it was a year ago in April I believe that he was

12   down on our boardwalk.

13                   MAYOR KANITRA:  Well, we just -- we

14   just -- what we just objected to was actually the State

15   -- the State was allowing sediment testing for the

16   laying of these cables.  And that's what we objected

17   to.  But we'll look into it.  It's a good point,

18   Councilman.

19                   COUNCILMAN CORTES:  Okay.

20                   MAYOR KANITRA:  I believe Margaret

21   Windrem was next?

22                   MS. WINDREM:  Margaret Windrem, 133

23   Broadway.

24                   Thank you, everybody, for your time

25   tonight.

M. Windrem                                    117

1          And I just wanted to say that I agree

2     with the statement that was read by the Chief tonight

3     in the committee report.  I think that the continuation

4     of strong and strict enforcement is really necessary.

5     I live on the north end of the boardwalk, and starting

6     before the summer I was -- dogs, smoking, drinking.  To

7     be fair, some of the drinking is unintentional.

8     Sometimes people leave a north end bar and don't

9     realize they're not supposed to bring a drink with

10    them.  But drinking.

11          Very blatant pot smoking.  I've been

12    seeing that over the last couple of years.  We've been

13    seeing more and more pot smoking.  But the smoking this

14    year is -- it's just -- it's unbelievable.

15          Littering, a lot of littering.  Some of

16    it's just not on the boardwalk.  Ocean Avenue, the

17    parking lot is full of litter.

18          The loud, thumping music, it is

19    unbelievable.  Groups of kids walking by, big speakers

20    being pulled down.  We all went from big -- remember

21    boom boxes back in the -- you know, decades ago, and

22    then everybody got these little, tiny Bose.

23    Everybody's pulling a speak now on wheels.  It's

24    unbelievable.

25          Language that would make a sailor

M. Windrem                                    118

1    blush.  I have been told to, quote/unquote, "f" off in

2    ways that you can't even begin to imagine, mostly,

3    again, by teenagers.

4                  You know, I'm hoping it's a strange

5    year, but the behavior on the boardwalk has been

6    alarming, and it's out-of-towners.  You know, some of

7    this behavior, a lot of the pot smoking, is out-of-town

8    people.  But I know there are also a lot of local

9    teenagers who are up here causing a lot of havoc.

10                 I will say since we've gotten more

11   police force in mid-June, it has gotten better.  There

12   are a lot of police up here.  Chief Michigan is very

13   aware of what's going on up here.  He's paying

14   attention to it.  And I know every neighborhood has its

15   issues, so this is an issue that I see outside my

16   window.

17                 So I just want to ask for the Council

18   and the Mayor to continue to support Chief Michigan and

19   his officers to continue to strictly enforce this

20   because it's been a neigh -- it's been a summer that

21   made me think, you know, kind of what am I doing up

22   here.

23                 And just because DPW was brought up in

24   a couple of the committee reports, I just wanted to say

25   that anytime I've had any dealings with DPW and/or the

M. Windrem/E.J. Geiger                    119

1   water department, which I've had a number of instances

2   to deal with this year, the employees are always

3   extraordinarily pleasant and very helpful.  And I'm

4   just throwing that in as an aside to the conversation

5   about the behavior up here on the boardwalk because

6   they were brought up today.  And I wanted to give a

7   shout out to them because they're always, always

8   extremely helpful.

9               I thank you.

10              COUNCILMAN CORTES:  I'll pass that

11  along to Mr. Trout.

12              MAYOR KANITRA:  Thank you very much.

13              Okay.  Who's next.

14              MR. GEIGER:  E.J. Geiger, 115 Arnold.

15              MAYOR KANITRA:  Hey, E.J.  How are you?

16              MR. GEIGER:  Hey.  Good.

17              I just want to check -- talking about

18  the speakers on the boardwalk, how far down, if they do

19  that, are they going to extend them?  Like, are they

20  going to go into the residential section or just keep

21  it in the business section?  Because I'm sure people

22  down in the residential section don't want to hear, you

23  know, the same statements going off --

24              MAYOR KANITRA:  That's a good --

25              MR. GEIGER:  -- every 15 minutes.

E.J. Geiger                                    120

1           MAYOR KANITRA:  That's a good point.  I

2     think we would have to position them so that they

3     weren't intrusive.  Since we're passing -- we're

4     possibly passing a noise ordinance, we don't want to do

5     anything that residents are going to hear from their --

6     their decks all summer.

7           So, Christine, when we figure out that

8     spacing, if we do do the whole thing, can we just make

9     sure that they're not in the residential areas, or if

10    they are there, they're so low that you wouldn't even

11    hear them on your deck.

12          MS. RIEHL:  Right.  So what we're doing

13    now is getting a quote to see what it might cost to

14    extend it throughout the boardwalk.  It's certainly up

15    to the governing body to decide where and if they want

16    to install them.

17          MR. GEIGER:  Okay.  And that would tie

18    into the last speaker's comments about the noise.

19          Looking at the Beach Ordinance, I would

20    love to see the dog hours extended a couple of hours.

21    You know, 3 p.m., as somebody said earlier, you know,

22    those of us that work until 5 p.m., that kind of cuts

23    us out of getting up there.  So maybe they could make

24    that six o'clock.  To be able to take the dogs up there

25    on a leash would be great.

E.J. Geiger/K. Hennessy                           121

1           And I notice there was something about

2   the drones, no drones.

3           MAYOR KANITRA:  We already -- that's

4   redundant too.  We already have a No Drone Ordinance.

5           MR. GEIGER:  Okay.  I just saw it on

6   there, and I just wanted, you know, to check to make

7   sure that it wouldn't affect, you know -- because it

8   does say just drones, it wouldn't affect any law

9   enforcement or journalism or anything else like that

10  that needs to operate up -- up there.

11          MAYOR KANITRA:  Okay.  I don't think it

12  will.  I think we allow -- yeah, we allow commercial

13  uses.

14          MR. RIORDAN:  Yeah.

15          MAYOR KANITRA:  We allow permits.  We

16  allow, you know, realtors.

17          MR. GEIGER:  Okay.  I just wanted to

18  see if we needed a permit or whatever.

19          That's all.

20          MAYOR KANITRA:  Thank you, E.J.

21          MR. GEIGER:  All right.  Cool.

22          Thanks a lot, guys.  Have a good night.

23          COUNCILWOMAN TESTA:  Thank you, E.J.

24          MS. HENNESSY:  May I have an

25  opportunity to speak, Mayor?  This is Kristin Hennessy.

K. Hennessy                                    122

1          MAYOR KANITRA:  Miss Hennessy, sure, go

2    ahead.

3          MS. HENNESSY:  Yes.  Kristin Hennessy,

4    New Jersey Avenue.

5          Can you hear me okay?

6          MAYOR KANITRA:  We can hear you loud

7    and clear.

8          MS. HENNESSY:  Okay.  I want to first

9    respond to something that Councilman Vitale said in his

10   committee report, and that is the cancellation of the

11   townwide recreation program, otherwise known as the

12   Park Program.

13         While I recognize that this was

14   probably an extremely difficult decision for the

15   Recreation Committee to make, I feel that it's

16   important to just state that I think it's absolutely

17   disgraceful that this counselor that was hired, you

18   know, was so irresponsible to -- to show up to work

19   knowing that she had had this -- this test for COVID,

20   suspecting that she had the virus and the negative

21   impact that that has had on a hundred plus kids in the

22   town.

23         With the stress and the emotional

24   strain and anxiety that these kids in our town have

25   been under since the middle of March, I just can't even

K. Hennessy                                  123

1    believe that someone would be so stupid.  And I hope

2    that that person is going to punished or prosecuted.

3    She's over the age of 18, and I don't know what can be

4    done.

5                  But, furthermore, I was disappointed to

6    hear that the Recreation Committee made the difficult

7    decision.  I know there were certain (indiscernible)

8    sent out to the parents, but, again, I think that --

9    you know, Manasquan had an outbreak.  There were 30 to

10   40 young high school, young college people that tested

11   positive for the Coronavirus.  They took a week off,

12   reevaluated and then reinstated their recreation

13   programs.

14                  (Indiscernible) since March have

15   nothing but recreation and maybe Little League.  And to

16   just flat out cancel the program the way you did after

17   one week, it really disappointed a lot of kids who I

18   know and particularly my three nephews.  To use the

19   word "devastated" would -- would not be too strong of a

20   word.

21                  So I'm disappointed that the Recreation

22   Committee didn't go in a different direction with that

23   decision and didn't give that a little bit more careful

24   thought to how that decision might adversely affect

25   kids that are already struggling with the quarantine

K. Hennessy                                    124

1   and the pandemic.

2                   The only thing I'd like to say is

3   directed at the Mayor.

4                   And, Mayor Kanitra, I just want to say

5   to you that I think -- I listened to your -- your

6   Mayor's Report, and, you know, everything you said was

7   right on the money.

8                   And here's the bottom line.  We need

9   rules to -- to maintain the integrity of our town and

10  to preserve the family-oriented town that we've always

11  been that many people moved here for, that many people

12  like myself choose to stay in town for.  We need to set

13  the character and the tone of our community, and to do

14  that means we need rules.  And I'm disappointed in a

15  few Council Members that kind of want to take the

16  position that anything goes, whether it's cutting down

17  trees or it's allowing anything goes on the beach and

18  the boardwalk or just whittling down the rules at the

19  skateboard park.  We need rules.  We need strict

20  enforcement and we need strict rules.

21                  Someone, I think it was, Borough

22  Attorney Mr. Riordan, talked about the ordinance for

23  the beach and boardwalk preservation being modeled

24  after Spring Lake.  And I think that's exactly what we

25  need to do.  I think we need to look at communities

**K. Hennessy**                                    **125**

1    near us that we love and admire and see what they're

2    doing to keep their towns great and model after what

3    kind of ordinances they have.

4                    I mean, you know, you're -- you're --

5    you're arguing -- some of you are arguing over the size

6    of a cooler, you know, in terms of inches.  Someone

7    told me, as recently as yesterday, you're not even

8    allowed to bring food and beverages onto the beach in

9    Bay Head.  Now, I don't know if that's true.

10                   MAYOR KANITRA:  I apologize real

11   quickly.  I believe -- I -- I just want to be fair with

12   everybody.  I believe you can talk about that when we

13   get to the ordinances too.

14                   MS. HENNESSY:  I just want to make a

15   blanket statement and say that I really do think that

16   we need strict rules to preserve our charm as a

17   community.  And I think, Mayor, you and especially,

18   Councilwoman Testa and Councilman Vitale and

19   Councilwoman Byrnes -- I don't want to leave anybody

20   out, but you guys seem to really be on the right track

21   and -- and I support you 100 percent.

22                   Thank you.  That's all I have to say.

23                   MAYOR KANITRA:  Thank you so much.

24                   Sorry for cutting you off.

25                   MS. HENNESSY:  That's okay.

**B. Esrig**                                              126

1            MAYOR KANITRA:   Okay.  Who's next?

2            MR. CAVAGNARO:  Dave Cavagnaro.

3            MR. ESRIG:  (Indiscernible)

4            MR. CAVAGNARO:  Oh, sorry.

5            MAYOR KANITRA:  Dave.

6            MR. ESRIG:  Dave, are you going to go

7    or am I going to go?

8            MR. CAVAGNARO:  You can go.

9            MR. ESRIG:  Okay.  Hi.

10            This is Burt Esrig, 1311 Oceanfront,

11   Point Pleasant Beach.

12            MAYOR KANITRA:  Hey, Burt.

13            MR. ESRIG:  Hey.

14            I live and I'm one of the owners of

15   Bradshaws Beach.  Bradshaws Beach is owned by Bradshaws

16   Beach LLC, and there's a beach committee of three

17   members of that company that run the day-to-day beach

18   operations.  And we have contracted AquaServe, who also

19   runs the Maryland Avenue Beach, to run the day-to-day

20   operations of Bradshaws Beach.  There's a Facebook page

21   for Bradshaws Beach and AquaServe has a website.

22            I have spoken to some of the members of

23   Bradshaws Beach and I've spoken to the head of

24   AquaServe, and we applaud your efforts on cracking down

25   on some of the very bad behavior in the town and

B. Esrig                                          127

1    particularly on the beaches.

2              However, we haven't been contacted to

3    discuss this proposed ordinance and how it might

4    operate in practice.  And both Bradshaws Beach

5    representatives and AquaServe would like to volunteer

6    to identify potential operational problems created by

7    some of the items in the ordinance that we who run a

8    beach day to day might know and to also generate

9    procedures as to who does what on a day-to-day basis

10   and to identify any equipment, gates or anything else

11   we might need to purchase or install to affect what we

12   need to affect.

13             As an example, are we going to put

14   gates up?  Who's going to lock them?  Who's going to

15   open them?  When the time comes to clear the beach,

16   what do we do if we have problems?  We had -- we have

17   problems almost all the time when we want to close the

18   beach.  What are we going to do with Thursday night

19   fireworks that go off at 9:30 and every, you know,

20   resident in town is used to going there?

21             What does operating mean?  We have

22   lifeguards there till four o'clock.  Does operating

23   mean we have to have lifeguards?

24             What happens with the -- the private

25   homes that are adjacent to us?  What is our

B. Esrig                           128

1    responsibility in checking things?  In other words, if

2    we perform certain procedures and somebody hides a

3    joint and winds up on our beach are we liable.  Or once

4    you approve our procedures and we do them is that

5    sufficient to protect us?

6                   So I can go on and on, but we'd like to

7    volunteer to work with you, Mayor, the Council, the

8    Borough Administrator and anybody else you'd like to

9    make sure that this gets off to the right start and

10   really becomes affective.

11                  MAYOR KANITRA:  Well, Burt, I -- I

12   appreciate that tremendously and -- and I'd offered you

13   a couple of different things.  As -- as you know, you

14   know, you have legislation and then you have the rule-

15   making once -- once it's been passed and the

16   implementation of the procedures and everything along

17   those lines.

18                  So depending on what happens with the

19   Beach and Boardwalk Ordinance, we'd -- we'd be happy to

20   meet with you and to meet with other stakeholders that

21   would be affected and talk through, you know, how we're

22   planning on enforcing it and hear your thoughts on

23   everything.  You know, work with the realities of that.

24   And I believe that a conversation with the Borough

25   Attorney would be very fruitful as well.  And what I

B. Esrig/D. Cavagnaro                    129

1    would suggest, depending on how this goes tonight, is

2    that we set up those meetings not only just for

3    Bradshaws but for other operators as well in the

4    intervening time, preferably next week I would say so

5    that we have enough time to talk through everything and

6    -- and be there for a potential second reading.

7                    MR. ESRIG:  Great.  Look forward to

8    working with everyone.

9                    MAYOR KANITRA:  Thank you so much,

10   Burt.  Appreciate it.

11                   COUNCILWOMAN TESTA:  Thank you, Burt.

12                   MR. ESRIG:  Thanks.

13                   MAYOR KANITRA:  Okay.  I'm sorry.  Now

14   it's -- it's Dave Cavagnaro.

15                   MR. CAVAGNARO:  Good evening.

16                   Dave Cavagnaro, 118 Parkway.

17                   I'll start with the Beach Ordinance

18   since that was just mentioned.  I appreciate your

19   concerns and your dedication for what you're trying to

20   do.  My sticking point is that for the sake of public

21   safety you are again tampering with people's private

22   property rights.  And this owner just indicated what my

23   big concern would be.  Before an ordinance like this

24   comes to the table, why wasn't there a sit-down meeting

25   with all the beach owners first to see what their input

D. Cavagnaro                        130

1   would be before the ordinance even comes to the table?

2   It shouldn't be introduced first and then let's sit

3   down and talk to the people with their problems or

4   issues.

5               So I don't take up to much time, on the

6   Tree Shade Ordinance, I understand that there was a

7   revision.  Last time I checked was sometime around mid-

8   afternoon and I didn't see the new version.  When did

9   the new version hit the agenda?

10              MAYOR KANITRA:  I believe around 11

11  a.m.  And, again, it was numerical.  It was moving --

12  moving the diameter from four inches to six inches if

13  it's in the (indiscernible) and 12 if it's in the

14  footprint and taking up the (indiscernible).

15              MR. CAVAGNARO:  Okay.  And, again, when

16  ordinances are changed, the public doesn't have any way

17  of knowing that at the last minute they should go back

18  and check an agenda for something like that.  So that,

19  to me, I think is a problem.

20              I respect some people are passionate

21  about trees.  The tree-lined streets I think are nice.

22  We have an ordinance that already addresses that.  This

23  is an ordinance that is now again going to selectively

24  attack private property rights, not for all property

25  owners but just some which to me makes it a little

D. Cavagnaro/A. Lightburn                    131

1    discriminatory.   The number of homes east of the tracks

2    that are below flood elevation that in time are going

3    to have to be either removed or raised, they're going

4    to be affected by this ordinance, which is going to

5    affect this property values also.

6                   I think trees are important, but they

7    shouldn't be more important than people's private

8    property rights.   And this ordinance doesn't just make

9    a tree important.   It makes it the most important.   It

10   is the first step before anyone can do anything to try

11   and improve their property, and I think that's the

12   wrong priority of where a tree should be.   However,

13   that's my opinion.

14                   Thank you very much.

15                   MAYOR KANITRA:   Thank you very much,

16   Councilman.

17                   Who's next?

18                   MS. LIGHTBURN:   Hi.

19                   Anne Lightburn.

20                   MAYOR KANITRA:   Hi, Anne.   How are you?

21                   MS. LIGHTBURN:   Oh, I'm pretty good.

22                   Fascinating meeting.

23                   I'm -- I do want to talk about the Tree

24   Ordinance, but I'd also like to talk a little bit about

25   the Beach Ordinance because I know myself, as well as a

**A. Lightburn**                                    132

1   lot of people, come down after hours to go in the

2   water.  So I would like permission along with the

3   surfboarding.  I think that somebody should be allowed

4   to walk into the water if they so choose at their own

5   risk.

6                   MAYOR KANITRA:  I think that will be

7   addressed with the lateral.  I think that would be

8   addressed with the lateral --

9                   MS. LIGHTBURN:  Okay.

10                  MAYOR KANITRA:  -- issue.

11                  MS. LIGHTBURN:  All right.  Going to --

12  to the Shade Tree Ordinance, it's not really a Shade

13  Tree Ordinance.  It's a tree protection ordinance.  And

14  I would hope that this Council would vote yes on that

15  ordinance.  And really what we want to do is protect

16  the trees from needless cutting when there is new

17  construction or a developer takes over a property and

18  just clears it out.

19                  Now, as you've mentioned, Paul, you

20  changed it.  You made it very clear that the trees that

21  we're really trying to protect are six inches or more

22  in diameter which is a big tree.  And these are the

23  perimeter trees.  These are trees that a

24  (indiscernible) ordinance would not impact the

25  construction of the home or a pool or anything else.

**A. Lightburn**                                    133

1              And, you know, going back to what
2       Kristin said, ordinances are important because
3       ordinances are about the aesthetics of our town, how it
4       looks, how it feels and its future.  It's also about
5       behavior too.
6              And to talk to what Dave was saying,
7       there's always a delicate balance between the community
8       interests and their goals as well as property rights.
9       And also this ordinance addresses the rights to
10      adjacent property owners of not having tree cutting
11      going on around them.
12             And we have so many building codes and
13      ordinances, including the height of fences and how tall
14      your grass is, and trees should be no less important
15      than those issues.
16             And I know the Council has read this
17      already, and I hope that you appreciate one of the more
18      important things, the flexibility built into this
19      ordinance.  The developers or property owners who want
20      a treeless lot, they can have it.  This ordinance does
21      not cause anyone to have a tree on their property if
22      they so choose.  But it is -- it does provide for a fee
23      to have that treeless lot.
24             So the intent of this whole ordinance
25      is just to discourage the unnecessary removal of mature

**A. Lightburn**                          134

1    perimeter trees only.  And we're just here to ensure

2    that these trees are either replaced or that they're

3    going to be replaced somewhere else in town.

4              Trees are important to the aesthetics

5    of our town and the environment.  So I'm asking each

6    Councilperson to vote yes.  This is really too

7    important with the increase of knock-downs that we've

8    seen and the new construction of, you know, what is

9    primarily a second home.  So I would appreciate a yes

10   vote.

11             Thank you.

12             MAYOR KANITRA:  Anne, I want to give

13   you this -- one more minute with a question that I have

14   for you.  I was -- I had someone reach out to me that

15   had a very unique situation.  It's a gentleman who owns

16   a couple lots together, had gotten them approved as a

17   subdivision.  And I guess they went through a process

18   with you all where they -- they gave a conservation

19   area to you, like, a hundred foot conservation area for

20   trees on Baltimore Avenue.  They granted, like, a

21   conservation area or something like that.  Would you be

22   okay -- and you seem shocked like you don't know about

23   it.  But would you be okay, if that was the case -- and

24   maybe this was done a long time ago -- about

25   grandfathering anybody that, you know, sets -- you

**A. Lightburn**                              135

1    know, sets apart a conservation area or something like

2    that because then it would be redundant?

3                    MS. LIGHTBURN:  Well, the property

4    owner -- the way the ordinance reads now, I don't know

5    if it would be redundant.  But without knowing all the

6    details this would be my impression.  If this

7    individual was subdividing a property and he's talking

8    about dedicating a strip for trees out of his --

9    carving out a strip for trees -- is that what he's

10   talking about?

11                   MAYOR KANITRA:  I totally just stepped

12   on Councilwoman Byrnes because he reached out to her as

13   well, right?

14                   COUNCILWOMAN BYRNES:  Yes, he did.  We

15   had a lot of dialogue on this.

16                   The property in question is 307

17   Baltimore, Anne.  It's 302 Chicago and 302A Chicago.

18   So I guess during the subdivision proceedings, the

19   Shade Tree Committee asked and received a conditional

20   approval if he created a --

21                   MR. RIORDAN:  Let me -- let me

22   interrupt, folks.

23                   If what the resident said turns out to

24   be accurate, he can petition the governing body to

25   waive the fees.  That's the way to handle it.  It

K. Stillufsen                                    136

1    shouldn't be discussed now.  It's not part of the

2    ordinance.

3                    MAYOR KANITRA:  Perfect.  Okay.  Thank

4    you.

5                    Thank you, everybody.

6                    Thank you, Anne.

7                    Is anybody else next?

8                    MS. STILLUFSEN:  Mayor.

9                    MAYOR KANITRA:  I see Louise

10   Stillufsen.

11                   MS. STILLUFSEN:  It's actually Kitty.

12                   MAYOR KANITRA:  Oh, hey, Kitty.  How

13   are you?

14                   MS. STILLUFSEN:  Is the timer started?

15                   MAYOR KANITRA:  You're good.  Three

16   minutes.

17                   MS. STILLUFSEN:  Okay.  Okay.  Thank

18   you.

19                   I really just want to kind of echo a

20   lot of what Chairwoman Anne Lightburn just said about

21   the Tree Ordinance.  I'm very much in favor of the

22   proposed tree ordinance.  I was the Chairwoman of the

23   Shade Tree Commission for eight years, and I can tell

24   you this, the Shade Tree group, they get a lot of

25   training.  I don't know if everybody knows that.

K. Stillufsen                                    137

1    They're a commission.  They're not a committee.  And

2    they work very closely with the tree experts, a group

3    of highly-credentialed persons, and this has been,

4    like, on the -- in their minds for a very long time.

5                    I can tell you on my street, River

6    Avenue, there is a home that went in, and it's a

7    beautiful, brand-new construction, clear-cut lot.  I

8    mean, what a tragedy.  If you've ever had to try to

9    plant a tree yourself, you would appreciate the value

10   of these trees.  This proposed ordinance is -- it's

11   like a crumb in terms of environmental protection.

12   It's truly the very least we can do for ecology.

13                    As for infringement on private property

14   rights, I say hardly.  I mean, just to put it in

15   perspective, it's only healthy trees of a significant

16   size.  It's been increased to six inches in diameter

17   just to make way for new construction.  And it's the

18   right thing to do.  If they're going to take down a

19   mature, healthy tree, that reduces the urban canopy in

20   our community.  That affects our air, our water

21   quality, our noise, the aesthetics.  The right thing to

22   do is to replant these trees, and it really has to be

23   regulated because over the 20-plus years that I've been

24   working with trees in town, I just have not seen that

25   happen.

K. Stillufsen                          138

1              And like Mrs. Lightburn said, the new

2       tree doesn't even have to be on the some property.  You

3       don't even have to do it yourself.  And one other thing

4       that I would like to point out, if you do have to take

5       down a healthy tree for new construction and you don't

6       want it on your property or you want the Shade Tree

7       Commission to do it for you, it's a tax deduction.  The

8       amount that they're paying is tax deductible.

9              I think the schedule I saw, if you're

10      going to take down a ten-inch tree in diameter, it's

11      about $800 to replace that tree.  I think I saw the

12      schedule in that ordinance.

13             And as far as, like, if you're going to

14      sell your house, will this, like, possibly cost you the

15      sale of that house?  Highly doubtful.  The average home

16      in our town is about $500,000.  The cost to remove a

17      tree (indiscernible) have to be there anyway so that

18      cost is moot.

19             Hold on a second.

20             MAYOR KANITRA:  Well, Kitty, while

21      you're --

22             MS. STILLUFSEN:  Anyway, if -- if

23      you're not going to -- if you're going to have a sale

24      of $500,000, $800 to replace a tree, it's highly

25      doubtful that it's going to get in the way of that

K. Stillufsen                                    139

1   sale.  I just don't see that as -- as realistic.

2                    And then, also, just to speak to again

3   to what Miss -- Mrs. Lightburn said, we have a lot of

4   regulations on private property already and -- and many

5   of them are meant to benefit the community at large.

6   Like, we can't pour oil into our soil because we have

7   to protect our groundwater.  We have to keep our air

8   clean by controlling pollu -- automobiles and just,

9   like, having building setbacks.  I'm just trying to

10  think of, like, a few examples of things on private

11  property.  The car one was not such a good example.

12                   But we already have a lot of

13  regulations on private property.  This is no different.

14  And trees shouldn't be, like, pooh, poohed off to the

15  side.  I mean, they should be, like -- like herald as a

16  very important thing for our planet and mainly for our

17  survival.

18                   So, yes, I'm very much in favor of

19  this.  I hope the Council passes this.  I'm sure that

20  any piece that can be -- I'm sure the Shade Tree

21  Commission would be absolutely open to that just to get

22  something passed.

23                   And I feel, like, there's almost, like,

24  a -- like, a fear mongering.  This is infringing on our

25  private property.  No, it's to benefit our community

K. Stillufsen/J. Taurozzi                        140

1    and our air, our water and everything else so...

2                   MAYOR KANITRA:  Kitty, I -- I

3    appreciate you taking the time, and we all appreciate

4    your passion and thank you very much.

5                   MS. STILLUFSEN:  You're welcome.

6                   Can I have ten more seconds just to --

7                   MAYOR KANITRA:  You have ten quick

8    seconds.  Go ahead.

9                   MS. STILLUFSEN:  Yes, I agree with Mrs.

10   Lightburn.  I like to go swimming after hours at the

11   beach with no lifeguards.  That's, like, my favorite

12   time.

13                  Okay.  Thank you.

14                  MAYOR KANITRA:  Thank you very much.

15                  I see John Taurozzi.  You're next.

16                  MR. TAUROZZI:  Hey, Mayor and Council.

17                  This is John Taurozzi, 509 Delaware

18   Avenue.

19                  Regarding the Tree Ordinance, thank you

20   for all your feedback.  I am opposed, against the Tree

21   Ordinance, not because I don't like trees.  I have

22   plenty of trees on my property that my wife and I have

23   put on our property over the last 30 years.  Basically,

24   I agree with Dave regarding personal property rights.

25   An ordinance is not the way for a volunteer committee

J. Taurozzi                     141

1    to make a statement.  I believe a volunteer committee

2    should be educating the town, working with the

3    stakeholders in town, not trying to get an ordinance

4    pushed through because, in my opinion, you're going to

5    be issuing ordinances on what color I'm going to paint

6    my house, what kind of decorations I could put up for

7    the holidays and so forth.  And I don't want to belong

8    to a homeowners association, you know, for that matter.

9    I don't need an ordinance to tell me how to maintain my

10   property.

11              Rules are required, but they don't have

12   to be mandated.  I mean, we have plenty of rules.  You

13   mentioned about having skin in the game.  This

14   ordinance has a fee fund that people can opt out and

15   pay a fee.  And one of my recommendations I made to the

16   Council was that if we really want to save trees, why

17   don't we help the homeowners maintain trees.

18   Homeowners have a lot of expenses, and now we're asking

19   homeowners to keep trees, maintain trees.  It costs a

20   lot of money to prune a tree after 10, 15, 20 years.

21   They cause damage.  So if we're going to have this

22   bucket of money out there that's collecting fees, this

23   money should be used besides purchasing new trees in

24   town, we should offset some costs to homeowners.  You

25   know, give them a little 10 percent, 15 percent

J. Taurozzi                                    142

1    discount if they come in.  If you want to have -- if

2    you really want to support trees, let's all do it with

3    action, like you said, versus having homeowners always

4    foot the bill.  I --

5                    MAYOR KANITRA:  I will --

6                    MR. TAUROZZI:  My three minutes are up.

7              I have plenty of bills to pay.  You

8    also said and Anne Lightburn also said that everything

9    is a small fee.  You know, I don't like when other

10   people spend my money.  So you really can't say what is

11   a small fee in relation to what a person can do with

12   the money.

13             Next week I'm going to pay my property

14   taxes.  I may ask you to pay my property taxes because

15   that's a small fee.  You know, maybe the Mayor or the

16   Shade Tree Commission would like to pay my property

17   taxes.  So we've got to be very careful about spending

18   other people's money.  And I really, strongly believe

19   that an ordinance is just forcing homeowners to spend

20   more money when they don't have to.

21             Thank you.

22                    MAYOR KANITRA:  John, what I wanted to

23   clarify was with the Shade Tree Ordinance, I think it's

24   very important for everybody listening to understand --

25   and I don't even know if it's been said clearly enough

**A. Lightburn**                                  143

1    -- but it's for new construction only.  You know,

2    obviously, you have your concerns and, you know, I

3    think that we -- we listened to your concerns and we

4    try to tailor things to, you know, what your concerns

5    were.  And, again, you know, everybody has their own

6    opinions.  I think it's clear that no matter what we

7    change the diameter to, you know, you wouldn't be happy

8    with that, and that's fine.  That's totally your right.

9                To the point that you said that maybe

10   some of these fees could be utilized to help

11   homeowners, maybe that might be something the Shade

12   Tree Commission would be interested in, in terms of,

13   you know, giving advice to homeowners and -- and using

14   some of the fees to help offset, you know, some costs

15   or something like that with pruning of trees.  I'm sure

16   that they seem pretty open-minded.  So maybe we can

17   make yet another concession here.  And -- and again in

18   that continued quest to find middle ground, that might

19   be something to add that the Shade Tree Commission

20   could take a look at.

21                Okay.  Moving on.

22                MS. LIGHTBURN:  Can I chime in for the

23   Shade Tree Commission?

24                MAYOR KANITRA:  Yes.

25                MS. LIGHTBURN:  There will be if this

A. Lightburn                    144

1    ordinance passes a tree replacement fund which would be

2    under the, not under the Shade Tree Commission's

3    authority, but under the Council's authority.  And it

4    would be their decision whether or not they want to use

5    that fund as something that could also help homeowners

6    on private property.

7              And just to reiterate what you said,

8    Paul, this is only on development lots.  It has nothing

9    to do with established homes.

10             Thank you.

11             MAYOR KANITRA:  Thank you very much,

12   Anne.

13             MS. LIGHTBURN:  Okay.

14             MAYOR KANITRA:  Okay.  Is there anybody

15   else?

16             Okay.  If there's -- if there's nobody

17   else, can I get a motion to close public participation

18   and adopt the consent resolutions?

19             COUNCILMAN CORTES:  I'll make a motion

20   to close public and approve Consent Resolutions 1, 2, 3

21   and 4.

22             COUNCILMAN VITALE:  I'll second that.

23             MS. FARRELL:  Councilman Vitale.

24             COUNCILMAN VITALE:  Yes.

25             MS. FARRELL:  Councilwoman Testa.

145

1              COUNCILWOMAN TESTA:  Yes.

2              MS. FARRELL:  Councilwoman Byrnes.

3              COUNCILWOMAN BYRNES:  Yes.

4              MS. FARRELL:  Councilman Cortes.

5              COUNCILMAN CORTES:  Yes.

6              MS. FARRELL:  Councilman Santanello.

7              COUNCILMAN SANTANELLO:  Okay.  So I

8    abstain on 4f), 4g), 4h), 4i), 4j), 4l), 4m) and 4o)

9    and yes to everything else.

10             MS. FARRELL:  Okay.  And you said "m"

11   as in Mary, correct?

12             COUNCILMAN SANTANELLO:  Yes.  So f) --

13             MS. FARRELL:  Okay.

14             COUNCILMAN SANTANELLO:  -- g), h), i),

15   j), l), m), o).

16             MS. FARRELL:  Okay.

17             Councilman Migut.

18             Councilman Migut.

19             COUNCIL PRESIDENT MIGUT:  Hello.

20             I abstain on 4a) as needed, abstain on

21   4d), abstain on 4k).

22             MS. FARRELL:  So that was 4a), 4d),

23   4k)?

24             COUNCIL PRESIDENT MIGUT:  Yes.

25             MS. FARRELL:  Okay.  Thank you very

**146**

1    much.

2              MAYOR KANITRA:  Okay.  Now, we're going

3    to actually move on to the ordinances, right?

4              MS. FARRELL:  Yep.  Hold on one moment.

5    I'm going to read that.

6              Ordinance 2020-11, An Ordinance Of The

7    Borough Of Point Pleasant Beach, Amending Chapter III,

8    Police Regulations, Of The Revised General Ordinances

9    Of The Borough Of Point Pleasant Beach To Require Tree

10   Removal Permits For Removal Of Trees Related To New

11   Construction.

12             MAYOR KANITRA:  Do I need to make a --

13   have a motion or do we open it up?

14             COUNCILMAN CORTES:  No, it's first

15   reading.

16             MR. RIORDAN:  You don't open it up.

17   This is first reading.

18             COUNCILMAN CORTES:  It's introduction

19   only.

20             MAYOR KANITRA:  So I don't -- I don't

21   think there's any amendments.  Does anybody have any

22   amendments?

23             Okay.  Is there a motion?

24             Is there a motion for the Shade Tree

25   Ordinance?

147

1              COUNCILMAN VITALE:  I'll --

2              COUNCILWOMAN BYRNES:  I'll --

3              COUNCILMAN VITALE:  -- make that

4    motion.

5              MAYOR KANITRA:  Okay.

6              MS. FARRELL:  Is that Doug?

7              COUNCILMAN VITALE:  Yes.

8              MAYOR KANITRA:  And somebody else

9    jumped in too.

10             COUNCILWOMAN BYRNES:  Caryn.

11             MAYOR KANITRA:  Caryn Byrnes.

12             COUNCILWOMAN BYRNES:  Yes.

13             MS. FARRELL:  Caryn, you're making the

14   second?

15             COUNCILWOMAN BYRNES:  Yes.

16             MS. FARRELL:  Okay.

17             Councilman Vitale.

18             COUNCILMAN VITALE:  Yes.

19             MS. FARRELL:  Councilwoman Testa.

20             COUNCILWOMAN TESTA:  (Indiscernible)

21             MS. FARRELL:  Is that a yes?

22             COUNCILWOMAN TESTA:  That's a no.

23             MS. FARRELL:  No, okay.

24             Councilwoman Byrnes.

25             COUNCILWOMAN BYRNES:  Yes.

148

1              MS. FARRELL:  Councilman Cortes.

2              COUNCILMAN CORTES:  I do love trees,

3      but I do have an issue with the private property.

4              I'm going to vote no.

5              MS. FARRELL:  Councilman Santanello.

6              COUNCILMAN SANTANELLO:  No.

7              MS. FARRELL:  Councilman Migut.

8              COUNCIL PRESIDENT MIGUT:  No.

9              MS. FARRELL:  That was a no?

10             COUNCIL PRESIDENT MIGUT:  Yes, it was a

11     no.

12             MS. FARRELL:  Okay.

13             MAYOR KANITRA:  So the motion fails.

14             Ordinance --

15             MS. FARRELL:  Okay.  So 2000 --

16     Ordinance 2020-12, An Ordinance Of The Borough Of Point

17     Pleasant Beach, Amending Chapter XXI, Beaches, Of The

18     Revised General Ordinances Of The Borough Of Point

19     Pleasant Beach.

20             MAYOR KANITRA:  Well, I'd like to ask

21     if there could be a motion to amend that based on what

22     Councilman Vitale had mentioned, Mike from Surf Rider,

23     about diving, about the lateral shore.  And I'd like to

24     add one myself if people would be open to it, an

25     exception for Thursday night fireworks.  Obviously,

149

1  along the boardwalk, I think they can --

2               MR. RIORDAN:  Mayor, that's

3  unnecessary.  The fireworks are already taken care of.

4               MAYOR KANITRA:  Oh, they are?  Okay.

5  So people can go on the beach at Maryland or Bradshaws

6  or fur -- further south to Jenkinsons on a Thursday

7  night to --

8               MR. RIORDAN:  The language in the

9  ordinance is with the special permission of the owner

10  which was designed with fireworks in mind.

11               MAYOR KANITRA:  Oh, perfect.  Okay.

12  All right.  Great.

13               Then can we -- can I ask for an

14  amendment just for the diving to be added and the

15  lateral shoreline access?

16               COUNCILMAN VITALE:  I'll make that

17  motion.

18               COUNCILWOMAN TESTA:  I'll second it.

19               MS. FARRELL:  Okay.  So I have a motion

20  by Councilman Vitale, second by Councilwoman Testa?

21               COUNCILWOMAN TESTA:  Yes.

22               MS. FARRELL:  Okay.  Councilman Vitale.

23               COUNCILMAN VITALE:  Yes.

24               MS. FARRELL:  Councilwoman Testa.

25               COUNCILWOMAN TESTA:  Yes.

150

1           MS. FARRELL:  Councilwoman Byrnes.

2           COUNCILWOMAN BYRNES:  Yes.

3           MS. FARRELL:  Councilman Cortes.

4           COUNCILMAN CORTES:  I am for a lot of

5    the stuff on this ordinance.  I mean, we have to

6    control it.  I do have a problem, though, with

7    regulating by, you know, private owners on when they

8    can operate and who they can hire.  Other than that I

9    love it.

10          But I'm going to vote no because it's

11   my heart.

12          MS. FARRELL:  Councilman Santanello.

13          COUNCILMAN SANTANELLO:  No.

14          MS. FARRELL:  Councilman Migut.

15          COUNCIL PRESIDENT MIGUT:  No.

16          MAYOR KANITRA:  My turn?

17          MS. FARRELL:  Yes.

18          MAYOR KANITRA:  I vote yes.

19          MS. FARRELL:  And this is just to amend

20   the ordinance and to pass it as amend -- approve it as

21   amended?  Is that correct?

22          MAYOR KANITRA:  Correct.

23          MS. FARRELL:  Okay.  The public hearing

24   on this ordinance will be on August 4th.

25          MAYOR KANITRA:  Okay.

151

1               MS. FARRELL:  Okay.  Ordinance 13.  One

2   moment.

3               The public hearing will be August 4th.

4               Ordinance 2020-13, An Ordinance Of The

5   Borough Of Point Pleasant Beach, Amending Chapter III,

6   Police Regulations, Subchapter 8, Waste Materials And

7   Collection Of The Revised General Ordinances Of The

8   Borough Of Point Pleasant Beach To Further Regulate The

9   Use Of Bags As Receptacles For Trash Left For Curbside

10   Pick Up.

11               MAYOR KANITRA:  Okay.  And since we

12   didn't get a chance to talk about this -- again, I

13   mentioned it briefly in -- in my report.  Again, what

14   this is meant to do is to cut down on just the bags

15   being thrown out there all by themselves and being torn

16   open by the seagulls.  If you have extra trash and you

17   don't have enough that you can fit into your -- your

18   bin, your fine.  It just has to go out with the bin at

19   the same time.

20               COUNCILMAN SANTANELLO:  Mayor, may I

21   ask you a quick question?

22               MAYOR KANITRA:  Okay.

23               COUNCILMAN SANTANELLO:  Any way to

24   amend this to five cans?  And I'm saying that for a

25   reason, not to be -- to bust chops or anything.  A lot

152

1    of times --

2                    A MALE VOICE:   (Indiscernible)

3                    MAYOR KANITRA:   You have to go on mute.

4    We can hear you.

5                    COUNCILMAN SANTANELLO:   I don't know if

6    you caught what I said but a lot of times on the

7    weekend I'll pick -- I'll clean the yard, and that'll

8    be three or four cans right there.  And I did notice

9    that in this ordinance, there's no way to take garbage,

10   extra garbage to the town dump.  Is there any way we

11   can make it five cans?  I just know that quite often

12   I've got five cans rather than four.

13                   That's okay.  I'm not going to vote no,

14   but I'm asking if we can.

15                   MAYOR KANITRA:   How many -- how many

16   cans is it now?

17                   COUNCILMAN SANTANELLO:   Four.

18                   COUNCILMAN CORTES:   Four, whether

19   they're cans or bags.

20                   MR. RIORDAN:   It's been four for about

21   ten years.

22                   COUNCILMAN CORTES:   Correct.

23                   COUNCILMAN SANTANELLO:   I know.

24                   MAYOR KANITRA:   Look, look, if you want

25   to make a motion, make a motion to add it, but I'm not

**153**

1    -- I don't have an opinion one way or another on it.

2              COUNCILMAN SANTANELLO:  All right.  So

3    I'll make a motion to switch it to five rather than

4    four plus one bag.

5              MAYOR KANITRA:  But wait.  Wait, wait.

6    Hold on.  I just want to clarify that.  Five cans but

7    you can still have a bag.  I mean, you know, like, if

8    you really own one can and it's filled up and you add

9    one bag to the side that's still fine.

10             COUNCILMAN SANTANELLO:  Yeah.

11             MAYOR KANITRA:  Okay.

12             COUNCILMAN SANTANELLO:  Anybody want to

13   second it?

14             MR. RIORDAN:  At the present time, what

15   the ordinance says, if I might, before -- before these

16   changes, what the present ordinance says is four trash

17   cans or bags.  Total is four.  It can be bags or trash

18   cans.  It doesn't matter.

19             And, Councilman, if I understand what

20   you're suggesting is you would like to make it five

21   bags or cans?

22             COUNCILMAN SANTANELLO:  I thought it

23   was receptacles.  I thought it was four receptacles

24   plus a bag.  Did I misread that?

25             MR. RIORDAN:  I believe so, Councilman.

**154**

1   I believe it to be four receptacles, total, any number

2   of which could be bags.  The new ordinance says they --

3   that they can be bags but only if there are cans.

4                    COUNCILMAN SANTANELLO:  I'm a little

5   confused.  I really thought, Mayor, that we were

6   looking to (indiscernible).

7                    MAYOR KANITRA:  Right.

8                    COUNCILMAN SANTANELLO:  So then it

9   could be five bags.  I might be completely

10  misunderstanding this.

11                   MAYOR KANITRA:  Okay.  So let me just

12  make this clear again.  Because sometimes people get an

13  extraordinary amount of trash, we wanted to leave the

14  ability for you to say -- let's say I own two trash

15  cans and one day I've got six bags, whatever, and I

16  filled up two trash cans, and I still have to have one

17  sitting next to it.  This will allow that.  This was --

18  this was about keeping the bags off the street by

19  themselves.

20                   COUNCILMAN SANTANELLO:  Well, that's

21  where I'm confused, because the Borough Attorney just

22  said that a receptacle could be a bag, so there could

23  be four bags.  Am I correct?

24                   MR. RIORDAN:  Yes.  And -- and -- and

25  here's what I said.  At the present time the ordinance

155

1    says four -- no more than four receptacles, and a

2    receptacle can be either a bag or a can.  So you could

3    actually have four bags, no can.

4              The new change requires that at least

5    one of those receptacles be a can.

6              MAYOR KANITRA:  Right.

7              COUNCILMAN SANTANELLO:  So we're still

8    talking one can and four bags.  Okay.  Or three bags.

9    It doesn't seem to answer what the Mayor is looking

10   for, which I agree with, which is us not having bags in

11   the street.

12             MR. RIORDAN:  If it makes you feel any

13   better, Councilman, I wrote it originally so that there

14   could be only one bag out of the four and the rest had

15   to be cans, and somebody -- and I don't remember, it

16   might have been the Mayor; he'll jump in -- suggested

17   that it had to be -- it had to be more than one bag.

18             MAYOR KANITRA:  I actually see what Bob

19   is saying.

20             COUNCILMAN CORTES:  Right.

21             MAYOR KANITRA:  And, Bob, this is

22   interesting --

23             MR. RIORDAN:  Me too, Bob.

24             MAYOR KANITRA:  This is interesting

25   coming from you because what I worried about is let's

**156**

1    just say, you know, somebody owns two trash bins or

2    something like that.  Is everybody in town going to go

3    out and need to buy another one or what if they have a

4    day when they have an extra bag, are we going to expect

5    to say, well, you have two plastic bags out there

6    instead of one and -- and cite them?

7                    COUNCILMAN SANTANELLO:  Mayor, as I was

8    saying, I thought we were trying to eliminate bags in

9    the streets.

10                   MAYOR KANITRA:  We are.  We are.

11                   COUNCILMAN SANTANELLO:  (Indiscernible)

12   said that they don't want to have bags out three

13   because the -- the -- the seagulls get into the bags,

14   and she'd rather just see all cans as well and maybe

15   one bag.

16                   MAYOR KANITRA:  I'm totally fine with

17   it.  If you've got a better mousetrap, I'm not too

18   proud on that.  We can amend that.

19                   COUNCILMAN CORTES:  Mayor.

20                   MAYOR KANITRA:  Yes, Councilman Cortes.

21                   COUNCILMAN CORTES:  Is this -- you

22   know, I take this ordinance as more as the focus is

23   Ocean Avenue.  Am I -- you know, I mean --

24                   MAYOR KANITRA:  There's a lot of

25   vacation rentals.  East of Ocean Avenue, you'd see it

157

1    quite bit.  I assume east of 35, you'd see this -- a

2    fair amount.

3               COUNCILMAN CORTES:  Okay.  Well, I'm --

4    I'm open -- and I agree with you.  You know, bags --

5    you know, food waste in bags always gets picked, you

6    know.  If I put a bag out, it's usually something other

7    than food.  But Ocean Avenue, in particular, we're

8    trying to, like, eliminate the bags out there.  You

9    know, I'm -- you had -- you had me working on that with

10   Miss Riehl and John Trout.  I'm -- I love it.  I mean,

11   I don't want torn-open bags, you know, garbage.  I'm

12   with Councilman Santanello and with you on this.  But

13   it is kind of confusing.

14               MAYOR KANITRA:  I am fully --

15               COUNCILMAN SANTANELLO:  Just to make

16   one last statement.  I mean, I have -- I -- I live in

17   two different places as you know.  Most of the year I'm

18   on Central Avenue, but I make sure that during the

19   summer when my renters are there, they've got six cans

20   there.  I mean, I don't want them putting garbage bags

21   in the streets.  And when I live up -- and when I live

22   up here -- when I live up here on -- on Brunswick

23   Place, I have -- forever I've never left garbage out in

24   the street.  I always use the cans even at the alleyway

25   for the garbage guys to pick up.

158

1          MAYOR KANITRA:  Then let's do -- let's

2     do --

3          COUNCILMAN SANTANELLO:  So I'm --

4          MAYOR KANITRA:  Let -- let's do what

5     you just said.  Make a motion for up to five -- up to

6     five receptacles, only one of which can be a bag by

7     itself.  Is that fair?

8          COUNCILMAN SANTANELLO:  Okay.  That

9     works for me.  I'll make a motion, because I have to do

10    it, not you.  So I'll make a motion for five

11    receptacles, four of which have to be cans, and one can

12    be a bag.

13         MAYOR KANITRA:  Or -- or one can and

14    one bag.

15         COUNCILMAN SANTANELLO:  Okay.

16         MAYOR KANITRA:  Okay.

17         MR. RIORDAN:  So, gentlemen, the way

18    that will read is you can have up to five receptacles

19    and no more of one of which can be a bag.  And if you

20    have a bag, one has to be a can.

21         MAYOR KANITRA:  All right.

22         COUNCILMAN SANTANELLO:  Yes.  Okay.

23         Anybody want to second that?

24         COUNCILMAN CORTES:  Okay.  I'm good

25    with that.  I'll second that.

159

1    MAYOR KANITRA:   Look at us -- look at

2  us all getting along here.

3    MS. FARRELL:   The motion is for up to

4  five receptacles, none of which can be a bag.   And if

5  you have a bag, one has to be a can.   Is that correct?

6    (Laughter)

7    MR. RIORDAN:   No.   Let me say it again.

8    The way -- the way the new ordinance is

9  going to read is you can have up to five receptacles.

10  You can have no more than one bag.   And in order to

11  have even one bag, you have to have at least one can.

12    COUNCILMAN SANTANELLO:   Perfect.

13    COUNCILMAN CORTES:   (Indiscernible)

14  head is going to be spinning.

15    MR. RIORDAN:   Hey, it's 10:30 at night.

16    COUNCILMAN SANTANELLO:   Well, listen,

17  I've got to tell you.   I can't stand it.   When I go

18  home on -- when -- when I stop at my house on a

19  Saturday to check the old residents out and put the new

20  residents in, the renters, you know, I hate to say it,

21  but I've got neighbors that have five or six bags out

22  there.   I'm horrified by that.

23    COUNCILMAN CORTES:   Right.   Right.

24    MAYOR KANITRA:   Right.

25    MS. FARRELL:   Okay.   All right.   The

160

1    motion to approve with the amendment for up to five

2    receptacles, no more than one bag, and in order to have

3    even one bag, you must have one can.

4                    COUNCILMAN CORTES:  I want to

5    correct --

6                    MR. RIORDAN:  Correct, Eileen.

7                    COUNCILMAN CORTES:  Eileen, you said

8    approve.  Motion to introduce.

9                    MS. FARRELL:  Oh, yes.  Correct.

10                   Was there a motion?

11                   MAYOR KANITRA:  Bob made one.

12                   COUNCILMAN SANTANELLO:  I made the

13   motion and Andy seconded it.

14                   COUNCILMAN CORTES:  I seconded it.

15                   MS. FARRELL:  Okay.

16                   Councilman Vitale.

17                   COUNCILMAN VITALE:  Yes.

18                   MS. FARRELL:  Councilwoman Testa.

19                   COUNCILWOMAN TESTA:  Yes.

20                   MS. FARRELL:  Councilwoman Byrnes.

21                   COUNCILWOMAN BYRNES:  Yes.

22                   MS. FARRELL:  Councilman Cortes.

23                   COUNCILMAN CORTES:  I'm going to do an

24   Arlene.  "Yes."

25                   MS. FARRELL:  Councilman Santanello.

161

1          COUNCILMAN SANTANELLO:  Yes.

2          MS. FARRELL:  Councilman Migut.

3          COUNCIL PRESIDENT MIGUT:  Yes.

4          MS. FARRELL:  Okay. So the public

5     hearing will be August 4th.

6          Let's see.

7          There's one more ordinance.  I just

8     want to -- let me just confirm.  Ordinance 2020-11,

9     that was denied, correct?

10          COUNCILMAN CORTES:  Yes.

11          MS. FARRELL:  Yes.

12          All right.  <u>Ordinance 2020-14, An</u>

13    <u>Ordinance Of The Borough Of Point Pleasant Beach In The</u>

14    <u>County Of Ocean, New Jersey, Providing For Various</u>

15    <u>Capital Improvements To The Borough Of Point Pleasant</u>

16    <u>Beach And Appropriating $1,951,100, Therefore, And</u>

17    <u>Providing For The Issuance of $1,853,545 In General</u>

18    <u>Improvement Bonds Or Notes Of The Borough Of Point</u>

19    <u>Pleasant Beach To Finance The Same</u>.

20          COUNCIL PRESIDENT MIGUT:  Motion to

21    introduce.

22          COUNCILMAN VITALE:  I'll second that.

23          MS. FARRELL:  Okay.

24          Councilman Vitale.

25          COUNCILMAN VITALE:  Yes.

162

1          MS. FARRELL:  Councilwoman Testa.

2          COUNCILWOMAN TESTA:  Yes.

3          MS. FARRELL:  Councilman Byrnes.

4          COUNCILWOMAN BYRNES:  Yes.

5          MS. FARRELL:  Is that a yes?

6          COUNCILWOMAN BYRNES:  That's a yes,

7     Eileen.

8          MS. FARRELL:  Thank you.

9          Councilman Cortes.

10          COUNCILMAN CORTES:  Yes.

11          MS. FARRELL:  Councilman Santanello.

12          Councilman Santanello.

13          COUNCILMAN SANTANELLO:  Yes.  Yes.

14          MS. FARRELL:  Councilman Migut.

15          COUNCIL PRESIDENT MIGUT:  Yes.

16          MS. FARRELL:  Okay.  The public hearing

17     will be held on August 4th.

18          Ordinance 2020-15 was tabled.

19          MR. RIORDAN:  Correct.

20          MAYOR KANITRA:  Okay.  Second public

21     participation.

22          Hearing none.

23          MR. CAVAGNARO:  Hello.

24          MAYOR KANITRA:  Hello.

25          COUNCILMAN CORTES:  Oh.

**D. Cavagnaro** 163

1     MR. CAVAGNARO:  Sorry.

2          (Laughter)

3     MR. CAVAGNARO:  Two quick ones.  Well,

4   actually, probably just one.

5          I appreciate that all of you care very,

6   very much about trees.  And I appreciate what a

7   difficult decision it was for some of you to vote no.

8   Our property rights were higher.  So thank you very

9   much as a property owner.

10          And have a wonderful evening.

11          COUNCILMAN CORTES:  Thank you, Dave.

12   You too.

13          MAYOR KANITRA:  Hold on one second.

14          Councilwoman Testa did you have

15   something to say?

16          COUNCILWOMAN TESTA:  Well, in regards

17   to the tree ordinance, when there was discussion that

18   they had brought up when if you wanted to talk about it

19   you would have another chance, then to see the changes

20   in the tree ordinance?

21          MR. RIORDAN:  No, ma'am, the tree

22   ordinance got voted down.

23          COUNCILWOMAN TESTA:  Okay.

24          MR. RIORDAN:  So it's done.

25          COUNCILWOMAN TESTA:  Got you.

**164**

1          Thank you.

2          MAYOR KANITRA:  I have a question.

3          COUNCILWOMAN TESTA:  So the tree

4    ordinance -- I guess what I'm trying to say is that if

5    the tree ordinance didn't pass this time, if they go

6    back to the drawing board and do another ordinance,

7    let's say, within a month, this could be revisited

8    again, correct?

9          COUNCILMAN CORTES:  No.

10         MR. RIORDAN:  No.  Policy makes it

11   quite clear that you cannot bring up a subject that has

12   been voted down before during the same year unless a --

13         COUNCILWOMAN TESTA:  Okay.

14         MR. RIORDAN:  -- a member of the group

15   that voted it down moves to have it considered.

16   Somebody has to change their mind.

17         COUNCILMAN CORTES:  I stand corrected.

18   You're right, Kevin.

19         COUNCILWOMAN TESTA:  Okay.  So if I

20   wanted to change my mind, I could, before this meeting

21   is over.  Is that it?

22         MR. RIORDAN:  No.  No, ma'am.

23         COUNCILWOMAN TESTA:  Okay.  Never mind

24   then.  I misunderstood.  That's all I wanted to ask.

25         Thank you.

165

1          MR. RIORDAN:  You're welcome.

2          MAYOR KANITRA:  Kevin, can I ask?

3          MR. RIORDAN:  Yeah.

4          MAYOR KANITRA:  If you're still in the

5    same meeting can you --

6          MR. RIORDAN:  I can't hear you.

7          MAYOR KANITRA:  Can you hear me?

8          MR. RIORDAN:  I'm having trouble

9    hearing you, Paul.

10          MAYOR KANITRA:  Kevin Riordan, can you

11    hear me?

12          MR. RIORDAN:  I can now hear you.

13          MAYOR KANITRA:  Okay.  That's just an

14    interesting question in general.  Because I feel like

15    we did that once two years ago at a Council Meeting.

16    Can you -- can you reconsider the vote if the meeting

17    is not adjourned?

18          MR. RIORDAN:  Can you reconsider the

19    vote if the meeting is not adjourned?

20          Certainly, when we're not talking about

21    an ordinance, the easy answer to that question is yes.

22    An ordinance is a more difficult question to answer.

23          Tell me what's going on.

24          MAYOR KANITRA:  It just sounded to me

25    like Councilwoman Testa -- I -- I don't know.  I don't

166

 1    know.

 2                    MR. RIORDAN:  Councilwoman Testa,

 3    what's going on?

 4                    COUNCILWOMAN TESTA:  Well, I guess --

 5    no, nothing shady or anything.  I guess --

 6                    MR. RIORDAN:  No, no.

 7                    COUNCILWOMAN TESTA:  No, no.  No pun

 8    intended.

 9                    No, I guess what I'm saying is with the

10    first reading if it had passed it would be open to

11    discussion again at the second meeting.  So now that it

12    failed, it failed.

13                    MR. RIORDAN:  That is correct, right.

14                    COUNCILWOMAN TESTA:  Okay.  All right.

15    If I -- I didn't real -- I guess I didn't realize it.

16    I thought it would be brought up again at the second

17    reading to have another vote on it.  So I misunderstood

18    that.  Again, I'm learning.  I should ask these things

19    ahead so that's why.  Because I know there were some

20    things brought up that I guess we would have had an

21    opportunity to look at that and make the changes for

22    some people that -- that wanted more changes.  That's

23    all that I was asking.

24                    MR. RIORDAN:  You voted no, right?

25                    COUNCILWOMAN TESTA:  Yes, I did vote

**167**

1    no, but I --

2              MR. RIORDAN:  Okay.  So -- so all you

3    have to do is -- is discuss the changes that would

4    cause you to want to vote yes, and you and I can talk

5    and we can draft something that has those changes and

6    you can bring it up because you voted no and --

7              COUNCILWOMAN TESTA:  No, I was -- I

8    was --

9              MR. RIORDAN:  -- and that would work.

10             COUNCILWOMAN TESTA:  The -- the changes

11   I'm talking about is what was mentioned where if they

12   would give the incentives to the homeowner.

13             MR. RIORDAN:  Okay.  Well, we could

14   talk about that, you know, after this meeting is over.

15             COUNCILWOMAN TESTA:  Okay.

16             Thank you.

17             MR. RIORDAN:  And that had nothing to

18   do with the ordinance.  That was (indiscernible)

19   anyway.

20             MAYOR KANITRA:  You can always bring it

21   up as soon as the calendar year changes too, right?

22             MR. RIORDAN:  Exactly.

23             COUNCILMAN CORTES:  Yes.

24             MAYOR KANITRA:  Fair enough.

25             COUNCILWOMAN TESTA:  Okay.  Thank you.

168

1          I just -- I was just asking.

2          Thank you.

3          COUNCILMAN SANTANELLO:  I mean, it's a

4  whole different issue.  There's nothing wrong with

5  asking if, you know, the Shade Tree Committee -- forget

6  about the ordinance -- that the Shade Tree Committee do

7  something to help the residents.  That's a whole

8  different issue.

9          MR. RIORDAN:  That's absolutely

10 correct, Councilman.  I'm sorry.  I didn't hear you the

11 last time.  That's absolutely correct.

12         COUNCILMAN SANTANELLO:  Okay.  So

13 that's something separate we could discuss in the

14 future.

15         MAYOR KANITRA:  For something to be

16 brought up, it would have to be a substantive change in

17 the calendar year, right?

18         MR. RIORDAN:  Or -- or -- yes, a

19 substantive change or something that was brought up by

20 somebody who voted no.

21         MAYOR KANITRA:  Okay.

22         MR. RIORDAN:  You know, if it's so

23 different that it's not the same ordinance, then we're

24 not talking about something that got voted down.  But

25 if we're talking about a change that is a cosmetic

169

1    change to something that was voted down, it would have

2    to be brought up by somebody who voted no.   The

3    purpose is to avoid having to vote over and over and

4    over again on the same thing.

5                    COUNCILWOMAN TESTA:  Okay.

6                    MAYOR KANITRA:  Okay.  And that makes a

7    lot of sense.  So either Councilwoman Testa,

8    Santanello, Cortes or Migut would (indiscernible).

9                    MR. RIORDAN:  That's exactly right.

10                   COUNCILWOMAN TESTA:  Thank you.

11                   MAYOR KANITRA:  Okay.  Was there any

12   other public participation?

13                   All right.  We got done.  Everybody

14   thought this was going to be midnight.  We're done at

15   10:30.

16                   COUNCILMAN CORTES:  Make a motion to

17   adjourn.

18                   COUNCILMAN SANTANELLO:  I'll second

19   that.

20                   MAYOR KANITRA:  All right, everybody.

21                   COUNCILMAN CORTES:  Signing off.

22                   (Whereupon, the meeting concludes at

23   10:40 p.m.)

**170**

# C E R T I F I C A T E

I, ISABEL E. COLE, Certified Court

Transcriber, AOC #101, do hereby certify the foregoing

transcript to have been prepared from a digital

recording made by COLE TRANSCRIPTION, L.L.C. and is

true and accurate to the best of my knowledge and

ability.


/s/ Isabel E. Cole
Carol E. Blackler    AOC #101
**COLE TRANSCRIPTION, L.L.C.**
Dated:  August 1, 2020

# EXHIBIT 2

1

BOROUGH COUNCIL
BOROUGH OF POINT PLEASANT BEACH - COUNTY OF OCEAN
STATE OF NEW JERSEY

TRANSCRIPT OF PROCEEDINGS

Point Pleasant Beach Municipal Building
416 New Jersey Avenue
Point Pleasant Beach, New Jersey 08742

AUGUST 4, 2020
7:30 P.M.

COUNCIL MEMBERS PRESENT:

PAUL M. KANITRA, Mayor
CARYN BYRNES
ANDY CORTES
THOMAS MIGUT, Council President
ROBERT SANTANELLO
ARLENE TESTA
DOUGLAS VITALE

ALSO PRESENT:

Eileen Farrell, Municipal Clerk

COLE TRANSCRIPTION, L.L.C.
Certified Court Transcribers
P.O. BOX 34
WHITING, NEW JERSEY 08759
848-227-5001

**2**

APPEARANCES:

        KEVIN B. RIORDAN, LLC
        BY:  KEVIN RIORDAN, ESQ.
        20 Hadley Avenue
        Toms River, New Jersey 08753
        Attorney for the Borough

3

# I N D E X

| COMMITTEE MEMBERS: | PAGE |
|---|---|
| Councilman Vitale | 12 |
| Councilwoman Testa | 14 |
| Councilwoman Byrnes | 19 |
| Councilman Cortes | 26 |
| Councilman Santanello | 32 |
| Council President Migut | 48 |

| MEMBERS OF THE PUBLIC: | PAGE |
|---|---|
| Rob Moreau | 62/88/106 |
| Mary Steiner | 70 |
| Vincent Castin | 74 |
| Dave Cavagnaro | 79/95 |
| Ron Gasiorowski | 84 |
| Bob Rinaolo | 96 |
| Christine Orlando | 99 |
| David Betten | 100 |
| Kim Allen | 109 |
| Tom Highton | 110 |
| Joylene Rock | 112 |

4

1           (Whereupon, a virtual meeting takes

2     place and is being recorded.  Due to feedback and

3     interference in audio, various parts of the recording

4     are indiscernible.)

5               MS. FARRELL:  Okay.  "Adequate notice

6     of the time and place of this meeting was given under

7     the provisions of the Open Public Meetings Act and was

8     posted and sent to the officially designated newspapers

9     in compliance with the law."

10              Mayor Kanitra.

11              I'm not hearing.

12              Mayor Kanitra.

13              MAYOR KANITRA:  Here.

14              Can you hear me?

15              MS. FARRELL:  Now, I can, yes.  Thank

16    you.

17              MS. FARRELL:  Councilman Vitale.

18              COUNCILMAN VITALE:  Here.

19              MS. FARRELL:  Councilwoman Testa.

20              COUNCILWOMAN TESTA:  Here.

21              MS. FARRELL:  Councilwoman Byrnes.

22              COUNCILWOMAN BYRNES:  Here.

23              MS. FARRELL:  Councilman Cortes.

24              COUNCILMAN CORTES:  I am here.

25              MS. FARRELL:  Councilman Santanello.

5

1          Councilman Santanello.

2              I know that Councilman Santanello is on

3      the line, but I'm not hearing him.

4          Councilman Santanello.

5          COUNCILMAN SANTANELLO:  Can you hear me

6      now?  Can you hear me now?

7              MS. FARRELL:  Yes.  Thank you.

8              COUNCILMAN SANTANELLO:  Okay.

9          MS. FARRELL:  Councilman Migut.

10         COUNCIL PRESIDENT MIGUT:  Here.

11         MS. FARRELL:  Okay.

12         MAYOR KANITRA:  Okay.  If everyone

13     could rise for the flag salute and remain standing for

14     the invocation.

15             (Whereupon, the Pledge of Allegiance is

16     recited, an invocation is given, and the meeting then

17     continues as follows:)

18         MAYOR KANITRA:  Okay.  Welcome,

19     everybody.

20             If we could get a -- an approval of

21     the minutes from July 21st?

22         COUNCILMAN VITALE:  I'll make a motion.

23         MAYOR KANITRA:  Is there a second?

24         COUNCIL PRESIDENT MIGUT:  Second.

25         COUNCILWOMAN BYRNES:  I'll second that,

6

1    Mayor.

2                    MAYOR KANITRA:  Eileen.

3                    MS. FARRELL:  Was that Councilman Migut

4    first?

5                    COUNCIL PRESIDENT MIGUT:  Yes.

6                    MS. FARRELL:  Thank you.

7            Okay.  Councilman Vitale.

8                    COUNCILMAN VITALE:  Yes.

9                    MS. FARRELL:  Councilwoman Testa.

10                   COUNCILWOMAN TESTA:  Yes.

11                   MS. FARRELL:  Councilwoman Byrnes.

12                   COUNCILWOMAN BYRNES:  Yes.

13                   MS. FARRELL:  Councilman Cortes.

14                   COUNCILMAN CORTES:  Yes.

15                   MS. FARRELL:  Councilman Santanello.

16                   COUNCILMAN SANTANELLO:  Yes.

17                   MS. FARRELL:  Councilman Migut.

18                   COUNCIL PRESIDENT MIGUT:  Yes.

19                   MAYOR KANITRA:  Okay.  We're going to

20   move right into department head memos.

21                   Councilman Vitale, if you could start

22   it off.

23                   COUNCILMAN CORTES:  No, we have fencing

24   on Arnold Avenue.

25                   MAYOR KANITRA:  Oh, I saw department

7

1    head memos.  Sorry.  Sorry.

2                    Let me -- let me move that back.

3    Sorry.

4                    Who is that?

5                    COUNCILMAN CORTES:  Well, it's actually

6    public property because it's going to be in the right-

7    of-way.  This happens to be E.J. Geiger's house, and I

8    had a chance to go look at it.  I spoke with him and we

9    have -- in the packet we have our code enforcement

10   comments.

11                   He had to delineate his driveway.  He

12   has a complete stone front yard and driveway, but he

13   had to delineate the driveway and put in some paver

14   blocks, like Belgian blocks.  They taper down when they

15   come to the sidewalk, like any of them.  But it is --

16   has created a tripping hazard when people are walking

17   on the sidewalk.  As you know, they have a tendency to

18   not stay on the cement sidewalk proper.  So he is

19   asking to put a small fence up along the sidewalk and

20   down his driveway just to stop people from, you know,

21   tripping, keep them on the sidewalk.  The problem is it

22   will be outside of his setback property line.  So he's

23   -- he was told to just get approval from the Council

24   and it would be okay.  And I don't see a problem with

25   it.  You know, the houses are set back farther on

8

1    Arnold Avenue so the property line is --

2                    MR. RIORDAN:  Councilman.

3                    COUNCILMAN CORTES:  Yeah.

4                    MR. RIORDAN:  Councilman, let -- let me

5    interrupt.

6                    So to the extent that what he wants to

7    do is put a fence on borough property that is in the

8    right-of-way, then that -- what you traditionally do in

9    those circumstances is you enter into what's called a

10   license agreement which basically says, look, you can

11   put this on borough property but we're not going to

12   give you the borough property.  And if at any time the

13   Borough, for whatever reason, needs the property,

14   you're going to give it back.  And that suffices for

15   the borough property.

16                   To the extent that the fence violates

17   zoning ordinances and setbacks and stuff like that, the

18   governing body doesn't have the power to grant him

19   those passes.  Those, he would have to go to the Boards

20   for.  And I don't -- I didn't look at the layout

21   carefully enough.

22                   Is it in the packet, Andy?

23                   COUNCILMAN CORTES:  No.  As far as I

24   know it was just a comment in an email reference.  I --

25   I'm not sure if -- I see that Georgia Cassidy is on.

9

1    I'm not sure if E.J. is on.  They might be able to

2    speak.  But I understand, Mr. Riordan, we did that a

3    couple of years ago with a property owner on Broadway

4    that had a white fence running from the boardwalk and

5    westbound for about a hundred feet and we also --

6                    MR. RIORDAN:  Councilman Cortes, that's

7    exactly right.

8                    COUNCILMAN CORTES:  And we did that on

9    Ocean Avenue with a house north of Water Street that

10   happened to be rebuilding a porch that abutted right up

11   against the sidewalk.

12                   MR. RIORDAN:  But this -- do you want

13   to keep going?

14                   COUNCILMAN CORTES:  Well, I just

15   remember those things there, Mr. Riordan.

16                   MR. RIORDAN:  No.  And -- and -- and,

17   Councilman, that's exactly right.  So certainly I -- I

18   -- I would recommend that you enter into the license

19   agreement like you have on all the other properties.

20   But any zoning violations, you can't do that.  You have

21   to wait for the Zoning Board to do that.

22                   COUNCILMAN CORTES:  E.J., are you on --

23   on the --

24                   MR. GEIGER:  Yeah, I am.

25                   We actually -- I -- I put in the

10

1   application.  I was, you know, informed about the

2   setback, which is 4 feet from -- from the sidewalk.

3   So, originally, I was told to apply for a variance, and

4   then I got a call the next day that they had looked at

5   everything -- meaning the zoning officer and, I guess,

6   whoever does the variances, Karen and that -- and they

7   said for what I wanted -- because it wasn't a full

8   fence, I guess -- it's just a corner fence and then a

9   corner fence on the other side -- we could just do it

10  this way.

11              Like I said, the (indiscernible) was

12  put in at the town's request.

13              MR. RIORDAN:  I -- I think that's an

14  interesting interpretation of the zoning ordinance.

15  Although I haven't seen the plans -- and apparently

16  they have -- the bottom line stays the same, assuming

17  that what you need is permission to build in the town's

18  right-of-way, that's simply a license agreement.

19  Assuming you have setback requirement problems, that's

20  an issue for the zoning office.  And, certainly, if

21  they have questions, they have my number.

22              MAYOR KANITRA:  Can we approve it

23  contingent on that confirmation?

24              MR. RIORDAN:  Well, what I would

25  recommend is that you approve a license agreement.

11

1       COUNCILMAN CORTES:  Correct.

2           MR. RIORDAN:  And then send E.J. back

3   to the -- the building department for whatever more

4   permits he might need.  And E.J. is a standup guy.

5   He'll tell them what I said.  And if they're confused,

6   they'll call me.

7           MR. GEIGER:  Sure.  And, like I said, I

8   put in the permit and, you know, she called me right

9   away and just said it needed to be adjusted.  And then

10  I was going to adjust it and then we realized how far

11  back it was, and I said, well, it doesn't make sense to

12  put the fence four feet in.  You're not going to

13  delineate any -- you're not going to stop any tripping

14  hazard if you do that.

15          COUNCILMAN CORTES:  Okay.  Upon the

16  Borough Attorney's recommendation, I'd like to move

17  this to a consent resolution to authorize to enter into

18  a license agreement for 115 Arnold Avenue, contingent

19  upon any building department requirements.

20          Right?  Is that correct there, Mr.

21  Riordan?

22          MR. RIORDAN:  That's perfect,

23  Councilman.  Thank you.

24          COUNCILMAN CORTES:  See I did learn

25  something --

**D. Vitale**                                                      **12**

1          MS. FARRELL:  I'll make that Item 1v).

2          MAYOR KANITRA:  Okay.

3          COUNCILMAN CORTES:  Okay.  That'll be

4     one what?

5          MS. FARRELL:  "V" as in Victor, 1v).

6          COUNCILMAN CORTES:  Okay.

7          MS. FARRELL:  I'm just -- can I just

8     say that I'm having a lot of trouble hearing.  There's

9     just a lot of background noise.

10          MAYOR KANITRA:  I can hear you okay,

11     Eileen.  But, Doug, if there's anybody else that needed

12     to be muted on the line, please do that but don't mute

13     yourself because you're up for department -- committee

14     reports.

15          COUNCILMAN VITALE:  Okay.  Thank you,

16     Mr. Mayor.

17          So let's start with the police

18     department.

19          Tomorrow night is a meeting of the

20     Neighborhood Partnership Initiative at 7 p.m. via Zoom.

21     This is a great opportunity to interact with Chief

22     Michigan and his staff to discuss any topics of

23     interest, specifically quality-of-life issues.

24          The Zoom details were sent out via

25     numerous Facebook pages.  If anybody is listening and

D. Vitale                                    13

1    they're not on Facebook, feel free to email me and I'll

2    get you the information.  Again, that's tomorrow night

3    at 7 p.m., via Zoom.

4                    We're looking to start this up again.

5    The pandemic kind of sidelined us, but we will start

6    doing monthly meetings with the police department.

7                    Moving on to the Rec. Committee, the

8    tug-of-war, unfortunately, was the latest victim of the

9    pandemic.  We met with Manasquan Rec. and the sponsors,

10   and it was -- it was thought that, you know, it -- it's

11   just not worth trying to put this together and then

12   have, you know, low attendance.  So it's cancelled

13   until next year.

14                    Summer camp has --

15                    (Whereupon, Councilman Vitale is

16   indiscernible due to conversations coming through the

17   recording.)

18                    COUNCILMAN VITALE:   -- and those codes

19   were posted on the Rec. Facebook page.

20                    And the Rec. Committee is looking to

21   move forward with Family Fishing Night sometime in

22   September at the inlet.  We're still working out the

23   details.  We figure we can do that in a socially-

24   distanced environment.  So we have some bait shops and

25   some of the charters that are willing to help out.  So

D. Vitale/A. Testa                          14

1   we're going to move forward with that.

2                    And we're looking to move forward with

3   the bonfire.  Again, we'll do it in a socially-

4   distanced environment.  More information will becoming

5   in the next few weeks on that.

6                    And then one last thing.  On the street

7   sewers, I've been working with Councilman Santanello

8   and Christine Riehl on the -- there's pooling water in

9   front of Jimmy's Cucina on the corner of Broadway and

10  Baltimore.  So Christine has reached out to the County

11  for assistance on that, and we're waiting to hear back

12  from them.

13                   And that's all I have, Mayor.

14                   MAYOR KANITRA:  Great, Councilman.

15  Thank you very much.

16                   We're getting (indiscernible).  I can't

17  -- I can't figure it out who it is.  There you go.

18  Thank you.

19                   And, Councilman Migut's line is giving

20  us feedback.  So maybe you can turn it off.

21                   Thank you.

22                   Councilwoman Testa, you're next.

23                   COUNCILWOMAN TESTA:  Thank you, Mayor.

24                   I'm going to jump right into the Arts

25  Committee.  So there are a couple of things that are

**A. Testa**                              **15**

1   going on right now with the Arts Committee that they're

2   planning.  They want to -- well, actually, it would be

3   tonight.  It's an online art show this evening.  So if

4   you're on this, I believe you can go onto

5   pointbeacharts.com or you can check out the gallery on

6   the website for display.  It will (indiscernible) if

7   the residents or public want to look at the art, they

8   can maybe do a public vote and then they'll send it

9   over to judges.  That's actually scheduled for tonight.

10           Also, they -- downtown with the gallery

11   --- I had mentioned it in my last committee report,

12   they're moving forward with that, and I don't know if

13   some of you have noticed already, on Bay Avenue with

14   Stella Luna, how they started adding more art to the

15   wall.  They're like the black, I guess, blackbirds.  I

16   mean, it looks really cool.  So I don't know if anyone

17   saw that.  But they're going to be moving forward with

18   that.

19           And they're also talks of doing a blog.

20   It's going to be called "What Inspires You to Blog."

21   There will be more information coming out for that.

22           Also, they would like to have a small

23   gathering.  Some of the events that they're thinking

24   about, I'll keep you posted.  But right now one is a

25   small gathering at the Little Point Library, possibly

A. Testa                                16

1    in the back parking lot behind the shop -- and

2    obviously, it's social distancing and masks required --

3    to do some reading.  Some -- some authors are going

4    there and just, you know, reading their books.  So

5    that's something that they're considering.  So as we

6    move forward, I'll give you those dates.  But those are

7    things that the Arts Committee is thinking of doing

8    right now.

9              I don't really -- as far as

10   Beautification goes, I know that news -- Kristen

11   O'Rourke is going to have the newsletter come out, and

12   Beautification is going to be in there, and they have a

13   lot of how you can become a member, what -- and what

14   the Beautification Committee is about, if you'd like to

15   join.

16              But as of right now, basically, they're

17   just working hard watering those barrels, maintaining

18   their garden, and I think they're doing a fabulous job.

19   I mean, this -- this heat wave is unbelievable.  So,

20   you know, hats off to the Beautification Committee and

21   -- and their members that are out there diligently

22   every day watering and taking care of their gardens.

23   So kudos to you.  Great job, Beautification Committee.

24              And, lastly, I do get a lot of

25   requests, you know, about -- because I guess with the

**A. Testa**                                        17

1   street initiative, a lot of residents will email me,

2   and I do forward all your emails always.

3                    So the latest update that I have right

4   now from Kristen O'Rourke and with Christine Riehl is a

5   resident had requested to look at, Kristen, Chicago.

6   So, as per the request, we will ask DOT to look at

7   those areas.  Again, everything, you know, takes time

8   because they have to do a -- they have to do, like, a

9   survey.  They have to, you know, weigh it out.  They

10  have -- it takes a couple of months.  So -- so we are

11  going to look at, Kristen, Chicago.  I know that is a

12  big area of concern for some residents over there.

13                   Also, Ocean and Broadway are county

14  roads.  So that you're talking -- we're going to talk

15  about that.  Christine spoke with the County recently

16  regarding Broadway, and they have plans to add some new

17  crosswalks at certain intersections.  I'm not sure

18  about all the details.  But as we move forward, I'll

19  keep -- I'll keep you posted.

20                   Kristen O'Rourke and Christine Riehl

21  met with the DOT yesterday -- well, this is in -- in my

22  text -- about 35 South and Arnold.  They are putting in

23  a work order for "Don't Block the Box" to be painted on

24  the pavement over the next couple of weeks.

25                   Also, a resident had asked about a "No

**A. Testa**                                                      18

1   Outlet" sign over by Yale.  And I believe they're going

2   to put a work order in for that as well.

3                   So, you know, keep them coming.  I

4   forward them to Christine Riehl and to Kristen

5   O'Rourke, and we do, you know, take -- we try to do

6   what we can.  And, you know, at each meeting I will

7   keep you updated.  So that's what I have for now.

8                   And that's really it.

9                   So thank you, Mayor.

10                  MAYOR KANITRA:  Wonderful.

11                  COUNCILWOMAN TESTA:  Thank you to --

12  you know, again, to our police, our wonderful Police

13  Chief Michigan and all the police and (indiscernible).

14                  .MAYOR KANITRA:  If You're Seabyc, could

15  you go on mute, please, and, Doug, could you mute them.

16  S-E-A-B-Y-C.

17                  COUNCILMAN VITALE:  Got them.  They're

18  muted.

19                  COUNCILWOMAN TESTA:  And that's it.

20                  Thank you.

21                  MAYOR KANITRA:  Thank you,

22  Councilwoman.  Great report, although people are

23  probably sad that you didn't break out a cooler this

24  time.

25                  COUNCILWOMAN TESTA:  Don't worry.  You

K. Byrnes                               19

1  never know.

2                    MAYOR KANITRA:  Councilwoman Byrnes.

3                    COUNCILWOMAN BYRNES:  Hello, everybody.

4  Thank you for joining us.  Thank you, Mayor.

5                    Just real quickly, let me say, Mayor,

6  for all your tireless efforts really making this town

7  as nice as it could be, thank you.

8                    Chief Michigan, who I'm not really sure

9  is with us tonight, I wanted to say that with all the

10  so many people that I come in contact with on a daily

11  basis everybody is grateful for such a fine department.

12  And they all notice and everybody is grateful and so

13  thank you for that.

14                    MAYOR KANITRA:  He's on well-deserved

15  vacation rest.

16                    COUNCILWOMAN BYRNES:  Yes.  I'm sure.

17                    Okay.  So I'm going to go right to my

18  committee reports but I'm going to start with Shade

19  Tree because I met with them last night.  Let me start

20  with saying too I have to give a shout out to all those

21  volunteers, really, because they're just such a great

22  group of well-intentioned, hard-working people, you

23  know.  I mean, they're well-informed.  They're --

24  they're just -- they're articulate.  They care.

25  They're passionate, you know.  And, you know, they --

K. Byrnes                          20

1   they give it all they have.  You couldn't really know

2   all that -- all that they do until you get really

3   familiar with them, you know -- you know, from the

4   physical demands of what volunteers could incur,

5   really, it's -- it's all the behind-the-scene stuff.

6   You know, it's identifying grants and it's the

7   inventory of the trees and identifying the trees that

8   could be damaging and -- and dangerous and

9   communicating with the residents that want a tree and

10  -- and all of the -- the list goes on and on and on.

11              So, really, every single piece that

12  they do improves the town such a great deal.  You know,

13  and it all -- they go unnoticed.  So I just want to say

14  thank you to them because we are really all

15  appreciative of that.

16              Some concerns that they did have last

17  night -- of course, you know that the ordinance didn't

18  pass was a little disappointing, but they will stay the

19  course.

20              Let's see.

21              They spoke with some concerns about

22  maybe the irrigation system over by the lake.  You

23  know, I guess the concerns would be that they expressed

24  that Rob may be taken from his watering duties, and

25  they were so, you know -- that -- that the irrigation

K. Byrnes                    21

1   would not be suitable enough, you know.  So they were a

2   little concerned over that.

3                    They did speak about how important

4   Rob's performance has been to our town and how

5   noticeably better our trees are for it.  They requested

6   if we can all do our best to please get him a larger

7   water tank.  You know, it's -- they said it's such a

8   small-ticket item that if we can't see ourselves to --

9   to purchase that for them, that they would take that on

10  themselves.

11                   And the probability of having 30 new,

12  additional trees along with the 50 that have not

13  matured yet enough to, you know, to drop the watering

14  on, there is concern there for that.

15                   MAYOR KANITRA:  If you want to, you're

16  more than welcome to work with the Borough

17  Administrator after we get the irrigation system set up

18  and see if that has lessened the need for a big tank or

19  if we still need a big tank and talk with her about,

20  you know, how necessary it is.  Give it -- give it a

21  couple of weeks to get installed and everything and

22  we'll see where we're at.  But if you want to work with

23  the Borough Administrator --

24                   COUNCILWOMAN BYRNES:  Sure.

25                   MAYOR KANITRA:  -- and see what the

K. Byrnes                                    22

1    possibilities are or what the needs are at that time.

2              COUNCILWOMAN BYRNES:   Sure, positively.

3              They spoke about how badly needed the

4    bike racks are downtown and are really looking forward

5    to that.  So in addition to the bike racks to -- to

6    complement the -- the -- you know, that the -- that the

7    trees don't really sustain any more damage, they're

8    also purchasing some tree guards.  That will be -- be

9    implemented in the next couple of weeks as well.

10             And then -- so then we have -- let's

11   see.

12             We spoke about some educational

13   opportunities for the constituents to learn how to

14   prune a tree, you know, because there may be some of

15   that, you know.

16             The Fisher Fund trees that are coming,

17   anybody that's the recipient of a Fisher Fund tree,

18   they have all made the -- made the -- made the

19   commitment to watering these trees themselves and

20   letting them, you know -- and nurturing them until they

21   take root.  So then there would not be any trouble

22   there with those.

23             Let's see.

24             We have the Environmental Commission

25   which I don't have too much on.  They're going to take

K. Byrnes                                23

1    on that tract of land on Arnold Avenue between the

2    firehouse and the -- and the -- and the -- and the post

3    office.  And they'll be looking for -- you know, there

4    will be another volunteer project.  And they'll be

5    looking for a considerable amount of high school sen --

6    students who are willing to get involved with the

7    project and design right through the execution of this

8    project.  So they'll be looking for -- they'll be

9    working alongside a professional with the volunteers

10   that would work with the students and would be quite

11   informative for them too.

12              So if any of you listening are here

13   with us tonight that have any students that this would

14   be right up their alley, certainly, reach out to me or

15   any of the people on the Shade Tree, and we'll

16   certainly put them on our list to join with us in our

17   efforts.

18              That's all we have on them.

19              The green -- the Green Team continues

20   to work on a number of sustainable Jersey actions that

21   are a great benefit to our community.  We have a bronze

22   certificate now, and we're just working on a number of

23   actions and efforts to possibly bring that to a silver

24   certification.  One night I can maybe explain what all

25   that really -- what all that really means, but it is

K. Byrnes                                    24

1    quite lengthy.

2                    And I think that's -- you know, I

3    reached out to Chief Ryan today.  I know he said I'll

4    get back to you Caryn, I'm on a lot of calls, which was

5    understandable during that storm this morning.  I do

6    know, though, that they are having a fundraiser.  And

7    they're having a T-shirt fundraiser.  We -- we bought a

8    few.  They're really high-quality.  It's a small way to

9    be able to say, you know, thank you for all you do, you

10   know, and recognize their efforts.  And that's it.  If

11   anybody would like to purchase one, I could certainly

12   help get the information to you or bring one over to

13   the house or whatever.  You could just reach out for

14   me.

15                   A FEMALE VOICE:  So you're the one to

16   get it, Caryn, from you, right?

17                   COUNCILWOMAN BYRNES:  Well, I could

18   just help make it easier for you, sure.

19                   A FEMALE VOICE:  Okay.

20                   COUNCILWOMAN BYRNES:  The quality-of-

21   life concerns, I receive a real lot of calls on this,

22   and I work very closely with Gina.  And that's all been

23   going, you know -- it's all been going very nicely,

24   actually.

25                   And then I think that's it.

K. Byrnes                                    25

1      I've spoken to our weekend residents, I

2  guess, on the garbage that we're going to discuss

3  tonight.  And so they shared their concerns with me.

4  There are really -- there are quite a few, actually,

5  you know.  But, you know, they understand.  I guess

6  they were a little hopeful, maybe, that there would be

7  something over at the DPW that they could drop their

8  stuff off.  They understand all the complications that

9  any -- any of the solutions may involve and, you know,

10  we -- we haven't lost them for it.  You know, they --

11  they understand it.

12      And I think that's pretty much it.

13      MAYOR KANITRA:  Thank you,

14  Councilwoman.

15      And just one other aside for the Shade

16  Tree Commission.  I wrote a letter in support for a

17  grant application that they applied for with the County

18  for the trees, some very mature trees to go on -- on

19  some of our highways and some of our more industrial

20  routes.  I think we feel good about our chances for

21  that.

22      COUNCILWOMAN BYRNES:  They feel very

23  positive about that, actually, Mayor.

24      MAYOR KANITRA:  They're doing --

25  they're doing a lot of great stuff, and I know that

C. Byrnes/A. Cortes                    26

1   they --

2                   COUNCILWOMAN BYRNES:  They certainly

3   are.

4                   MAYOR KANITRA:   -- they are grateful

5   for your help on that.  So thank you.

6                   COUNCILWOMAN BYRNES:  Thank you.

7                   MAYOR KANITRA:  Okay.  Councilman

8   Cortes.

9                   COUNCILMAN CORTES:  Thank you, Mayor.

10                  Good evening, everyone.

11                  A MALE VOICE:  Nine o'clock is the high

12  tide, yeah.

13                  MAYOR KANITRA:  Whoever just said "Nine

14  o'clock is the high tide," please put yourself on mute.

15                  COUNCILMAN VITALE:  I got him.

16                  COUNCILMAN CORTES:  Thank you.

17                  Now, that we all know that, that's

18  great.  We'll be out looking.

19                  Thank you, Mayor.

20                  First thing, personnel -- Personnel

21  Committee, recognize first month -- first meeting of

22  the month the three people that have anniversaries this

23  month.

24                  From the police, Jerry Quaglia.  He's

25  celebrating 24 years, but he will be retiring at the

A. Cortes                    27

1    end of this year.  So he's making 24 and then he's

2    going.

3                        Our Administrator -- our

4    Administrator's secretary, Patti Kyle, does a numerous

5    amount of work.  She's here eight years.

6                        And DPW, Collette Betz, the overseer of

7    our recycling and drop-off, six years.

8                        Congratulations to them.

9                        Public property, buildings and grounds,

10   that's the committee I've chaired for, oh, probably,

11   six, maybe, seven years now.

12                        If anybody is out there, my cell phone

13   is 732-232-3316.  Call me if you have any issue.  I

14   will come and look, and I will try to resolve it, or

15   I'll tell you if we can't resolve it.  I'm always in

16   town.

17                        One r) on the agenda, I spoke to John

18   Trout.  He met with Enviroscapes over at Lake of the

19   Lillies, and I hope we get a -- a vote on that.

20   Enviroscapes said the level was perfect for flooding

21   and for the vegetation, so I'm hoping we'll get a

22   positive vote on that one.

23                        One p), Boston Avenue bulkhead,

24   finally.  This has been on the work -- in the works for

25   a while.  That's on the agenda.  I hope we can get

A. Cortes                                28

1   approval for that.  O'Donnell Stanton is getting the

2   engineering bid, I'm happy to see, instead of a

3   Canadian company.

4              The 1f), 1f) on here, this is

5   interesting.  This is Sura Surf mat.  Playgrounds have

6   to have certain, special, you know, matting for safety

7   which I find -- I find it crazy because how do you

8   learn, you know, not to get hurt if you don't get hurt.

9              But, anyway, the inlet -- the inlet

10  playground over at Loughran Point has had special play

11  sand.  And when we get a storm or high winds or just,

12  you know, any kind of high tide with flooding, it gets

13  contaminated with regular sand, so you just can't leave

14  it, and I know it sounds crazy.  You know, we can't use

15  -- you know, we have to have special sand.  We've had

16  to purchase over the past -- since the -- that

17  playground has been built, we numerous times purchased

18  new sand, man hours with DPW to go down and sift it.

19              These mats will allow DPW to go down

20  there with -- with regular blowers, you know, that you

21  would use on your own property for grass clippings or

22  leaves and just blow the sand away, and it conforms to

23  all the safety regulations in JIF.  So I'm hoping

24  anybody looking at that high-dollar amount, that should

25  pay for itself over -- within a few storms or high

1    winds.   I hope we get a yes vote on that.

2                    If you've been down Cook's Lane by DPW,

3    there's a larger pile of mulch.  Some more mulch was

4    delivered.  That is free to the residents.  If you want

5    to go down with a garbage pail, feel free to shovel

6    some mulch.

7                    We did purchase and receive a second,

8    small street vac, and that's been out there and being

9    used and it's been phenomenal.  If one breaks, we still

10   have one.  Having both out there, we're covering more

11   ground in a quicker amount of time in cleaning up some

12   of this garbage that -- that's been laying around.

13                   The new Neptune water antenna was

14   installed on top of the water tower.  We had an issue

15   there.  It was struck by lightning.  Christine Riehl,

16   our Administrator, will be submitting that for an

17   insurance claim.  And we also have a spare antenna,

18   God forbid, that ever happens again.  We were -- we

19   weren't in a position where we couldn't read meters,

20   but we actually, speaking to the water department, we

21   had missed two or three constant-flow alerts by having

22   that antennae.  It took some time to get it replaced

23   because they're all specifically made to a certain

24   length for the frequency.  So it's not a standard off

25   the -- off-the-shelf item.  But we have two now.  So

A. Cortes                                          30

1    that's great.

2                   On the agenda, 11), DPW wants to

3    auction a surplus vehicle.  That is a 2002

4    International dump-truck.  And Jim Trout usually gets

5    the best amount of money that he can when he auctions

6    off his vehicles.  So he'll do that.

7                   Lastly, I'm going to touch on --

8    Councilwoman Byrnes touched on the sprinkler system.  I

9    received a call from Anne Lightburn yesterday.  I spoke

10   to her.  Her concerns were -- is at -- at Little Silver

11   Lake, is it going to be along the lake and shooting out

12   into the parking lot or along the parking lot and

13   shooting in there?  I don't know that.  It didn't say

14   that on the quote.

15                  But I have done an in-depth study of

16   both bids that we got, and the one that we're going to

17   go with is going to put 149 rotor heads in the Little

18   Silver Lake parking lot area, starting from the band

19   shell out.  Those rotor heads will hit anything from 20

20   to 50 feet.  So like I told Anne Lightburn, I think

21   that's enough water that's going to cover grass and

22   trees.  And if the trees don't get a sufficient amount

23   of water, Rob is still out there, our part-time guy,

24   who will probably water those trees anyway.  So I told

25   her that she can feel safe that the trees will not die

A. Cortes                                    31

1    or be lack -- lacking of any water.

2                      As far as the size of the tank, they

3    will limited to a 100-gallon tank because they used the

4    Toro.  Rob now is in a -- a pickup truck, albeit a

5    small-size pickup, not a full-size truck.  I'm not sure

6    what size tank can fit in the back of that.  I know he

7    uses the fire hydrant now to fill it up.  So it takes

8    about three minutes to fill a 100-gallon tank instead

9    of a garden hose like the Shade Tree Commission was

10   using.  So it might take him -- he might get six or

11   seven trees out of the 100-gallon tank, and it takes

12   him about 15 minutes to go back to the yard, fill it up

13   and go back out.  If you calculate that over the course

14   of a full day, yeah, would a larger tank help?  I'm

15   just now sure.  I would have to speak to John Trout.

16   I'm not sure if it'll fit in the back of the small

17   pickup truck or a small-size truck.

18                      MAYOR KANITRA:  Maybe Councilwoman

19   Byrnes can work on that with John --

20                      COUNCILWOMAN BYRNES:  Sure.

21                      MAYOR KANITRA:  -- and see --

22                      COUNCILMAN CORTES:  Sure, yeah.  It

23   just has -- you know, you have to take some dimensions

24   and measurements.  Like I said, I know that he just --

25   they took it off the Toro and put it in the bed -- the

A. Cortes/R. Santanello                    32

1    bed of this truck.  And it's, like I said, a smaller

2    pickup.  It's not a full-size, like, F150 or a --

3                    COUNCILWOMAN BYRNES:  Right.

4                    COUNCILMAN CORTES:  -- Dodge 1500.

5                    COUNCILWOMAN BYRNES:  Right.

6                    COUNCILMAN CORTES:  So we can check on

7    that.

8                    COUNCILWOMAN BYRNES:  Okay.

9                    COUNCILMAN CORTES:  Mayor, I believe

10   that's it for me.

11                   MAYOR KANITRA:  Great.  Thank you,

12   Councilman.

13                   Councilman Santanello.

14                   COUNCILMAN SANTANELLO:  Thank you,

15   Mayor.

16                   Can everybody hear me okay?

17                   MS. FARRELL:  Yes.

18                   MAYOR KANITRA:  Yes.

19                   COUNCILMAN CORTES:  Yes.

20                   COUNCILMAN SANTANELLO:  Okay.  I know

21   we were struggling earlier so...

22                   Mayor, I am going to ask you one favor

23   before I start my report.  I know I say some things

24   that annoy you at times.  I would just like you let me

25   get through my report tonight without interjecting.  I

R. Santanello                                      33

1    find myself going about 14 minutes.  If you could just

2    take notes and then yell at me all you want when I'm

3    done, I'd appreciate that.  Fair enough?

4                        MAYOR KANITRA:  Fourteen minutes?

5                        COUNCILMAN SANTANELLO:  Fourteen.

6    Fourteen.

7                        MAYOR KANITRA:  Okay.

8                        COUNCILMAN SANTANELLO:  One-four.  All

9    right.

10                       So a few agenda items before I get to

11   the meat of tonight's discussion.

12                       One d) to me is nothing but a massive

13   money grab by the Borough Engineer.  It's an additional

14   $550 in fees going right in their pockets; $3,000 more

15   in bonds.  And having built a home in town, I can

16   assure you that every penny of that 3,000 will be

17   spent.  In essence, the engineering firm will be

18   extracting a total of $7100 instead of $3500.  It looks

19   like in addition to the Mayor's promise to make Riordan

20   rich, he promised the same thing to the new engineering

21   firm who just happen to be a large distributor to his

22   campaign.

23                       I also object to the entire recharge

24   system in (indiscernible).  It's ridiculous to have a

25   homeowner pay thousands of dollars for a system that

R. Santanello                                                34

1   doesn't work because our watertable is no more than a

2   foot -- a foot and a half to two feet deep.

3           All right, 1m).  In the midst of the

4   biggest economic slump in the history of the United

5   States, we're taking our taxpayers' hard-earned money

6   and sending it to a Canadian real estate firm.  I

7   object.

8           One p), while I'm in favor of the work

9   being done, I'll continue my objections to the Borough

10  Attorney review and him getting paid to pretend he

11  knows something about engineering.

12          Next, we received a statement of the

13  revenue for the town-to-date, 2020.  As I've stated

14  repeatedly during the budget conversations that with

15  massive losses of revenue, approximately $350,000 so

16  far -- and that's just in June -- 2020 was not the time

17  to go on a spending spree, but that's what we're doing.

18  And we're going to be paying some substantial legal

19  fees, but more on that later.

20          It's also interesting that the Mayor

21  says it's no big deal (indiscernible).

22          Now, I would like to thank the Mayor

23  and Councilman Vitale for their time and thoughts to

24  the Skate Park Ordinance.

25          I want to ask Mr. Riordan real quickly.

**R. Santanello**                    35

1   Are we voting on the final Skate Park Ordinance that

2   was the red line one that you sent to us about two

3   hours ago?

4                    MR. RIORDAN:   That's my understanding.

5                    COUNCILMAN SANTANELLO:   Okay.  Good.

6   Thank you.

7                    While I'm not completely thrilled with

8   the entire ordinance, it's -- it's good enough.   It's a

9   good compromise.

10                   And, frankly, it's nice to know that we

11  can all work together, just like the Garbage Can

12  Ordinance that's on tonight, and come to something that

13  we all agree upon in the end.

14                   And, by the way, on the Garbage Can

15  Ordinance, I will tell you that some folks up here on

16  Brunswick Place told me earlier today that frankly

17  they're thrilled with the lack of garbage on Ocean

18  Avenue.   That's working out really well, and I hope

19  everybody votes on that as well.

20                   Which leads me to the very unpleasant

21  task that I have tonight.   I promised in my first

22  meeting this year that I wouldn't start any fights with

23  other members of the governing body.   I think I've done

24  an okay job on that, and my fellow Council Members have

25  been excellent as well.   Sadly, I feel a fight has been

R. Santanello                              36

1   brought to me personally and to people that I care

2   about and people I respect by the Mayor.

3                    Our last meeting went very well.  We

4   had some policy differences but it was cordial.  I'll

5   even quote the Mayor who said, "Look at all of us

6   getting along."  Well, apparently, the Mayor wasn't

7   happy that he didn't get his way on everything because

8   less than eight hours later he put out a social media

9   post that was just out flat out repulsive to a whole

10  bunch of people and placed blame for things happening

11  under his watch on anyone and everyone he could think

12  of.  And even though he already hung his mission

13  accomplished banner and took a victory lap, the

14  ordinance has not passed yet, although I expect it

15  will.

16                    There's a Chinese proverb that

17  basically says if you blame others all the time, you

18  have a long journey to go; if you blame yourself,

19  you're halfway there; and if you don't blame at all,

20  you've arrived.  And to be clear I wrote this statement

21  that I'm going to have coming up right here well before

22  receiving communication from some other attorneys

23  today.

24                    Let's take a look at who the Mayor

25  insulted.  First, he said rules being placed to stem

1   the tide of disrespect left unchecked for the last five

2   years.   The Mayor simply can't resist taking shots at

3   Steven Reid even seven full months after he took

4   office.   There's nothing worse in my opinion than

5   kicking a man when he's down, but it's behavior I've

6   come to expect.

7              At the same time he was also insulting

8   Tom Toohey, Tom Vogel, Andy Cortes, myself and Tom

9   Migut, a person he called (indiscernible) endorsed his

10  campaign and a person he's fully endorsed for

11  reelection this year.   Apparently, we spent the last

12  five years sitting around doing nothing.   I'm calling

13  b.s. on that.   He conveniently forgets that we passed

14  an ordinance limiting the (indiscernible) coolers

15  already and we worked with the (indiscernible) to ban

16  people from staying on the beach after 5 p.m. without a

17  badge, no tables and chairs, no chafing dishes and

18  limiting the (indiscernible).

19             To insinuate any of the people that I

20  just mentioned didn't care about this town and

21  (indiscernible) was insulting.   How dare you?   These

22  are people that dedicated their lives to making Point

23  Pleasant Beach a better place.

24             Considering the fact that I have heard

25  the mayors of Lavallette, Brick Town, Belmar and quite

R. Santanello                          38

1   a few other towns along the shore have comments on the
2   breakdown in behavior this year, it's clearly not just
3   a Point Pleasant Beach thing.  But I guess it must make
4   the Mayor feel better about himself by pointing a
5   finger at anybody but himself.
6                    So let me be clear.  I don't blame
7   Mayor Kanitra either.  We are experiencing massive
8   societal upheaval, the highest unemployment in history.
9   People are economically devastated.  We're in a
10  pandemic of a scale none of us have ever seen in our
11  lives and an uncertainty about schools, jobs and homes.
12  People are angry and scared.  But by the Mayor's logic,
13  Steve Reid and the rest of us are all responsible for
14  the breakdown in civility.  Yet, Lavallette, Brick,
15  Belmar and all the other places where there's unrest is
16  the fault of the previous governing body.  Give me a
17  break.
18                   And before anyone makes some kind of
19  stupid comments that I'm fine with what's going on, of
20  course I don't.  There's no excuse for lawlessness, but
21  blaming others isn't the answer.
22                   At the same time he's pointed a finger
23  at our police department.  To make a comment that
24  things have gotten progressively worse is an accusation
25  that they haven't been doing their job.  I've said it

R. Santanello                    39

1   before and I'll say it out.  I live up by the boardwalk

2   in the summer, and I see that it got better every year

3   of the four years I lived up there.  I have never felt

4   unsafe or in fear for my family.  I will agree, though,

5   that for the first time, yes, this year is the worst

6   year ever.  But, again, to blame what's going on on a

7   previous governing body and police force is just wrong.

8           And he insulted myself, Councilman

9   Cortes and Councilman Migut for favoring special

10  interests over the residents.  I'm calling b.s. on that

11  one.  That line is lifted directly from him.

12          Congrats, Mayor.  You're now been

13  (indiscernible) success.

14          Just so everyone knows, we don't owe

15  anything to anybody.  We aren't anybody's tools.  We're

16  independent, thinking adults that don't apologize for

17  having our own opinion.

18          Then he insulted the owners of the

19  board business with his skin-in-the game comment.

20  That's the most ignorant comment and concept that I've

21  heard to date.  It was ignorant when Barrella said it,

22  and it's ignorant now.  To act like the board

23  businesses don't care who comes into town and what they

24  do is ridiculous.  These are businesspeople running

25  businesses.  Their demographic is for families coming

R. Santanello                    40

1   down and spending their money.  Why would they
2   intentionally drive away the very people that they want
3   to attract?  That would be stupid.  And as a reminder,
4   they're not just the largest source of tax revenue for
5   Point Pleasant Beach, most of them live in town.
6   Again, why would they want to ruin their own town?
7   It's preposterous.  But, yeah, let's demonize them
8   (indiscernible).
9              Let's take a look at this empty,
10  unconstitutional, unenforceable vague ordinance with
11  great flaws in the public access.  I'll compare the
12  ordinance with what happens at Christmas time.  You see
13  all the pretty Christmas trees with gift boxes in the
14  windows.  But, if you go in and look closer, you'll
15  realize the trees are fake and the boxes are empty.
16              Number one, telling the businesses they
17  can operate and who they can hirer as if the majority
18  of our governing board are simply (indiscernible), that
19  goes against everything our free society of capitalism
20  stands for.  It is actionable (indiscernible) and we
21  could be sued over that.  It violates the Public Trust
22  Document.  We could get sued over that.  Only those
23  over 18 can examine a cooler.  Now, we're saying who
24  they can hire.  The beach operator should be charged if
25  somebody sneaks out onto the beach.  I guess no one up

R. Santanello                                          41

1   here has ever gone to a college or a sporting event,

2   but to think that people won't buy a pair of binoculars

3   or empty out a water bottle and fill it with vodka or

4   dump out half the Gatorade and fill it with rum -- but

5   I suppose the checker is supposed to open every

6   container to smell for alcohol.  It's overly burdensome

7   and we'll be sued over that.

8              Making loud noises to the annoyance of

9   another.  It's vague, rude, unenforceable and

10  actionable, and we'll be challenged repeatedly.  We

11  already have laws on the books for disturbing the peace

12  and disorderly conduct that can be used.

13             The cooler size, I've already

14  mentioned.  This was tried already and shrinking it

15  further isn't going to make any difference.  Those that

16  ignore history are doomed to repeat it.

17             Now, for those people who have said to

18  me we have to do something, I'll simply reply that

19  doing something that causes harm to our residents is

20  worse than supposedly doing nothing.  My vote against

21  this is just a waste of papers, cost to our residents

22  of tens of thousands of dollars of legal fees for an

23  ordinance that won't stand up to legal challenges.

24  The only ones who win here are the attorneys.

25             Now, since the ordinance was passed on

R. Santanello                    42

1    the first reading -- which, by the way, means it's not
2    law yet, despite the Mayor's claim that it is --
3    there's been a full-court press by the Mayor to try and
4    make this an overwhelming victory for him.  Despite
5    spitting in the face of Councilmen Cortes and Migut in
6    his Facebook post, he then sent them an email this past
7    week begging them to change their vote.  Here's the
8    (indiscernible) of the email.  (Indiscernible)
9    platform.  I guess we're supposed to vote based upon
10   what social media says rather than our platform.  But
11   let me be clear.  I will never base a vote on the
12   opinion of the -- I guess I can just call them the
13   great uninformed rabble on Facebook.  It's the place
14   where truth goes to die and everyone has an opinion no
15   matter how misinformed, and people with way too much
16   time on their hands start fights with each other.
17                I'll tell you this.  I don't need
18   (indiscernible) affection, affirmation and accolades.
19   That's for people with low self-esteem and narcissism.
20                The beach operators are
21   (indiscernible).  Well, surprise, surprise.
22   Organizations have contracts with the town that they
23   can lose if they buck the Mayor, and the
24   (indiscernible) to continue to operate are certainly
25   not going to argue.  Nobody does anymore because they

R. Santanello                    43

1    know the Mayor will go after you on social media, and

2    he'll go after your family members if it doesn't work.

3              Number three, the (indiscernible)

4    businesses are not the ones that elected us.  The

5    residents are.  As I mentioned previously, they are

6    residents as well.

7              And then this is an historic turning

8    point for Point Pleasant Beach.  It's nice to be able

9    to say you're on the right side of things.  Well,

10   here's a little history lesson.  The Mayor's hero,

11   Vinnie Barrella, tried the same divisive use against --

12   of us-against-them ordinance, all of which failed and

13   cost our residents hundreds of thousands of dollars in

14   legal bills.

15             In you want people to have, as you say,

16   skin in the game, why don't ask all those people that

17   -- that give you likes and comments on Facebook posts

18   to (indiscernible) to help defray the costs to our

19   residents.

20             So you have to ask yourself, why the

21   full-court press?  It sounds like this is more about

22   the Mayor's public image than it is about what's best

23   for our residents.  Make no mistake about it.  This is

24   truly a made-for-Facebook ordinance, designed to get

25   the Mayor his 885 likes and 305 comments.  He's already

R. Santanello                          44

1    got that.  (Indiscernible) start doing everything on

2    social media again.

3                      Now, to my fellow Members of Council

4    who intend to vote yes on this, I truly respect your

5    opinion, but I want to remind you of what I've said

6    before.  Just because Riordan says it's legal, that's

7    just his opinion.  It doesn't make it correct or

8    lawful, and only a judge can decide that no matter what

9    he's told you.

10                     What I'm going to tell you, now, should

11   chill you to the bone.  I've already stated repeatedly

12   that Riordan is a walking, breathing, conflict of

13   interest to residents as the Borough Attorney.  He's

14   the head of the Republican Party in town and the

15   Committee Chair of the (indiscernible).

16                     Over the last week, he has called

17   Councilmen Migut and Cortes to try to twist their arms

18   to get them to change their votes.  And he tried it

19   again today with Councilman Cortes.  So how could a

20   Borough Attorney actively advocate for an ordinance

21   that he is going to bill an obscene amount of money

22   from and through inevitable litigations?  That goes

23   beyond politics.  It goes beyond logic.  It goes beyond

24   ethics and, in my opinion, is outright corruption.

25   He's here to give us legal advice, not to

R. Santanello                                    45

1   (indiscernible) ordinance for his own enrichment.

2              Even worse, he told Councilman Cortes

3   that once he was done convincing him that he should

4   change his mind, that Andy should then call me and

5   pretend that on his own he wanted to ask me to change

6   my vote as well.  He's encouraging a sitting Councilman

7   to lie to another sitting Councilman.  That's just

8   despicable.  And I'm horrified that he's entrusted with

9   such an important position.

10             Now, due to this unethical behavior,

11  I'm making a motion now that neither Riordan nor his

12  firm makes dime one for litigation tied to this

13  ordinance.  My motion is that one of the other several

14  dozen firms who signed contracts this year should

15  handle this litigation.  It's imperative that we have

16  representation that is unbiased, that doesn't have a

17  vested financial interest in the ordinance.  Please

18  send a message that behavior like that is simply

19  unacceptable.  Even if you agree with the ordinance,

20  you have to recognize the entire reason and motivations

21  behind it are suspect as well.

22             So I have a motion on the floor.  Does

23  anybody want to second it?

24             COUNCILMAN CORTES:  I'll second that.

25             MS. FARRELL:  Please repeat what your

R. Santanello                                    46

1     motion is for me.

2                    COUNCILMAN SANTANELLO:  My motion is

3     that the Riordan Law Firm are no longer involved in any

4     litigation that is involved in this ordinance.

5                    MS. FARRELL:  And you're speaking of

6     the Beach Ordinance, correct, Ordinance 2020-12?

7                    MAYOR KANITRA:  Can we just make a

8     motion as a governing body to dis -- you know, to

9     exclude the Borough Attorney who wrote the ordinance?

10                   COUNCILMAN CORTES:  Well, on Reorg. Day

11    I questioned why we had so many attorneys still listed

12    on the RFP, and to quote you, Mayor, I believe not

13    verbatim but you said, so we have a big pool of

14    attorneys to choose from if we need to.  So we must

15    have enough attorneys that can litigate any -- any

16    issues that might come from this ordinance should it

17    pass tonight.

18                   MR. RIORDAN:  Folks, this is real

19    simple.  There are no conflicts despite what Mr.

20    Santanello may say.  Certainly, this is an issue that

21    could be discussed.  But I have to object to the idea

22    that I be disqualified based on what -- based on what

23    Councilman Santanello said.  And I would also suggest a

24    review should be on who's best able to defend this

25    ordinance, and I would suggest to you that that's my

**R. Santanello**                                                    47

1   firm.

2                   COUNCILMAN SANTANELLO:  Object --

3   objection noted, but there's a motion on the floor, and

4   Andy seconded it.

5                   COUNCILMAN CORTES:  I made the second.

6                   MS. FARRELL:  Councilman Vitale.

7                   MAYOR KANITRA:  Councilman Vitale, are

8   you there?

9                   COUNCILMAN VITALE:  Sorry.

10                  No.

11                  MS. FARRELL:  Councilwoman Testa.

12                  COUNCILWOMAN TESTA:  No.

13                  MS. FARRELL:  Councilwoman Byrnes.

14                  COUNCILWOMAN BYRNES:  That's a no.

15                  MS. FARRELL:  Councilman Cortes.

16                  COUNCILMAN CORTES:  Yes.

17                  MS. FARRELL:  Councilman Santanello.

18                  COUNCILMAN SANTANELLO:  Yes.

19                  MS. FARRELL:  Councilman Migut.

20                  COUNCIL PRESIDENT MIGUT:  Yes.

21                  MS. FARRELL:  Mayor Kanitra.

22                  MAYOR KANITRA:  I see absolutely no

23   reason why the person who drafted this ordinance

24   (indiscernible) vote on it and why the Borough Attorney

25   who's been friends with Councilman Cortes isn't allowed

R. Santanello/T. Migut                          48

1   to talk with him.  So I say no.  I think that it's

2   ridiculous.

3                    COUNCILMAN SANTANELLO:  Okay.  Well, it

4   failed.  But I have to say four members of the

5   governing body are in favor of and encouraging and

6   approving of a Borough Attorney encouraging another

7   Councilman to lie to another one.

8                    But I'm done, Mayor.  Please free to

9   spin away.

10                   MAYOR KANITRA:  Actually, Councilman

11  Santanello, normally I go through a whole list of all

12  the reasons why your -- your ramblings were insane, but

13  I'll -- I'll just take a pass because I don't even want

14  to even (indiscernible).

15                   Council President Migut, go ahead.

16                   COUNCIL PRESIDENT MIGUT:  Can you hear

17  me?

18                   MAYOR KANITRA:  Yep.

19                   COUNCILMAN CORTES:  Yes.

20                   COUNCIL PRESIDENT MIGUT:  Okay.

21                   The Planning Board Meeting for August

22  has been cancelled.

23                   The Parking Authority will meet

24  virtually on Thursday night.

25                   Today the first cars were parked by

T. Migut                              49

1   downtown employees in the railroad lot under the

2   Employee Parking Pass Program.  Thank you to Joe Leone

3   for being the first participant.  We expect a second

4   large business to begin participation in a week or so.

5                    The new fire truck has been ordered.  I

6   worked about a week and a half ago with Christine Riehl

7   on the purchase order.  It's been sent to Wisconsin to

8   the factory, and the factory has told the fire company

9   to go to their suppliers for things like engines and

10  transmissions being affected by COVID shut-downs.  It

11  will take 12 months to build the new fire truck.

12                   It was wise for the Council to approve

13  the $5,000 repair to the old truck back in March

14  because, from the words of the fire company, the truck

15  would not have made it that long.

16                   The Shared Services Agreement, Kevin,

17  could you get that to Christine by August 11th when she

18  comes back from vacation, do you think?

19                   MR. RIORDAN:  As I said to you last

20  time, Councilman, that's Gary's, and certainly you

21  should contact him and discuss it with him.

22                   COUNCIL PRESIDENT MIGUT:  Fine.

23                   And, finally, finance.  Councilman

24  Santanello mentioned my email to Christine Riehl.  I

25  did send an email to her asking her to send -- prepare

T. Migut                                        50

1   a memo to department heads regarding capital requests

2   for next year, that the requests be sent in earlier and

3   that they include a statement describing each item

4   that's requested as to what it is, what it does,

5   whether it's a new purchase or a replacement, and

6   ranking its need.

7                  And that's all, Mr. Mayor.

8                  MAYOR KANITRA:  Thank you, Council

9   President.

10                 Okay.  And while I've been sitting

11  here, I just -- I can't -- I can't let what Councilman

12  Santanello said just go unchecked.

13                 I mean, for the past seven months

14  during the pandemic and everything else, I've taken all

15  of your sarcasm, Bob, all of your lies, all of your

16  insane conspiracy theories.  I've sat here and I've let

17  it roll off my back time and time again because I have

18  incredibly thick skin and because, luckily, there are

19  other Council Members up here who have had the backbone

20  to safeguard this town from you.  But now you're

21  threatening the very fabric of our existence and Point

22  Pleasant Beach's future.  And I -- I think I'm done

23  sitting back and staying silent.

24                 You should be ashamed of yourself.  You

25  too, Andy.  You are literally trying to sell the town

51

1    out.  All you two do is sit there every single Council

2    Meeting and act as bitter obstructionists and sore

3    losers.  You don't do any work.  You offer zero

4    solutions.

5          Bob couldn't even get the gazebo

6    painted which was the one task we asked of him all

7    year.  You don't volunteer for lake clean-ups, downtown

8    clean-ups, art events, bonfires, nothing, which is no

9    surprise because throughout your terms you have barely

10   ever even showed up for your committee assignments.

11         Now, Bob is going to smile and try and

12   use his snarky laugh to dismiss it, but let me make

13   this abundantly clear for everyone on the line.  We are

14   in this situation as a town because Andy and Bob have

15   been vegetables just sitting in their chairs, selling

16   the town down the road for years.  Their lack of

17   attention to downtown is why there were a dozen

18   vacancies when we took office.  It's why businesses let

19   their properties go to hell without any accountability.

20   It's why contractors have done shoddy work and

21   professionals as well.

22         Their allowing some private businesses

23   to do whatever they want is why we're now a spring

24   break destination with the most disrespectful tourists

25   that think they can get away with anything because Bob

52

1    and Andy have let them for years.  You have literally

2    never said no to the boardwalk ever.  How messed up is

3    that?  How insane is that?  That's not Republicanism.

4    That's not Libertarianism.  It's being a crony, a

5    lackey and not having a spine to do what's right for

6    your fellow neighbors.

7              It doesn't mean you're antiboardwalk

8    for saying no once in a while and having a spine.  It

9    doesn't mean you're a Vinnie Barrella worshiper either,

10   who I've never even talked to.

11             Bob, thank God you are retiring next

12   year.  I actually like you as a person, but your

13   government legacy is going to reflect how little you

14   cared for anything other than letting everyone get away

15   with whatever they wanted and keeping this town from

16   realizing its full potential.

17             Now, that's said.

18             I want to thank the DPW for cleaning up

19   so quickly after the storm.  While sections of town are

20   still without power, we were lucky to receive only a

21   glancing blow.  And as Councilman Santanello mentioned

22   in -- in his report, I want to thank the over 1,000

23   people who reached out in support of the Beach and the

24   Boardwalk Ordinance.  In all my years of government,

25   I've never seen such unanimously strong support for a

53

1    big issue like this from a group of constituents.

2                I want to thank all the beach operators

3    and lifeguard companies that have expressed their

4    support for the ordinance.

5                All but one (indiscernible) has

6    expressed support for what we're doing.

7                I'd also like to thank Carol Vaccaro

8    and the Chamber of Commerce for making the hard

9    decision to cancel the Seafood Festival.  They put the

10   town and safety first and they're to be commended.

11               They're also requesting tonight that

12   streets be shut down downtown every Wednesday night,

13   and I'd like us to approve that contingent on what

14   Chief Michigan says when he comes back and the

15   realities associated with that so we can try and help

16   him out.  It's mainly going to be taking place in the

17   fall after school starts.

18               In addition to that, we've been putting

19   together the Master Plan Subcommittee, and we have a

20   little bit of a meeting coming up here this coming

21   week.  We're working on historic downtown ordinances as

22   well.

23               And I know that Councilman Santanello

24   also mentioned the revenue number.  This is very clear.

25   Everything we speak about, this Council, is fact.

54

1    There was a deadline difference with ABC licenses

2    that's skewing 50,000 of it, and we budgeted $200,000

3    less for parking because we made sure that we were

4    really conservative in our budget.  So, really, at the

5    end of the day, we might be down $100,000 from our

6    budget last year.  And considering that people have

7    been coming on weekdays and that people have been

8    coming off-hours, we anticipate that, in my talks with

9    the Borough Administrator, who is not here tonight, to

10   make that up in August, September and even October when

11   people are going to continue to come to the beach even

12   when it's 50 and 60 degrees out as well.

13             I have a couple other things.

14             We have the Speaker Ordinance on the

15   agenda tonight.  Not an ordinance, excuse me,

16   resolution for quotes for the police substation.  We're

17   also going to put the flag up there and we're going to

18   do the National Anthem every morning.  I think that

19   that's really important.

20             As mentioned, we've exchanged

21   correspondence with the DOT about the installation of a

22   crosswalk at 35 South and E Street.  They're sending

23   out a survey crew and they should get back to us

24   shortly.  Also, proceeding with additional signage at

25   35 South and Arnold and the block -- the block

55

1     installation that was mentioned previously in a

2     committee report.

3                There was a meeting with Enviroscapes

4     with the Borough Administrator and Kristen O'Rourke at

5     Lake of the Lillies.  They have been researching

6     alternative aeration methods.  I also sent them five

7     years of lake -- of lake treatment history so that we

8     can look at some different solutions to stopping the

9     algae blooms before they -- one of those things

10    involved something called hydroraking.  And they did

11    state that the correct vegetation after the most recent

12    treatment looks great.

13                We ordered as a town another 75 feet of

14    balloon mat for the walkover at the Maryland Avenue

15    Beach.  Some people have seen the white T that went out

16    on that intersection.  The blue mat is necessary for it

17    to actually be wheelchair compliant because right now

18    we don't have enough blue mat from before to -- it was

19    zigzagged and it wasn't done.

20                The banners for downtown

21    (indiscernible) from yesterday.  They're going to

22    becoming within the next week.

23                As Councilman Migut mentioned, the

24    employee parking passes for the railroad lot were

25    handed out this week.

56

1          The Ocean Ave. water main replacement

2     is underway.  We have 50 percent planned.  We're

3     working with our funding sources, and construction is

4     supposed to start in the spring of 2020.  We'll send

5     letters out to and (indiscernible) alleys that may want

6     to take advantage of our project and enlarge their

7     water service while it's excavated and open.

8          The Storm Sewer Mapping Grant was just

9     finalized by the State.  We'll be proceeding with

10    mapping and televising that as per the grant.  We

11    accepted the quote from Jersey Shore Sprinkler System.

12    As Councilman Cortes mentioned, they'll be onsite this

13    week to start the project.

14          We're revisiting the kayak ramp

15    proposal for Lake Louise, not on Lake Louise itself but

16    on a street end around Randall, to see how viable that

17    is.

18          There's a large tree on the corner of

19    Central and St. Louis that has come at several

20    meetings, and we're suggesting a "Stop Sign Ahead" for

21    that location because you can't see traffic because the

22    tree is so big.

23          (Indiscernible) started yesterday.  The

24    second starts next Monday.  They're absolutely vital to

25    getting our work done that we need.

57

1           The tax rate was certified.   The

2    fourth-quarter bills are being processed and will be

3    mailed shortly.

4           On the quality-of-life front, we have a

5    couple of different things here.   Let's see.

6           The first thing is the newsletter.

7    That's being reduced to two pages.   That will be done

8    within the next week and going out to the printer.

9           Offshore wind, we continue to monitor

10   that, and we're drafting three different sets of

11   comments to be submitted for pubic comment.

12          The Electronic Vehicle Charger Grant,

13   we had a meeting with -- with John Trout and an EV

14   charger electrician.   It's scheduled for the coming

15   week to evaluate where that's going to be going.

16          The next (indiscernible) grant that I

17   mentioned at the last Council Meeting, that deadline is

18   August 10th.   It's being submitted in just a few days.

19          And the pop-up shop program that I keep

20   mentioning, the inventory is finally completed and

21   collated (indiscernible) targeted shops and crafters as

22   well.   We -- we left a message for the Chamber of

23   Commerce on landlord information, and we're looking to

24   finish that out.   And we also need to recreate the

25   pop-up fee, which will be an ordinance, finish the logo

58

1    and the mission statement.

2           The Senior Committee, we have the

3    senior survey call with Katie York from Montclair to

4    understand how that town (indiscernible).  It went

5    really well.

6           The Mayor's Health Campaign, we're

7    going to be targeting obesity, smoking, vaping,

8    drinking and mental health depression.

9           The bike racks that were mentioned

10    earlier, we have the town locations all mapped out

11    already.

12           And the census is coming to the farmers

13    market on (indiscernible).  We'll hand out fliers and

14    enumerate on the spot.  We also have Spanish language

15    literature that's going to be dropped off to our -- our

16    Spanish-speaking population and then disseminated

17    amongst them as well.

18           And, other than the, the Municipal

19    Alliance Grant amounts were calculated.  We're going to

20    bring in, I believe, a total of $3,000 from the County.

21    We did speak to a Point Committee member.  That should

22    be on the next Council agenda as well.

23           That's it from me.

24           Eileen, I think Councilwoman Testa had

25    something.

59

1                   COUNCILWOMAN TESTA:  Yes.  Yes.

2                   I wanted to know if the basketball was

3      put on the agenda tonight for St. Peter's for the

4      basketball, like the girls have on Monday night for the

5      high school?  I don't see it on there.  Was it added?

6                   MS. FARRELL:  I have not received

7      anything about that.

8                   COUNCILWOMAN TESTA:  Oh, you haven't?

9      Because I was under the impression that it was going to

10     be on tonight.

11                  COUNCILMAN VITALE:  Is that Hoop Group?

12                  MAYOR KANITRA:  (Indiscernible)

13                  COUNCILMAN VITALE:  Is that Hoop Group?

14                  COUNCILWOMAN TESTA:  Yeah, Hoop Group.

15                  MS. FARRELL:  Oh, Hoop Group is on the

16     agenda.

17                  COUNCILWOMAN TESTA:  I didn't see it.

18     I apologize.  Hoop Group --

19                  MS. FARRELL:  That's Item 1t).

20                  COUNCILWOMAN TESTA:  One t)?

21                  MAYOR KANITRA:  (Indiscernible)

22                  COUNCILWOMAN TESTA:  I'm sorry.  What

23     is it?

24                  MS. FARRELL:  It's 1t) as in "Tom."

25                  COUNCILWOMAN TESTA:  Thank you so much.

60

1                MS. FARRELL:  You're welcome.  Sorry.

2                COUNCILWOMAN TESTA:  That's okay.  I

3    have my hard copy.  I didn't -- I didn't look online.

4    So that's why.

5                Thank you.

6                MS. FARRELL:  You're welcome.

7                MAYOR KANITRA:  Eileen, are you done

8    with everything for the -- for the agenda?

9                There's no Administrator's report

10   because Christine is not here.

11               MS. FARRELL:  Since the last -- since

12   the agenda was last posted, you'll notice on the

13   ordinances tonight, Ordinance 20-15 has been revised.

14   That was just reposted on the agenda page on the

15   website this evening.

16               Also, since it was originally posted,

17   we have the additions of Items 1s), 1t), 1u), 2e) and

18   2f).  And we are adding to the agenda Item 1v), the

19   authorization to enter into a license agreement for 115

20   Arnold Avenue contingent upon building department

21   requirements.

22               That's it.

23               MAYOR KANITRA:  Okay.  We're ready for

24   first public participation.

25               Councilman Vitale, are you ready for

R. Moreau                                    61

1   that, to unmute everybody?

2                    COUNCILMAN VITALE:  Yes.

3                    Everyone could unmute themselves.  And

4   remember star-six if you have a landline.

5                    COUNCILMAN CORTES:  And please remember

6   to mention your name and address.

7                    MR. RIORDAN:  And just let me remind

8   everybody that this is agenda items and ordinances on

9   first reading only.  So this is not the ordinances on

10  second reading.  I believe the only ordinance on first

11  reading is the -- the Skateboard Park Ordinance.

12                   COUNCILMAN CORTES:  Correct.

13                   MR. MOREAU:  Hello.

14                   MAYOR KANITRA:  Hello.

15                   MR. MOREAU:  Yeah, hi.

16                   This is Rob Moreau.

17                   MAYOR KANITRA:  Dr. Moreau, how are

18  you?

19                   MR. MOREAU:  Just fine.  How are you,

20  Mayor?

21                   MAYOR KANITRA:  Good, thank you.

22                   MR. MOREAU:  So how do we speak to a

23  second reading agenda?  Do we get to speak to that

24  before it is --

25                   COUNCILMAN CORTES:  Yes.

R. Moreau                                      62

1          MR. RIORDAN:  Yes.  The -- the

2    ordinance has a second reading that will be open to the

3    public later on in the agenda.

4          MR. MOREAU:  Perfect.  Thank you.

5          I'd like to ask about the -- the

6    payment to the psychologist for $10,500 for 21

7    policemen.  That means that each of the policemen had

8    ten hours of psychological counseling or testing.  Is

9    that correct??

10         MAYOR KANITRA:  Captain, I know you're

11   on the line.

12         My understanding is that every single

13   police officer that comes in needs to undergo a

14   psychological evaluation.  And that's standard process

15   for the state.

16         Captain, do you have anything to add?

17         CAPTAIN:  That's correct.  That was for

18   the new employees, some of them that went to the police

19   academy.  There's an initial screening that they're

20   screened and -- and they see the psychologist.  They go

21   to medical appointments and -- and -- and -- and, you

22   know, stress tests and stuff like that.  That's part of

23   the screening to go to the police academy and to become

24   a police officer, yes.

25         MR. MOREAU:  But it seems that the

R. Moreau                                      63

1   psychologist for 21 was -- we're -- we're paying --

2   Point Pleasant Beach is paying a psychologist ten times

3   the going rate.

4                    CAPTAIN:  Per candidate -- it's $500

5   per candidate.

6                    MR. MOREAU:  So that -- that means ten

7   hours of work, Captain.  Is that correct?

8                    CAPTAIN:  Excuse me?

9                    MR. MOREAU:  Then that would mean ten

10  hours of work on the psychologist's part per candidate.

11  Is that what -- what you see as happening?

12                   CAPTAIN:  No, that -- that is

13  incorrect.  I don't if the -- the number is there with

14  the 21.  We sent 30 -- 31 candidates to the

15  psychologist.

16                   MR. MOREAU:  Okay.  It says 21 on

17  the --

18                   CAPTAIN:  Yeah, I do see that.

19                   MR. MOREAU:  -- agenda.

20                   CAPTAIN:  Yep.

21                   MR. MOREAU:  Okay.  I -- I just --

22  maybe -- I don't know how we'd look into that but that

23  -- the average psychologist rate is (indiscernible) an

24  hour.  So if -- if -- if they're just getting an hour,

25  they're getting charged -- we're getting charged, as

**R. Moreau**                                                64

1   taxpayers, $500 an hour.

2                CAPTAIN:  Yeah.  I don't know the exact

3   amount of time they spend on each candidate.  That does

4   vary.

5                MR. MOREAU:  Can you find out?

6                CAPTAIN:  Absolutely.

7                MR. MOREAU:  Thank you.

8                Also, re -- regarding the $10,000 for

9   45 Glocks -- Glock 45's, excuse me, that means there's

10  10 Glocks that you're purchasing?

11               CAPTAIN:  I can't see the -- the -- the

12  -- I can't see the whole thing there.  Okay.  That is

13  for equipment.  That was for belts, duty belts for the

14  officers and --

15               MR. MOREAU:  Which are -- which are 30

16  to 50 dollars each .  And Glocks run from between 400

17  to 700 dollars per Glock.  So I'm just wondering how do

18  we get to $10,000?

19               CAPTAIN:  Okay.  Well, it says for 45

20  Glocks, belt keepers, cuff cases, etc.  So I'd have to

21  look at obviously the -- the invoice itself.

22               MR. MOREAU:  Well, how many Glocks are

23  we purchasing?

24               CAPTAIN:  That isn't for the weapons.

25               MR. MOREAU:  Say what?

R. Moreau                                            65

1              CAPTAIN:  It's for equipment.  That's

2      for -- that's for holsters, belt -- belt keepers, cuff

3      cases, and, like I said, it says et cetera, so I'd have

4      to look at the whole --

5              MR. MOREAU:  Yeah.  We really need to

6      see the et cetera, et cetera before we vote on this

7      because, like I say, a belt keeper costs about 50

8      bucks.  A cuff case is 20 tops, and the Glocks

9      themselves are 4 to 700 dollars.  So $10,000 is a lot

10     of et cetera.

11             CAPTAIN:  Right.  We -- we didn't order

12     45 belts.  We ordered 75 of each of those and --

13             MR. MOREAU:  Seventy-five?

14             CAPTAIN:  Yes.

15             MR. MOREAU:  How many police do we

16     have?

17             CAPTAIN:  We have approximately 35

18     Class 2 Officers, and we have about 30 Class 1

19     Officers.

20             MAYOR KANITRA:  Excuse me.  Can I ask

21     the Borough Attorney -- excuse me, Kevin.  Does -- does

22     the Captain need to be interacting in the -- in the

23     comment or that just a courtesy?

24             MR. RIORDAN:  That's up to the Mayor

25     and Council as to whether or not they would like the --

R. Moreau                                          66

1   like the Captain to be answering these questions.

2                  One option, of course, is to ask that

3   the -- that the questioner and the Captain have this

4   discussion at another time.

5                  MR. MOREAU:  Well, that's not possible

6   because we're voting on putting this money out, Kevin.

7                  MAYOR KANITRA:  You have to understand

8   too that tactical equipment is more expensive than the

9   equipment that you and I would buy because it's

10  ruggardized and it has --

11                 MR. MOREAU:  I went on the website.  I

12  went on Atlantic Tactical's website for these things,

13  Paul.

14                 MAYOR KANITRA:  Okay.

15                 MR. MOREAU:  So --

16                 MAYOR KANITRA:  Do we have an itemized

17  -- is there not an itemized receipt, Captain?

18                 CAPTAIN:  Oh, yes, there is.  I'd have

19  to speak to the -- to the secretary and -- and get

20  that.  I don't have that on me right now.

21                 MR. MOREAU:  (Indiscernible) being able

22  to be looked at.

23                 MR. RIORDAN:  Mr. Mayor, it was looked

24  at.  It's part of the packet for the Councilmen.

25                 MAYOR KANITRA:  Hold on.  Give me one

**R. Moreau**                                    67

1    second and I'll put it up.

2                     MR. RIORDAN:  I'm pretty sure.

3                     What's the -- what's the agenda item?

4                     MAYOR KANITRA:  It's -- Doug, you're

5    scrolling -- oh, you're going through the --

6                     MS. FARRELL:  It's Item 2c).

7                     MR. RIORDAN:  Thank you, Eileen.

8                     MAYOR KANITRA:  Eileen, do you have the

9    form that --

10                    MS. FARRELL:  I have the invoice that

11   goes with the purchase order.  It's several pages.  Let

12   me see.

13                    MR. RIORDAN:  It's part of the packet,

14   right, Eileen?

15                    MS. FARRELL:  It is part of the packet,

16   yes.

17                    Let's see.

18                    It looks like -- I mean, I don't know

19   what a lot of this stuff is.  Belts, cuff, mace,

20   Glocks.  You know, I don't know what -- what any of

21   this is.

22                    MR. MOREAU:  Okay.  Has anyone on the

23   Council or the Mayor looked at this -- looked at this

24   invoice?

25                    MAYOR KANITRA:  I reviewed the -- I

R. Moreau                                                68

1   reviewed the package just like everybody else, I

2   assume.

3                   COUNCILMAN VITALE:  I reviewed the

4   package as well.

5                   COUNCILMAN CORTES:  We look over the

6   packet and --

7                   MAYOR KANITRA:  I didn't memorize the

8   number of belts and -- and pieces and everything.  I

9   mean, it was itemized in our packet.

10                   MR. RIORDAN:  And it was probably

11   reviewed by the Police Committee, depending upon what

12   they were able to do in light of the pandemic.

13                   COUNCILMAN VITALE:  Right.

14                   MR. RIORDAN:  Okay.  There was --

15                   MR. MOREAU:  These numbers just seem

16   out of whack to me.  And I apologize for that.  In the

17   agenda it seems like we're buying a -- a single Glock.

18   And, you know, 10,500 is just a lot of money.  I

19   appreciate if that was opened to the public.

20                   MAYOR KANITRA:  I don't know what the

21   practice is on that, Rob.  Sorry.  But I know that I

22   looked over it, and I'm sure my fellow Council Members

23   did.  And when I looked at it, nothing seemed out of

24   whack to me.  It's, like, a big order.  It's definitely

25   a big order but I assume that that was because they

R. Moreau                                      69

1    were buying (indiscernible) too.

2                    COUNCILMAN CORTES:  Forty-five Glock,

3    17 Algins (phonetic) right hand.  Seventy-five --

4                    CAPTAIN:  That's referring to the

5    holsters, sir.

6                    COUNCILMAN CORTES:  Okay.  This is

7    Councilman Cortes.

8                    Seventy-five patrol tech belt keepers,

9    seventy-five nylon duty belts, seventy-five cuff cases,

10   mace holders, forty-five molded double mag pouch.

11   Okay.

12                   MR. MOREAU:  Councilman Cortes.

13                   COUNCILMAN CORTES:  Yes.

14                   MR. MOREAU:  How many shootings have we

15   had in Point Pleasant Beach?

16                   COUNCILMAN CORTES:  It's not a matter

17   of that.  I understand what you're saying, but they do

18   have to possess a weapon and they do have to train from

19   what I understand.

20                   MAYOR KANITRA:  Dr. Moreau, we've hit

21   -- we've hit a three-minute limit for you.

22                   MR. MOREAU:  All right.

23                   MAYOR KANITRA:  And I wish they

24   (indiscernible).  They're pulling knives and guns off

25   of people in other shore towns, and I certainly would

M. Steiner                                    70

1    not want to be not prepared.

2                    So I'm sorry, but thank you very much.

3            Who's next?

4            MS. STEINER:  Mary Steiner.

5            Hello.

6            MAYOR KANITRA:  Yes, Mary.

7            MS. STEINER:  Mary Steiner, 423 Yale

8    Avenue.

9                    And I have some questions about the

10   skateboard park.

11                   Who is going to be opening it and

12   closing it?  Who is going to be supervising to make

13   sure the rules are being adhered to?  And, most

14   importantly, in the ordinance I do not see anything --

15   the Mayor and I were down there and two children asked

16   whether we could -- they could have BMX bikes, regular

17   bikes and scooters in the skateboard park so...

18                   MAYOR KANITRA:  That's a -- that's a

19   good question for the Borough Attorney.

20                   Have we specifically outlawed those

21   kinds of things at the skateboard park?

22                   MR. RIORDAN:  Well, at the present time

23   it says it's a skate park, so we're talking about

24   skateboards.  If somebody thinks those things should be

25   permitted, then that -- the ordinance could be altered

M. Steiner                                                    71

1    to allow them.  At the present time, they're not

2    allowed.

3                    MAYOR KANITRA:  Can we -- could we make

4    a motion for this -- for this meeting?

5                    MR. RIORDAN:  This is -- this ordinance

6    is on for first reading.  So if you guys wanted to make

7    changes to it like that to allow those kinds of -- of

8    vehicles, that could certainly be done.  You might want

9    to get input from the Rec. Committee on it.  They,

10   after all, are the ones who are -- to answer the first

11   part of the question -- are mostly in charge of some of

12   the procedures and enforcement, although the

13   Administration is in charge of the Rec. Committee, and

14   the police department will have a hand.

15                   MAYOR KANITRA:  Mrs. Steiner, I -- I'm

16   happy to have Councilman Vitale, who is the head of the

17   Rec. Committee and who's been working -- working on

18   this project to -- to look into.  You know, I'm -- I

19   don't think that that's something that even the

20   skateboard community would be (indiscernible).  Nobody

21   wants it getting messed up.  Would you be okay if we

22   looked at that and added it as an amendment possibly at

23   the next reading?

24                   COUNCILMAN VITALE:  Sure, I'll take a

25   look.

M. Steiner                                     72

1        COUNCILMAN CORTES:  If -- if that's the

2   case, this is on for first reading.  If we hold it,

3   then you can make some adjustments.

4              Correct, Mr. Riordan?

5        MR. RIORDAN:  Absolutely.  And somebody

6   correct me if I'm wrong because I -- I have lost my

7   enthusiasm for watching the Governor, not through any

8   fault of his, other than, you know, it just got to be

9   too much.  But I don't believe that he has yet allowed

10   the type of activity that would be a skateboard park.

11              Does anybody know if I still have that

12   right?

13        COUNCILMAN SANTANELLO:  I'm not sure.

14              This is Councilman Santanello.

15              But I do want to say that I would be

16   against adding other types of equipment onto the

17   skateboard park.  Now, I want to make sure that I

18   understand.  We're not talking about adding BMX bikes,

19   are we?

20        MR. RIORDAN:  That's what I believe the

21   suggestion was, Councilman.

22        COUNCILMAN SANTANELLO:  Well, I would

23   be against that.  I mean, it's a skateboard park.  If

24   you're talking about BMX bikes, they cause a lot more

25   damage than a skateboard does.  And the thought of

M. Steiner                                              73

1   having BMX bikes flying through the air next to kids

2   that are on skate parks -- skateboards, I would be

3   totally against.

4                    MR. RIORDAN:  And I know this is going

5   to shock the Councilman, but I actually know absolutely

6   nothing about what you're talking about which is why I

7   suggested it be referred to the Rec. Committee.

8                    MAYOR KANITRA:  If -- if everybody's

9   fine with it, I don't know if there's anybody up here

10  that wants (indiscernible).

11                   COUNCILMAN CORTES:  My issue is we

12  introduce --

13                   A FEMALE VOICE:  (Indiscernible)

14                   COUNCILMAN CORTES:  -- it tonight and

15  then we make changes, we're going to have to

16  reintroduce it again.  So do we hold it again?  I know,

17  Bob, we've held it once before.  Do we hold it again,

18  make changes and then introduce or what?  What's your

19  pleasure?

20                   COUNCILMAN SANTANELLO:  Well, can

21  everybody -- can everybody else chime in.  Do you -- do

22  you think we should add these things because I don't.

23  I think it should be skate -- skateboards only.

24                   MAYOR KANITRA:  You're not hearing it

25  correctly.

M. Steiner/V. Castin                              74

1                    Mrs. Steiner and I were --

2                    MS. STEINER:   Excuse me, everybody.

3      Everybody.   My question was, if you only want

4      skateboards allowed it should be put in the ordinance

5      that you're banning everything else, BMX bikes and

6      scooters.   That was my question.

7                    MR. RIORDAN:   While I appreciate that

8      comment, ladies and gentlemen, it is unnecessary.   As

9      written the ordinance bans them.

10                   COUNCILMAN SANTANELLO:   Okay.   Thank

11     you.

12                   MAYOR KANITRA:   Okay.

13                   MR. CASTIN:   Okay.   I'm next.

14                   MAYOR KANITRA:   Okay.   Who's that?

15                   MR. CASTIN:   Me, Cousin Vinny.

16                   Can you hear me?

17                   MAYOR KANITRA:   Yeah.   Go ahead.

18                   Say your address and get going.

19                   MR. CASTIN:   Oh, 15 Trenton, Point

20     Pleasant Beach.

21                   Okay.   A couple of things.

22                   One f) that -- I'm not sure I

23     understand that surface thing.   Maybe Andy, Mr. Cortes,

24     can help me out.   Is that -- is that a -- a fixed piece

25     that's going on there or is that --

**V. Castin**                                                    75

1            COUNCILMAN CORTES:  I will help you

2     with that.

3                    That is a fixed piece that will be

4     contoured to the shape of the playground, which I still

5     believe the border is rectangular and will be cut

6     around whatever holes are supporting the equipment.

7     And it is an approved mat.  You either have to have

8     that or some granularized rubber, certain rubber or

9     certain play sand.  And we all know with wind and just

10    a normal high tide, you know, and even a storm, the

11    sand has been coming over mixing in, regular beach-type

12    sand mixing in with the play sand.  It had to be

13    removed and new sand put in.  We've done that, oh, more

14    than, I don't know, a half a dozen or more times since

15    it's been done.  So this -- this is approved by

16    whatever, playground equipment, you know, companies,

17    and our insurance company, the JIF.  You have to have a

18    soft material under any playground equipment.  But it

19    is fixed, yes.

20            MR. CASTIN:  Oh, it's going to be -- it

21    won't -- when that water from the inlet washes over,

22    that's not going to take that away?

23            COUNCILMAN CORTES:  No, it's not.  From

24    what I understand it's not going to --

25            MR. CASTIN:  Okay.

**V. Castin**                                                  76

1           COUNCILMAN CORTES:  If any sand gets on

2    it, they can just take the -- the blowers that they

3    use, you know, landscaping-type blowers, and just blow

4    the sand off of it, and it's good to go.  We don't have

5    to purchase sand and spend the time down there removing

6    the old sand and putting new sand in.

7           MR. CASTIN:  Okay.

8           COUNCILMAN CORTES:  I don't know.  I

9    grew up playing on rocks and metal sliding boards.  You

10   learn from mistakes.

11          MR. CASTIN:  I played stick ball on

12   tarred streets.  How does that sound?

13          COUNCILMAN CORTES:  There you go.

14          MR. CASTIN:  One e), we're paying flood

15   insurance for 1000-1002 Ocean Avenue.  Where -- where

16   is that?

17          COUNCILMAN CORTES:  That would be --

18   1000?  Well, if 900 Ocean Avenue is the end of New

19   Jersey, the condos, then 1000 and 1002 has to be the

20   bathhouse that has the Food Shack in it.

21          MR. CASTIN:  That's our property?

22          COUNCILMAN CORTES:  Yeah, that -- that

23   bathhouse.  Yeah.  And the -- you know, the concession

24   stand, the old -- you know, the Risdens bathhouse.  We

25   own them.

**V. Castin**                                              77

1              MR. CASTIN:  Oh, okay.  That -- that

2     one down there.  Okay.

3              MR. CORTES:  Huh-huh.

4              MR. CASTIN:  Yeah, got it.

5              Okay.  Real quick.  On the 2d), I'm not

6     -- I'm not going to get into that because I think it's

7     been covered, the tactical stuff and all that.

8              And to go along with that, open system

9     integrators for the police station sound system, what

10    exactly are those?  What's an open system integrator?

11             COUNCILMAN CORTES:  The Mayor is going

12    to have to handle that, you know.

13             MAYOR KANITRA:  Can you go to the

14    number, Doug.  Where are we talking about?

15             COUNCILMAN VITALE:  Two f).  It's on

16    the screen.

17             MAYOR KANITRA:  Two f) is the open

18    system integrators.  That's the speakers or on the

19    boardwalk for the National Anthem and for telling our

20    visitors of our ordinances and the fines.

21             MR. CASTIN:  Oh, oh, okay.  Okay.

22             And on the boardwalk, I know there's no

23    smoking up there now, but I think you ought to take a

24    look at this, Mr. Mayor.  The largest "No Smoking"

25    signs should be on the boardwalk access ramps and also

1   larger cigarette dispense containers as opposed to

2   those little, tiny one there.  It might help people to

3   see it and put their cigarettes out before they get up

4   there.  I think we've had them before.

5                    MAYOR KANITRA:  And, Vince, just so you

6   know, we are making metal signs that are going to

7   attach to the railing of the boardwalk right next to

8   every access point, but they're not going to be ready

9   till next season, and they're going to clearly state

10  what our rules are.  They're going to be graphically

11  pleasing so that people just don't glaze over them.

12                    Okay, Vince, back to --

13                    MR. CASTIN:  Good Okay.

14                    MAYOR KANITRA:  Thank you.

15                    Next?

16                    MR. CASTIN:  Now, wait, wait.  This is

17  not a question.  This is a statement, and I'd like to

18  be clear on this.  I heard dissertation between

19  yourself and Mr. Santanello.  And I'd like to say that,

20  as we all know, the Council is there to work together

21  as a team.  We've all played sports.  I have and I know

22  you guys have.  You don't love everybody there, but the

23  goal is the same for everybody, to win.  And I think,

24  you guys, should maybe shake hands a little bit.  And,

25  everyone, you've got to agree to disagree.  But I think

V. Castin/D. Cavagnaro                                   79

1    for the -- for the benefit of the town and -- and for

2    the (indiscernible) itself, I -- I think you guys out

3    to maybe get together, have a beer or something,

4    because I love you both.  I think you're both bright,

5    intelligent guys.  But you can't miss -- you can't miss

6    to get together on that.

7                    MAYOR KANITRA:  Thank you, Vince.

8                    COUNCILMAN SANTANELLO:  Appreciate it,

9    Vince.

10                   MAYOR KANITRA:  Okay.  Who's next?

11                   MR. CAVAGNARO:  Dave Cavagnaro, 118

12   Parkway.

13                   MAYOR KANITRA:  Councilman, go ahead.

14                   MR. CAVAGNARO:  Good evening, everyone.

15                   Two quick things, I hope.

16                   Mayor, I'm not sure.  Did you reference

17   a tree on Central and St. Louis by a stop sign?  And,

18   if so, what was the comment because I think I missed

19   it?

20                   MAYOR KANITRA:  Yes.  Let me just pull

21   up all my notes.  It's come up at meetings in the past

22   that it's apparently too large so we're working on a

23   "Stop Sign Ahead" sign so people can (indiscernible).

24                   MR. CAVAGNARO:  Okay.  I heard that

25   before.  I just -- I thought there was something

D. Cavagnaro                                80

1    changing.  But, okay, good.  Thank you.

2              And I understand that the skateboard

3    park as changed very recently.  What changes occurred

4    from the first reading?

5              MAYOR KANITRA:  I believe the only

6    change was the concept of displaying versus having

7    permits (indiscernible) because we're looking at a pink

8    board permit and an electronic app.  And this would

9    allow for that where it isn't necessary that

10   (indiscernible).

11             Is that correct, Councilman Vitale and

12   Kevin?

13             MR. RIORDAN:  In addition, I believe

14   the opening hours were changed from 10 a.m. to 8 a.m.,

15   and the COVID-specific sections of the ordinance were

16   moved to a section of the ordinance which references

17   the public health emergency and has them in place only

18   during public health emergencies as declared by the

19   Point Pleasant Beach Office of Emergency Management.  I

20   think I've got them all.

21             COUNCILMAN SANTANELLO:  There was one

22   more that we talked about.  How it's only a sticker

23   with just the permit number rather than personal

24   information.

25             MR. RIORDAN:  Right.  And that's the

D. Cavagnaro                                   81

1      change that was made this afternoon.

2                   COUNCILMAN SANTANELLO:  Correct.  No

3      further ones were made --

4                   COUNCILWOMAN TESTA:  It's also the

5      amount of -- the amount of skaters that are allowed in

6      there or am I wrong?

7                   MR. RIORDAN:  No, very -- you're right,

8      Councilwoman.  It makes it 13.

9                   COUNCILWOMAN TESTA:  Thank you.

10                  MR. CAVAGNARO:  Thanks for the

11     information.

12                  MAYOR KANITRA:  Okay.  Thank you, Dave.

13                  Who's next?

14                  Okay.  All right.  Unless there's

15     anybody else, can I get a motion to close public

16     participation and adopt the consent resolutions?

17                  COUNCILWOMAN TESTA:  I motion for the

18     closed public session.

19                  COUNCILMAN VITALE:  I'll second that.

20                  COUNCILMAN CORTES:  Is that just to

21     close public?  Be specific.

22                  MS. FARRELL:  That -- was that motion

23     to close and adopt?

24                  COUNCILWOMAN TESTA:  Yes.

25                  MS. FARRELL:  Councilman Vitale.

82

1          COUNCILMAN VITALE:  Yes.

2          MS. FARRELL:  Councilwoman Testa.

3          COUNCILWOMAN TESTA:  Yes.

4          MS. FARRELL:  Councilwoman Byrnes.

5          COUNCILWOMAN BYRNES:  Yes.

6          MS. FARRELL:  Councilman Cortes.

7          COUNCILMAN CORTES:  I'm going to vote

8   no on 1m) and 1d) as in "David," yes on everything

9   else.

10          MS. FARRELL:  So that's no on 1m) as in

11   "Mary" and 1d) as in "David."

12          COUNCILMAN CORTES:  Correct.

13          MS. FARRELL:  Council -- Councilman

14   Santanello.

15          COUNCILMAN SANTANELLO:  Okay.  So no on

16   1d) as in "David," no on 1m) as in "Mary," no as 1p) as

17   in "Peter," and then abstain on 2c), d), e) and f).

18          MS. FARRELL:  Okay.  So that's 2c), d),

19   e) and f)?

20          COUNCILMAN SANTANELLO:  Two c) as in

21   "Charlie, d) as in "David," e) as in "Edward," f) as in

22   "Frank."

23          MS. FARRELL:  Okay.

24          COUNCILMAN SANTANELLO:  And yes to

25   everything else.

83

1              MS. FARRELL:  Councilman Migut.

2              COUNCIL PRESIDENT MIGUT:  Yes but

3    abstaining as necessary on 2a).

4              MS. FARRELL:  Okay.  All right.

5              We have a couple of ordinances on for

6    second reading.

7              The first ordinance is <u>Ordinance 2020-</u>

8    <u>12, An Ordinance Of The Borough Of Point Pleasant</u>

9    <u>Beach, Amending Chapter XXI, Beaches, Of The Revised</u>

10   <u>General Ordinance Of The Borough Of Point Pleasant</u>

11   <u>Beach.</u>

12             MAYOR KANITRA:  Okay.  I'm going to

13   open it up for public participation.  If there's

14   anybody on this one.

15             Doug, can you scroll up.  Thank you.

16             MR. CASTIN:  What are the changes?  I

17   don't have a copy of that.

18             MAYOR KANITRA:  Kevin, would you like

19   to replay the changes for Vince?

20             MR. RIORDAN:  Well, no, no, no.  The

21   -- the ordinance in -- this is an ordinance on second

22   reading, so there are no changes.  This is the same

23   ordinance that was read the last time.

24             MR. GASIOROWSKI:  We -- we actually do

25   have a comment about the ordinance.

**R. Gasiorowski**                                    **84**

1              MS. FARRELL:  Please give your name and

2       add -- your name and address.

3              MR. GASIOROWSKI:  Good evening.

4              Can you hear me?

5              MAYOR KANITRA:  We can hear you.

6              MR. GASIOROWSKI:  My name is Ron

7       Gasiorowski.

8              I'm an attorney with an office in Red

9       Bank, New Jersey, and I represent the Storino Family

10      who are the primary owners of all of the

11      (indiscernible) property which I believe is referred to

12      in the ordinance which is being considered this

13      evening.

14             I wrote an email to the Mayor, to the

15      -- Mr. Riordan as well as the Members of the Council

16      and I'd like to know whether or not you've all received

17      it.

18             COUNCILMAN CORTES:  Yes.

19             MR. GASIOROWSKI:  I'm sorry?

20             MAYOR KANITRA:  Yes, we received it and

21      we also received a memo from the Borough Attorney

22      afterwards.

23             MR. GASIOROWSKI:  Was that memo emailed

24      to me because I didn't see it?

25             MAYOR KANITRA:  No, it was just for the

R. Gasiorowski                                    85

1   governing body, actually.

2                MR. GASIOROWSKI:  Okay, fine.

3                Rather than go through the letter which

4   I think is self-explanatory, I'd like to raise a couple

5   of questions with comments that were made this evening,

6   particularly, by the Mayor after Councilman Santanello

7   spoke.

8                You know, I think the words "cronyism"

9   and "lackey" are, in fact, pejorative and would

10  indicate that if, in fact, a Council Member is

11  practicing cronyism or was serving as the lackey for

12  someone, they'd be doing it in conjunction with another

13  person who is not --

14               MAYOR KANITRA:  I have a question for

15  the Borough Attorney, if you don't mind.  Excuse me for

16  one second.

17               Excuse me, Kevin, Borough Attorney,

18  considering that the gentleman on the line has

19  threatened in public comment and letter a lawsuit

20  against the Mayor and the Council, should I even be

21  responding to any of this or would that basically be

22  like some sort of cross-examination or something like

23  that?  It would seem like it veers away from normal

24  public comment.

25               MR. RIORDAN:  In -- in general, I would

R. Gasiorowski                                    86

1      -- I would recommend that Mr. Gasiorowski be permitted

2      to speak, but I would encourage all members of the

3      governing body to not answer any questions.  Litigation

4      is likely.  And at that point there will be time to

5      answer questions in a different forum.

6                    MAYOR KANITRA:  Great.  Thank you very

7      much.

8                    MR. GASIOROWSKI:  Well, at this public

9      forum -- at this public forum, the Mayor specifically

10     accused Council Members of cronyism and serving as a

11     lackey for certain interests.  I want to know who he

12     was referring to, as to whose interests they were

13     serving, who were they cronies with and who were they a

14     lackey to?

15                   MR. RIORDAN:  No, I'm going to direct

16     him --

17                   MR. GASIOROWSKI:  He raised that in his

18     vitriolic comments this comments and he should be man

19     enough to answer them.

20                   MR. RIORDAN:  And I'm going to direct

21     him not to answer it.

22                   Thank you.

23                   MR. GASIOROWSKI:  On what basis?

24                   MAYOR KANITRA:  This isn't a courtroom.

25     This is our Council Meeting.

R. Gasiorowski                                        87

1          MR. GASIOROWSKI:  This is not a

2     courtroom, but this is a public hearing of a public

3     body, and at this public meeting which is being

4     broadcast you have impugned -- impugned the reputations

5     of members of this community, which at this particular

6     time is unknown.  Now, clearly, you were referring to

7     specific people.  Be man enough to tell us who you were

8     referring to.

9          MR. RIORDAN:  There will be a time and

10     a place for that, Mr. Mayor.  This isn't it.

11          MR. GASIOROWSKI;  Well, isn't this a

12     matter of public knowledge for today?  Are -- aren't

13     the citizens of Point Pleasant Beach entitled to know

14     who he's accusing of something?

15          MR. RIORDAN:  Mr. Gasiorowski, if you

16     have no more comments on the ordinance, we can move on.

17          MR. GASIOROWSKI:  I have further

18     comment.  Please don't cut me off.  This is a very

19     important matter.

20          MR. RIORDAN:  All right.  Then move on

21     to the ordinance.

22          MR. GASIOROWSKI:  The Mayor also said

23     that ceratin actions were destroying the fabric of the

24     community.  Who was he referring to?

25          MR. RIORDAN:  Mr. Gasiorowski, I'm not

R. Gasiorowski/R. Moreau                    88

1   going to ask you again.  Move on to the ordinance or

2   we're going to move on to somebody else.

3                  MR. GASIOROWSKI:  Move on to the

4   ordinance?  Well, I've stated my opinions quite

5   clearly.  What I really find troubling -- what I really

6   find troubling are the accusations of a Mayor in his

7   public comments which, as far as I'm concerned, have

8   been harmful to my client.  Let him say specifically

9   what it is that they are doing that is wrong.

10                  MR. RIORDAN:  Mr. Gasiorowski, you have

11  threatened to sue the Mayor and the governing body.

12  I'm going to ask them not to answer your questions

13  unless and until we get to that forum.

14                  Thank you.

15                  MR. GASIOROWSKI:  Let's make one thing

16  very clear.  This is not a threat.

17                  MR. MOREAU:  May I speak regarding the

18  ordinance?

19                  MAYOR KANITRA:  Who is that?  My -- my

20  screen froze a little bit.  Who's that?

21                  MR. MOREAU:  This is Rob Moreau, 208

22  River Avenue.

23                  MAYOR KANITRA:  Sure, Dr. Moreau.  Go

24  ahead.

25                  MR. MOREAU:  Thank you.

R. Moreau                                89

1           I -- I -- I just think that this

2      ordinance is incredibly broad, and one of the

3      statements says if anybody right next to you is

4      bothering you, that's not acceptable.  And, of course,

5      this is going to initiate court proceedings.

6           MAYOR KANITRA:  Dr. Moreau, that's not

7      accurate.  I -- I have to correct you there.  I'm so

8      sorry.

9           It's -- it's basically saying if you're

10     playing -- if you're playing your music so loudly that

11     you're disturbing someone else, that that's not

12     allowed.

13          MR. MOREAU:  That's not the way it's

14     written, Paul, honestly.  Look at it, please.  There's

15     such -- I could give you the letter of it, but it is so

16     broad that it's just -- it's not that specific.  I wish

17     it were.

18          MR. RIORDAN:  Let me interrupt for just

19     a second, Doctor.

20          MR. MOREAU:  Yeah.

21          MR. RIORDAN:  The section of the

22     ordinance that you're talking about --

23          MR. MOREAU:  Yeah.

24          MR. RIORDAN:  -- is borrowed from an --

25     from the ordinance that's been -- has been in effect

**R. Moreau**                                                    90

1    and has been being enforced on the Maryland Avenue

2    Beach for over a decade, and that ordinance is mod --

3    is modeled on what Seaside Park, Seaside Heights and

4    virtually every town up and down the shore has in their

5    ordinance.  So those sections of the ordinance are not

6    really what Mr. Gasiorowski has a problem with or --

7              MR. MOREAU:  I don't care about Mr.

8    Gasiorowski.  I care nothing about that.

9              It honestly is -- the fact that it is

10   so broad that a person could say you're bothering me

11   and it would have to, under this ordinance, it would

12   have to be enforced by the police.

13             MR. RIORDAN:  That's not the way that

14   ordinance has been enforced down the Jersey Shore for

15   more than a decade.  I'm sure that's not the way it

16   will be enforced in our town.

17             MR. MOREAU:  But you're memorializing

18   it as such.  Now, you can say that it won't be enforced

19   that way, but you're legalizing the enforcement of it.

20   So that -- that's just not the case, Kevin.

21             MR. RIORDAN:  Doctor, that's not what

22   the ordinance says.  I don't practice veterinary

23   medicine.  You shouldn't tell me what the ordinance

24   says.

25             MR. MOREAU:  I can -- I can read

R. Moreau                                      91

1    English, Kevin.  And it says that if you're bothering

2    somebody, you can -- and you've also memorialized that

3    the police will be enforcing this -- you can ask the

4    police to come over and stop somebody from bothering

5    you.

6                    MR. RIORDAN:  Can you show me where

7    that is, Rob?  I'm sorry, I don't see that anyway.

8                    MAYOR KANITRA:  Read the -- read the

9    section.

10                   MR. MOREAU:  I am so sorry.  I don't

11   have it in front of me.

12                   MAYOR KANITRA:  Because that -- it's

13   not what it says.  I -- I wrote it along with Kevin,

14   looked at it with Kevin, and it definitely is very

15   clear about --

16                   MR. MOREAU:  It's one of the last

17   sentences right before you create the Beach

18   Municipality or Municipality Beach.

19                   Anyone, let me just say one other

20   thing, and then I'll move on.

21                   If Mr. Riordan is advocating, as Mr.

22   Santanello says, for passage and is being behind the

23   scenes -- being an advocate for this ordinance and that

24   was true, that requires you guys to table this

25   ordinance.  This cannot be because obviously there is

R. Moreau                          92

1    going to be litigation.  This is completely a conflict

2    of interest.  And -- and especially if you guys are

3    voting four to three over that.  This needs to be

4    tabled until you can get over that.  You need a further

5    legal opinion from people outside --

6                    MAYOR KANITRA:  Thank you.

7                    MR. MOREAU:  -- Kevin's office.

8                    MAYOR KANITRA:  And your three minutes

9    is up, Doctor.

10                   Thank you very much.

11                   MR. MOREAU:  All right.  Thank you,

12   Paul.

13                   MAYOR KANITRA:  Okay.  Hearing no one,

14   is there a motion to close and adopt?

15                   COUNCILWOMAN TESTA:  A motion to close

16   and adopt.

17                   COUNCILMAN VITALE:  I'll second that.

18                   MS. FARRELL:  All right.  Councilman

19   Vitale.

20                   COUNCILMAN VITALE:  Yes.

21                   MS. FARRELL:  Councilwoman Testa.

22                   COUNCILWOMAN TESTA:  Yes.

23                   MS. FARRELL:  Councilwoman Byrnes.

24                   COUNCILWOMAN BYRNES:  Yes.

25                   MS. FARRELL:  Councilman Cortes.

93

1          COUNCILMAN CORTES:  Before I vote I'm

2    going to say I'm not in favor of bad things happening

3    on the boardwalk and on the beach.  I love the town

4    contrary to the Mayor and his little rant before.  And

5    I take really offense to that saying that I don't do

6    anything.  My -- I'm not going to go on, but my track

7    record over the past eight years and all my elections

8    and reelections speak volumes.

9          I cannot vote yes for this.  I'm voting

10   no because of the way it's written.  I've made that

11   clear.  We are governing private property's hours of

12   operation and who they can hire.  And other towns, like

13   our attorney alluded to, own their beaches in the

14   entirety.  We do not.

15          So I vote no.

16          MS. FARRELL:  Councilman Santanello.

17          COUNCILMAN SANTANELLO:  No.

18          MS. FARRELL:  Councilman Migut.

19          COUNCIL PRESIDENT MIGUT:  I just want

20   to say I believe there are numerous constitutional and

21   statutory flaws with this ordinance.  It takes rules

22   for public property and imposes them on private

23   property.  I have a problem with that.  It's the same

24   reason I voted against the Tree Ordinance.  It's

25   government overreach.

94

1              Also, I've had a number of discussions
2      with residents in favor of the ordinance believing it
3      can discourage people of different ethnicities from
4      visiting the town.  The intent to change the type of
5      people who visit the town in terms of ethnicity and
6      (indiscernible) status is not a proper function of
7      government.
8              No.
9              MAYOR KANITRA:  That sounds like it was
10     drafted by somebody.
11             MS. FARRELL:  Mayor Kanitra.
12             MAYOR KANITRA:  Today the governing
13     body received a letter from one beach operator's
14     attorney timed to conveniently hit just a few hours
15     before this vote.  As it was emailed to the entire
16     governing body, it's now considered public record, and
17     I'm asking the Borough Clerk to attach it to the
18     minutes for this meeting.
19             The first part of this letter is where
20     they threaten to sue us if we don't back down and do
21     exactly as they say, yada, yada, yada.  The second part
22     goes on to say just how the beach party was really no
23     big deal and there's no bad or slovenly behavior on the
24     beaches.  Our Borough Attorney has read this letter and
25     explains just how baseless it is.  But it still is an

**D. Cavagnaro**                                    95

1    entertaining read, and I encourage everyone to review

2    it when they get a chance.

3                    That all said, I'm going to vote yes

4    because I'm not going to sell out my hometown.

5                    MS. FARRELL:   Okay.   So this ordinance

6    has passed.

7                    The next ordinance is <u>Ordinance 2020-</u>

8    <u>13, An Ordinance Of The Borough Of Point Pleasant</u>

9    <u>Beach, Amending Chapter III, Police Regulations,</u>

10   <u>Subchapter 8, Waste Materials And Collections, Of The</u>

11   <u>Revised General Ordinances Of The Borough Of Point</u>

12   <u>Pleasant Beach To Further Regulate The Use Of Bags As</u>

13   <u>Receptacles For Trash Left For Curbside Pick Up.</u>

14                   MAYOR KANITRA:   Okay.   Opening public

15   participation.

16                   MR. CAVAGNARO:   Dave Cavagnaro, 118

17   Parkway.

18                   COUNCILMAN CORTES:   Go ahead, Dave.

19                   MR. CAVAGNARO:   Oh, okay.   I wasn't

20   sure if I was off or not.

21                   I understand what you're doing with the

22   ordinance and I appreciate it.   My only concern is with

23   the public works employees when I see them lifting a

24   pail and having to turn it upside-down to get it over

25   the back of a truck.   That's a big strain.   And a bag

D. Cavagnaro/B. Rinaolo                    96

1    is much easier for them to sling.  So I would only ask

2    going forward that you monitor the health conditions of

3    our public works employees.  And if it turns out that

4    they're getting a lot of back issues from lifting a lot

5    of garbage pails, possibly reconsider down the road

6    adding more garbage bags.

7              COUNCILMAN CORTES:  Good point.  Very

8    good, Dave.

9              MR. CAVAGNARO:  Thank you.

10             MR. RINAOLO:  Bob Rinaolo.

11             Can you hear me?

12             MAYOR KANITRA:  Yep.

13             MR. RINAOLO:  Bob Rinaolo, 1411

14   Oceanfront.

15             MS. FARRELL:  I'm sorry.  Would you

16   please restate your name.

17             MR. RINAOLO:  Bob Rinaolo,

18   R-i-n-a-o-l-o, 1411 Oceanfront.

19             MS. FARRELL:  Thank you.

20             MR. RINAOLO:  I'm a nonresident so, you

21   know, I generally come on Friday, go home on Sunday.

22   Sunday night, if I put my garbage out in cans, the cans

23   will remain there until Friday when I return.  I don't

24   have a neighbor who can bring the cans in for me.  I

25   made a couple of suggestions in an email that I sent to

**B. Rinaolo**                                                   97

1  (indiscernible) and it was circulated to a number of

2  you.  Maybe a dumpster over at the recycling center

3  where we can bring our garbage rather than have that

4  can sit outside all week.  And -- or another suggestion

5  that I sent over to Caryn Byrnes, which was, you know,

6  I would be willing to pay to have the trash collector

7  bring the can back into my yard.  I realize -- I -- I

8  get the idea that it's a can, but I've got to tell you

9  in 38 years I've never had my garbage broken into by

10  any birds or critters or anything.  So I don't see the

11  reason for it, and it is much easier.

12               I also have a garbage compactor which

13  creates a big block of garbage in a heavy-duty plastic

14  bag.  To pick up that bag and to put it in a can and

15  then have the trash collectors lift up that can just to

16  dump out one -- one block of garbage, maybe 40 pounds

17  worth, doesn't seem to be right and --

18               MAYOR KANITRA:  Can I could just --

19  sorry.  Bob, all I would suggest if you were willing to

20  pay the DPW, could you just find a local kid to bring

21  it in or out for you once a week and pay him ten bucks?

22               MR. RINAOLO:  Unfortunately, I don't

23  have that option.  But I wish I did.  I wish I had a

24  neighbor who was here to do it for me, but both my

25  neighbors are not here.  You know, this also applies to

**B. Rinaolo**                                                  98

1    people who rent their property.  On Saturday when

2    there's change-over, they generate garbage that goes

3    out by the curb at noon on Saturday and stays there

4    till Monday morning.  And that garbage, if we had the

5    option of going to a dumpster somewhere -- the

6    recycling center would be the likely -- you know, that

7    garbage would also be -- you know, the people that

8    clean houses can bring it up to the recycling center

9    and dispose of it.

10                   COUNCILMAN CORTES:  Bob, I'll -- I'll

11   take up a discussion with John Trout, our

12   superintendent over at DPW tomorrow, and see if -- if a

13   dumpster is possible or feasible.  And it would have to

14   be limited, though, so it wouldn't be overflowing.

15                   You know, Mayor, I'll do that.  I'll

16   check with John Trout.

17                   MAYOR KANITRA:  Thank you.

18                   MR. RINAOLO:  Thank you very much.

19                   MR. CASTIN:  Can't he just put his

20   garbage out in a plastic bag?

21                   MAYOR KANITRA:  No.  That's the whole

22   point of the ordinance, Vince.

23                   MR. CASTIN:  I know, a plastic -- a

24   black plastic bag, no?

25                   MAYOR KANITRA:  They tear those open

C. Orlando                             99

1    too.

2                        All right.  Never mind.

3                        Anybody else?

4                   MS. ORLANDO:  Yes.

5                        Christine Orlando, 300 (indiscernible)

6    Philadelphia Avenue.

7                   MAYOR KANITRA:  Hello.

8                   MS. ORLANDO:  Hi, Mayor.

9                        I -- I would appreciate that also

10   because we're down on the weekends, and even when we're

11   not down, our neighbor puts her plastic bags on our

12   lawn --

13                  MAYOR KANITRA:  Okay.

14                  MS. ORLANDO:  -- for pickup.  So I

15   don't want to be fined if someone else is putting their

16   garbage on my lawn.  Typically, I take, like, my

17   recycling home, back home.  But when you're down on the

18   weekend, it is hard to -- to bring the garbage cans in.

19   I would also appreciate it if there were a place to

20   bring it.

21                        Thank you.

22                  MAYOR KANITRA:  Maybe we can even leave

23   something outside of the gates of DPW if they're

24   closed, just like a big dumpster or something like

25   that.  But Councilman Cortes will look into it.

C. Orlando/D. Betten                    100

1              COUNCILMAN CORTES:  I'll look into it,

2      yeah.

3              MS. ORLANDO:  Thank you.

4              COUNCILMAN CORTES:  It would have to be

5      limited.  You know, I don't know how.  But I'll look

6      into it with John.  I'll check it out.

7              MS. ORLANDO:  Thank you.

8              MAYOR KANITRA:  Okay.  Hearing no more

9      public comment, I'd make a motion -- can somebody make

10     a motion to --

11             MR. BETTEN:  David Betten.

12             MAYOR KANITRA:  Sorry, was there was

13     a --

14             MR. BETTEN:  I'm sorry.  May I still

15     make a comment?

16             MAYOR KANITRA:  Oh, yeah.  Go ahead.

17             MR. BETTEN:  I'm sorry.

18             David Betten, 400 New Jersey Avenue.

19             Thanks, everyone.

20             MS. FARRELL:  Was that Benton,

21     B-e-n-t-o-n?

22             MR. BETTEN:  B-e-t-t-e-n.

23             Thank you.

24             If I read the ordinance correctly,

25     which I may have not, I can put up to five containers

C. Orlando/D. Betten                    101

1    outside before I can put a garbage bag.  Is that

2    correct?

3                    MAYOR KANITRA:  No.  You can have a

4    maximum of five, but you can't put a bag by itself.  If

5    you wanted to fill a trash bag -- a trash bin with bags

6    and there was one overflow, you could do that.  If you

7    wanted to fill two or three and have one overflow, you

8    could do that, but you can't have more than five trash

9    cans.

10                   MR. BETTEN:  But I'm only allowed one

11   overflow bag?

12                   MAYOR KANITRA:  Yes.

13                   MR. BETTEN:  All right.

14                   A MALE VOICE:  Or one bag altogether?

15                   MR. RIORDAN:  Only one bag.

16                   MR. BETTEN:  I understand now.  Thank

17   you.

18                   The only thing that I would ask is that

19   you consider two bags.  Other than that, I'm onboard.

20                   COUNCILMAN CORTES:  If I'm correct, you

21   know, reading it, it's one bag only but only with a

22   container, correct?

23                   MR. RIORDAN:  That is correct.

24                   COUNCILMAN CORTES:  So you --

25                   MR. RIORDAN:  The maximum -- go ahead,

                              D. Betten                    102

1       Andy, I'm sorry.

2                       COUNCILMAN CORTES:  You can't put one

3       bag out alone by itself.

4                       MAYOR KANITRA:  Correct.

5                       MR. RIORDAN:  No one bag out alone.

6       And the maximum you can put out is five cans and one

7       bag.

8                       MR. BETTEN:  Yeah, I mean, just for the

9       sake of -- of parties and household items that, you

10      know, if you're renovating or something like that, like

11      minor things, that -- you know, I -- I have two cans

12      myself.  No big deal.  That's more than adequate on

13      most days.  But, you know, on the rare occasion that I

14      have a party, the two cans and a bag would never, ever

15      be enough.  And two bags and two cans, you know, I

16      could always make that work.  I just think one bag is

17      just not enough.  It's my opinion only.

18                      Thank you.

19                      MAYOR KANITRA:  Thank you.

20                      Okay.  Anybody else?

21                      Is there a motion to close and adopt?

22                      COUNCILMAN SANTANELLO:  I'll make a

23      motion to close and adopt.

24                      MAYOR KANITRA:  Thank you.

25                      COUNCILWOMAN TESTA:  I'll second.

103

1          MS. FARRELL:  Was that Councilman

2    Santanello?

3          COUNCILMAN SANTANELLO:  Yes.

4          MS. FARRELL:  Who made the second?

5          COUNCILWOMAN TESTA:  Arlene, Councilman

6    Testa -- Councilwoman Testa.

7          MS. FARRELL:  Thank you, Councilwoman.

8    Councilman Vitale.

9          COUNCILMAN VITALE:  Yes.

10         MS. FARRELL:  Councilwoman Testa.

11         COUNCILWOMAN TESTA:  Yes.

12         MS. FARRELL:  Councilwoman Byrnes.

13         COUNCILWOMAN BYRNES:  Yes.

14         MS. FARRELL:  Councilman Cortes.

15         COUNCILMAN CORTES:  Yes.

16         MS. FARRELL:  Councilman Santanello.

17         COUNCILMAN SANTANELLO:  Yeah.

18         MS. FARRELL:  Councilman Migut.

19         COUNCIL PRESIDENT MIGUT:  Yes.

20         MS. FARRELL:  Okay.  So Ordinance

21   2020-13 has passed.

22              Ordinance 2020-14 -- on for second

23   reading -- An Ordinance Of The Borough Of Point

24   Pleasant Beach, In The County Of Ocean, New Jersey,

25   Providing For Various Capital Improvements For The

104

1   Borough Of Point Pleasant Beach On Appropriating

2   $1,951,100, Therefore, And Providing For The Issuance

3   Of $1,853,545 In General Improvement Bonds Or Notes Of

4   The Borough Of Point Pleasant Beach To Finance The

5   Same.

6                   MAYOR KANITRA:  Okay.  Open to public

7   comment.  Is there any comment on this?

8                   COUNCIL PRESIDENT MIGUT:  Motion to

9   close and adopt.

10                  COUNCILMAN CORTES:  Second.

11                  MS. FARRELL:  Thank you.

12                  That was you, Andy, who seconded,

13  correct?

14                  COUNCILMAN CORTES:  Correct.

15                  MS. FARRELL:  Thank you.

16                  Councilman Vitale.

17                  COUNCILMAN VITALE:  Yes.

18                  MS. FARRELL:  Councilwoman Testa.

19                  COUNCILWOMAN TESTA:  Yes.

20                  MS. FARRELL:  Councilwoman Byrnes.

21                  COUNCILWOMAN BYRNES:  Yes.

22                  MS. FARRELL:  Councilman Cortes.

23                  COUNCILMAN CORTES:  Yes.

24                  MS. FARRELL:  Councilman Santanello.

25                  COUNCILMAN SANTANELLO:  Yes.

**105**

1          MS. FARRELL:  Councilman Migut.

2          COUNCIL PRESIDENT MIGUT:  Yes.

3          MS. FARRELL:  Okay.  So Ordinance

4   2020-14 has been adopted.

5          We have Ordinance 2020-15 on for first

6   reading.  <u>An Ordinance Of The Borough Of Point Pleasant</u>

7   <u>Beach Amending Chapter III, Police Regulations, Of The</u>

8   <u>Revised General Ordinances Of The Borough Of Point</u>

9   <u>Pleasant Beach.</u>

10          MAYOR KANITRA:  Okay.  Opening public

11   participation.

12          COUNCILMAN CORTES:  No, first reading,

13   Mayor.

14          MAYOR KANITRA:  Oh, first reading.

15          MR. RIORDAN:  First reading --

16          MAYOR KANITRA:  Sorry.

17          MR. RIORDAN:  -- you just need a

18   motion.

19          COUNCILMAN SANTANELLO:  I'll make a

20   motion.

21          COUNCILMAN CORTES:  I'll second.

22          MS. FARRELL:  Okay.  That was

23   Councilman Santanello and Councilman Cortes.

24          COUNCILMAN CORTES:  Correct.

25          COUNCILMAN SANTANELLO:  Yes.

R. Moreau                                    106

1          MS. FARRELL:  Councilman Vitale.

2          COUNCILMAN VITALE:  Yes.

3          MS. FARRELL:  Councilwoman Testa.

4          COUNCILWOMAN TESTA:  Yes.

5          MS. FARRELL:  Councilwoman Byrnes.

6          COUNCILWOMAN BYRNES:  Yes.

7          MS. FARRELL:  Councilman Cortes.

8          COUNCILMAN CORTES:  Yes.

9          MS. FARRELL:  Councilman Santanello.

10         COUNCILMAN SANTANELLO:  Yes.

11         MS. FARRELL:  Councilman Migut.

12         COUNCIL PRESIDENT MIGUT:  Yes.

13         MS. FARRELL:  Okay.  The public hearing

14    will be on August 18th.

15         MAYOR KANITRA:  Okay.  Second public

16    participation.  Is there anybody?

17         MR. MOREAU:  Yeah, Paul.

18         Rob Moreau.

19         MAYOR KANITRA:  Dr. Moreau.

20         MR. MOREAU:  I -- I can hear that in

21    your voice.  I apologize.

22         The -- on the newly adopted Beach

23    Ordinance, it was 21-1.4, Subsection 13, and it reads,

24    quote "molest or disturb any person in the peaceful

25    enjoyment of said beach or facilities."  And this is

**R. Moreau**                                                              107

1   going to be enforced by the police.  And so if some --

2   if a gay couple kisses on the beach and that bothers

3   their neighbors, you have just memorialized that the

4   police will step in.

5                    MAYOR KANITRA:  That would be a --

6                    MR. RIORDAN:  No.

7                    (Indiscernible -- simultaneous

8   conversations.)

9                    MR. MOREAU:  Kevin, can I finish,

10  please.  You can -- you can talk after me.  Please

11  don't talk over me.

12                    MR. RIORDAN:  Rob, I -- I can't let you

13  sit here and say that those words --

14                    MR. MOREAU:  This is public --

15                    MR. RIORDAN:  They have never meant

16  that.  And it's not the police who enforce it.  It's a

17  -- it's a judge.

18                    MR. MOREAU:  This is public

19  participation.  I may be spouting horrible things but I

20  -- you can listen to it and then we'll talk just like

21  normal adults.

22                    Anyway, a black family may be -- or a

23  white family may be disturbed by a black family and

24  vice-versa.  You are memorializing that the police will

25  take care of that complaint.

R. Moreau                                    108

1          So I know you hated Councilman Migut's

2    prepared speech, but it was spot on, and this is what

3    we've adopted.

4               Now, Kevin, you're free to speak.

5               MAYOR KANITRA:  I'll speak, actually.

6               MR. RIORDAN:  No, no.  Actually, why

7    don't we let the Captain speak, Mr. Mayor.

8               Captain, is that how you're going to

9    enforce the ordinance?

10              CAPTAIN:  No, it is not how it would be

11   -- how it will be enforced.

12              MR. MOREAU:  But it's how it's written.

13              MR. RIORDAN:  Thank you, Captain.

14              MR. MOREAU:  But it's how it's written.

15   That's how it is written.

16              MAYOR KANITRA:  Doctor, any

17   discrimination in Point Pleasant Beach is not going to

18   be tolerated, you know.

19              MR. MOREAU:  Paul, I --

20              MAYOR KANITRA:  I'm the head of the

21   governing body.  I'm the CEO of the town.  I'm a 40-

22   year old guy.  I'm not -- I'm not some, you know, some

23   -- some relic or somebody from, you know, the 1700s.

24              MR. RIORDAN:  Easy, Mr. Mayor.

25              MAYOR KANITRA:  We won't tolerate any

R. Moreau/K. Allen                    109

1    discrimination in this town.

2                    MR. MOREAU:  And -- and, Paul, I know

3    you won't.  I know your heart.  What I'm saying is, as

4    the way this is written and adopted, you have

5    memorialized it to be okay.  That's all I'm saying.  I

6    am not casting aspersions on anyone.  This is a very

7    poorly written ordinance, and it's going to invite

8    lawsuits.

9                    MAYOR KANITRA:  All right.  Anybody

10   else?

11                   MS. ALLEN:  Yeah.  It's Kim, Kim Allen,

12   146 Ocean Avenue.

13                   I just want to say thank you for the

14   garbage ordinance.  I'm sick of looking at everyone's

15   trash in the street in front of our house.

16                   And I just want to encourage the idea

17   of the dumpster at public works, because the bane of my

18   existence at Barefoot Real Estate is tenants' garbage

19   on Saturdays.  So it's a problem that we've had for

20   years.  No one has been able to figure it out.  And a

21   simple dumpster would basically be the easiest

22   solution.  So please look into that.

23                   Thank you.

24                   COUNCILMAN CORTES:  I definitely will.

25                   MS. ALLEN:  Good night.

T. Highton                                    110

1           MR. HIGHTON:  Hello.

2           MAYOR KANITRA:  Yes.

3           MR. HIGHTON:  Tom Highton, 400 Central

4     Avenue.

5           MAYOR KANITRA:  Hey, Tom.

6           MR. HIGHTON:  I just want to say thank

7     you for finally addressing the issue at Central and St.

8     Louis.  I hope that resolution of having some sort of

9     a, you know, speed hump or whatever else, takes place

10    sooner than later.  It's getting precarious to watch

11    some of these cars whiz by kids on beach cruisers and

12    whatnot.

13          I want to thank the Council for

14    approving the measure to address some of the quality-

15    of-life concerns on the boardwalk.  I personally don't

16    think they go far enough.

17          To Councilman Santanello, your theory

18    that somehow we have become a town that is family-

19    oriented, that every car that pulls up in this town,

20    every train that unloads is somehow filled with

21    righteous families who are looking to do right by Point

22    Pleasant Beach is simply untrue.  And I can point to

23    any number of instances, whether it's me sending my

24    seven-year-old into the house because the smell of

25    marijuana smoke is so thick bellowing over the fence

T. Highton                                    111

1    that I don't want him out there, whether it's the fact

2    that we have again endless times where there is just

3    endless poor language, foul language coming over the

4    fence.  Or, Councilman, if you'd like to stop by my

5    house and just sit on my porch and witness this

6    sometime, on the Fourth of July, the good, wholesome

7    families of four 25-year-olds, who looked me in the eye

8    while throwing Burger King on my lawn.  Or, better

9    still, come on over and explain to my son why, again,

10   at seven years old, on Friday night he had to witness a

11   couple having oral sex in their car in front of my

12   house.

13            So if those are the good, wholesome

14   families that you espouse all of the virtue to and how

15   great all of the downtown businesses who do such great

16   things for us, the boardwalk businesses pay all of the

17   taxes that somehow offsets my tax bill which they

18   don't, and, of course, to the attorney for the Storino

19   family who says that how dare we impugn the bad name of

20   those boardwalk businesses, come on over, explain to me

21   how the tax benefit, the net tax benefit of a family

22   who packs or goes to the beach, eats food out that

23   cooler, pays their beach tag fees, comes back to the

24   nonpaid parking spot in front of my house and then

25   drives away, tell me how that benefits me as a

T. Highton/J. Rock                                112

1     taxpayer.  I'll take any explanation that you have.

2                  MAYOR KANITRA:  Thank you, Tom.

3                  MR. HIGHTON:  Thank you.

4                  Anyone else?

5                  MS. ROCK:  Hi.

6                  This is Joylene Rock, 215 Trenton

7     Avenue.

8                  I'm not even sure if I can speak to

9     this right now, so stop me if it's not okay.  I'm just

10    chiming in about the skate park.  I know there was some

11    question as to whether BMX bikes or scooters would be

12    allowed.  I was hoping they'd allow scooters because I

13    see most skate parks do have scooters.  They're similar

14    to the skateboard.  They just have sort of a handle on

15    them.  A lot of the younger kids use them, a lot of

16    kids who have balancing issues and rely on those, one

17    being my son, who enjoys going to skate parks and using

18    the scooter.  I would hope that maybe that you guys

19    would consider that.

20                  That's it.

21                  And thank you for the great work,

22    everyone.  I appreciate it.

23                  MS. TESTA:  Thank you, Joylene.

24                  MAYOR KANITRA:  And we can look into

25    that.

113

1            MAYOR KANITRA:  Okay.  Who's next?

2            Okay.  Is there a motion to close and

3    adjourn?

4            MS. TESTA:  Motion to close and

5    adjourn.

6            COUNCILMAN VITALE:  I'll second that.

7            MAYOR KANITRA:  Okay.

8            MS. FARRELL:  All in favor?

9            COUNCIL MEMBERS:  Aye.

10           MS. FARRELL:  Good night.

11           COUNCILWOMAN TESTA:  Good night.  Thank

12   you, everyone.

13           COUNCILWOMAN BYRNES:  Good night,

14   everybody.

15           (Whereupon, the meeting adjourns at

16   9:33 p.m.)

114

# C E R T I F I C A T E

I, CAROL E. BLACKLER, Certified Court Transcriber, AOC #336, do hereby certify the foregoing transcript to have been prepared from a digital recording made by COLE TRANSCRIPTION, L.L.C. and is true and accurate to the best of my knowledge and ability.


/s/ Carol E. Blackler
Carol E. Blackler     AOC #336
**COLE TRANSCRIPTION, L.L.C.**
Dated:  August 13, 2020

# Civil Case Information Statement

## Case Details: OCEAN | Civil Part Docket# L-002009-20

**Case Caption:** JENKINSON'S PAVILION   VS BOROUGH OF PT. PLEAS AN

**Case Initiation Date:** 08/28/2020

**Attorney Name:** RONALD S GASIOROWSKI

**Firm Name:** GASIOROWSKI & HOLOBINKO

**Address:** 54 BROAD STREET
RED BANK NJ 077010000

**Phone:** 7322129930

**Name of Party:** PLAINTIFF : Jenkinson's Pavilion

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** CIVIL RIGHTS

**Document Type:** Verified Complaint

**Jury Demand:** NONE

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Jenkinson's Pavilion?** NO

**Are sexual abuse claims alleged by: Anthony Storino?** NO

**Are sexual abuse claims alleged by: Frank Storino?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
　　　**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
　　　**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

08/28/2020
Dated

/s/ RONALD S GASIOROWSKI
Signed